United States District Court
Southern District of Texas
**ENTERED**
March 03, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DHI GROUP, INC., F/K/A DICE HOLDINGS, INC. AND RIGZONE.COM, INC., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-16-1670 |
| DAVID W. KENT, JR. SINGLE INTEGRATED OPERATIONS PORTAL, INC. D/B/A OILPRO AND OILPRO.COM, ESTEVAN DUFRIN, MATTHEW KENT, BRYAN ROBINS, JEREMY ANTONINI, AND JOHN DOE NOS. 1-10, | § § § § § § § § | |
| Defendants. | § § | |

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] is Defendant Bryan Robins' ("Robins") Motion to Dismiss (Doc. 33). The court has considered the motion, Plaintiffs' response (Doc. 48), Robins' reply (Doc. 54), all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Robins' motion to dismiss be **GRANTED in PART** and **DENIED in PART**.

## I.  Case Background

Plaintiffs filed a complaint on June 10, 2016, alleging violations of the Computer Fraud and Abuse Act ("CFAA"), the Stored Wire and Electronic Communications and Transactional Records Access

---

[1]  This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. <u>See</u> Doc. 4, Ord. Dated June 16, 2016.

Act ("SCA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Texas Uniform Trade Secrets Act ("TUTSA"), the Texas Harmful Access by Computer Act ("THACA"), the Texas Theft Liability Act ("TTLA"), as well as claims for misappropriation of confidential information, conversion, trespass to chattels, fraud, breach of fiduciary duty, unfair competition, tortious interference with present and prospective business relationships, civil conspiracy, and aiding and abetting.[2]

## A.  **Factual Background**

The following factual account is derived from Plaintiffs' live complaint.

### 1.  **The Creation of Rigzone**

Defendant David Kent created a website called Oceandril Data Services in 2000 where users could offer oil and gas equipment for sale.[3]  The name of the website was later changed Rigzone.com and it began offering other services, including job postings for the oil and gas industry in the Houston and Gulf Coast Region.[4]

DHI Group ("DHI") purchased Rigzone.com, Inc. ("Rigzone") (collectively, "Plaintiffs") for fifty-one million dollars in August 2010; David Kent received approximately thirty-five million

---

[2]     See Doc. 1, Pls.' Compl.

[3]     See id. p. 6.

[4]     See id.

dollars from the sale due to his seventy-percent ownership stake.[5]
The sale included Rigzone's website and assets.[6]  Other defendants,
including Matthew Kent, Robins, and Jeremy Antonini ("Antonini")
also received a portion of the sale proceeds and continued to work
for Rigzone after the sale.[7]  DHI later acquired two other job
posting websites, World Wide Worker and Oil Careers, in an effort
to provide a single platform for professionals in the energy
industry under the name Rigzone.[8]

Members of Rigzone were given a username and password, and
after logging in, they could create a profile, upload their resume,
and apply for jobs.[9]  Once a member uploaded a resume, it was given
a unique number, and each profile was stored in Rigzone's member
database.[10]  Recruiters and employers would pay Rigzone to have
direct access to Rigzone members about job opportunities.[11]  Only
those who paid to use Rigzone's database had access to it.[12]
Rigzone also generated revenue by selling advertisement space on

--------

[5]     See id.

[6]     See id. pp. 6-7.

[7]     See id. p. 7.

[8]     See id.

[9]     See id. p. 8.

[10]    See id.

[11]    See id.

[12]    See id.

its website.[13]   In order to safeguard the information contained in
its member database, Rigzone invested in a variety of security
measures, including password protection for employee computers and
the hiring of computer specialists to update its security measures
regularly.[14]   Former employees of Rigzone were not permitted to
access Rigzone's internal computer system.[15]

### 2.  Sale of Rigzone and Launch of Oilpro

In January 2012, David Kent's consulting agreement expired,
and he created Single Integrated Operations Portal, Inc.
("SIOPCO"), which became Oilpro's parent company.[16]   After the
expiration of his non-compete clause, David Kent publicly launched
Oilpro on October 1, 2013.[17]

Oilpro was able to start up with a large membership base
because David Kent accessed, without permission, Rigzone's computer
system, including its member database, after he sold it to DHI.[18]
This software backdoor to Rigzone's computer system allowed David
Kent to view the private resumes on Rigzone's site without its

---

[13]   See id.

[14]   See id. p. 9.

[15]   See id.

[16]   See id. p. 11.

[17]   See id. p. 9.

[18]   See id. pp. 9-10.

4

knowledge.[19]  Additionally, David Kent persuaded a Rigzone employee to make a backup copy of Rigzone's database and instructed another employee to download a backup copy to an external hard drive.[20] These copies disappeared after David Kent left Rigzone.[21]

Rigzone soon began losing employees to Oilpro.[22]  Estevan Dufrin ("Dufrin") began working for Oilpro in December 2013, one month after he left Rigzone's employment.[23]  Matthew Kent, David Kent's brother and a former vice president of sales for Rigzone before and after it was acquired by DHI, was also hired by Oilpro.[24] As vice president of sales, Plaintiffs allege that Matthew Kent was familiar the inner workings of the Rigzone member database, the details of Rigzone's relationships with employers and recruiters, and the methodology that Rigzone used to grow its membership.[25]

Robins worked for Rigzone as a vice president of sales, prior and subsequent to its acquisition by DHI.[26]  He was later hired by Oilpro as head of advertising sales.[27]  Plaintiffs allege that based

---

[19]     See id. p. 10.

[20]     See id. p. 11.

