United States District Court
Southern District of Texas

**ENTERED**

April 21, 2017

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DHI GROUP, INC., F/K/A DICE HOLDINGS, INC. AND RIGZONE.COM, INC., | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-1670 |
| | § | |
| DAVID W. KENT, JR. SINGLE INTEGRATED OPERATIONS PORTAL, INC. D/B/A OILPRO AND OILPRO.COM, ESTEVAN DUFRIN, MATTHEW KENT, BRYAN ROBINS, JEREMY ANTONINI, and JOHN DOE NOS. 1-10, | § § § § § § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] is Plaintiffs DHI Group, Inc. f/k/a Dice Holdings, Inc. ("DHI Group") and Rigzone.com's ("Rigzone") (collectively, "Plaintiffs") Motion to Dismiss Defendant's Second Amended Counterclaims (Doc. 64). Plaintiffs' earlier motion to dismiss Defendant Single Integrated Operations Portal, Inc. d/b/a Oilpro and OILPRO.com's ("Oilpro") First Amended Answer and Counterclaim (Doc. 49) is **DENIED AS MOOT.** The court has considered the motion, Oilpro's response (Doc. 72), Plaintiffs' reply (Doc. 82), all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** Plaintiffs' motion to

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 4, Ord. Dated June 16, 2016.

dismiss be **GRANTED IN PART** and **DENIED IN PART**.

## I.   Case Background

Defendants filed their second amended counterclaim on November 15, 2015, alleging violations of the Computer Fraud and Abuse Act ("CFAA"), the Digital Millennium Copyright Act ("DMCA"), the Lanham Act, the Texas Harmful Access by Computer Act, as well as claims for trespass to chattels, breach of contract, copyright infringement, misappropriation, common law trademark infringement, unjust enrichment, and interference with prospective business relations.[2]

## A.   Factual Background

### 1.   Oilpro

Oilpro's website, www.oilpro.com, was a social media website created for oil and gas industry professionals to receive news, network with each other, share information about the industry, and look for jobs.[3]  Oilpro had 600,000 members as of November 2016.[4]

Individuals became members of Oilpro by visiting the website and creating an account using their name and email address.[5]  After establishing an account, a member could upload a resume or CV and build a profile containing information such as educational

---

[2]      See Doc. 63, Def.'s 2ᵈ Am. Countercl.

[3]      See id. p. 26.

[4]      See id.

[5]      See id.

background, work experience, skills, and contact information.[6]
After constructing a profile, a member could connect with other
members and send invitations to those who had not yet joined
Oilpro.[7]  The resumes uploaded to profiles were only available on
the profile or when submitted in response to a job posting.[8]
Recruiters and employers did not have to pay to post a job on
Oilpro but could become "Pro" subscribers which gave them extra
resources to help utilize the website.

The users of the Oilpro website agreed to Oilpro's terms and
conditions, which prohibited the following conduct:

> a.  Using automated means, including spiders, robots,
> crawlers, agents, or the like to download data from any
> database of Oilpro, or from the Site itself (for example,
> site or page scraping is prohibited).
>
> b.  Harvest or otherwise collect or store information
> about others, including e-mail addresses.
>
> c. Use, download or otherwise copy, or provide (whether
> or not for a fee) to a person or entity any directory of
> users of the Services or other user or usage information
> or any portion thereof.[9]

Oilpro attached the terms and conditions to its second amended
counterclaim, and therein stated that they were updated on
September 2, 2015, and the terms listed above were effective and

---

[6]      See id.

[7]      See id.

[8]      See id.

[9]      Id. p. 27.

not modified since January 11, 2014.[10]

Oilpro spent significant resources to create and maintain its website.[11]  Oilpro obtained copyright registration for its website on October 12, 2016.[12]  Oilpro also registered the trademark for "OILPRO."[13]  Oilpro began using an unregistered design mark ("Oilpro Design Mark") on its website on October 1, 2013.[14]

To protect its website, Oilpro utilized safeguards to prevent unauthorized access.[15]  One such safeguard was a robots.txt file, which instructed automated programs that visited the website.[16]  The robots.txt file allowed some programs, such as search engines, to view the whole website, but it prevented access by automated programs used by data scrapers.[17]  Oilpro also blocked data scraping by monitoring its website for automated programs, and, if one of these automated programs was detected, the IP address from which it originated would be blocked from accessing Oilpro's website.[18]

---

[10]     See id.

[11]     See id. p. 27.

[12]     See id.; Doc. 63-2, Ex. B to Oilpro's 2d Am. Countercl., Oilpro Website Copyright Regis. p. 1.

[13]     See Doc. 63, Def.'s 2d Am. Countercl. p. 27.

[14]     See id. p. 28.

[15]     See id. pp. 28-29.

[16]     See id. p. 29.

[17]     See id.

[18]     See id.

