```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF TEXAS

 3                      HOUSTON DIVISION

 4   DHI GROUP, INC., ET AL      §    CASE NO. 4:16-CV-01670
                                 §    HOUSTON, TEXAS
 5   VERSUS                      §    TUESDAY,
                                 §    MARCH 20, 2018
 6   KENT, JR., ET AL            §    11:02 A.M. TO 11:53 A.M.

 7

 8                        MOTIONS HEARING

 9          BEFORE THE HONORABLE NANCY K. JOHNSON
                UNITED STATES MAGISTRATE JUDGE

10

11                         APPEARANCES:

12       FOR THE PARTIES:             SEE NEXT PAGE

13       COURT RECORDER:             DESIREE SILLAS

14

15

16

17

18

19

20                  TRANSCRIPTION SERVICE BY:

21            JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                   935 ELDRIDGE ROAD, #144
22                 SUGAR LAND, TEXAS 77478
              Tel: 281-277-5325 ▼ Fax: 281-277-0946
23               www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.
```

1                           APPEARANCES:

2

3   FOR THE PLAINTIFF:            BAKER BOTTS LLP
                                  Amir Halevy, Esq.
4                                 910 Louisiana
                                  One Shell Plaza
5                                 Houston, TX  77002

6                                 JORDAN LYNCH & CANCIENNE
                                  Walter G. Lynch, Esq.
7                                 1330 Post Oak Blvd.
                                  Suite 2575
8                                 Houston, TX  77056

9                                 JORDAN LYNCH & CANCIENNE
                                  Joseph W. Golinkin, II Esq.
10                                1980 Post Oak Blvd.
                                  Suite 2300
11                                Houston, TX  77056

12
    FOR THE DEFENDANT:            GARDERE WYNNE SEWELL LLP
13                                James G. Munisteri, Esq.
                                  1000 Louisiana
14                                Suite 2000
                                  Houston, TX  77002-5007
15

16

17

18

19

20

21

22

23

24

25

1       HOUSTON, TEXAS; TUESDAY, MARCH 20, 2018; 11:02 A.M.

2              THE COURT:  All right.  Good morning.

3              ALL:  Good morning Judge.

4              THE COURT:  All right, be seated.  All right, I

5     think it's back like a bad penny.

6              All right, who's representing the Plaintiffs?

7              MR. LYNCH:  Your Honor, Walter Lynch on behalf of

8     the Plaintiffs.  I have Jeff with me and Amir Halevy.

9              THE COURT:  All right.  And Mr. Munisteri.  It

10    looks like some things have been resolved.

11             MR. MUNISTERI:  True, Your Honor.

12             THE COURT:  Okay.  So, Mr. Munisteri, what are you

13    still concerned about?

14             MR. MUNISTERI:  So, on the motion the first fire

15    is the request that concerns damages and evaluation by third

16    parties in the sales process during the last year and a half

17    by Rickton (phonetic).

18             And then the requests are, in particular, 135

19    through 138.

20             THE COURT:  But 135 through 138 aren't addressed

21    to damages at all.

22             MR. MUNISTERI:  Well, they are in this sense.

23             THE COURT:  Well I read them and your -- they seem

24    very off point.

25             MR. MUNISTERI:  They're exactly on point, Your

1    Honor.  The Court will remember the Court's comment at the

2    last hearing and maybe even at the hearing before that the

3    Court properly observed that the two parties have very

4    different views about how you value damages, if any, in

5    terms of methodology.

6            And in essence, as the Court knows, our view is

7    that cash flow is how you value a business.  And it's

8    customers, customer's contracts, and cash in that when you

9    value --

10           THE COURT:  That's your view now.  Because when

11   you were selling the company, did you value it on cash flow?

12           MR. MUNISTERI:  We didn't buy it.

13           THE COURT:  When they bought it from you?

14           MR. MUNISTERI:  Yes.  There's a short --

15           THE COURT:  When Kent, the company, he valued the

16   company based on?

17           MR. MUNISTERI:  And the short answer is yes.  And

18   we're in a court proceeding --

19           THE COURT:  Yes, he based it on cash flow?

20           MR. MUNISTERI:  Yes.

21           THE COURT:  Okay.

22           MR. MUNISTERI:  I mean, there are other dynamics

23   and attributes to the business as there are with any

24   business.  But the issue in this case are the -- $20 million

25   claimed by the Plaintiff.

1          They calculate that on a method by taking, as the

2     Court knows, the total value -- market value of the

3     company -- and dividing into that amount the number of

4     members that they think -- it's an incorrect number -- but

5     that they claim converted into oil for members.  That's

6     their methodology.

7          As the Court said at the last hearing, two

8     different views.  The very best way for the Court and the

9     gatekeeper and the jury, if it gets past the gatekeeper, to

10    test that theory.  If what the actual buyers do when they

11    look to buy Rigzone in the last year and a half.

12         And the other thing, remember, is it's not just

13    Rigzone that they're buying, it's also Rigzone and OilPro --

14    which was a May 2014 acquisition that was somewhat

15    transformative.

16         So the method by which the other parties value, as

17    well as the consultant that Rigzone hired value -- the

18    methodology is directly relevant to answering the question

19    of whether when someone looks at Rigzone, do they actually

20    in reality -- not an expert witness that's hired, you know,

21    a professor of finance who's never done this before who

22    doesn't have anything to do with the social media industry

23    -- like their expert.

24         But in actual reality, when somebody's got to cut

25    a check, how do they value this business?  And so any of

1  the -- the identity of the people that bid, the amount they

2  bid, and then obviously their records on how they calculated

3  their bids.

4         THE COURT:  But your questions -- and maybe I'm

5  not looking at the right request for production, but you're

6  looking at 135 to 138; 135 asks you to produce all email

7  attachments sent to, from or copying one or more of the

8  Defendants from a particular period of time.  It refers to

9  Rigzone and these -- I mean, you're scooping up a zillion

10 documents.

11        MR. MUNISTERI:  Well that may be a different

12 request because --

13        THE COURT:  All right, then maybe I'm not looking

14 at the right one.  So can you hand me the right ones?

15        MR. LYNCH:  Well, I've got a chart of the ones I

16 think that may still -- some of these may have been

17 resolved, but these are the ones that the original motion

18 were on.

19        THE COURT:  I thought we were talking about 135 to

20 138 for the alleged damaged questions.

