# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

DHI GROUP, INC. F/K/A DICE
HOLDINGS, INC. AND
RIGZONE.COM, INC.,

              *Plaintiffs,*

   v.

DAVID W. KENT, JR., SINGLE
INTEGRATED OPERATIONS
PORTAL, INC. D/B/A OILPRO AND
OILPRO.COM, ET AL.,

              *Defendants.*

C.A. NO.: 16-cv-01670

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## ON OILPRO'S COUNTERCLAIMS

JORDAN, LYNCH & CANCIENNE PLLC

**Walter Lynch**
State Bar No. 24046330
Federal ID No. 965265
**Amir Halevy**
State Bar No. 24065356
Federal ID No. 1259956
**Joseph ("Jeb") W. Golinkin II**
State Bar No. 24087596
Federal ID No. 2515657
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713-955-4020 (Telephone)
wlynch@jlcfirm.com
ahalevy@jlcfirm.com
jgolinkin@jlcfirm.com

ATTORNEYS FOR PLAINTIFFS DHI GROUP,
INC. F/K/A DICE HOLDINGS, INC. AND
RIGZONE.COM, INC.

# TABLE OF CONTENTS

Page

I.     SUMMARY OF ARGUMENT ................................................................1

II.    NATURE AND STAGE OF PROCEEDING.......................................4

III.   STATEMENT OF ISSUES AND STANDARD FOR REVIEW................5

IV.    STATEMENT OF FACTS.......................................................................6

    A.    "Operation Resume Hoard."..............................................6

    B.    Kent's Hacking, Arrest, and Guilty Plea. ........................8

    C.    Kent's Retaliatory Counterclaims. ...................................9

    D.    Oilpro's T&Cs Did Not Appear on Oilpro.com or its Site Map Until After DHI's Alleged Scraping. ...............10

V.     ARGUMENT AND AUTHORITIES .....................................................12

    A.    Oilpro's Filthy Hands Bar All of its Counterclaims. ...12

    B.    Oilpro has Sued the Wrong Parties. ...............................13

    C.    Oilpro's Counterclaims Fail. ..........................................14

        1.    Breach of Contract. .............................................14

        2.    Copyright Infringement......................................15

        3.    Digital Millennium Copyright Act Claim. ........18

        4.    Computer Fraud and Abuse Act.........................20

        5.    Harmful Access by Computer. ...........................21

        6.    Misappropriation.................................................22

        7.    Trademark Infringement (Lanham and Texas Common Law). ...........................................23

        8.    Tortious Interference with Prospective Business Relations. ...........24

VI.    CONCLUSION .....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

*American Eagle Ins. Co. v. United Technologies Corp.*,
   48 F.3d 142 (5th Cir. 1995) ................................................................ 13

*American Rice, Inc. v. Producers Rice Mill, Inc.*,
   518 F.3d 321 (5th Cir. 2008) .......................................................... 23

*Bridgmon v. Array Sys. Corp.*,
   325 F.3d 572 (5th Cir. 2003) .................................................... 16, 17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................ 5

*Compass Bank v. Villarreal*,
   No. CV L-10-08, 2012 WL 13046324 (S.D. Tex. Feb. 28, 2012)..................... 12

*Darden v. Peters*,
   488 F.3d 277 (4th Cir. 2007) .......................................................... 17

*Dresser-Rand Co. v. Virtual Automation Inc.*,
   361 F.3d 831 (5th Cir. 2004) .......................................................... 22

*Engineering Dynamics, Inc. v. Structural Software, Inc.*,
   26 F.3d 1335 (5th Cir. 1994)  ......................................................... 15

*Fontenot v. Upjohn Co.*,
   780 F.2d 1190 (5th Cir. 1986) .......................................................... 5

*King v. Ames*,
   179 F.3d 370, 375 (5th Cir. 1999)..................................................... 17

*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) ............................................................ 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................... 5

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
   629 F.3d 928 (9th Cir. 2010) .......................................................... 19

*MGE UPS Sys., Inc. v. GE Consumer & Indus.,*
    622 F.3d 361 (5th Cir. 2010) ...................................................................... 18, 19

*Nola Spice Designs, LLC v. Haydel Enterprises, Inc.,*
    783 F.3d 527 (5th Cir. 2015) ............................................................................ 16

*Nguyen v. Barnes & Noble, Inc.,*
    763 F.3d 1171 (9th Cir. 2014) .......................................................................... 15

*Orthoflex v. ThermoTek, Inc.,*
    986 F. Supp. 2d 776 (N.D. Tex. 2013)............................................................. 22

*Petro Franchise Systems, LLC v. All American Properties, Inc.,*
    607 F. Supp. 2d 781 (W.D. Tex. 2009) ............................................................ 13

*Positive Black Talk Inc. v. Cash Money Records, Inc.,*
    394 F.3d 357 (5th Cir. 2004 .............................................................................. 16

*Rodriguez v. Riddell Sports, Inc.,*
    242 F.3d 567 (5th Cir. 2001) ............................................................................ 13

*Royal v. CCC & R Tres Arboles, LLC,*
    736 F.3d 39 (5th Cir. 2013) ................................................................................ 5

*Smith Int'l, Inc. v. Egle Grp., LLC,*
    490 F.3d 380 (5th Cir. 2007) ............................................................................ 14