[21]     Id.

[22]     Id. pp. 11-13.

[23]     See id. p. 11.

[24]     See id. p. 12.

[25]     See id.

[26]     See id.

[27]     See id.

on Robins' employment at Rigzone, he understood the methodology of Rigzone's advertising sales and would have known that the swift membership growth of Oilpro was unrealistic and was not acquired by legitimate means.[28]  Robins "had the experience, skills, position, opportunity, and motive to support, assist, and participate with David Kent, Oilpro, and others in the illegal and tortious conduct" and he "worked closely with David Kent" at Oilpro.[29]

Antonini became chief of technology for Oilpro after leaving Rigzone, where he had served as vice president of technology prior and subsequent to DHI's acquisition of Rigzone.[30]  Antonini was well versed in Rigzone's technology and, along with David Kent, was the "most familiar with the code for Rigzone."[31]

The former employees from Rigzone, including Antonini, Robins, Dufrin, and Matthew Kent, became partial owners of Oilpro.[32]  Aside from David Kent, the employees of Oilpro owned around fifteen percent of the company.[33]

### 3.  Hacking of Plaintiffs' Information

Several different rounds of hacks took place from late 2013

---

[28]    See id.

[29]    See id. pp. 12-13.

[30]    See id. p. 13.

[31]    Id.

[32]    See id.

[33]    See id.

through 2016.

### a.  First Round of Hacks

David Kent accessed Rigzone's member database on February 6, 2014.[34]  Rigzone learned of potential hacking on February 26, 2014, when one of Rigzone's members told Rigzone's customer service that she had received an email solicitation from Oilpro.[35]  Rigzone conducted a review that showed that no Oilpro employee accessed the profile through an authorized account.[36]

As a result of this hacking, two DHI employees created fake accounts with information only accessible through Rigzone's member database to track potential future hacking.[37]  These two fake members received email solicitations on April 14, 2014, from Oilpro asking them to create Oilpro profiles.[38]  Rigzone determined that no Oilpro employee viewed these profiles by using Rigzone's website and no Rigzone user had looked at both profiles.[39]  On April 14, 2014, other Rigzone members received email solicitations from Oilpro to become members.[40]  Oilpro obtained these email addresses

---

[34]    See id. p. 15.

[35]    See id.

[36]    See id.

[37]    See id.

[38]    See id.

[39]    See id.

[40]    See id. p. 18.

by accessing 13,000 profiles in Rigzone's member database between April 4, 2014, and April 6, 2014.[41]

Rigzone checked its computer systems and determined that from October 17, 2013, through April 15, 2014, 100,000 suspect hypertext transport protocol ("HTTP") requests[42] went out to Rigzone's member database through the internet.[43]  These HTTP requests sought resumes from the Rigzone member database by "direct[ing] the [database] to give the user access to specific resumes" and were created by capitalizing on Rigzone's unique source code.[44]  Only the creators of the source code, including David Kent, knew its particulars.[45]  These HTTP requests came frequently and accessed a large volume of resumes, indicating that they were carried out by a computer program, not by manual inputs.[46]

The HTTP requests originated from twenty-three different IP addresses, twenty-two of which were registered to UK Dedicated Servers Limited ("UK DSL"), a company that conceals its customers' IP addresses.[47]  One of David Kent's email addresses maintained an

---

[41]    See id.

[42]    "An HTTP request is a computer code command transmitted to a website over the internet."  Id.

[43]    See id. pp. 15-16.

[44]    Id. p. 16.

[45]    See id.

[46]    See id.

[47]    See id.

account with UK DSL, and this email address received information from UK DSL near the time of these first hacks.[48]   The other IP address that was not registered with UK DSL was registered to SIOPCO, Oilpro's parent company.[49]   On February 6, 2014, February 7, 2014, April 3, 2014, and April 15, 2014, the dates of the HTTP requests, some of the concealed IP addresses logged into a social media account of David Kent.[50]

These first hacks resulted in access of information from 98,000 resumes of Rigzone members which led to an increase in the use of Oilpro's website, including by Rigzone members whose profiles were hacked by Oilpro.[51]   On April 24, 2014, David Kent reached out to DHI stating that he had received an investment offer and that he built Oilpro with a potential future acquisition by DHI in mind.[52]   DHI declined to buy Oilpro or provide investment funds at that time.[53]

### b.  Hacks of Google Analytics Data

Google Analytics provides information for websites, "including (1) number of visits to the website, (2) number of new users, (3)

---

[48]   See id. p. 17.

[49]   See id.

[50]   See id.

[51]   See id.

[52]   See id. p. 18.

[53]   See id.

pages viewed per visit, and (4) average duration of each visit."[54]
Google Analytics users must log into their accounts via a
password.[55]   Plaintiffs maintained a Google Analytics account
protected by a password.[56]

Dufrin, who left Rigzone on November 27, 2013, accessed
Plaintiffs' Google Analytics account and sent the information to
David Kent.[57]  David Kent sent Dufrin an email on January 20, 2015,
asking how the Oilpro Google Analytics data compared to their
"friend's site."[58]  In response, Dufrin accessed Plaintiffs' Google
Analytics account and forwarded to David Kent specific private
information about Rigzone's website, including page views.[59]

On June 10, 2015, Dufrin sent an email to David Kent stating,
"So, I'm trying to scratch the engagement on Rusty[60] a bit and
noticed that the folks searching their jobs are 75% return users
regardless of the source."[61]  David Kent replied with two separate

---

[54]    Id.

[55]    See id.

[56]    See id.