Oilpro additionally utilized Microsoft Windows Advanced Firewall Software to prevent access by automated programs.[19]

### 2. Rigzone

DHI Group owned www.rigzone.com, a website which allowed oil and gas professionals to learn about industry news, sell and buy oilfield equipment, and find job postings.[20] Rigzone's website was not social media website like Oilpro, so its users could not network with other oil and gas professionals or invite non-users to join Rigzone.[21] A prospective member had to provide an email address, contact information, and employment information in order to join Rigzone.[22] Rigzone was a place for employers to post available jobs.[23]

### 3. Plaintiffs' Scraping of Oilpro's Website

Plaintiffs, on June 16, 2015, used an automated program to bypass Oilpro's security measures and downloaded data, including member profiles and other information, from Oilpro's website.[24] Oilpro alleges that this violated its terms and conditions for use

---

[19]    See id.

[20]    See id.

[21]    See id.

[22]    See id.

[23]    See id.

[24]    See id. p. 30.

of its website.[25]   Rigzone's own website had similar terms and conditions, stating that it prevented the "[u]se [of] any robot, spider, site search/retrieval application, or other manual or automatic device or process to retrieve, index, 'data mine,' or in any way reproduce or circumvent the navigational structure or presentation of the Site or its contents."[26]   Oilpro alleges that Plaintiffs have scraped other websites "in a similar fashion" which has caused them to "develop[] a negative reputation for this activity on various Internet media websites."[27]

After obtaining this information from Oilpro, Plaintiffs published it on www.dice.com/open-web ("Dice Open Web"), a website owned by DHI Group.[28]   Subscribers to Dice Open Web paid and were given access to resume information in one place, so they did not have to join other websites like Oilpro.[29]   Plaintiffs obtained information from all 600,000 of Oilpro's members without Oilpro's permission and published this information on Dice Open Web.[30]   This publication of information on Dice Open Web included Oilpro's Design Mark.[31]

---

[25]   See *id.*

[26]   *Id.*

[27]   *Id.*

[28]   See *id.*

[29]   See *id.*

[30]   See *id.* p. 31.

[31]   See *id.*

B. __Procedural Background__

Plaintiffs commenced this action on June 10, 2016.[32]  Oilpro filed its first amended answer asserting counterclaims against Plaintiffs on August 8, 2016.[33]  On September 2, 2016, Plaintiffs filed a motion to dismiss these counterclaims.[34]  However, on November 15, 2016, within the deadline for filing amended pleadings, Oilpro filed its second amended answer and counterclaims, thereby superseding its first amended answer and counterclaim and rendering Plaintiffs' first motion to dismiss moot.[35]  Plaintiffs filed the pending motion to dismiss on December 5, 2016, and Oilpro responded on December 27, 2016.[36]

## II.  Legal Standard

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), dismissal of an action is appropriate whenever the complaint, on its face, fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts.  Sullivan v. Leor Energy, LLC, 600 F.3d 542, 546 (5th Cir. 2010).

---

[32]    See Doc. 1, Pls.' Compl.

[33]    See Doc. 34, Oilpro's 1st Am. Countercl.

[34]    See Doc. 49, Pls.' Mot. to Dismiss Oilpro's 1st Am. Countercl.

[35]    See Doc. 63, Oilpro's 2d Am. Countercl.

[36]    See Doc. 64, Pls.' Mot. to Dismiss Oilpro's 2d Am. Countercl.; Doc. 72, Oilpro's Resp. to Pls.' Mot. to Dismiss Oilpro's 2d Am. Countercl.

A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555.  In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555.  When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice.  See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are

incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); see also United States ex rel. Adrian v. Regents of the Univ. of Cal., 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).

However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed. 1990); see also Ayers v. Johnson, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) ("[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.")(quoting Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co., 195 F.3d 765, 771 (5th Cir. 1999)).

### III. Analysis

#### A.  Breach of Contract

In their motion to dismiss, Plaintiffs argue that Oilpro's breach of contract claim should be dismissed because the terms and conditions on Oilpro's website were not an enforceable contract.

Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2)

9

performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." <u>Smith Int'l, Inc. v. Egle Group LLC</u>, 490 F.3d 380, 387 (5th Cir. 2007)(quoting <u>Valero Mktg. & Supply Co. v. Kalama Int'l, LLC</u>, 51 S.W.3d 345, 351 (Tex. App.–Houston [1[st] Dist.] 2001, no pet.)).

Parties must mutually assent to a contract in order to be bound. <u>Baylor Univ. v. Sonnichsen</u>, 221 S.W.3d 632, 635 (Tex. 2007). "Assent may be manifested directly, as by the written or spoken word, or indirectly, through one's actions or conduct." <u>Southwest Airlines Co. v. BoardFirst, LLC</u>, [hereinafter "<u>BoardFirst</u>"] No. 3-06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007)(unpublished)(citing <u>R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.</u>, 428 F.3d 214, 222 (5th Cir. 2005); <u>Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.</u>, 480 S.W.2d 607, 609 (Tex. 1972)). "To manifest tacit assent to a contract through conduct, one must '[intend] to engage in the conduct and know [] or ha[ve] reason to know that the other party may infer from his conduct that he assents.'" <u>Karl Rove & Co. v. Thornburgh</u>, 39 F.3d 1273, 1291 (5th Cir. 1994)(quoting the Restatement (Second) of Contracts § 19(2)).