21        MR. LYNCH:  Yes.

22        MR. MUNISTERI:  Your Honor, here's what the

23 request, -- if I may?

24        THE COURT:  Sure.

25        MR. LYNCH:  And this may be useful at some point.

1           THE COURT:  Okay, this is not what I'm looking

2   for.  All right.

3        (Pause in the proceedings.)

4           THE COURT:  All right, so Mr. Lynch, did Rigzone

5   -- were you trying to get divest yourself of Rigzone in

6   2017?

7           MR. LYNCH:  There were -- yeah, there were

8   discussions.

9           THE COURT:  There were discussions?

10          MR. LYNCH:  Yeah, but what happened in 2017,

11  different market conditions unrelated to the time in

12  question when the values are really, you know, the damage

13  models want to be looked at.  It's really apples and

14  oranges.

15          I mean, yes, there was -- there is some

16  information there.  I just don't see how it relates to what

17  was going on two years before --

18          THE COURT:  Was the method different?

19          MR. LYNCH:  I can't say that it is or it isn't.  I

20  don't know for sure.  I don't know that it would matter

21  because it's a different -- it's valuing a different thing

22  at a different time.

23       (Pause in the proceedings.)

24          THE COURT:  All right.  So I think that how you

25  value a company like this is relevant.  So you will turn

1    over evidence, documents relating to how it is valued.  That

2    does not mean -- and I'm not sure what the limits of this

3    should be, but you don't get all communications.  You just

4    get valuation information.  How they're valuing --

5              MR. LYNCH:  And Your Honor,

6              THE COURT:  -- how you are valuing it.

7              MR. LYNCH:  How Rigzone was valuing it?

8              THE COURT:  Exactly.

9              MR. LYNCH:  Okay.

10              THE COURT:  Yes.

11              MR. MUNISTERI:  How the third parties in a fair

12    market value with willing buyer, willing seller.  Willing

13    buyer values.  It is important.  Their offer letters.  And

14    that's really all I need is to identify these people who

15    made the offers or declined offers, and what they offered,

16    and then I'll make a decision whether to subpoena their

17    records.  But the Court to remember -- because I know the

18    Court has cases -- the Plaintiffs subpoenaed records from

19    potential purchasers of --

20              THE COURT:  This is what I'm concerned about,

21    Mr. Munisteri.  I think it -- you know, we all value things

22    differently and that's -- you know, I may think my house is

23    worth, you know, a zillion dollars, but maybe a fair market

24    value person would not think that.  Okay?

25              If I -- you're trying to impeach my valuation, it

1    would be impeaching me to -- if I've ever in the past said

2    my house was not worth a zillion dollars, it was worth a

3    half a zillion dollars.

4              What I'm concerned about is when we're valuing

5    things in the marketplace it may not be wholly relevant what

6    someone else thinks my property is worth, okay?

7              MR. MUNISTERI:  It's completely relevant.  Fair

8    market value is tested by what a willing buyer, willing

9    seller under normal market circumstances will offer.

10             So we have in this case the sort of evidence that

11   is very unique.  You have a Plaintiff that says, here's how

12   you value it, and you've got people who have valued it --

13             THE COURT:  You only have fair market value if you

14   have a transaction.  If you don't have a consummated

15   transaction, you've got the seller's view of what it's worth

16   and the buyer's view of what it's worth.

17             MR. MUNISTERI:  And that's very relevant.

18             THE COURT:  So, it's not relevant.  Because buyers

19   can say -- sellers can over value and buyers can underbid.

20   It's a bargaining process.

21             MR. MUNISTERI:  But if he --

22             THE COURT:  You don't have a meeting of the minds

23   until you have a transaction where they both agree what the

24   fair market value is.  That's my concern.

25             You don't -- because you're going to get in to

1  motivations of a third party who is -- may be undercutting

2  the market and you want to use that without -- and then

3  we've got a collateral issue on what were they thinking?

4  What was their motivation?  Was it really a bonafide offer

5  for value, or is this just a low ball that's ridiculous?

6         MR. MUNISTERI:  So, Your Honor, there are some

7  things that the Court doesn't know just because it's not

8  come before the Court.

9         THE COURT:  Right.

10        MR. MUNISTERI:  But the Court has a number of

11  times -- like a lot of judges, indicated that sort of what's

12  good for one side is good for the other.

13        Part of their damage model is based not on what

14  OilPro thought it was worth, but what a third party whom

15  they subpoenaed thought it was worth and how they valued it.

16        So a critical part of their damage model is

17  exactly the type of evidence that you're saying is not

18  relevant.  And so when I come to a jury -- and as I've said

19  I think I should come to you first as the gatekeeper -- I

20  need to be able to say that in the same way that they have,

21  that when a person actually put money on the table, here is

22  how they valued the company.  They valued it based on cash

23  flow.

24        And so for there to be -- and I don't know the

25  answer -- but for there to be five companies that were

1    solicited and made offers -- not just valued it differently

2    in accordance with how I think damages are valued when you

3    value a company -- but also may not have even offered

4    anywhere close to the damages they claim.

5         They claim $20 million of damages for a company

6    that basically doesn't even cash flow positive because of

7    the oil prices which preceded these events.

8         So they put my client in the position to defend a

9    case where they are relying on third party data -- the

10   method and the forecasts.  But I can't look at third party

11   data.  It's unfair.

12        It's also the -- when someone -- take the Court's

13   example about the house.  You have a view about your house

14   value.  The seller -- the buyer has a view about the house

15   value.  But generally how that's regarded is how have people

16   in other transactions with similar homes, what have they

17   paid?  So you look at comps.

18        What's remarkable abut this case is you actually

19   have evidence of comps or how people have valued for the

20   very same company, for the same house.

21        THE COURT:  I don't have a problem with comps.

22   What I have a problem with is an offer that, you know, is

23   subject to negotiations.  That is not a comp.  A comp is --

24        MR. MUNISTERI:  Well, the jury should be able to

25   consider whether someone went through due diligence and

1   offered -- let's just say $2 million -- 10 percent of their

2   damage claim, but for the whole company.

3           The jury is entitled to know reality.  I mean,

4   I've often said, Your Honor, that we live in sort of a

5   strange profession where the jurors are asked to make

6   decisions based on the evidence that's introduced through

7   the witnesses in sort of a courtroom rambling.