*Southwest Airlines Co. v. BoardFirst, LLC,*
    No. 3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007).............. 15

*Specialties of Mex. Inc. v. Masterfoods USA,*
    2010 WL 2488031 (S.D. Tex. June 14, 2010)................................................. 24

*Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.,*
    553 F. Supp. 2d 680 (N.D. Tex. 2008) ............................................................ 17

*United States v. Reichert,*
    747 F.3d 445 (6th Cir. 2014) ............................................................................ 18

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001) ............................................................................. 18

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,*
    698 F.2d 786 (5th Cir. 1983) ............................................................................ 24

Plaintiffs DHI Group, Inc. ("DHI") and Rigzone.com, Inc. D/B/A Rigzone and Rigzone.com (collectively, "Rigzone" and together with DHI, "Plaintiffs") move for summary judgment on all of Oilpro's remaining counterclaims. As set forth below, under Federal Rule of Civil Procedure 56, Plaintiffs are entitled to judgment as a matter of law.

## I.     SUMMARY OF ARGUMENT

David Kent pled guilty and was incarcerated for hacking into the Rigzone Resume Database and stealing 796,000 resumes. Plaintiffs brought this lawsuit to seek compensation for the extensive damages David Kent caused by committing his criminal acts. In retaliation, Kent had Oilpro brought 11 counterclaims against Plaintiffs. The thrust of the active claims is simple: his crimes are not that different from the completely legal scraping Work Digital, Inc. did.

This is not the first time, however, Kent has tried to distract from his own misconduct by complaining about others' use of legal scraping methods. Kent first trotted out this argument in his Sentencing Memorandum to U.S. District Judge Denise Cote. In it, Kent wrote that "it is significant that DHI, in causing the government to initiate its investigation into Mr. Kent, failed to disclose its own similar misconduct directed at Oilpro."[1]

Kent's efforts to point the finger at DHI evidently bothered Judge Cote. At Kent's sentencing hearing, Judge Cote went out of her way to criticize Kent's misguided attempts to "create a false equivalence with respect to the [scraping of Oilpro] by

---

[1] D. Kent's Sentencing Memorandum (Ex. 1) at 17.

DHI."[2] "[Kent] assert[s] that the victim invaded Oilpro's computer system engaging by implication in the same activity that the defendant engaged in when he hacked Rigzone's computer system. *I don't think they are equivalent or the same*. And indeed, I don't know that anything that Rigzone did here or the victim did here was a violation of law but as I understand it, what happened was that public information on Oilpro's website was scraped. And it may have been a violation of the terms of use but as sadly, we know in this computerized age there are all kinds of scraping technologies out there that are used every day of the week by a variety of ventures and there are various ways that one tries to prevent your information being scraping. *But it is of an all together different kind of activity than the kind of hacking in which the defendant engaged.*"[3]  And Kent agrees. He has admitted that not only is scraping legal, but that "thousands of companies" do "exactly what we do."[4]

At least for his sentencing hearing, Kent took Judge Cote's words to heart. After hearing the above, Kent told the court that: "I'm deeply remorseful for my actions. With every fiber in my body I wish I could go back and change the actions that I took and the harm and pain that it's caused to other people. I ask for their forgiveness."[5]

Kent's "remorse" lasted just long enough to obtain a reduced sentence. But Kent's antics during the sentencing process pale in comparison to his conduct here. With his counterclaims, Kent seeks to bamboozle this Court into permitting him to present nine counterclaims premised on a profoundly disingenuous, if not downright

---

[2] Tr. of Oct. 6, 2017 Sentencing Hrng (Ex. 2) at 10:7-22.
[3] *Id.*
[4] Tr. of March 30, 2016 FBI Interview of D. Kent (Ex. 3) at 31:11-18.
[5] Ex. 2 at 31:1-4.

dishonest, factual assertion, in the hope that Defendants can confuse a jury. Specifically, Oilpro alleges that DHI "knowingly and intentionally" violated its Terms and Conditions ("T&Cs") by copying publicly available information on Oilpro's website "on or before June 16, 2015."

What Oilpro omits—and has gone to extraordinary lengths to conceal in its counterclaims as well as in its responses to Plaintiffs' various motions to dismiss these claims—is that the phrase "terms and conditions" was not referenced on Oilpro.com "on or before June 16, 2015," nor was there a link to the URL which purportedly displayed the T&Cs. Oilpro first included a reference and hyperlink to the "Terms and Conditions" page on or around September 5, 2015, which also just so happens to be three days after the T&Cs Oilpro attached to its counterclaims went into effect. In sum, Oilpro cannot show Plaintiffs knowingly violated Oilpro's T&Cs on or before June 16, 2015 because the terms and conditions were not even referenced, much less linked to, on the website.

To add to the confusion over who is to blame, Oilpro has not even sued the right entity for the conduct it complains of. The scraping that Oilpro alleges harmed it was done by Work Digital, Inc., a subsidiary of DHI, and not before the Court.

If the Court allows Defendants' counterclaims to proceed to a jury, Kent will use them to attempt to muddy the waters and distract from his own criminal misdeeds. If the doctrine of unclean hands has *any* teeth, Defendants should not be given that opportunity.