[57]    See id. pp. 18-19.

[58]    Id. p. 19.

[59]    See id.

[60]    Plaintiffs allege that Rusty was Oilpro's code name for Rigzone, as
evidenced by an email sent by David Kent on December 8, 2014, stating "Rusty =
[Rigzone].   Much easier to say and conveys [Oilpro] is the new, non-rusty
solution to all of your oil & gas data needs.  Also protects my feelings because
at one point, that was a product I loved . . . it has just gotten a bit rusty."
Id. pp. 19-20.

[61]    Id.

emails to Dufrin stating that they should have someone "scrape"[62] full time to equal or surpass the job listings of Rigzone and that Oilpro should hire someone to post all the "Rusty jobs."[63]

### c. Second Round of Hacks

On June 11, 2015, David Kent sent an email to Dufrin regarding hiring a freelancer "for web scraping/crawling/automated data extraction solutions," and stated that he wanted to hire the freelancer to "scrape job boards including resume databases" to "find backdoors, etc."[64]  Dufrin replied, also hoping that this potential freelancer could find a "backdoor to full CVs."[65]

On July 20, 2015, an employee of DHI commenced making a profile on Rigzone, but failed to complete it and it was never published on Rigzone's member database.[66]  However, this employee was solicited by Oilpro by email.[67]  Rigzone's computer systems revealed that from June 17, 2015, to August 2, 2015, 750,000 suspect HTTP requests were sent to the Rigzone member database via the internet.[68]  Ten IP addresses, none of which was used in the

---

[62]     "Scraping" "refer[s] to automated programs that extract large amounts of data from websites.  Id. p. 21.

[63]     Id. p. 20.

[64]     Id.

[65]     Id. pp. 20-21.

[66]     See id. p. 21.

[67]     See id.

[68]     See id.

first hacks, were used for these HTTP requests.[69]  At least two of these IP addresses were registered to UK DSL, and at least one was registered to SIOPCO.[70]  These hacks were different from the first hacks because they targeted Rigzone's resume_writer.asp[71] file.[72] These hacks resulted in the access of information from 700,000 resumes in Rigzone's member database.[73]

On October 25, 2015, David Kent contacted DHI, telling its CEO that Oilpro had acquired an investor.[74]  David Kent also represented that he thought Rigzone would be the best fit for Oilpro's software.[75]  DHI again declined to invest in, or acquire, Oilpro.[76]

### d.  Attempted Third Round of Hacks

On October 28, 2015, David Kent again contacted the CEO of DHI to tout Oilpro's success.  Kent attributed Oilpro's 540,000 members to what he called "LinkedIn style growth hacks," a software program where members of Oilpro were asked to upload their LinkedIn.com ("LinkedIn") contacts.[77]  Once those contacts were uploaded, Oilpro

---

[69]     See id.

[70]     See id.

[71]     "A '.asp' page file is script that generates web page content."  Id.

[72]     See id. pp. 21-22.

[73]     See id. p. 22.

[74]     See id.

[75]     See id.

[76]     See id.

[77]     See id.

was able to contact these persons with invitations to join the site.[78]

In response to questions from the CEO of DHI, David Kent replied by email one week later, explaining that Oilpro's growth was attributed to its LinkedIn strategy.[79]  On November 11, 2015, David Kent sent another email to the CEO of DHI, where he reiterated Oilpro's LinkedIn strategy and mentioned that Oilpro also used traditional marketing approaches for growth.[80]   On November 25, 2015, David Kent sent another email to the CEO of the DHI where he discussed Oilpro's investor, a venture capital firm, stating that it had "invested $3,000,000 at a $20,000,000 valuation."[81]

The CFO, CEO, and General Counsel of DHI had a conference call with David Kent on December 8, 2015, about the potential sale of Oilpro to DHI.[82]  David Kent stated that Oilpro's top method for growth was their LinkedIn strategy.[83]  David Kent "also attributed the growth of Oilpro to 'effort' and the fact that oil and gas is a 'safe haven industry.'"[84]  The CEO of DHI stated that he would be

---

[78]   See id. pp. 22-23.

[79]   See id. p. 23.

[80]   See id. pp. 23-24.

[81]   Id. p. 24.

[82]   See id.

[83]   See id.

[84]   Id.

interested in further discussions about an acquisition or merger, and David Kent reiterated that he wanted to work with DHI more than any other investor.[85]

On December 11, 2015, five suspect HTTP requests came to Rigzone's member database seeking resume information.[86]  However, Rigzone had changed the resume.asp file, so no resumes were taken from the database.[87]  One of the IP addresses used for the suspect HTTP request was registered to David Kent's UK DSL account.[88]  This account was accessed by an IP address associated with SIOPCO around the time of the attempted third hack.[89]  On December 13, 2015, an IP address from David Kent's home in Spring, Texas, accessed the UK DSL account.[90]

David Kent met with DHI in New York City on January 20, 2016.[91] David Kent again emphasized Oilpro's LinkedIn growth strategy, expressing "that this 'network effects' strategy was the 'core way' and 'enough' to grow Oilpro to over 500,000 members in a short period of time."[92]

---

[85]     See id.

[86]     See id. p. 25.

[87]     See id.

[88]     See id.

[89]     See id.

[90]     See id.

[91]     See id.

[92]     Id. p. 26.