Oilpro contends that Plaintiffs agreed to the terms and conditions through the use of Oilpro's website and had constructive knowledge of these terms and conditions, therefore making it an

enforceable browsewrap agreement. Plaintiffs argue that the terms and conditions are unenforceable because Oilpro cannot show that Plaintiffs accepted the terms and conditions.

Browsewrap agreements are normally found in the form of a notice that states that a condition for utilizing the website includes abiding by the website's terms and conditions, which may be found on that page or via a hyperlink. BoardFirst, 2007 WL 4823761, at *4 (citations omitted). "A defining feature of a browsewrap license is that it does not require the user to manifest assent to the terms and conditions expressly-the user need not sign a document or click on an 'accept' or 'I agree' button. A party instead gives his assent simply by using the web site." Id. (citing Pollstar v. Gigmania, Ltd., 170 F. Supp.2d 974, 981 (E.D. Cal. 2000)("[A] browse wrap license is part of the web site and the user assents to the contract when the user visits the web site.")).

With the growth of technology in recent years, courts have analyzed the enforceability of these browsewrap agreements. BoardFirst, 2007 WL 4823761, at *5. These cases have resulted in "mixed" outcomes, but "one general principle that emerges is that the validity of a browsewrap license turns on whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site." Id. In BoardFirst, the court discussed two cases from the Second Circuit which reached different outcomes on the enforceability of browsewrap agreements. Id. at

11

*5-6.  In Specht v. Netscape Communications Corp., 306 F.3d 17, 31 (2$^d$ Cir. 2002), the court found that the browsewrap agreement was unenforceable because the license terms on the website were not enough to give a reasonably prudent person even constructive notice of usage conditions.  Users of the website were encouraged to download free software by clicking on a button, and the license agreement was found via a hyperlink only after scrolling down to the next page.  Specht, 306 F.3d at 22-23.  By contrast, in Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2$^d$ Cir. 2004), it was undisputed that the website users had actual knowledge of the website's posted terms and conditions, and the court therefore found them enforceable.  In Boardfirst, the court found that the facts were more similar to Verio, and held that there was a valid contract formed between the parties because the defendant had knowledge of the terms and conditions and used the website in violation of those terms.  Boardfirst, 2007 WL 4823761, at *7-8.

In this case, Oilpro alleges that Plaintiffs had knowledge of the terms and conditions on Oilpro's website, agreed to them through the use of Oilpro's website, and violated them by scraping, crawling, or using other automated means to download data from the website.  This is enough to survive the motion to dismiss.

**B.  Trespass to Chattels**

Plaintiffs argue that Oilpro failed to state a claim for trespass to chattels because it cannot meet either element of this

claim.   Oilpro disagrees.

Trespass to chattels is the wrongful interference with the possession or use of property.  <u>Jarvis v. S.W. Bell Tel. Co.</u>, 432 S.W.2d 189, 191 (Tex. Civ. App.—Houston [14th Dist.] 1968, no writ).  "Liability does not attach, unless the wrongful detention is accompanied by actual damage to the property or deprives the owner of its use for a substantial period of time."  <u>Zapata v. Ford Motor Credit Co.</u>, 615 S.W.2d 198, 201 (Tex. 1981)(citing <u>Lyle v. Waddle</u>, 144 Tex. 90, 188 S.W.2d 770 (1945); Restatement (Second) of Torts § 218 (1965)).  In <u>In re Simons Broadcasting, LP</u>, No. W-11-CA-172, 2013 WL 9542015, at *18 (W.D. Tex. Nov. 19, 2013)(unpublished), the court dismissed the plaintiff's claims for trespass to chattels for downloading and accessing the plaintiff's client information, stating that "[t]his Court is not aware of any Texas court expanding trespass to personalty claims to trade secrets or other intangible property, and declines to do so today."

In Oilpro's second amended counterclaim, Oilpro alleges that Plaintiffs "intentionally, and without authorization, accessed and interacted with the Oilpro Website and with Oilpro's computer systems and servers" and that they violated the terms and conditions of Oilpro's website through this access.[37]  Through this access, Oilpro alleges that Plaintiffs scraped data, including member profiles and other information.

---

[37]     Doc. 63, Oilpro's 2<sup>d</sup> Am. Countercl. p. 33.

As the court recognized in its memorandum and recommendation dated March 3, 2017, and adopted on March 22, 2017, Texas law has not recognized claims for trespass to chattels concerning intangible property.    Therefore,   the   court   recommends   that   Oilpro's counterclaim for trespass to chattels be dismissed.

## C. <u>Copyright Infringement</u>

Plaintiffs challenge Oilpro's claim for copyright infringement on three grounds, arguing that: (1) Oilpro's website is not a copyrightable work; (2) Oilpro has not adequately pled what works were infringed; and (3) Oilpro failed to plead copying.  Oilpro argues in its response that it has alleged both elements of a copyright claim because it alleged that its copyright was registered, provided a copy of the registration, and alleged that Plaintiffs scraped information from the website.