8           But our job -- Mr. Lynch's job, my job, even the

9   Court's job to some extent -- but the advocate's job is to

10  make sure we give them as much of reality as we can.

11          To rely on a forecast which they have from a third

12  party, but not allow me to come in and say when they try to

13  sell the company -- not a single company, not a single

14  company used the method that their expert used.  And not a

15  single company even offered anywhere close to what they

16  claim in damages, is incredibly relevant.

17          And it ties both hands behind my back to not be

18  able to argue that, particularly in a case where damages is

19  the issue.

20          THE COURT:  Mr. Lynch?

21          MR. LYNCH:  Yeah, I'm concerned that I'm confused

22  about the reference to prior evaluation and experts.  What I

23  understand is there was a prior evaluation of OilPro by an

24  interested purchaser that invested money actually into the

25  company and created a valuation.

1              And through that process they used some of the

2    metrics that our expert uses to do the valuations in the

3    expert's report.  That was a consummated transaction.  And I

4    think you're then comparing apples and oranges like Your

5    Honor suggested when you actually have something that went

6    through where there was a $20 million valuation of OilPro by

7    $3 million investment -- 15 percent.  And then now, two and

8    a half years later, people bidding on it or maybe trying to

9    get a good deal when somebody wants to get out of the

10   business.  Those aren't the same thing.

11             And so I'm confused as to -- we're trying to make

12   an argument to say that there is -- something our expert

13   used was a transaction or a proposed transaction -- well

14   that was consummated.  That just, as Your Honor suggested,

15   that's the ones that matter because we actually have a

16   meeting of the minds.

17             THE COURT:  I'm just concerned with putting out

18   numbers where we're going down a twisty little road on what

19   motivated that offer.

20             MR. MUNISTERI:  Well, what he just said gets into

21   that.  So, he's going to rely on what motivated

22   Mr. Fairbanks and --

23             THE COURT:  I thought Mr. Lynch was talking a

24   consummated transaction, not an offer.

25             MR. MUNISTERI:  And he's going to -- consummated

1   or not, that gentlemen, Mr. Fairbanks, will be subject to

2   cross-examination about what motivated him.

3              THE COURT:  Of course.

4              MR. MUNISTERI:  And so all of the -- and they have

5   a consummated transaction, too, --

6              THE COURT:  But, --

7              MR. MUNISTERI:  -- and they also have -- because

8   they do.  They sold part of Rigzone to one party that's

9   publicly announced and they've received bids from multiple

10  parties for the rest of Rigzone, but they've not consummated

11  them.

12             And to give the, you know, to -- ultimately if

13  you're making a damage claim, as they are, on the value of

14  the business -- which for lots of reasons I don't think is

15  proper, but that's where we are.

16             And if you're basing it on a methodology that I

17  can't find any literature for, other than an article in

18  *Forbes* by someone who's not a damage valuation expert, which

19  is what they based it on -- then I should be able to basis

20  on the type of information that a real expert evaluation

21  would look to, which are either actual offers, actual -- or

22  actual transactions.

23             I thought, Your Honor, about spending the time

24  yesterday to get an affidavit from one or both of our expert

25  witnesses to help the Court and put in the record how -- for

1  them to prepare their rebuttal expert reports they want to

2  see in it as a damage evaluation expert it is relevant for

3  them to consider both consummated and offers transactions.

4          I didn't think it'd be necessary.  I'm happy to

5  supplement the record, both --

6          THE COURT:  I think you need to.  I'm very

7  concerned about just how far a field we are going when

8  Mr. Lynch will have to be impeaching, you know, whether an

9  offer is bonafide or not.

10          Because, I mean --

11          MR. MUNISTERI:  I'm going to have to do the same

12  with Mr. Fairbanks.  So I'm happy to submit a supplement and

13  move to the next issue.

14          THE COURT:  All right, let's move to the next

15  issue.

16          MR. MUNISTERI:  This is an important issue and

17  I'll --

18          THE COURT:  I know it's important.  I'm just

19  concerned that, you know, when you start throwing numbers

20  around to a jury and you give legitimacy to maybe an offer

21  that was just kind of like a flyer.  It wasn't real.  It

22  wasn't a bonafide offer.

23          It was just kind of a low ball and the jury is

24  supposed to, kind of, give credence to a low ball offer.

25  And I don't think that Judge Miller wants to go and have

1  Mr. Lynch call all these offers and say were you just making

2  low ball, you know, kind of -- you'd have to find that out

3  what their motivation was.  Why did you think this was, you

4  know, this company was worth $2 million?  And they're just

5  like, well, that's all we wanted to pay for it.

6          Well that's just stupid.  You know, it may not

7  be --

8          MR. MUNISTERI:  Well if that's all they say,

9  that's all they say.  But I suspect that when we get down to

10  it, they're going to say we did a -- we ran the numbers and

11  here's what we found with the earnings from this company

12  EBITDA and here's how we brought in the forecasts.

13          And that's the very sort of information --

14          THE COURT:  I will be happy to consider your

15  expert's affidavit.  You then tell me, you know, why you

16  think that, you know, that's unreliable and no one can

17  listen to it.

18          MR. MUNISTERI:  Understood.

19          THE COURT:  All right.

20          MR. LYNCH:  And we've already been ordered to

21  produce how it was valued by Rigzone.

22          THE COURT:  Yes.

23          MR. LYNCH:  So we'll move forward with that --

24          THE COURT:  Yeah, I mean, you can be impeached on

25  how you value inconsistencies within --

1          MR. LYNCH:  Right.

2          THE COURT:  -- your own valuation of your company.

3          MR. MUNISTERI:  And Your Honor, does that -- let I

4  mean add a little.  Does that include their consultants?

5  Because they hired someone to run the auction process.

6  Someone that they hired --

7          THE COURT:  Yes, I mean, their consultants are

8  them.  I mean, that's how they are valuating the company.

9          MR. MUNISTERI:  Is this Friday sufficient, Your

10 Honor?

11         THE COURT:  This Friday?

12         MR. MUNISTERI:  For the supplement.

13         THE COURT:  If you can get it in by that time.

14         MR. MUNISTERI:  I can.

15         THE COURT:  Okay.  So what's the next dispute?

16         MR. MUNISTERI:  I think the next issue is

17 Request 26 which are basically what steps were taken by DHI

18 to access and scrape OilPro's website.  And the issue there

19 is that they've not withdrawn their objection.  I don't

20 know --

21         THE COURT:  I thought they were going to produce

22 26.