3

## II.    NATURE AND STAGE OF PROCEEDING

On June 10, 2016, DHI sued Kent, Oilpro, and others based on Defendants'
criminal conduct. On November 15, 2016, Oilpro filed its second amended answer and
counterclaims.[6] Oilpro asserted the following counterclaims: (1) computer fraud and
abuse in violation of 18 U.S.C. § 1080; (2) trespass to chattels; (3) breach of contract; (4)
violations of the Digital Millennium Copyright Act; (5) copyright infringement; (6)
misappropriation; (7) trademark infringement in violation of 15 U.S.C. § 1051; (8)
common–law trademark infringement; (9) harmful access by computer in violation of §
33.02 of the Texas Penal Code; (10) unjust enrichment; and (11) interference with
prospective business relations.

DHI moved to dismiss all of Oilpro's counterclaims.[7] Judge Johnson
recommended that the Court dismiss Count II (Trespass to Chattels) and Count X
(Unjust Enrichment) of Oilpro's counterclaims, but otherwise deny Plaintiffs' Motion to
Dismiss.[8] This Court agreed with Judge Johnson and dismissed Oilpro's trespass to
chattels and unjust enrichment claims, but nothing else.[9]

Almost a full year has passed since the Court allowed Oilpro to go forward with
the remainder of its counterclaims, yet Oilpro's allegations remain completely
unsupported by the evidence. There is *no* evidence in the record to support Oilpro's
remaining claims. Defendants thus are entitled to judgment as a matter of law on all of
Oilpro's remaining counterclaims.

---

[6] *See* ECF No. 63.
[7] *See* ECF No. 64.
[8] *See* ECF No. 102.
[9] *See* ECF No. 153.

### III.    STATEMENT OF ISSUES AND STANDARD FOR REVIEW

Whether Oilpro has enough evidence to support its remaining counterclaims to survive summary judgment.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine dispute of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R Tres Arboles, LLC*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Once the movant provides the basis of its motion and identifies the portions of the record that demonstrate the lack of a genuine issue of material fact, the burden is on the nonmovant to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts" and instead "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586–87 (citations omitted). "If the nonmoving party fails to meet this burden, the motion for summary

judgment *must* be granted." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc) (emphasis added).

## IV.    STATEMENT OF FACTS

The history of David Kent's and Oilpro's misconduct is set out fully in Plaintiffs' Motion for Summary Judgment on its Misappropriation of Trade Secrets Claim Against Oilpro. Briefly, David Kent founded Rigzone in 2000 and built it into the most important professional network in the energy space. In 2010, Kent sold Rigzone to DHI for $51 million.

Kent signed a non-compete that prevented him from competing directly with Rigzone for a short period after he resigned from Rigzone, but Kent still stirred up hype for Oilpro by displaying a countdown ticker on the website Oilpro.com tied to the expiration of the non-compete.[10] The second Kent's non-compete expired, Oilpro went live and Kent and Oilpro began competing with Rigzone.[11]

### A.    "Operation Resume Hoard."

To compete, Oilpro needed to grow Oilpro's resume database. As David Kent explained during his deposition, "resumes are [] an element that create value for the business line that we're in."[12] In an email about a potential acquisition target, Kent elaborated on the centrality of resumes to the prospects of a smaller competitor:

> They are going to reach a pivot point like Rigzone did where their growth takes off. I believe the pivot point is based on the number of resumes in

---

[10] D. Kent Dep. Tr. (Ex. 4) at 83:25-84:15.
[11] *Id*. at  17:8-10.
[12] *Id*. at 62:13-14.

their database. If they get to 200,000 plus then they are going to hockey stick and shoot through $1 [million]; [2] million, etc.[13]

To turbocharge the growth of its resume database, Kent launched "Operation Resume Hoard."[14] This "operation" is the first item on Kent's list of goals for Oilpro in 2014.[15] It involved Oilpro accessing the Rigzone, LinkedIn, Careerbuilder, and other competitors' resume databases and using a scraper to copy as many resumes as possible.[16] David Kent personally built the tool Oilpro used to scrape resumes from these sites.[17]

There was one major obstacle to this plan: the contents of Rigzone's Resume Database are not publicly available, and only paying subscribers can access the Resume Database.[18] Kent testified that he knew Rigzone would not sell Oilpro a subscription because Rigzone's Resume Database provided it a competitive advantage over Oilpro. In an attempt to circumvent Rigzone's policy, Kent paid a recruiter named Brad Smith to obtain a subscription that Oilpro would pay for and use without Rigzone's knowledge.[19] To obtain that subscription, Brad Smith *signed* a contract with Rigzone in which he expressly agreed not to use any automatic device or process to scrape resumes, which we now know Oilpro intended to do all along.[20]

---

[13] 5/13/2013 Email from David Kent to Joseph Triepke (Ex. 5) at Oilpro_0026477.
[14] SIOPCO Goals (Ex. 6) at Oilpro_0002647.
[15] *Id.*
[16] Dep. Ex. 18 (Ex. 7) at Oilpro_000705.
[17] 4/6/2015 Email from David Kent to Jeremy Antonini (Ex. 8).
[18] Ex. 4 at. 60:18-62:14.
[19] *Id.* at 61:20-62:14.
[20] Contract Between Rigzone and Brad Smith (Ex. 9).