14

After this meeting, David Kent sent the CEO of DHI a spreadsheet containing Oilpro's membership growth figures.[93] Oilpro acquired 3,085 new members in December 2013, 4,486 in January 2014, 12,131 in February 2014, 28,763 in April 2014, 45,936 in June 2014, and 45,823 in September 2015.[94] By January 2016, Oilpro grew to at least 500,000 members.[95]

Overall, around 796,000 Rigzone accounts containing 586,560 email addresses were hacked by Oilpro, and Oilpro sent 17.7% of these email addresses invitations to join Oilpro.[96] As a result, 111,000 of the hacked accounts ended up joining Oilpro.[97]

### 4. Criminal Complaint

On March 23, 2016, the Federal Bureau of Investigation filed a criminal complaint against David Kent, alleging violations of 18 U.S.C. §§ 371, 1343, and 2.[98] David Kent was charged with conspiracy to violate 18 U.S.C. §§ 1030(a)(2)(C), 1030(c)(2)(B), and 1343 and wire fraud under 18 U.S.C. §§ 1343 and 2.[99] A criminal information was filed against David Kent on June 3, 2016, in the

---

[93]  See id.

[94]  See id. pp. 26-27.

[95]  See id. p. 14.

[96]  See id. pp. 17-18.

[97]  See id. p. 18.

[98]  See id. p. 29.

[99]  See id.

U.S. District Court for the Southern District of New York, alleging conspiracy and wire fraud.[100]

## B.  Procedural Background

Plaintiffs filed their complaint on June 10, 2016, alleging claims of civil conspiracy and aiding and abetting against Robins.[101]  Robins filed the pending motion to dismiss on August 5, 2016, arguing that Plaintiffs failed to state a claim against him.[102]  Plaintiffs responded on September 2, 2016, and Robins replied on September 16, 2016.[103]

## II.  Legal Standard

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), dismissal of an action is appropriate whenever the complaint, on its face, fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts.  Sullivan v. Leor Energy, LLC, 600 F.3d 542, 546 (5th Cir. 2010).

A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the

---

[100]    See id.

[101]    See Doc. 1, Pls.' Compl.

[102]    See Doc. 33, Robins' Mot. to Dismiss.

[103]    See Doc. 48, Pls.' Resp.; Doc. 54, Robins' Reply.

16

speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.  A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Twombly</u>, 550 U.S. at 555.  In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678.

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Twombly</u>, 550 U.S. at 555.  Under Rule 9(b), a party alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); <u>United States ex rel. Grubbs v. Kanneganti</u>, 565 F.3d 180, 185 (5th Cir. 2009).  Pleadings alleging fraud require "simple, concise, and direct" allegations that make relief plausible under the standard of <u>Twombly</u>.  <u>Id.</u>

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice.  <u>See</u> <u>Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.</u>, 313

F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); see also United States ex rel. Adrian v. Regents of the Univ. of Cal., 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).

However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed. 1990); see also Ayers v. Johnson, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) ("[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.")(quoting Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co., 195 F.3d 765, 771 (5th Cir. 1999)).

### III. Analysis

Robins has moved to dismiss Plaintiffs' aiding and abetting and conspiracy claims, and challenges Plaintiffs' request for judicial notice of documents from the criminal case against David

Kent.  Robins additionally requests attorney's fees under the TTLA.

In the motion to dismiss, the response, and the reply, the court takes note that the parties have some confusion about which claims Plaintiffs allege against Robins.  Reading the plain language of Plaintiffs' complaint, Plaintiffs allege that Robins aided and abetted in Defendants' violations of the CFAA, SCA, TUTSA, THACA, TTLA, and the following common law causes of action: misappropriation of confidential information, conversion, trespass to chattels, unfair competition, and tortious interference with business relationships.  The court finds that Plaintiffs explicitly allege that Robins conspired to violate the CFAA, SCA, TUTSA, THACA, and TTLA.  In their response, Plaintiffs state that they pled conspiracy claims based on theft, misappropriation of trade secrets and confidential information, trespass to chattels, unfair competition, fraud, and tortious interference against Robins.[104] The court will address each of Robins' challenges to these claims.

## A.  <u>Judicial Notice</u>

In Plaintiffs' response to Robins' motion to dismiss, Plaintiffs ask the court to take judicial notice of the criminal complaint, criminal information, and a motion filed in David Kent's criminal proceeding.  Robins argues that it is improper for the court to take judicial notice of these records because they contain disputed facts.

---

[104]    <u>See</u> Doc. 48, Pls.' Resp. p. 28.

Judicial notice is proper for a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201(b).

The court can consider "matters of which judicial notice may be taken" in ruling on a motion to dismiss. <u>Willard v. Humana Health Plan of Tex., Inc.</u>, 336 F.3d 375, 379 (5th Cir. 2003). Courts may take judicial notice of the existence of court orders, as they are matters of public record. <u>Basler v. Barron</u>, No. H-15-2254, 2016 WL 1672573, at *2 (S.D. Tex. Apr. 27, 2016)(unpublished)(citing <u>Davis v. Bayless</u>, 70 F.3d 367, 372 (5th Cir. 1995)). In this case, the criminal complaint, criminal information, and motion are all matters of public record, and, therefore, the court may take judicial notice of the existence of these documents. However, Robins and other Defendants dispute facts within these records that support the arguments of the government. Facts that are disputed cannot be judicially noticed. <u>See id.</u> Therefore, only the existence of these documents can be judicially noticed, but not the facts found within the documents.