The elements of copyright infringement are ownership of a valid copyright, actionable copying, and substantial similarity.  <u>Armour v. Knowles</u>, 512 F.3d 147, 152 (5th Cir. 2007).  Ownership of a valid copyright encompasses issues of originality, copyrightability, and compliance with statutory formalities.  <u>Compaq Computer Corp. v. Ergonome Inc.</u>, 387 F.3d 403, 407-08 (5th Cir. 2004).  Before a plaintiff may bring a civil action for copyright infringement, it must be registered with the United States Copyright Office.  17 U.S.C. § 411(a).  The Copyright Act requires that courts recognize a timely obtained certificate of copyright registration as "prima

14

facie evidence of the validity of the copyright and the facts stated in the certificate."  17 U.S.C. § 410(c); see also <u>Gen. Universal Sys., Inc. v. Lee</u>, 379 F.3d 131, 141 (5th Cir. 2004).

Here, Oilpro has provided a copy of the United States copyright registration of its website, including "text" and "artwork," which is prima facie evidence of a valid copyright.  Oilpro alleges that the website is an "original work" that includes such original aspects as "the distinctive page layout, design, graphical elements, and organization of member profile pages, as well as the Oilpro homepage and news feed."[38]  Oilpro alleges that Plaintiffs infringed by copying data, including member profiles and other information, from its website and publishing it on Dice Open Web.  Whether the information copied was protected by the Copyright Act must wait for another time.  As of now, the allegations are sufficient to survive a motion to dismiss.

**D.  <u>DMCA</u>**

Plaintiffs argue for dismissal of Oilpro's DMCA claim, arguing that the information allegedly taken was not copyrighted and that Oilpro cannot meet the elements.  Oilpro responds that the website was copyrighted and that Plaintiffs circumvented Oilpro's technological safeguards and took information from Oilpro's website.

One of the reasons the DMCA was enacted was to prevent technological protections from circumvention.  <u>MGE UPS Sys., Inc.</u>

---

[38]    <u>See</u> Doc. 63, Oilpro's 2ᵈ Am. Countercl. p. 27.

v. GE Consumer and Indus., Inc., 622 F.3d 361, 365 (5th Cir. 2010).
Under the DMCA, "[n]o person shall circumvent a technological
measure that effectively controls access to a work protected under
this title."   17 U.S.C. § 1201(a)(1)(A).   "'Circumvent a
technological measure' means to descramble a scrambled work, decrypt
an encrypted work, or otherwise to avoid, bypass, remove,
deactivate, or impair a technological measure, without the authority
of the copyright owner."   17 U.S.C. § 1201(a)(3)(A).   "[A]
technological measure 'effectively controls access to a work' if the
measure, in the ordinary course of its operation, requires the
application of information, or a process or a treatment, with the
authority of the copyright owner, to gain access to the work."   17
U.S.C. § 1201(a)(3)(B).

As explained above, the court has found that Oilpro has alleged
enough to survive a motion to dismiss its copyright infringement
claim.  Oilpro alleges that it had technological measures in place,
including a robots.txt file, monitoring software, and firewall
software, to prevent automated technologies from accessing the
website.   Oilpro alleges that Plaintiffs circumvented these
technological measures to access the Oilpro website and downloaded
material that was then published on Plaintiffs' own website.
Therefore, the court finds that Oilpro has alleged enough to survive
a motion to dismiss its DMCA claim.

**E.  CFAA**

16

Plaintiffs argue that Oilpro's claim under the CFAA should be dismissed because Oilpro has not shown how Plaintiff's access to its website was unauthorized, and Oilpro has not alleged facts to support the elements of a claim under the CFAA.

In Oilpro's second amended counterclaim, Oilpro alleges that Plaintiffs violated Section 1030(a)(2)(C) of the CFAA because they "knowingly accessed [Oilpro's] protected computers, computer systems, and servers without authorization or exceeding authorized access, and thereby obtained information involved in interstate or foreign commerce."[39]   Oilpro alleges that Plaintiffs' actions violated Section 1030(c)(4)(A)(i)(I) by causing loss to Oilpro of more than $5,000 in value during a one-year period.   Oilpro also alleges that Plaintiffs violated the terms and conditions by collecting data from its website.

The CFAA creates civil and criminal penalties for certain computer-related activities.  See Fiber Sys. Int'l, Inc. v. Roehrs, 470 F.3d 1150, 1156 (5th Cir. 2006); 18 U.S.C. § ("Section") 1030(a)(1)-(7).  Section 1030(g) enables a plaintiff to bring a civil action for violations of the CFAA.  However, Section 1030(g)'s authorization of a civil suit is not coextensive with the entire statute.  The statute states in relevant part, "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III),

---

[39]   See Doc. 63, Oilpro's 2d Am. Countercl. p. 33.

17

(IV), or (V) of subsection (c)(4)(A)(i)."  See 18 U.S.C. § 1030(g).