23         MR. LYNCH:  We are.

24         MR. MUNISTERI:  But they've not withdrawn subject

25 to the objections.  And if they are, then that's fine.

1          THE COURT:   What were the objections?

2          MR. LYNCH:   It's overbroad, but we're going to

3    produce.  We're going to our best to produce and produce

4    responsive documents.  I think that one is --

5          THE COURT:  All right.  I haven't really heard how

6    it's overbroad so I'm going to overrule the overbroad

7    objection.  Produce what you've got, see where we go.

8          What else, Mr. Munisteri?

9          MR. MUNISTERI:  The next two categories deal with

10   the other companies whose websites were scraped.  And the

11   relevance of this is that the core of their defense -- and

12   it's really the only defense they have in this case -- is on

13   the breach of contract claim in particular of the counter

14   claim.

15         Their defense is that they did not assent to the

16   terms of conditions.  And the CEO has said in his testimony

17   that there's someone who's supposed to review all the terms

18   and conditions before they scrape a website.  The individual

19   who's a corporate rep, sort of said differently.  We don't

20   look at them.

21         We'd like to see the corporate practice that they

22   have, which is, first of all with one particular example

23   LinkedIn.  We know there is a demand letter and a response.

24   In discussions last week, I offered to limit the request to

25   just the actual letter from LinkedIn and their response.

1   There's some testimony about it.

2         My understanding from Mr. Lynch was that he was

3   going to consult with his client and I didn't hear back.  So

4   that's --

5         THE COURT:  So you're saying that Mr. Lynch's

6   client scraped LinkedIn?

7         MR. MUNISTERI:  They did.

8         THE COURT:  Okay.

9         MR. MUNISTERI:  And then LinkedIn sent the letter

10  saying we believe, based on the testimony, that this is in

11  violation of our terms and conditions that say you cannot

12  access our website through automated means.  That's the type

13  of software which they used to access OilPro's website.

14        And there's apparently a response letter and then

15  they ceased scraping LinkedIn site.  I've not asked for any

16  other -- any documents other than the letter with respect to

17  LinkedIn, the letter and the response.

18        And then there are other sites.  There's like a

19  couple hundred sites that they scraped.  And my theory, in

20  part, will be based on their commercial practice of their

21  knowledge of the other site's terms and conditions and the

22  prohibition that's really typical in these sites against

23  automated means of scraping and any discussion they have of

24  those terms and conditions because the CEO said they're

25  supposed to look at it.

1          THE COURT:  Okay.  Mr. Lynch?

2          MR. LYNCH:  I'm worried this is going to become a

3    sideshow of no direct relevance to this case.  What

4    LinkedIn's position is on scraping or collecting

5    data -- publicly available data I -- is really not relevant

6    to parties at issue here.

7          Just because we had a dispute with them about what

8    we were doing and that they thought that we were in

9    violation of the law.  You know, I just fear that that

10   becomes way too powerful and an anchor for the jury to

11   decide the issues on something other than what's before you.

12         THE COURT:  Right, I think Mr. Lynch you're going

13   to have to make that argument in an *in limine* motion.  I

14   think it's marginally relevant.  I think the scraping of

15   public website is a little different than what the

16   Defendants did to you, but that will be up to Judge Miller.

17         MR. LYNCH:  And so I understood from the reply

18   that -- well just to make sure I understand -- the letter

19   and the response and that takes care of this or are we going

20   to just start having to look for any other complaint by

21   anybody?

22         THE COURT:  No, I think the letters and the

23   response is fine.  I mean, the demand letters -- when you're

24   doing it, you need to turn that over.

25         MR. LYNCH:  Understood.

1          MR. MUNISTERI:  449 deals with the identification

2   and the -- well actually with the other request -- deal with

3   scraping other websites and what they did before scraping

4   the websites.  Did they do what the CEO said -- which is

5   someone is supposed to review the terms and conditions?

6          And that evidence would be a commercial practice

7   that would be probative and indicative if they reviewed the

8   terms and conditions of OilPro site.

9          THE COURT:  This is a request for production.  So

10  the only thing you're going to pull on that is if they've

11  got some policy on it, right?

12         MR. MUNISTERI:  Or some -- or some document that

13  relates to that particular site.

14         THE COURT:  And what do you think that would be?

15         MR. MUNISTERI:  I think it would either be --

16         THE COURT:  I'm not going to make -- I'm not going

17  to make them search their entire files for any mention of

18  LinkedIn or anything else.  It's got to be related to

19  scrapping and their policy of looking at the terms and

20  conditions, so.

21         MR. MUNISTERI:  I don't know their documents, Your

22  Honor, but certainly documents regarding the sites they

23  scrapped; the evidence that they reviewed the terms are

24  relevant.

25         I mean, I don't know if they have a form that goes

1  to that.  I don't know if it's an email.  I don't know their

2  documents.

3        THE COURT:  Normally you just check the box when

4  you're on the website.  I mean, I'm not sure what documents

5  we're talking about.

6        MR. MUNISTERI:  Well, so the documents would be

7  any internal documents about what -- every time they go

8  scrape information from a website, it's more than just

9  accessing them.  So they've got to set up accounts to go

10 through anonymous IP addresses so that the website doesn't

11 recognize that they're being scrapped.

12        So there'll be a lot of steps for, I mean, pick a

13 website, Monster.com.  For them to set up on Monster.com to

14 scrape it, they're not just getting on the website.  They're

15 doing more.  They're setting up anonymous IP addresses so

16 they're not detected.  And there should be, according to the

17 CEO, a review of the terms and conditions of the Monster.com

18 website.

19        THE COURT:  Mr. Lynch?

20        MR. LYNCH:  So I think -- and I thought he said 49

21 and 49 is one that we said we were going to produce.

22        THE COURT:  Right.

23        MR. LYNCH:  So I'm not really sure --

24        MR. MUNISTERI:  No, I misspoke, I believe, Your

25 Honor.  It's within 40, 42, 45, 50, 58, 59, 60, 61 --

1          MR. LYNCH:  Okay, all right.

2          THE COURT:  Okay.

3          MR. LYNCH:  So I think by doing the search for the

4   scraping documents -- which we're going to do --

5          THE COURT:  Okay.

6          MR. LYNCH:  -- that would subsume a request for

7   policies and procedures about checking terms and conditions

8   about when you're scraping.