**B.      Kent's Hacking, Arrest, and Guilty Plea.**

Kent, however, knew that his scraping operations would not yield the volume of resumes that he wanted and needed to drive Oilpro's growth, and resultant commercial value. He wanted and needed a rapid infusion of high quality resumes. Shortly after launching Oilpro, Kent began stealing resumes from the Rigzone Resume Database. Kent accomplished this by navigating to two administrative URLs that were known to only a handful of Rigzone insiders. Using his prior insider knowledge of the design of the Rigzone database as well as his knowledge of Rigzone's internal processes, Kent designed a computer program to steal hundreds of thousands of resumes.[21]

After stealing around 796,000 resumes from the Rigzone Resume Database, Kent tried to persuade DHI to purchase Oilpro. Given that growth is a driver of the commercial value of websites, Kent went out of his way to brag about Oilpro's rapid growth. Kent, of course, omitted the fact that much of Oilpro's growth was because of his repeated systematic theft of Rigzone's intellectual property.

In March of 2016, Kent was arrested and charged with crimes arising out of his hacking into Rigzone's Resume Database and theft of Rigzone's resumes. Kent ultimately pleaded guilty to fraud and related activity in connection with computers. At his plea hearing, Kent admitted: (1) that he "intentionally accessed without authorization the database of a website called Rigzone;"[22] (2) that he "circumvented the

---

[21] Ex. 4 at. 129:11-25.
[22] 12/19/16 Sentencing Plea Hearing Tr. (Ex. 10) at 12:24-13:4.

password protected features of the [Rigzone] website;"[23] and (3) that he "took the resumes for [his] own commercial advantage to help [his] business Oilpro."[24]

## C.    Kent's Retaliatory Counterclaims.

On June 16, 2016, Oilpro's largest outside investor—Jonathan Fairbanks— emailed Kent expressing frustration that he had been served with a subpoena related to this litigation.[25] Rather than apologize for involving Mr. Fairbanks in his criminal activity, Kent responded by bragging "*I have a countersuit I am considering with these guys. So let's coordinate. Dice will be the one shutting down.*"[26] Oilpro's counterclaims are clearly what Kent had in mind.

In the counterclaims, Kent accuses Plaintiffs of violating the same laws Kent has admitted violating. Oilpro alleges that "[o]n or before June 16, 2015, Counter-Defendants knowingly and intentionally circumvented the Technological Safeguards and other Oilpro security measures to use automated means to access the Oilpro website and improperly download data, member profiles, and other information from the Oilpro website" in violation of Oilpro's T&Cs.[27] According to Oilpro's Complaint, Oilpro's T&Cs state that users may not "[u]se automated means, including spiders, robots, crawlers, agents, or the like to download data from any database of Oilpro, or from the site itself."[28] As evidence of this, Oilpro cites a copy of a document titled

---

[23] *Id.* at 17:2-4. Kent quibbled about whether a password was necessary for the specific URLs through which he gained access were individually password protected, but acknowledged that he did not have a password for the Rigzone website. *Id.* at 17:5-20.
[24] *Id.* at 13:5-9.
[25] 8/16/16 Email From David Kent to Jonathan Fairbanks (Ex. 11).
[26] *Id.*
[27] ECF No. 63 at ¶ 27.
[28] *Id.*

"Oilpro T&Cs" that has a date stamp which states that it was "last updated" on September 2, 2015.[29]

**D.      Oilpro's T&Cs Did Not Appear on Oilpro.com or its Site Map Until After DHI's Alleged Scraping.**

Oilpro has produced no copy of T&Cs with a date suggesting that they were in effect at the time of the alleged scraping that is the basis of Oilpro's claims. Oilpro also has not produced *any* evidence to suggest that *any* T&Cs were *posted* on Oilpro's website at the time of the purportedly unlawful scraping. Indeed, Oilpro does not claim that, at the time of the allegedly actionable conduct, such T&Cs were posted on Oilpro.com, that there was a link to the T&Cs posted on Oilpro.com, or that there was *any* information on Oilpro.com that would tip a user off that *any* T&Cs even existed.[30] Oilpro's careful use of language and complete failure to explain how someone visiting Oilpro.com could find its T&Cs was not accidental. Using the "Wayback Machine," an archive of websites created by the non-profit Internet Archive, Plaintiffs discovered that Oilpro did not include *any* link or reference to T&Cs on its home page, the tabs available on its home page, or even on its Site Map on or before at least July 23, 2015:

---

[29] *Id.* at ¶¶ 12-13
[30] *Id.*



**OILPRO SITE MAP**

We've done our best to make the site look great while keeping it easy to navigate, but sometimes you just wanna get somewhere without all the flashiness. We hope that this page will help you get where you want to go in a hurry.

| Profiles | Companies | Answers | Jobs | Settings |
|---|---|---|---|---|
| Profiles | Companies | Recent Questions | Jobs | Update Email |
| Authors | Create a Company | Trending Questions | Recruiter Directory | Update Password |
| My Network | | Unanswered Questions | How it works | Email Settings |
| Build my Network | **Projects** | Ask a Question | | |
| Create a Profile | Projects | | **Recruiters** | **More** |
| Invite Others | Create a Project | **Links** | Recruiter | How Oilpro Works |
| My Settings | | Recent Links | Create a Job | About Us |
| | **Posts** | Trending Links | Recruitment Center | Contact Us |
| **Equipment** | Recent Posts | Submit a Link | Products and Pricing | Advertising |
| Equipment | Trending Posts | | Profile Search | Logos |
| Create Equipment | My Content | | | Privacy Policy |
| | Write a Post | | | Advisory Board |
| | | | | Twitter |
| | | | | Linkedin |