## B.  <u>Aiding and Abetting</u>

Plaintiffs argue that Robins aided and abetted in the violation of the CFAA, SCA, TUTSA, THACA, and TTLA. Additionally, Plaintiffs claim that Robins aided and abetted in Defendants'

violations of state common law torts of misappropriation of confidential information, conversion, trespass to chattels, unfair competition, and tortious interference with business relationships. Robins argues, in regards to the claims based on federal law, that there is no generalized federal civil aiding and abetting liability. In response to the claims for aiding and abetting under Texas law, Robins argues that Texas law has not recognized claims for aiding and abetting for underlying tort claims such as those asserted in this case.

### 1. Federal Claims

Robins challenges Plaintiffs' claims of aiding and abetting related to others violations of federal law, citing <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994).

In <u>Central Bank</u>, the Supreme Court held that because "Congress has not enacted a general civil aiding and abetting statute . . . for suits by private parties," that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." 511 U.S. at 182. The court stated that Congress's approach was to decide whether to impose aiding and abetting liability on a "statute-by-statute" basis. <u>See</u> <u>id.</u> at 182-83.

21

The court finds that Plaintiffs have not provided any persuasive authority to show that Congress established civil aiding and abetting liability under the CFAA or SCA.  Plaintiffs cite Joe N. Pratt Ins. v. Doane, No. V-7-07, 2008 WL 819011, at *10 (S.D. Tex. Mar. 20, 2008)(unpublished) to stand for the proposition that aiding and abetting liability is allowed under the CFAA.  However, the defendants in Doane did not challenge the validity of an aiding and abetting claim under the CFAA, as Robins does here.  Plaintiffs also cite In re Am. Airlines, 370 F. Supp.2d 552, 557 n. 10 (N.D. Tex. 2005), stating that this opinion "left open the possibility of aiding and abetting liability under the SCA."[105]  Plaintiffs fail to mention that the footnote Plaintiffs cite cautions, "Because defendants *do not raise the issue*, the court *assumes arguendo* that a person can be held liable under § 2707 of aiding and abetting." In re Am. Airlines, 370 F. Supp.2d at 557 n. 10 (emphasis added).

Here, Robins raises the issue that aiding and abetting liability is not explicitly allowed in these federal statutes and is therefore improper under Central Bank's holding that there is no general presumption for aiding and abetting liability in federal statutes.  In Abecassis v. Wyatt, 7 F. Supp.3d 668, 677 (S.D. Tex. 2014), the court agreed with other circuits' reasoning that, because the Anti-Terrorism Act was "silent as to the permissibility of aiding and abetting liability in the civil liability provision,

---

[105]    Doc. 48, Pls.' Resp. p. 48.

yet includes aiding and abetting language in the corresponding criminal provisions," Congress did not intend aiding and abetting liability to exist under the statute.  Plaintiffs fail to cite any authority to show that aiding and abetting civil liability is authorized by these statutes, and the court finds none.  Therefore, Plaintiffs' claims of aiding and abetting liability under CFAA and SCA should be dismissed.

**2.  State Claims**

Robins argues that Plaintiffs' claims of aiding and abetting liability should be dismissed because Texas law has not recognized aiding and abetting claims for competition-related torts. Plaintiffs argue that Texas law has recognized aiding and abetting liability for intentional torts, such as breach of fiduciary duty.

In <u>Floyd v. Hefner</u>, 556 F. Supp.2d 617, 654-55 (S.D. Tex. 2008), the court held that Texas law recognized a cause of action for aiding and abetting the breach of a fiduciary duty.  In <u>In re Houston Reg'l Sports Network, L.P.</u>, 547 B.R. 717, 758-59 (Bankr. S.D. Tex. 2016), the court found "that Texas would recognize the tort of aiding and abetting fraud."  Plaintiffs seek to extend these cases to aiding and abetting the competition- and theft-related torts of misappropriation of confidential information, conversion, trespass to chattels, unfair competition, tortious interference with business relationships, misappropriation of trade

secrets under the TUTSA, harmful acts by computer under THACA, and theft under the TTLA.

In Juhl v. Airington, 936 S.W.2d 640, 643-45 (Tex. 1996), the Texas Supreme Court discussed "concert of action" liability under Restatement (Second) of Torts § 876, but declined to apply that theory of liability.  The court cautioned that "[t]he purpose of the concert of action theory is to deter antisocial or dangerous behavior," cited cases where courts in other states applied aiding and abetting liability, and stated that the imposition of liability occurred in cases that "almost always involved conduct posing a high degree of risk to others," such as drag racing on public roads.  Id. at 644.

In New York Pizzeria, Inc. v. Syal, 56 F. Supp.3d 875, 883-84 (S.D. Tex. 2014), discussed Juhl, and held that "[e]ven if Texas courts are open to recognizing aiding and abetting liability, it is thus unlikely that they will extend it to claims for aiding and abetting the competition-related torts at issue here." (citing W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC, 437 S.W.3d 917, 922 (Tex. App.–Dallas 2014, pet. filed).  The court quoted Hinojosa v. City of Terrel, Tex., 834 F.2d 1223, 1231 n. 12 (5th Cir. 1988), which stated that "[a] party who wants a court to adopt an innovative rule of state law should litigate in state rather than federal court . . . Federal  judges are disinclined to make

24

departures in areas of law that we have no responsibility for developing." (citations omitted).

Thus, the court finds that there is no authority under Texas law for allowing an aiding and abetting liability theory to be applied to the competition- and theft-related torts asserted in this case. Plaintiffs argue that Defendants' behavior in this case was damaging to many victims because it was a theft of their personal information, and the court should therefore recognize aiding and abetting liability in this case. The court recognizes that the deliberate theft of personal information is abhorrent, but under the particular facts of this case, cannot agree that it falls within the "dangerous or antisocial" category suggested by Juhl.