Under Section 1030(a)(2)(C), a person violates the CFAA if he or she "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  "Exceeds authorized access" is defined as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. 1030(e)(6).

The court in BoardFirst faced the same issue as this case of "whether [the defendant] violated the CFAA simply by virtue of its breach of the Terms."  2007 WL 4823761, at *13.  In an earlier case, discussed in BoardFirst, the Northern District of Texas declined to dismiss a similar CFAA claim on a motion to dismiss.  Southwest Airlines Co. v. Farechase, Inc., [hereinafter Farechase] 318 F. Supp.2d 435, 439-40 (N.D. Tex. 2004).  In Farechase, the plaintiff argued that the defendant violated the CFAA by scraping the plaintiff's website, which was not acceptable under the website's terms and conditions.  Id. at 439.  The court agreed, holding that "[r]egardless of whether the Use Agreement creates an enforceable contract for purposes of a breach of contract claim pursuant to state law, [the defendant] knew that [the plaintiff] prohibited the use of 'any deep-link, page-scrape, robot, spider or other automatic device, program, algorithm or methodology which does the same

18

things.'"  Id. at 439.  Therefore, the Farechase court found that the plaintiff had alleged enough to state a claim under the CFAA. Id. at 440.

In BoardFirst, the court discussed Farechase and cases from the First Circuit, where the First Circuit found "that a computer use which violates the terms of a contract made between a user and the computer owner is unauthorized or 'exceeds authorized access,' and hence violates the CFAA."  2007 WL 4823761, at *13.  The court left the question open of whether violation of the terms and conditions was "without authorization" or "exceeded authorized access" and asked the parties for additional briefing on the issue.  Id. at *15.

Circuit courts have varied in how broadly or narrowly to interpret the terms "without authorization" or "exceeds authorized access" under the CFAA.  In 2010, the Fifth Circuit provided insight into its interpretation of "exceeds authorized access" in the criminal case of United States v. John, 597 F.3d 263 (5th Cir. 2010).  See Meats by Linz, Inc. v. Deare, No. 3:10-CV-1511-D, 2011 WL 1515028, at *2 (N.D. Tex. Apr. 20, 2011)(citing John and stating that "[t]he Fifth Circuit has interpreted the CFAA to encompass limits placed on the use of information obtained by permitted access to a computer system and data available on that system.").  In John, an employee used her access to her employer's confidential business information to perpetrate a fraud, which was not how the computer system was intended to be used and violated the employer's use

19

policy.  Id. at 269-70.  The Fifth Circuit elected to take the broader approach in interpreting the CFAA, in line with the First Circuit, holding that it "agree[d] with the First Circuit that the concept of 'exceeds authorized access' may include exceeding the purposes for which the access is 'authorized.'" Id. at 272.  The Fifth Circuit held that "[a]cess to a computer and data that can be obtained from that access may be exceeded if the purposes for which access has been given are exceeded." Id.  Some circuits, such as the Ninth, have taken a more narrow approach to interpreting the CFAA; for example, in Facebook, Inc. v. Power Ventures, Inc., No. 13-17102, 2016 WL 7190690, at *6 (9th Cir. Dec. 9, 2016), where the court found that a violation of the terms and conditions of the website did not create liability under the CFAA.

In this case, Oilpro has alleged that Plaintiffs exceeded authorized access through the scraping of data in violation of Oilpro's terms and conditions.  Looking to John, Farechase, and BoardFirst, the court finds that the statute's "without authorization" or "exceeds authorized access" provisions encompass violations of term and condition agreement as Oilpro has alleged in this case.  Plaintiffs' motion to dismiss should be denied on Oilpro's CFAA claim.

### F.  Harmful Access by Computer

Plaintiffs move to dismiss Oilpro's claim for harmful access by computer because it is undisputed that Oilpro's website is

publicly available.  Oilpro argues that Plaintiffs had knowledge or notice that they were violating its terms and conditions for accessing the website.

Under Texas Civil Practice and Remedies Code § 143.001, "[a] person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code, has a civil cause of action if the conduct constituting the violation was committed knowingly or intentionally."  Tex. Civ. Prac. &  Rem. Code § 143.001.  Texas Penal Code § 33.02 provides: "A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner." Tex. Penal Code. § 33.02(a).  "Consent is not effective if . . . used for a purpose other than that for which the consent was given."  Tex. Penal Code § 33.01(12)(E).

In <u>BoardFirst</u>, the court found that the defendant violated Texas Penal Code § 33.02 as a matter of law because the defendant violated of the terms and conditions of the plaintiff's publicly-available website, which was connected to the plaintiff's computer system.  2007 WL 4823761, at *16-17.  The court held that the defendant was not acting with effective consent because it was using the consent for a purpose other than that for which the consent was given, and allowed the plaintiffs' civil claim under Section 143.001 to proceed to trial.  <u>Id.</u>

The court agrees with the reasoning in <u>BoardFirst</u>.  While

Plaintiffs argue that Oilpro's website was publicly available, Oilpro has provided factual allegations that Plaintiffs knowingly violated the terms and conditions of Oilpro's website by their conduct.  Therefore, the court finds that Plaintiffs' motion to dismiss Oilpro's harmful access by computer claim should be denied.