9          So I don't know that there's a separate search

10  that needs to be done.  I don't -- I think it should be

11  captured in that search, what he's asking because what the

12  CEO did say is that it should be done.

13         THE COURT:  Okay.

14         MR. LYNCH:  Whether it was or it wasn't, he wasn't

15  really commenting on that.  He said he thought it should be

16  done.  And so by us producing the documents related to

17  scraping, that should subsume it.

18         MR. MUNISTERI:  And just to give the Court some

19  background.  If the group --

20         THE COURT:  No, I think he's right.  I think it

21  should come up with -- it's going to be in the search terms.

22         MR. MUNISTERI:  And that's what I was --

23         THE COURT:  So, you're going to get it.

24         MR. MUNISTERI:  -- give the Court some background.

25  The number of custodians in this with respect to these

1  searches is relatively limited.  It's a small group.  It's

2  three or four at most.

3          So I agree that the search terms should do it.

4  It's not a lot of expense.

5          THE COURT:  Okay, all right.  So it sounds like

6  we're in agreement.

7          What else Mr. Munisteri?

8          MR. LYNCH:  Vigorous agreement.

9          MR. MUNISTERI:  I mean, I think 49 is actually,

10 probably even more relevant because it's the same type

11 documents, but it's specific to OilPro.  And --

12         THE COURT:  Well they said they're going to run

13 search terms on that.  So, 49 you've got an agreement on.

14         MR. MUNISTERI:  Well they said they'd run search

15 terms on relevant accounts.  I don't even know what relevant

16 accounts means.  If that's custodians, then that's fine.

17         MR. LYNCH:  Yes, sorry --

18         MR. MUNISTERI:  Okay.

19         MR. LYNCH:  -- for the confusion.

20         THE COURT:  All right.

21         MR. LYNCH:  We'll search the right people.

22         THE COURT:  What else?

23         MR. MUNISTERI:  And 51, Your Honor, is basically

24 the reports regarding the number of --

25         THE COURT:  They said they're going to produce

1    this.

2              MR. MUNISTERI:  And I don't know what they mean by

3    a summary report.  There should be more than just a summary

4    report regarding what they scraped.

5              MR. LYNCH:  I think this is subsumed within 26 as

6    well.  That's --

7              MR. MUNISTERI:  I agree.

8              MR. LYNCH:  So I don't --

9              THE COURT:  Okay.

10             MR. LYNCH:  I mean, I don't know what

11   communications necessarily means, but I think no matter what

12   it means it should be subsumed within 26.

13             MR. MUNISTERI:  I mean a communication is a

14   communication.  It's an email from Prince, you know, to his

15   co-workers saying we got 100,000 today or we got a million

16   today.

17             MR. LYNCH:  Right.

18             MR. MUNISTERI:  And that's what a communication

19   is.

20             MR. LYNCH:  And that will be subsumed -- that will

21   be produced.

22             THE COURT:  Okay.

23             MR. MUNISTERI:  Okay.

24             THE COURT:  What else?

25             MR. MUNISTERI:  Then on 54, I didn't understand

1  their response --

2              MR. LYNCH:  It was --

3              MR. MUNISTERI:  It looked like it was a mistake.

4              MR. LYNCH:  It was.  That goes to, I believe, it's

5  54, 55, 56, 57.  I think what's really being asked for here

6  is a very strange thing called "Confluence Timelines."

7              It's basically where the company -- it's a system

8  called "Confluence" where they put subject matter specific

9  information.  Like a filing system --- a confluence.

10             THE COURT:  Right.

11             MR. LYNCH:  And so at the time -- talk about the

12  depositions -- and the confluence timeline is basically the

13  report of the things that went in to it.

14             THE COURT:  I thought you were producing those.

15             MR. LYNCH:  We do -- yes.  And there was a mistake

16  on the cut and paste on 54 response.  And so we are going to

17  produce the confluence timelines, which I think subsumes 54

18  through 57.  So same answer to those.

19             THE COURT:  Okay.

20             MR. MUNISTERI:  I think the only issue on -- so

21  just so there's clarity on the Record with respect to the

22  timelines, there was time when they said they would only

23  produce the one timeline.  If there were more than one

24  timeline, we ask that those be produced.

25             I understand from Counsel's comment they'll be

1    produced, but I'm -- I want to be clear on the Record.

2         MR. LYNCH:  I don't know how many timelines there

3    are.  I know that when it was asked for before, there was a

4    timeline that was identified.

5         THE COURT:  All right, well --

6         MR. LYNCH:  And I will ask again if there's any

7    other related timelines.

8         THE COURT:  And if there's some dispute, come back

9    on relevance.

10        MR. LYNCH:  I doubt it.

11        THE COURT:  All right.

12        MR. MUNISTERI:  I think the only issue on 71 and

13   122 is the timeframe.  And when Mr. Lynch and I spoke last

14   week, I told him 14, 15, and 16 was fine.  And that, I

15   think, is the only issue.

16        THE COURT:  Okay.

17        MR. LYNCH:  Well, -- so what are we -- remind me

18   the number again.  I'm sorry.

19        MR. MUNISTERI:  Seventy-one and 122.

20        MR. LYNCH:  Yes, --

21        THE COURT:  Right now.  Yeah you were going to

22   search from January 14 to mid-16.

23        MR. LYNCH:  Right because mid-16 is when this

24   lawsuit was filed, which is -- everybody's testified that's

25   when the scraping stopped.  So there's no reason for me --

1  this was putting a reasonable timeline.  I mean it's--

2          MR. MUNISTERI:  Oh no, the scraping of our website

3  did not stop on '16.

4          THE COURT:  True or not true?

5          MR. LYNCH:  All I know is what the people

6  testified to.

7          THE COURT:  What's your evidence of that?

8          MR. MUNISTERI:  My understanding -- and it's

9  principally in connection with essentially preparing our

10 damages expert report on our counterclaim, is that the

11 wheel -- the ability to essentially stop the scrapping ended

12 right after the corporate representative depositions, which

13 was April of '17.