31

Then, on or around September 5, 2015, a link to T&Cs suddenly appeared on the Site Map page available through the "More/Sitemap" tab on Oilpro's website:



**OILPRO SITE MAP**

We've done our best to make the site look great while keeping it easy to navigate, but sometimes you just wanna get somewhere without all the flashiness. We hope that this page will help you get where you want to go in a hurry.

| Profiles | Companies | Answers | Jobs | Settings |
|---|---|---|---|---|
| Profiles | Companies | Recent Questions | Jobs | Update Email |
| Authors | Create a Company | Trending Questions | Recruiter Directory | Update Password |
| My Network | | Unanswered Questions | How it works | Email Settings |
| Build my Network | **Projects** | Ask a Question | | |
| Create a Profile | Projects | | **Recruiters** | **More** |
| Invite Others | Create a Project | **Links** | Recruiter | How Oilpro Works |
| My Settings | | Recent Links | Create a Job | About Us |
| | **Posts** | Trending Links | Recruitment Center | Contact Us |
| **Equipment** | Recent Posts | Submit a Link | Products and Pricing | Advertising |
| Equipment | Trending Posts | | Profile Search | Logos |
| Create Equipment | My Content | | | Privacy Policy |
| | Write a Post | | | Terms & Conditions |
| | | | | Advisory Board |
| | | | | Twitter |
| | | | | Linkedin |

32

Not coincidentally, the T&Cs Oilpro attached to its Second Amended Answer and Counterclaims are dated September 2, 2015.[33]

---

[31] https://web.archive.org/web/20150723043850/http://oilpro.com:80/sitemap.

[32] https://web.archive.org/web/20150905011639/http://oilpro.com:80/sitemap.

[33] ECF No. 63-1 at ¶ 6.

## V.      ARGUMENT AND AUTHORITIES

### A.      Oilpro's Filthy Hands Bar All of its Counterclaims.

"A party seeking an equitable remedy, like unjust enrichment, must do equity and come to court with clean hands.  The doctrine of unclean hands applies to a litigant whose own conduct in connection with the same matter has been unconscientious, unjust, marked by a want of good faith, or violates the principles of equity and righteous dealing. A party seeking to invoke this equitable doctrine must show that he has been seriously harmed and the wrong complained of cannot be corrected without applying the doctrine. An unclean hands defense is inapplicable where the plaintiff's actions do not affect or prejudice the defendant." *Compass Bank v. Villarreal*, No. CV L-10-08, 2012 WL 13046324, at *9 (S.D. Tex. Feb. 28, 2012).

There is no genuine issue of material fact about the applicability of Plaintiffs' unclean hands defense against all of Oilpro's remaining counterclaims. Plaintiffs are suing David Kent to recover damages caused by a crime David Kent has admitted he committed against Plaintiffs. Even setting aside David Kent's crimes against Rigzone, David Kent and Oilpro engaged in the very conduct for which Oilpro now seeks to recover against Plaintiffs, only on a far more extreme level. While DHI's subsidiary engaged in scraping of public information and provided a link back to Oilpro's website each time it republished anything from Oilpro.com,[34] Oilpro engaged in an elaborate scheme to obtain a subscription to Rigzone precisely because Oilpro knew Rigzone

---

[34] M. Durney Dep. Tr. (Ex. 12) at 64:9-14.

would not sell it a subscription.[35] Thereafter, David Kent personally built the scraper Oilpro used to violate that signed contract.[36]

If the Court permits Oilpro to take its counterclaims to the jury, Plaintiffs will have to waste time showing that David Kent is hypocrite. This will not be hard, but Plaintiffs are not suing David Kent for being a hypocrite, they are suing him for the *criminal acts* he committed against them. Plaintiffs should not have to play Kent's game, and the Court should bar his counterclaims because "[t]o aid a party [who has acted inequitably] would make th[e] court the abetter of iniquity." *Petro Franchise Sys., LLC v. All Am. Properties, Inc.*, 607 F. Supp. 2d 781 (W.D. Tex. 2009).

## B.     Oilpro has Sued the Wrong Parties.

The conduct complained of by Oilpro, the scraping of Oilpro data, was not done by Plaintiffs, rather it was done by Work Digital, Inc., a subsidiary of DHI.[37] "'Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances.'" *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 577 (5th Cir. 2001) (*quoting Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1985) (finding that the parent company was not liable for the conduct of its subsidiary); *see also American Eagle Ins. Co. v. United Technologies Corp.*, 48 F.3d 142, 147 (5th Cir. 1995) ("Generally, there is no vicarious liability under Texas law if the parent

---

[35] *Id.* at 61:20-62:14.
[36] *See* Ex. 8.
[37] P. Chana Dep. Tr. (Ex. 13) at 27:25-28:3; 30:8-15; 56:2-6.

and the subsidiary corporations are entirely separate legal entities and there is no showing of fraud."). Accordingly, since the conduct complained of was not done by a party before the Court, rather by a subsidiary, all of Oilpro's counterclaims arising out of the scraping allegations should fail.