Therefore, Plaintiffs' aiding and abetting claims against Robins related to misappropriation of confidential information, conversion, trespass to chattels, unfair competition, tortious interference with business relationships, misappropriation of trade secrets under the TUTSA, harmful acts by computer under the THACA, and theft under the TTLA must be dismissed.

## C. Civil Conspiracy

Plaintiffs allege that Robins conspired in the violation of the following statutes: CFAA, SCA, TUTSA, THACA, and TTLA. Additionally, in Plaintiffs' response, they state that they pled that Robins conspired in claims of theft, misappropriation of confidential information and trade secrets, trespass to chattels,

unfair competition, fraud, and tortious interference.   Robins argues that Plaintiffs have not properly pled conspiracy claims because they have not alleged facts to support a finding that there was a meeting of the minds.

The elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the  minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.   Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005); Meineke Discount Muffler v. Jaynes, 999 F.2d 120, 124 (5th Cir. 1993).   "Civil conspiracy is a derivative tort" under Texas law, so a plaintiff must "state a separate underlying claim on which the court may grant relief," or the conspiracy claim fails.  Meadows v. Hartford Life Ins. Co., 492 F.3d 634, 640 (5th Cir. 2007).

### 1.  Breach of Fiduciary Duty and RICO

In Robins' motion to dismiss, Robins argues that Plaintiffs fail to state claims for conspiracy to breach another's fiduciary duty and conspiracy to violate RICO.  Plaintiffs agree in their response that they did not state these claims against Robins, and no discussion is required.

### 2.  Meeting of the Minds

Robins generally challenges all of Plaintiffs' conspiracy claims in his reply, arguing that they should be dismissed because

Plaintiffs have not alleged that there was a meeting of the minds between Robins and the other defendants.

"To establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act." Hey v. Irving, No. 97-60816, 1998 WL 723819, at *2 (5th Cir. Oct. 2, 1998)(unpublished).  "The gist of a civil conspiracy is the injury that is intended to be caused." Triplex Comm'ns, Inc. v. Riley, 900 S.W.2d 716, 719 (Tex. 1995)(internal quotations omitted). In order to survive a motion to dismiss, a plaintiff must allege specific facts showing that the defendants had a prior agreement.  Hey, 1998 WL 723819, at *2.

In their complaint, Plaintiffs allege that Defendants had a meeting of the minds to conspire to commit unlawful acts under federal and Texas law and that they "conspired to unlawfully appropriate Plaintiffs' trade secrets and proprietary information in order to, *inter alia*, expand Oilpro's business, inflate the value of Oilpro, and commit fraud against Plaintiffs."[106] Specifically to Robins, Plaintiffs allege that he worked for Rigzone, profited from the sale to DHI, and then began working for Oilpro as head of advertising sales.  Plaintiffs also allege that due to his experience working in the industry, Robins knew that Oilpro's membership growth was not fostered by legitimate means.

---

[106]    Doc. 1, Pls.' Compl. pp. 50-51.

The court rejects Robins' argument that Plaintiffs do not allege enough to show a meeting of the minds between the Defendants. Plaintiffs have provided extensive detail about the hacking incidents throughout their complaint to support their allegation that Defendants participated in wrongful conduct causing Plaintiffs damages. The court finds that, while the facts alleged against Robins are sparse, Plaintiffs have alleged enough to show a meeting of the minds through Robins' participation in the wrongful conduct outlined in the complaint.

### 3.  Knowledge and Intent

In his motion to dismiss, Robins argues that Plaintiffs have failed to allege facts to show that Robins had knowledge and intent of the conspiracy to commit misappropriation of trade secrets, misappropriation of confidential information, unfair competition, theft under the TTLA, conversion, or trespass to chattels.

However, Plaintiffs have alleged in their complaint that Defendants willfully and knowingly agreed to conspire, that they had a meeting of the minds, and that they "agreed and understood that the object of their goal was to commit the wrongful acts detailed above."[107]  The wrongful acts detailed by Plaintiffs include violations of the CFAA, SCA, TUTSA, THACA, TTLA, and unlawful appropriation of trade secrets and proprietary information to expand Oilpro's business, inflate its value, and commit fraud.

---

[107]    Doc. 1, Pls.' Compl p. 51.

Therefore, the court finds that Plaintiffs have pled that Robins had knowledge of the conspiracy and intentionally participated in the conspiracy to commit misappropriation of trade secrets, misappropriation of confidential information, unfair competition, theft under the TTLA, conversion, or trespass to chattels. Therefore, Robins' motion to dismiss on these grounds must be denied.

### 4. Conversion and Trespass to Chattels

Robins argues that Plaintiffs' conspiracy claims of conversion and trespass to chattels should be dismissed because Texas law does not allow for these types of claims in the context of intangible property.