## G.  <u>Misappropriation</u>

Plaintiffs argue that Oilpro's claim for misappropriation should be dismissed as Oilpro has not alleged facts to support a claim that Plaintiffs misappropriated a product, trade secrets, or proprietary information.  Oilpro contends that it has alleged a claim of unfair competition by misappropriation of time, labor, skill, and money, and not a misappropriation claim relating to products, trade secrets, or proprietary information.  In Plaintiffs' reply, they argue that Texas law does not recognize a claim for misappropriation without allegations of trade secrets or confidential information.

"The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." <u>Stutts v. Texas Saltwater Fishing Magazine, Inc.</u>, No 6:13-CV-10, 2014 WL 1572736, at *7 (S.D. Tex. Apr. 18, 2014)(unpublished)(quoting <u>United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.</u>, 865 S.W.2d 214, 218 (Tex. App.–Waco 1993, writ denied).  "Within the broad scope of unfair competition

22

are [] independent causes of action" including misappropriation. <u>Stutts</u>, 2014 WL 1572736, at *7 (citation and internal quotes omitted).

The elements of a cause of action for unfair competition by misappropriation under Texas law include: "(1) the creation of plaintiff's product through extensive time, labor, skill, and money; (2) the defendant's use of the product in competition with the plaintiff, thereby gaining a special advantage in that competition (<u>i.e.</u>, a 'free ride') because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff." <u>Dresser-Rand Co. v. Virtual Automation Inc.</u>, 361 F.3d 831, 839 (5th Cir. 2004)(quoting <u>United States Sporting Prods.</u>, 865 S.W.2d at 218); <u>see also</u> <u>Orthoflex v. ThermoTek, Inc.</u>, 986 F. Supp.2d 776, 784 (N.D. Tex. 2013).

The cases cited by Plaintiffs in their reply do not concern unfair competition by misappropriation, but instead discuss claims for misappropriation of trade secrets or confidential information. <u>See, e.g.</u>, <u>SP Midtown, Ltd. v. Urban Storage, L.P.</u>, No. 14-07-00717-CV, 2008 WL 1991747 (Tex. App.–Houston [14th Dist.] May 8, 2008, pet. denied)(unpublished); <u>Bluebonnet Petroleum, Inc. v. Kolkhorst Petroleum Co., Inc.</u>, No. 14-07-00380-CV, 2008 WL 4527709, at *4-5 (Tex. App.–Houston [14th Dist.] Oct. 9, 2008, pet. denied)(unpublished). Plaintiffs also cited <u>Wickfire, LLC v. Trimax Media, Inc.</u>, No. A-14-CA-34-SS, 2016 WL 4119917, at *7-8 (W.D. Tex.

Mar. 25, 2016)(unpublished), in support of their argument.   In
Wickfire, the court acknowledged that courts have allowed unfair
competition claims in the context of trade-secret law, "palming-
off," and misappropriation but found that the plaintiff had failed
to allege misappropriation of a trade secret.   Id. at *7-8.
Notably, the Wickfire court did not discuss Dresser Rand, which
appears to directly address the availability of this kind of claim.

In its second amended counterclaim, Oilpro alleges that it
invested time, skills, and money into its website, computer systems,
and website content that Plaintiffs wrongfully accessed.   Oilpro
alleges that they competed with Plaintiffs and that Plaintiffs'
actions to publish the information from Oilpro's website on Dice
Open Web was the result of Plaintiffs' free-riding on Oilpro's
investment into its website and resulted in damage to Oilpro.   The
court finds that these facts provide support for the elements of a
unfair competition by misappropriation claim under Texas law, and
therefore, Plaintiffs' motion to dismiss is denied on this claim.

**H.   Trademark Infringement**

In its counterclaim, Oilpro alleges that Plaintiffs violated
federal and Texas law by infringing the Oilpro Design Mark.
Plaintiffs challenge these claims, arguing that: (1) the mark is not
registered; (2) Oilpro has not alleged enough facts to state a
claim; (3) Oilpro has not alleged facts to show confusion or
mistake; and (4) any use of Oilpro's Design Mark is fair use.   The

24

court will analyze Oilpro's federal and state claims together, as
"a trademark infringement . . . action under Texas common law
presents essentially 'no difference in issues than those under
federal trademark infringement actions." Amazing Spaces, Inc. v.
Metro Mini Storage, 608 F.3d 225, 236 n. 7 (5th Cir. 2010); Zapata
Corp. v. Zapata Trading Int'l, Inc., 841 S.W.2d 45, 47 (Tex.
App.–Houston [14th Dist.] 1992, no writ).