14         THE COURT:  Ability to scrap and actual scraping

15 are two different things, so --

16         MR. MUNISTERI:  No, no ability to stop.  Ability

17 to preclude scraping.

18         THE COURT:  But what evidence do you have that

19 after June until they couldn't do it any more, they actually

20 did it?  That's what I'm hearing.

21         MR. MUNISTERI:  I think there is evidence.  I've

22 not gone back and studied that so I can't give the Court a

23 direct --

24         THE COURT:  All right

25         MR. MUNISTERI:  -- but my memory is, is that it

1  was -- it was after -- and in fact, I explained this to

2  Mr. Lynch last week -- it was after the April 2017

3  depositions that I understood the scraping stopped.

4         THE COURT:  So, right now the deadline is June --

5  mid-June of '14 unless he shows you that it was scrapped

6  after that time.

7         MR. LYNCH:  Understood.

8         MR. MUNISTERI:  Sixteen.

9         THE COURT:  Sixteen.  Sixteen, yeah.

10         MR. LYNCH:  Understood.

11         MR. MUNISTERI:  Now I'm not going to be able to

12  show this definitively as he can.  If he can confirm -- if

13  the Plaintiff's can confirm -- the counter-Defendants can

14  confirm -- that there was no scraping after June '16, I'm

15  fine with that.

16         THE COURT:  Yeah, just be -- yeah, confirm that --

17         MR. MUNISTERI:  And I'll look into what I have,

18  Your Honor.

19         THE COURT:  Yeah, just because they could get in

20  doesn't mean they did.

21         MR. LYNCH:  Right, I'll re-ask the question.  It's

22  been asked.

23         THE COURT:  Okay.

24         MR. MUNISTERI:  The next group, which is 74, 76,

25  78, 80 and 83 is basically board minutes and audit committee

1    minutes.  We've restricted scope.  I think the only issue

2    are whether the objections -- relevance, privilege and

3    vague -- are being withdrawn.

4            MR. LYNCH:  And more importantly, I believe our

5    Counsel had already agreed.  And I'm going to always honor

6    prior counsel's agreements.  And so he attached a letter

7    from Mr. Jacobs in reply.

8            I wasn't aware of that letter.  Apparently they

9    had come to an agreement.  So all I need is certainty on

10   what the clarification was of the request and we will

11   comply.

12           So if there was a statement in the letter and even

13   now that there is some clarification of the request,

14   modification of the request --

15           THE COURT:  Okay.

16           MR. LYNCH:  -- happy to comply with it.  Just need

17   to see what that clarification is.  Do you remember what the

18   clarification is?

19           MR. MUNISTERI:  I don't remember exactly.  It was

20   conceptually.  I don't need to see all the minutes.  I just

21   want to see anything that's related to David Kent, OilPro or

22   the subject matter of this lawsuit or the scraping if such

23   matter --

24           THE COURT:  The subject matter of the lawsuit

25   might be attorney/client privilege.

1          MR. LYNCH:  But on those we would not -- we would

2    withhold that.

3          THE COURT:  Right.

4          MR. LYNCH:  But I understand what he's requesting

5    then.

6          THE COURT:  All right, now next Mr. Munisteri?

7          MR. MUNISTERI:  I think the only issue on 94 is

8    whether to limit, as the Plaintiff's want to impose

9    limitations, only published business models.

10         And if we were talking about only published

11   information, I would get that publicly.  So what we've asked

12   for is we've asked for basically the business models and

13   stated goals for Rigzone and Dice open web, period, whether

14   published or internal.

15         And it's the internal documents that I'm really

16   seeking.

17         THE COURT:  So what do you think that would be?

18   Projections?  I'm not sure what you're talking about.  A

19   business model is different from a projection in my view.

20         MR. MUNISTERI:  So, I mean, a stated goal would be

21   earnings, number of members.  It could be a business model.

22   It could be an internal business plan.

23         THE COURT:  All right, Mr. Lynch?

24         MR. LYNCH:  Okay, with that clarification, I at

25   least understand it because before the goal could be we're

1   going to have better food in the break room.

2           THE COURT:  Right.

3           MR. LYNCH:  I mean, I didn't know what it meant.

4           THE COURT:  All right.  So, you need to turn over

5   published or non-published business models or business goals

6   and that goes through the time you're using to -- well,

7   let's just take it through the end of '16.  All right?

8           MR. LYNCH:  And some of the examples of those were

9   described -- and I don't have a transcript -- of those kinds

10  of things.  And I get a more a refined sense of that I think

11  I can move forward with that.

12          MR. MUNISTERI:  A business matrix, not --

13          MR. LYNCH:  Right.

14          MR. MUNISTERI:  -- material.

15          THE COURT:  Obviously.  What else, Mr. Munisteri?

16          MR. MUNISTERI:  So the next are communications

17  between the parties.  The Plaintiff's objections is well we

18  have those communications.  And we may have some or all of

19  those communications.  But I don't have an operating

20  company.

21          We responded to their similar request which was

22  identical and produced whatever we did have that went back

23  and forth.  There shouldn't be a lot.  It shouldn't even be

24  a burdensome operation because you're talking about

25  communications that took place between two competitors.

1       So I don't even understand what reason for their

2  objection if they think it's burdensome.

3       THE COURT:  Well they think that they've already

4  produced it.

5       MR. MUNISTERI:  And if they did, then that's fine.

6  But that's not my understanding of their objection.

7       MR. LYNCH:  I don't know that we've already

8  produced it.  I do think that they should already have it.

9  If he's telling me that they don't have it because they've

10 lost computers or don't have access to the same emails or

11 for some reason, then he can say that.  But I think

12 otherwise it's just as easy for him to grab --

13      THE COURT:  Right.

14      MR. LYNCH:  -- communications --

15      MR. MUNISTERI:  No, I am saying that and I said

16 that to him last week which is we had computer servers that

17 were physically taken, have gone through a certain chain of

18 custody, are not operating today.