**C.      Oilpro's Counterclaims Fail.**

    **1.      Breach of Contract.**

Oilpro's breach of contract claim is based on an alleged violation of its T&Cs. To prevail on its breach-of-contract claim, Oilpro must prove "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

In its response to Plaintiffs' Motion to Dismiss, Oilpro argued that it need not show that DHI was a member of the website or affirmatively viewed the T&Cs or even that the T&Cs were prominent on the website. According to Oilpro, a browsewrap contract is binding when a website user has actual or constructive knowledge of a site's T&Cs prior to using the site.[38] And this Court ruled that "the allegations that DHI knew or should have known about *the browsewrap agreement* because it uses a similar agreement on its own site are sufficient to state a plausible claim for relief."[39]

---

[38] *See generally* ECF No. 72.
[39] ECF No. 153.

The term "browsewrap agreement," however, has a specific meaning. In *Southwest Airlines Co. v. BoardFirst, LLC*, previously relied upon by Defendants, the court declared "they involve a situation where a notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." No. 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007); *see also Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) ("'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen."). In other words, there is no such thing as a "secret" browsewrap agreement. Thus, as noted above, Oilpro did not have a "browsewrap agreement" on its website until nearly three months after Plaintiffs' alleged scraping.

Oilpro's breach-of-contract claim must fail because the record lacks evidence that a "browsewrap agreement" existed on Oilpro's website until on or around September 5, 2015—three months after Plaintiffs' alleged access and breach. Plaintiffs cannot breach an agreement that did not exist.

## 2.    Copyright Infringement.

To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are copyrightable. *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994) *supplemented,* 46 F.3d 408 (5th Cir. 1995). The first element, copyright ownership, is shown by (a) "proof of originality and copyrightability in the work as a whole" and (b) "compliance with applicable statutory formalities." *Id.* "To establish

actionable copying (i.e., the second element), a plaintiff must prove: [a] factual copying and [b] substantial similarity." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154 (2010). Factual copying may be established by direct evidence of copying, or it may be inferred from proof of access to the copyrighted work and "probative similarity" between the two works. *Id.* at 368. Substantial similarity is established by proof that the defendant's copying was legally actionable, that the defendant's work is substantially similar to protectable aspects of the original. *See Nola Spice Designs, LLC v. Haydel Enter.s, Inc.,* 783 F.3d 527, 550 (5th Cir. 2015).

Moreover, the copyright claim is further evidence that Defendants' counterclaims are merely a litigation tactic in an attempt to confuse the jury. Plaintiffs filed their original complaint on June 10, 2016. At that time, Oilpro did not have a copyright because as noted in Oilpro's copyright registration, filed by the same law firm currently representing Defendants, Oilpro's "date of first publication" was July 25, 2016, and the effective date of the copyright was October 12, 2016.[40]

### a.    No Evidence of Substantial Similarity.

The Fifth Circuit has held that "law of this circuit *prohibits* finding copyright infringement without a *side-by-side comparison* of the two works." *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003). For this reason, the Fifth Circuit has repeatedly held that a plaintiff's failure to produce evidence to allow for the comparison of the

---

[40] ECF No. 63-2.

allegedly infringing work and the original work is fatal as a matter of law *even where there is testimonial evidence of direct copying*. *Id.* (emphasis added).

Oilpro has not identified, much less produced, a copy of the "entire website" that they allege Plaintiffs copied and published "on their own website." Indeed, Plaintiffs *still* do not know what copyrighted work they purportedly copied or where and when they reproduced it. Oilpro has produced no photographs of the alleged copyright-protected information or specifically describe the works that it alleges Plaintiffs have acquired, nor does it provide the URL or name of the infringed or infringing works.

Thus, binding Fifth Circuit precedent requires this Court to dismiss Oilpro's breach of copyright claim with prejudice. *Bridgmon*, 325 F.3d at 577; *King v. Ames*, 179 F.3d 370, 375–76 (5th Cir. 1999) (summary judgment mandatory where plaintiff failed to produce original copied work for comparison).

### b. The "Whole Oilpro Website" Is Not Copyrightable.

Even if Oilpro had produced a copy of the "whole Oilpro website," its claim would still fail because it is not copyrightable. Even though "a website may well contain copyrightable elements, . . . [the website itself] is not registrable." *Darden v. Peters*, 488 F.3d 277, 288 (4th Cir. 2007); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 700 (N.D. Tex. 2008) ("[T]he whole of the copyrighted work is the apparel webpage, not the entire website.").

Because Oilpro has not produced the allegedly copied work, and because Oilpro's entire website is not copyrightable, Plaintiffs are entitled to summary judgment on Defendants' Copyright Infringement claim.

3.      **Digital Millennium Copyright Act Claim.**

Oilpro's DMCA claim also fails. "The DMCA's anti-circumvention provision states, 'No person shall circumvent a technological measure that effectively controls access to a work protected under this title.'" *MGE UPS Sys., Inc. v. GE Consumer & Indus.*, 622 F.3d 361, 365 (5th Cir. 2010) (quoting 17 U.S.C. § 1201(a)(1)(A)).