#### a. Conversion

Conversion is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." Bandy v. First State Bank, Overton, Tex., 835 S.W.2d 609, 622 (Tex. 1992); see also Alliantgroup L.P. v. Feingold, 803 F. Supp.2d 610, 626 (S.D. Tex. 2011). "[C]onversion traditionally applies to tangible property interests, [but] courts have relaxed the rule to apply when an underlying intangible right has been merged into a document" and that document has been converted. Alliantgroup, 803 F. Supp.2d at 626 (citing Pebble Beach Co. v. Tour 18 I, Ltd., 942 F. Supp. 1513, 1569 (S.D. Tex. 1996); Prewitt v. Branham, 643 S.W.2d 122, 123 (Tex. 1983)); see also Quantlab

Technologies, Ltd., 719 F. Supp.2d 766, 777-78 (S.D. Tex. 2010);
WesternGeco v. Ion Geophysical Corp., No. 09-CV-1827, 2009 WL
3497123, at *3 (S.D. Tex. Oct. 28. 2009)(unpublished).  Texas law
does not recognize a claim for conversion of intangible property if
the intangible information has not been put in writing.
Alliantgroup, 803 F. Supp.2d at 626-27; Express One Int'l, Inc. v.
Steinbeck, 53 S.W.3d 895, 901 (Tex. App.–Dallas 2001, no
pet.)("Texas law has never recognized a cause of action for
conversion of intangible property except in cases where an
underlying intangible right has been merged into a document and
that document has been converted."); Robin Singh Educ. Servs., Inc.
v. Test Masters Educ. Servs., Inc., 401 S.W.3d 95, 97-98 (Tex.
App.-Houston [14[th] Dist.], 2011)("[U]nder Texas law, a tort action
for conversion is limited to tangible property.")(citing Express
One, 53 S.W.3d at 901).

Plaintiffs' complaint alleges that Robins conspired with David
Kent, Dufrin, and Oilpro to convert Plaintiffs' assets, including
the appropriation of "Plaintiffs' proprietary Members Database and
Google Analytics search processes, which constituted proprietary
trade secrets and assets of Plaintiffs."[108]  Plaintiffs have not
alleged in their complaint that these trade secrets were
incorporated into a document that was later converted by

_____

[108]    Doc. 1, Pls.' Compl. p. 44.

Defendants, which might afford them a safe harbor under the case law discussed above.  See Alliantgroup, 803 F. Supp.2d at 626.

The court therefore opts to follow the precedent under Texas that "conversion only applies to physical property."  See Quantlab Technologies, 719 F. Supp.2d at 779.  Plaintiffs' claims that Robins conspired to convert their intangible property must be dismissed.

### b.  Trespass to Chattels

Trespass to chattels is the wrongful interference with possession or use of property.  Jarvis v. S.W. Bell Tel. Co., 432 S.W.2d 189, 191 (Tex. Civ. App.—Houston [14th Dist.] 1968, no writ). "Liability does not attach, unless the wrongful detention is accompanied by actual damage to the property or deprives the owner of its use for a substantial period of time."  Zapata v. Ford Motor Creditor Co., 615 S.W.2d 198, 201 (Tex. 1981)(citing Lyle v. Waddle, 144 Tex. 90, 188 S.W.2d 770 (1945)).  In In re Simons Broadcasting, LP, No. W-11-CA-172, 2013 WL 9542015 (W.D. Tex. Nov. 19, 2013)(unpublished), the court dismissed the plaintiff's claims for trespass to chattels for downloading and accessing the plaintiff's client information, stating that "[t]his Court is not aware of any Texas court expanding trespass to personalty claims to trade secrets or other intangible property, and declines to do so today."

31

Plaintiffs allege that Robins conspired with the other Defendants to appropriate information from Plaintiffs' Google Analytics account and member database. However, the cases Plaintiffs cite in their response do not support a finding that Texas law allows for claims for trespass to chattels of intangible property. For example, Plaintiffs cite White Buffalo Ventures, LLC v. University of Tex. at Austin, 420 F.3d 366, 377 n. 24 (5th Cir. 2005), which cautions against "court[s] merely conclud[ing] without evidence or explanation, that the allegedly unauthorized use burdened the system," in what it calls "digital trespass" cases from other circuits. Plaintiff also cites Indigital Solutions, LLC v. Mohammed, No. H-12-2428, 2012 WL 5825824, at *2 (S.D. Tex. Nov. 15, 2012)(unpublished), an opinion about a discovery dispute in a case in which the court discussed a motion for expedited discovery, a case Plaintiffs cite because the plaintiff pled trespass to chattels.

As Robins points out in his reply, the cases cited by Plaintiffs do not address the issue presented in this case of whether a trespass to chattels claim for intangible property may be maintained under Texas law. The court agrees with the holding in In re Simons Broadcasting, and finds that, as in that case, Plaintiffs have not provided any authority to support their argument that a trespass to chattels claim for intangible property may be maintained under Texas law. Therefore, Plaintiffs' claim

32

that Robins conspired to trespass to Plaintiffs' chattels must be dismissed.

### 5.  Computer Access Violations

Plaintiffs allege that Robins conspired in the violation of 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(A), 1030(g), 2701(a)(1), and 2707.  Robins challenges Plaintiffs' conspiracy claim, arguing that there is no common-law civil conspiracy claim under the CFAA, and that Plaintiffs can only bring a conspiracy claim to commit a CFAA violation under Section 1030(b).  Robins challenges Plaintiffs' SCA claims, arguing that there cannot be a civil conspiracy claim under the SCA.  Robins argues that because fraud is involved, that Plaintiffs should have to meet the Rule 9(b) standard.

#### a.  Rule 9(b)

In his motion to dismiss, Robins argues that Plaintiffs have not properly pled conspiracy claims to violate the CFAA, SCA, and THACA to meet the heightened pleading standard of Rule 9(b).  However, Robins has cited no authority, and the court is aware of none, that the Fifth Circuit requires plaintiffs to meet the heightened pleading standard of Rule 9(b) for these computer access violations.  While fraud is involved in these claims, it is different from common law fraud that requires an actionable misrepresentation.  Therefore, the court dismisses Robins' argument that Plaintiffs have failed to satisfy Rule 9(b).