### 1. Unregistered Mark

Plaintiffs contend that Oilpro's claim for trademark
infringement is not proper under the Lanham Act because the Oilpro
Design Mark is unregistered. Under the Lanham Act, a trademark or
service mark is "any word, name, symbol, or device, or any
combination thereof . . . used by a person . . . to identify and
distinguish his or her goods [or services] . . . from those
manufactured or sold [or provided] by others to indicate the source
of the goods [or services], even if that source is unknown."
Amazing Spaces, 608 F.3d at 236 (quoting 15 U.S.C. § 1127). Section
32 of the Lanham Act, 15 U.S.C. § 1114, only applies to registered
trademarks, "but it is common ground that § 43(a) [15 U.S.C. §
1125(a)] protects qualifying unregistered trademarks and that the
general principles qualifying a mark for registration under § 2 of
the Lanham Act are for the most part applicable in determining
whether an unregistered mark is entitled to protection under §
43(a)." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768

25

(1992).

In Oilpro's counterclaim, Oilpro alleges that it has a federal trademark registration for "OILPRO" but not for the Oilpro Design Mark. However, in its counterclaim Oilpro only alleges that the Oilpro Design Mark was infringed by Plaintiffs. Although it is unclear under which section of the Lanham Act that Oilpro brings its claims, nowhere does Oilpro allege that the Oilpro Design Mark is a registered trademark. Therefore, the court will look to 15 U.S.C. § 1125 when considering Oilpro's federal trademark infringement claims, not 15 U.S.C. § 1114, as 15 § U.S.C. § 1114 only applies to registered trademarks.

### 2. 15 U.S.C. § 1125(a)

In Oilpro's counterclaim, Oilpro alleges that when Plaintiffs republished information scraped from Oilpro's website on DHI Open Web, Plaintiffs included the Oilpro Design Mark, causing "confusion as to whether Oilpro authorized or sponsored the content provided on the DHI Open Web Website."[40] Oilpro alleges that Plaintiffs violated federal and Texas law by using the Oilpro Design Mark, which was "likely to cause confusion, mistake, or to deceive the public as to the affiliation, connection, or association between [Plaintiffs] on the one hand and [Oilpro] on the other."[41]

Under 15 U.S.C. § 1125(a),

---

[40]   See Doc. 63, Oilpro's 2$^d$ Am. Countercl. p. 31.

[41]   See id. p. 37.

> [a]ny person who, on or in connection with any goods or
> services. . . uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any
> false designation of origin, false or misleading
> description of fact, or false or misleading
> representation of fact, which—(A) is likely to cause
> confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person
> with another person, or as to the origin, sponsorship, or
> approval of his or her goods, services, or commercial
> activities by another person . . . shall be liable in a
> civil action by any person who believes that he or she is
> likely to be damaged by such act.  15 U.S.C. § 1125.

As stated above, in analyzing this section of the Lanham Act, courts look to "the general principles qualifying a mark for registration under § 2 of the Lanham Act." Two Pesos, 505 U.S. at 768.  "To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion." Am. Rice, Inc. v. Producers Rice Mill, Inc., 518 F.3d 321, 329 (5th Cir. 2008).

There are five categories of marks, in order of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. Two Pesos, 505 U.S. at 768.  Marks that are suggestive, arbitrary, or fanciful "are deemed inherently distinctive and are entitled to protection." Id.  "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." Id. at 769.  Distinctiveness of a mark and a mark's secondary meaning are questions of fact.  Id.

The Fifth Circuit looks at the following eight factors in determining likelihood of confusion: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." Am. Rice, 518 F.3d at 328.  In analyzing using these factors, not all or even a majority need to be present in order to find a likelihood of confusion.  Id. Likelihood of confusion is a question of fact.  Id.

Here, Oilpro has provided an image of the Oilpro Design Mark, and alleges that Plaintiffs' publication of the mark along with content from Oilpro's website on DHI Open Web was likely to cause confusion.  Oilpro alleges that the Oilpro Design Mark is distinctive, valuable, and associated with Oilpro's goods and services.  Therefore, the court finds that Oilpro has pled enough facts to survive Plaintiffs' motion to dismiss.  The court will not reach the merits of whether the Oilpro Design Mark is distinctive, has secondary meaning, or is likely to cause confusion at this stage of the litigation.

### 3. Fair Use

Plaintiffs also challenge Oilpro's trademark infringement claims, arguing that any use of the mark by Plaintiffs was fair use. Courts have applied the fair-use defense in the context of Section

43(a) claims.  See Sugar Busters LLC v. Brennan, 177 F.3d 258, 270

(5th Cir. 1999).  Fair use is an affirmative defense and "allows a

party to use a term in good faith to describe its goods or services,

but only in actions involving descriptive terms and only when the

term is used in its descriptive sense rather than in its trademark

sense."  Id. at 270-71; 15 U.S.C. § 1115(b)(4).  The fair-use

defense is not applicable if "a term is used as a mark to identify

the markholder's goods or services."  Sugar Busters, 177 F.3d at

271.

Here, the court finds that the applicability of the fair-use

defense is better saved for a motion for summary judgment, as the

court has not decided whether the Oilpro Design Mark is distinctive

or descriptive.  Therefore, Plaintiffs' motion to dismiss on this

basis is premature.