19      Now, I've been through this, so I have said it and

20 I have explained it to Plaintiff's Counsel.

21      THE COURT:  All right, so run what you've got.

22      MR. LYNCH:  Understood.

23      MR. MUNISTERI:  121 I think is the request that

24 Your Honor was referring to at the beginning of this.  And

25 it is in essence trying to capture the communications that

1    refer to Mr. Kent's OilPro.  There shouldn't be a lot of
2    communications within one company after he left -- three
3    years after he left.
4           The same request was directed to us.  We spent the
5    required efforts to go through and do the searches and
6    produced anything that mentioned Rigzone.  And that's the
7    same request sent back to them.
8           And this is for the time period where Mr. Kent's
9    not involved or OilPro -- OilPro's always a competitor.  So
10   it's for a time period when there shouldn't really be a lot
11   of communications.
12          But to the extent there are, so the Court knows
13   this, general communications that have described OilPro have
14   been very important to the case.  They often are
15   communications to customers that produced -- and I'm giving
16   just an antidotal example -- that compares the two companies
17   and shows why they are so different.
18          And so any comparisons, any communications about
19   OilPro.  It's an easy search to run.  And if the issue is
20   the number of custodians, I'm happy to, you know, on
21   limiting the number of custodians because neither of these
22   companies was very big.  OilPro very small.  Rigzone,
23   relatively small.
24          MR. LYNCH:  Partly this is duplicative of other
25   requests.  I think it is assumed with some of them;

1   otherwise it's just a catch-all.

2           THE COURT:  All right.  Limit it to no more than

3   10 custodians and the relevant timeframe predates this

4   lawsuit.  So we don't capture privileged documents that

5   we've got to sort through.

6           MR. LYNCH:  Understood, Your Honor.

7           MR. MUNISTERI:  The last item on the request I

8   think we have agreed to.  We had Plaintiff's Counsel and I

9   had a discussion last week trying to resolve these.  I think

10  I threw out the number 10, but I told them I didn't know

11  what the prior agreement was.

12          It turns out there was a prior agreement that we

13  had with the preceding Counsel and was to limit the request

14  on 123, 126, 48 and 52 to five entities that we would choose

15  from the list.

16          THE COURT:  Okay.  Then that's resolved.

17          MR. MUNISTERI:  Then the one last issue is the

18  interrogatory answer.  And let me first give --

19          MR. LYNCH:  Let me --

20          THE COURT:  You were going to answer?

21          MR. LYNCH:  Yes.

22          THE COURT:  Okay.  He's going to answer.

23          MR. LYNCH:  I ask better questions.

24          THE COURT:  Okay.  All right.

25          MR. MUNISTERI:  The context is the key factual

1   issue in the damage analysis are the number of members that

2   Rigzone had at different times.  We just asked the question

3   and really, Your Honor, we sent the interrogatory -- one

4   interrogatory because solely of the damage expert report.

5           We're just asking the --

6           THE COURT:  So why isn't the information that

7   they've referred to, why do they have to do something else?

8           MR. MUNISTERI:  Because the documents don't answer

9   the question.  And Plaintiff's Counsel admitted and

10  frequently spoke that if the documents they referenced do

11  not answer the question, then an interrogatory is actually

12  appropriate.

13          THE COURT:  So, can you get this information

14  through a document or is this --

15          MR. LYNCH:  No it's not through a document.  It's

16  through other work.  And it's still the big if.  I don't

17  know -- other people think that it is answerable based on

18  the documents.  I have not --

19          THE COURT:  Okay.

20          MR. LYNCH:  -- I haven't looked at all of them to

21  determine whether or not I can figure it out.  Other people

22  thought it could be.  I've gone further than that and have

23  asked somebody else, you know, what the burden is to do

24  this.  I was told it was something that it would probably

25  tale them two hours to do and I said well then do it.

1          THE COURT:  Do it, all right.

2          MR. LYNCH:  All right, because I'm tired of the

3  fighting.

4          THE COURT:  Okay.  Super.  So you'll get that?

5          MR. LYNCH:  Yes, Your Honor.

6          MR. MUNISTERI:  Two issues that are apart from the

7  pending motion that I wanted to raise.  One, I've raised

8  with Mr. Lynch.  One I've literally thought of on the way

9  over here.

10          The first is the schedule order.  We spoke last

11  week about the amendments and tried to come up with an

12  agreed timeframe based on when the Plaintiffs believe

13  they'll be able to produce whatever documents the Court

14  orders today.

15          And the Plaintiffs have said they're going to

16  aggressively produce these documents quickly.  I will

17  reciprocate and get the depositions scheduled very quickly.

18  I think both sides, Your Honor, are very motivated to keep

19  the number of depositions to a minimum and to get them done

20  quickly.

21          From my perspective, what I want to make sure I do

22  so that my client is properly defended, is make sure that I

23  get the documents, have enough time -- you know, not a

24  week -- but a proper amount of time to be prepared for the

25  depositions.

1           And so we do need a new Scheduling Order.  I

2    talked about it with the prior Counsel, Mr. Jacobs.  We

3    never reached a full agreement, but we both agreed and the

4    Court agreed and at the last hearing that deadlines need to

5    be bumped.

6           That's the main issue.

7           THE COURT:  Can you agree on something and submit

8    it?

9           MR. MUNISTERI:  It seems like we both want to get

10   to trial first, but I'm concerned about -- or get to trial

11   as soon as we can -- but I'm very concerned about picking a

12   schedule that's not realistic.

13          And so I think when we went through it, my memory

14   is just thinking out loud of our conversation, sort of

15   looking at the number of depositions, time of year, just

16   history, you know, I came up with sort of late August.

17          And I said, look, if we took a very aggressive

18   position, I think we could finish the depositions by

19   August 1.  But I don't -- but that's a compromise.

20          And so that's where we ended up.  I understood

21   that Mr. Lynch was going to propose a schedule and I've not

22   received it or if he did send it, I'm not seeing it.

23          THE COURT:  Okay.

24          MR. LYNCH:  No, that -- I'm sorry you

25   misunderstood.  That was not what -- I said I was going to

1    look into it and try to figure it out, and I have.  And

2    based on these request and based on the works that -- these

3    requests are already being worked on.

4             THE COURT:  Okay.

5             MR. LYNCH:  Because we've already agreed to some.

6             THE COURT:  Okay, great.

7             MR. LYNCH:  It's happening.  And I think that we

8    should be able to produce the documents by April 6th.

9             THE COURT:  Okay.

10            MR. LYNCH:  Okay and so when we do that -- and my

11   feeling is well that'll give them a month to look through

12   the documents and then a month to do the depositions and we

13   could be done by June 8th.