As explained above, the information that Oilpro contends that Plaintiffs accessed is not even subject to copyright. There can thus be no violation of the DMCA. *See United States v. Reichert*, 747 F.3d 445, 448 (6th Cir. 2014) ("[T]he DMCA 'targets the *circumvention* of digital walls *guarding copyrighted material* (and trafficking in circumvention tools) . . .'") (second emphasis added); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001); *see also MGE UPS Sys.*, 622 F.3d at 366.

Even if that were not the case, however, Oilpro still does not offer any evidence that would plausibly satisfy either of the two key elements of its DMCA claim—namely, (1) that, at the time of the alleged copying, Oilpro effectively controlled access to the information that it claims was copied, and (2) that Plaintiffs circumvented any access control measure to access that information. The allegedly infringed works were all available for access and copying on publicly-accessible pages of Oilpro's website.[41]

a.      **No Effective Access Control Measures Were in Place at the Time of the Alleged Access.**

To "effectively control[] access to a work," a technological measure must, "in the ordinary course of its operation, require[] the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17

---

[41] *See* ECF. No. 34, Countercl. ¶ 17.

U.S.C. § 1201(a)(3)(B) (2008); *MGE UPS Sys.*, 622 F.3d at 365–66. Because the statute refers to "control[ling] access to a work protected under this title," it does not naturally apply when the "work protected under this title" is otherwise accessible. *Id.*

The "data and information" that Plaintiffs are alleged to have downloaded from Oilpro's website was not even partially protected by an access control measure at the time of the alleged access. Indeed, at the time of the alleged access by Plaintiffs, Oilpro left the ability to access that information through search engines, crawlers, and other means open to the public, including Plaintiffs.[42]

Because Oilpro has no evidence that supports its claim that a technological control measure was in place at the time of the alleged copying, as required by the DMCA, its DMCA claim must be dismissed with prejudice.

### b. Oilpro Fails to Allege Any Plausible Facts to Show that Plaintiffs Circumvented Any Technological Measure.

To "'circumvent a technological control measure'" means 'to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner.'" *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 945 (9th Cir. 2010) (quoting 17 U.S.C. § 1201(a)(3)(A)).

For the same reasons stated above, Plaintiffs would have had no need to circumvent any technological measure to access any allegedly infringed works—the

---

[42] *See,* e.g., ECF No. 34, Countercl. ¶ 17 (conceding that, even today, Oilpro's website can be accessed by the public through search engines and by "some webcrawlers").

Oilpro website was open to the public and could be accessed through search engines.[43] Although Oilpro's counterclaim alleges that Oilpro *currently* employs certain technological measures to protect its computers and servers,[44] Plaintiffs have offered no proof that *any* such measures were in place at the time of Plaintiffs' alleged access. Moreover, such measures, even if they existed, merely affected potential mechanisms used to obtain the work, not to restrict public access to the work.

There is also no evidence that Plaintiffs did *anything* to alter or circumvent a control measure to access Oilpro's purported copyrights. To the contrary, Princepreet Chana (Plaintiffs' 30(b)(6) witness on scraping) explicitly testified that he had personal knowledge about the alleged scraping, and that neither DHI nor Work Digital intended to or in fact did intentionally circumvent *any* technology safeguard or security measure.[45] Oilpro's lawyer did not like this answer, so he demanded to know whether Chana had personal knowledge of whether DHI *bypassed* Oilpro's technological safeguards.[46] Chana responded "I have knowledge and confirm that DHI did not."[47]

### 4.     Computer Fraud and Abuse Act.

The Computer Fraud and Abuse Act makes it a crime to "intentionally access[] a computer without authorization or exceed[] authorization, and thereby obtain[] information from any protected computer if the conduct involved interstate or foreign communication[.]" 18 U.S.C. § 1030(a)(2)(C).

---

[43] *See* ECF No. 34, Countercl. at ¶ 17.
[44] *Id.* at ¶ 41.
[45] Ex. 13 at 24:12-25:9.
[46] *Id.* at  25:10-12.
[47] *Id.* 25:13-14.

Oilpro's Computer Fraud and Abuse Act claim is premised on its assertion that "Plaintiffs knowingly exceeded authorized access through the scraping of data in violation of Oilpro's T&Cs."[48] However, the alleged violation of Oilpro's Terms and Conditions is conditioned on violating Oilpro's "browsewrap agreement." As discussed above, Oilpro's "browsewrap agreement" was not created until after Plaintiffs' alleged scraping, thus Plaintiffs did not exceed authorized access to Oilpro's public website.

### 5.   Harmful Access by Computer.

Under Texas Civil Practice and Remedies Code § 143.001, "[a] person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code, has a civil cause of action if the conduct constituting the violation was committed knowingly or intentionally." TEX. CIV. PRAC. & REM. CODE § 143.001. Texas Penal Code § 33.02 provides: "A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner." TEX. PENAL CODE § 33.02(a).

This Court previously denied Plaintiffs' Motion to Dismiss Oilpro's Harmful Access by Computer claim "because Oilpro has provided factual allegations that Plaintiffs knowingly violated the T&Cs of Oilpro's website by their conduct."[49] This claim is also conditioned on violating Oilpro's "browsewrap agreement," and as demonstrated above, it was not created until after Plaintiffs' alleged scraping thus Plaintiffs did "not knowingly violate[] the T&Cs."