### b.   Conspiracy to Violate the CFAA and SCA

The CFAA creates civil and criminal penalties for computer-related activities.  See Fiber Sys. Int'l, Inc. v. Roehrs, 470 F.3d 1150, 1156 (5th Cir. 2006); 18 U.S.C. § ("Section") 1030(a)(1)-(7). Section 1030(b) imposes liability on a person who conspires to commit an offense under Section 1030.

Section 1030(g) enables a plaintiff to bring a civil action for violations of the CFAA.  Roehrs, 470 F.3d at 1156-57; 18 U.S.C. § 1030(g).  However, Section 1030(g)'s authorization of a civil suit is not coextensive with the entire statute.  The statute states in relevant part, "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."  See 18 U.S.C. § 1030(g).

In Roehrs, the court reversed a lower court's determination that 1030(g)'s grant of civil liability was limited only to the predecessor section to Section 1030(c)(4)(A)(i) and found that Section 1030(g) extended civil liability to any person suffering a damage for a violation of Section 1030 as long as one of the five factors under subsection (a)(5)(B), now (c)(4)(A)(i), was present.

Robins cites U.S. v. Babcock, 250, U.S. 328, 331 (1919), for the proposition that if a statute creates a remedy, it is the exclusive remedy.  Robins also cites Hobby v. Hodges, 215 F.2d 754, 758 (1954), stating that Congress has the right to decide how the

34

rights it creates are enforced and that when Congress creates a remedy, it is usually exclusive.  Robins argues that the CFAA, by creating a statutory conspiracy claim, excludes common law conspiracy claims.  The court agrees.  Plaintiffs' ability to bring a civil conspiracy claim arising out of a violation of Section 1030 must be considered within the confines of that section.

The SCA makes it unlawful to intentionally access without authorization a facility through which an electronic communication service is provided.  18 U.S.C. § 2701(a)(1).  Section 2707 allows a plaintiff to bring a civil action and recover damages for violations of the SCA.  18 U.S.C. § 2707(a).  Section 2708 states that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."

As discussed above, when a statute provides a remedy it is usually exclusive.  The court will not imply a state law conspiracy remedy for violations of the SCA.

### 6. Fraud

In his motion to dismiss, Robins argues that Plaintiffs have failed to state a claim for the underlying tort of fraud, and therefore, their claim of conspiracy to commit fraud against Robins should be dismissed.

To state a prima facie case for fraud, a plaintiff must

establish:

> (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001).

In Plaintiffs' complaint, they allege that David Kent made misrepresentations to them that Plaintiffs relied and acted upon, causing them to suffer damages. Specifically, Plaintiffs allege that David Kent sold them Rigzone for fifty-one million dollars, but then turned around and stole trade secrets and proprietary data from them and then sought to sell his new product, Oilpro, that benefitted from the information obtained from these hacks to Plaintiffs. Plaintiffs allege that David Kent represented to them that the investor valued Oilpro at twenty million dollars and that their tremendous membership growth was based on their LinkedIn strategy, when it actually was acquired by hacking into Plaintiffs' membership database. Plaintiffs also allege that Robins and other Defendants conspired to commit fraud against Plaintiffs. Therefore, the court finds that Plaintiffs have properly pled a claim of conspiracy to commit fraud against Robins under the standard of Rule 9(b).

### 7. Tortious Interference with Business Relationships

In his motion to dismiss, Robins challenges Plaintiffs' claim

for conspiracy to commit tortious interference with present or prospective business relationships because Plaintiffs have not alleged that they lost business relationships with third parties. Robins also argues that Plaintiffs have not shown that Robins interfered with a present or prospective business relationship.

The elements of a claim for tortious interference with business relations include: (1) there was a reasonable probability that the parties would have entered into a contractual relationship; (2) the defendant committed an "independently tortious or unlawful act" that prevented the relationship from occurring; (3) the defendant committed the act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference–that is, that the defendant's actions prevented the relationship from occurring. Alliantgroup, 803 F. Supp.2d at 629 (citations omitted).

In their complaint, Plaintiffs allege that David Kent, Dufrin, and Oilpro interfered with the business relationships between Plaintiffs and their members, customers, and recruiters, and through that behavior, Plaintiffs lost actual and potential job placement transactions. However, it is unclear in the civil conspiracy section of Plaintiffs' complaint whether they pled civil conspiracy to commit tortious interference against Robins.

37

Plaintiffs pled that "Defendants conspired to unlawfully appropriate Plaintiffs' trade secrets and proprietary information in order to, *inter alia*, expand Oilpro's business, inflate the value of Oilpro, and commit fraud against Plaintiffs," and that they conspired to violate various statutes. However, the court finds nothing in the conspiracy section to put Robins and the other Defendants on notice that Plaintiffs allege that they conspired to tortiously interfere with present and prospective business relationships. Therefore, the claim of conspiracy to commit tortious interference against Robins should be dismissed.

**D.   Attorney's Fees Under the TTLA**

Robins requests attorney's fees under the TTLA, arguing that if the conspiracy to violate the TTLA claim is dismissed, he is entitled to attorneys fees under Tex. Civ. Prac. & Rem. Code § 134.005(b). That section states that "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." Here, the court has not dismissed Plaintiffs' conspiracy to violate the TTLA claim against Robins; Robins' motion for fees is premature.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** Robins' Motion to Dismiss be **GRANTED in PART** and **DENIED in PART**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days

from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 3rd day of March, 2017.

U.S. MAGISTRATE JUDGE