## I.  <u>Interference with Prospective Business Relations</u>

Plaintiffs challenge Oilpro's tortious interference with

prospective business relations claim, contending that Oilpro has

failed to plead facts to support the elements of this claim.  Oilpro

argues that it has alleged a claim, citing to its contention that

Plaintiffs' publishing of Oilpro's information on DHI Open Web

caused Oilpro to lose customers and subscribers.

The elements of a claim for tortious interference with business

relations include: "(1) there was a reasonable probability that the

plaintiff would have entered into a business relationship with a

third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." _Coinmach Corp. v. Aspenwood Apartment Corp._, 417 S.W.3d 909, 923 (Tex. 2013)(citations omitted). A party making a claim for tortious interference with prospective business relations "must show that the defendant's conduct was either independently tortious or unlawful, that is, that the conduct violated some other recognized tort duty." _Alliantgroup v. Feingold_, 803 F. Supp.2d 610, 629 (S.D. Tex. 2011)(citations omitted).

Oilpro has alleged that Plaintiffs copied information from Oilpro's website, namely member profiles, and published it on their own website, DHI Open Web, circumventing the need for potential customers and subscribers to use Oilpro's website. Oilpro alleges that there is a reasonable probability, without Plaintiffs' unlawful conduct, those who subscribed to DHI Open Web would have subscribed to Oilpro's website. Additionally, Oilpro alleges that Plaintiffs acted with a conscious desire to interfere or knew that it was impacting Oilpro's prospective relationships, which caused Oilpro damage. In light of these allegations, the court finds that Oilpro has alleged enough facts to survive a motion to dismiss on its tortious interference with prospective business relations claim.

30

## J.  Unjust Enrichment

Texas courts are divided on whether unjust enrichment is a separate cause of action, but "[m]ost of the Texas courts of appeals and federal courts that have considered the question under Texas law have rejected the existence of an independent cause of action for unjust enrichment."  David Dittfurth, Restitution in Texas: Civil Liability for Unjust Enrichment, 54 S. Tex. L.Rev. 225, 238 (2012). The Texas Supreme Court has yet to directly rule on whether unjust enrichment is an independent cause of action under Texas law.  See Davis v. OneWest Bank, N.A., No. 02-14-00264-CV, 2015 WL 1623541, at *2 (Tex. App.-Fort Worth, Apr. 9, 2015, pet. denied).

Some appellate courts have held that unjust enrichment is not an independent cause of action, stating that it instead "characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay."  Id. at *1 (quoting Argyle ISD ex rel. Bd. of Trustees v. Wolf, 234 S.W.3d 229, 246 (Tex. App.-Fort Worth 2007, no pet.)); see also Doss v. Homecomings Financial Network, Inc., 210 S.W.3d 706, 709 n. 4 (Tex. App.-Corpus Christi 2006, pet. denied)(quoting City of Corpus Christi v. Heldenfels Bros., 802 S.W.2d 35, 40 (Tex. App.-Corpus Christi 1990), aff'd 832 S.W.2d 39 (Tex. 1992)); Walker v. Cotter Properties, Inc., 181 S.W.3d 895, 900 (Tex. App.-Dallas 2006, no pet.).

However, in Pepi Corp. v. Galliford, 254 S.W.3d 457, 460 (Tex. App.–Houston [1st Dist] 2007, pet. denied), the First Court of Appeals held that "[u]njust enrichment is an independent cause of action," citing HECI Exploration Co. v. Neel, 982 S.W.2d 881, 891 (Tex. 1998), in which the Texas Supreme Court stated that "[w]e have recognized that, in some circumstances a royalty owner had a cause of action against its lessee based on unjust enrichment, but only when the lessee profited at the royalty owner's expense."

This court has agreed with the view that unjust enrichment is not an independent cause of action. See, e.g., Applin v. Deutsche Bank Nat. Trust, No. H-13-2831, 2014 WL 1024006, at *7 (S.D. Tex. Mar. 17, 2014)(unpublished)(quoting Doss and holding that unjust enrichment is not an independent cause of action); Schouest v. Medtronic, Inc., 92 F. Supp.3d 606, 614 (S.D. Tex. 2015)(holding that "because unjust enrichment is not a stand-alone claim, and there are no remaining claims upon which it can be based, the claim must be dismissed."). The court is persuaded by this view that unjust enrichment is not a separate cause of action under Texas law. Therefore, Oilpro's claim against Plaintiffs for unjust enrichment should be dismissed.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiffs' motion to dismiss be **GRANTED IN PART** and **DENIED IN PART.** The court **RECOMMENDS** that Plaintiffs' motion to dismiss Oilpro's claims for

trespass to chattels and unjust enrichment be **GRANTED**.  The court **RECOMMENDS** that Plaintiffs' motion to dismiss Oilpro's claims for breach of contract, copyright infringement, misappropriation, trademark infringement, tortious interference with business relations, and for claims under the DMCA, CFAA, and under the THACA for harmful access by computer be **DENIED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 21st day of April, 2017.

_____
U.S. MAGISTRATE JUDGE