14            And I am efficient.  I am aggressive.  I want to

15   get this done.  We need to get to the finish line.  This has

16   been around too long.  And the only way to do that really is

17   to have a real deadline that we really focus on.

18            THE COURT:  How many depositions?  Do you need any

19   more depositions?

20            MR. LYNCH:  I think we probably will end up

21   needing to take their experts and maybe three or four

22   others.  So we were talking between us a total of about

23   eight depositions.

24            MR. MUNISTERI:  Well if it's three or four others

25   plus experts, that's seven, eight.

1          MR. LYNCH:  Well, --

2          MR. MUNISTERI:  And then I have the same on my

3    side.  So we're really talking with experts, 14 to 16.  I

4    have never come close to 14, 16 depositions in a commercial

5    case in four weeks.  And I --

6          THE COURT:  Four weeks is overly optimistic.

7    So -- but I think 60 days is something to work toward.  So

8    if you bump out April 6 and get things done by July 6th.

9          MR. MUNISTERI:  August.

10          THE COURT:  No, you'll have --

11          MR. MUNISTERI:  If we have until August 1st.

12          THE COURT:  So you're going to get the documents

13   by April 6th.  You've got one month -- you want to look at

14   them for a month.

15          MR. MUNISTERI:  Two months for depositions.

16          THE COURT:  All right, August 1st.

17          MR. MUNISTERI:  Here's the last issue, Your Honor.

18   And I have not raised this with Plaintiff's Counsel, so I --

19   but I'm trying to think of ways -- I think both parties have

20   tried to settle the case.  We're far apart.

21          I don't know that this is an impediment, but I do

22   think that the large elephant in the room is whether the

23   $3.3 million that has already been paid as a credit will be

24   an offset.

25          THE COURT:  Of course it will.

1            MR. MUNISTERI:  We've looked at it.

2            THE COURT:  Why not?

3            MR. LYNCH:  Well I don't -- without any further

4    looking at it I think we looked at it too and we believe it

5    would be as well.

6            THE COURT:  Yeah, it's restitution.

7            MR. MUNISTERI:  Okay, fair enough then.  If that's

8    their position then I'll --

9            THE COURT:  I mean, if you've got some argument

10   that it isn't, but the point is, I don't know -- I mean,

11   it's criminal restitution for this very conduct.  To me

12   that's an offset.

13           Now if you've got some great case that says no, no

14   that's criminal restitution.  But it's not a fine, it's

15   restitution.

16           MR. LYNCH:  Right, no I'm not --

17           THE COURT:  So make your argument, file a motion,

18   but I think it's offset.

19           MR. LYNCH:  And I'm not arguing with you.

20           MR. MUNISTERI:  If we're agreed then I'm -- no

21   need for me to raise that.

22           MR. LYNCH:  You're right, I mean there's more --

23           MR. MUNISTERI:  Thank you, Your Honor.

24           MR. LYNCH:  We still have a couple other -- at

25   least one other little issue.  But just to -- I mean, this

1   isn't just a compensatory damages case.  This is a punitive

2   damages case.  And so there is some bad conduct here that I

3   think --

4           THE COURT:  Okay.

5           MR. LYNCH:  -- the jury is going to be permitted

6   to take a look at and see if some of the things were done

7   with malice.

8           THE COURT:  If you've got -- yeah, well Judge

9   Miller will be making that determination.

10          MR. LYNCH:  Understood.  One other thing that was

11  in the Scheduling Order that was never officially done,

12  there was a rebuttal expert deadline of February 23rd.

13          And so that -- they missed it.  And I understand

14  that you're just going to be inclined to give them a relief,

15  but they missed it.

16          And they didn't get anything official --

17          THE COURT:  No, I mean.  No, we're not -- we're

18  just extending -- you've got the experts you want, right?

19          MR. MUNISTERI:  Right and if the Court remembers,

20  we had this discussion at the last hearing which was we

21  wanted to take the depositions of their experts before our

22  rebuttal expert report was due.  And they said they wanted

23  the ability to supplement.

24          And so Your Honor said that February 23 date was

25  off and we come up with a new date and left it with me and

1    Mr. Jacobs to present the new dates.  But that Mr. Jacobs

2    will be given an opportunity to supplement his damages

3    report.

4            So the notion that we missed the deadline is just

5    not wrong.  And look, I understand --

6            THE COURT:  This is just supplementing expert

7    reports?

8            MR. MUNISTERI:  No, this is rebuttal experts --

9            THE COURT:  Oh, rebuttal expert.

10           MR. MUNISTERI:  And so the Court's instruction was

11   the February 23 date is off.  Come up with a new Scheduling

12   Order -- which we just talked about.

13           We, meaning the OilPro, David Kent parties, can

14   depose their damage experts first before the rebuttal expert

15   deadline, but the Plaintiff would get an opportunity to

16   supplement their expert reports.  And I was fine with that.

17           MR. LYNCH:  I know I'm new to the case, but that

18   wasn't exactly the agreement.  The agreement -- the

19   instruction was come up with a date and get it scheduled.

20   That never happened.  It was a date that was important to

21   them.  They should have done it.

22           I understand that you're going to give them relief

23   from this.

24           THE COURT:  I am.

25           MR. LYNCH:  I full well expect.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1          THE COURT:  I am.  But this is something when you
2    get, you know, from now until August 1st, you work on -- I
3    mean, get the experts taken care of -- they're, of course,
4    most difficult.  And figure out when you're going to do it,
5    when your supplemental reports are due.  You've got enough
6    time within the timeframe I've just given you to get this
7    all worked out on supplementing experts' reports.
8          Obviously it needs to be done before they are
9    deposed, right?  So, anything else?
10          MR. MUNISTERI:  No, Your Honor.
11          MR. LYNCH:  Nothing.
12          THE COURT:  You-all have a good day.
13          MR. MUNISTERI:  Thank you, Judge.
14          MR. LYNCH:  Thank you, Judge.
15       (Proceeding adjourned at 11:52 a.m.)
16                         * * * * *
17          *I certify that the foregoing is a correct*
18    *transcript to the best of my ability produced from the*
19    *electronic sound recording of the proceedings in the above-*
20    *entitled matter.*
21    */S/ MARY D. HENRY*
22    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
23    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
24    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
25    *JTT TRANSCRIPT #58400          DATE FILED:  APRIL 2, 2018*