---

[48] ECF No. 102 at 20.
[49] ECF 102 at 22.

6.      **Misappropriation.**

The elements of a cause of action for unfair competition by misappropriation under Texas law include "(1) the creation of plaintiff's product through extensive time, labor, skill, and money; (2) the defendant's use of the product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a 'free ride') because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 839 (5th Cir. 2004) (*quoting U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App.—Waco 1993, writ denied); *see also Orthoflex v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 784 (N.D. Tex. 2013).

"In its second amended counterclaim, Oilpro alleges that it invested time, skills, and money into its website, computer systems, and website content that Plaintiffs *wrongfully* accessed."[50] Oilpro's allegation that Plaintiffs *wrongfully* accessed its publicly available information is based on the unfounded assertion that Plaintiffs knew Oilpro's T&Cs prohibited Plaintiffs from copying the publicly available information. As shown above, there were no T&Cs referenced or linked to on the website, so Plaintiffs cannot have knowingly violated them. Nor could Plaintiffs have had constructive knowledge that nearly three months after the alleged scraping, Oilpro would reference or link to T&Cs on the website. For this reason, Plaintiffs are entitled to summary judgment.

---

[50] ECF 102 at 22 (emphasis added).

7.      **Trademark Infringement (Lanham and Texas Common Law).**

Oilpro alleges that when Plaintiffs republished information scraped from Oilpro's website on DHI Open Web, Plaintiffs included the Oilpro Design Mark, causing "confusion as to whether Oilpro authorized or sponsored the content provided on the DHI Open Web Website."[51] Oilpro also alleges that Plaintiffs violated federal and Texas law by using the Oilpro Design Mark, which was "likely to cause confusion, mistake, or to deceive the public as to the affiliation, connection, or association between [Plaintiffs] on the one hand and [Oilpro] on the other."[52]

"To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion." *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

Oilpro offers *no* evidence that there is a likelihood of confusion. Plaintiffs have not retained an expert on this issue, so they cannot and will not present survey evidence. Nor have they identified a single person who confused, or in any way affiliated, connected, or associated Oilpro with DHI or Rigzone because Plaintiffs used Oilpro's mark to identify the source of the information as Oilpro.   Since likelihood of confusion is an element of both of Oilpro's claims for trademark infringement, both should be dismissed with prejudice.

Moreover, even if Oilpro could show confusion, the doctrine of "fair use" requires dismissal of the claims. When the allegedly infringing trademark is 'used fairly

---

[51] ECF No. 63, Oilpro's 2nd Am. Countercl. at 31.
[52] *Id.* at 37.

and in good faith only to describe to users the goods or services of a party, or their geographic origin,'. . . a defendant in a trademark infringement action may assert the 'fair use defense.'" *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 791 (5th Cir. 1983) (citing 15 U.S.C. § 1115(b)(4)), *abrogated on other grounds by KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111 (2004).

The evidence establishes that DHI used the Oilpro trademark *to identify Oilpro as the source* of the copied information and linked back to the location of the information on Oilpro's website.[53] As DHI President Mike Durney testified, DHI used the Oilpro trademark "to refer people back to the Oilpro site."[54] This is the embodiment of fair use, and to deny Plaintiffs' Motion on this Count would encourage content aggregators *not* to credit the source of the information they aggregate.

## 8. Tortious Interference with Prospective Business Relations.

To establish this claim, a plaintiff must prove: (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did that act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Specialties of Mex. Inc. v. Masterfoods USA,* Civil Action No. L–09–88, 2010 WL 2488031, at *10 (S.D. Tex. June 14, 2010).

---

[53] Ex. 12 at 64:9-14.

[54] *Id.*

Oilpro has not offered evidence of a single customer with whom it believes it might have done business, but for an independently tortious or unlawful act by Plaintiffs, nor has Oilpro offered any evidence that Plaintiffs acted with a conscious desire to prevent this undefined relationship with the undefined customer. In sum, Oilpro lacks proof of every element of this claim.

## VI.     CONCLUSION

For the reasons set forth above, Plaintiffs request that the Court enter summary judgment in their favor and against Kent and Oilpro on all of Oilpro's remaining counterclaims.

Respectfully submitted,

**JORDAN, LYNCH & CANCIENNE PLLC**

By: _s/ Walter Lynch_
    **Walter Lynch**
    State Bar No. 24046330
    Federal ID No. 965265
    **Amir Halevy**
    State Bar No. 24065356
    Federal ID No. 1259956
    **Joseph ("Jeb") W. Golinkin II**
    State Bar No. 24087596
    Federal ID No. 2515657
    1980 Post Oak Blvd., Ste. 2300
    Houston, Texas 77056
    713-955-4020 (Telephone)
    713-955-9644 (Fax)
    wlynch@jlcfirm.com
    ahalevy@jlcfirm.com
    jgolinkin@jlcfirm.com

    ATTORNEYS FOR PLAINTIFFS DHI GROUP, INC. F/K/A DICE HOLDINGS, INC. AND RIGZONE.COM, INC.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document has been served by ECF on all counsel of record on this 12th day of October, 2019.

*/s/ Jeb Golinkin*
Jeb Golinkin