**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| DHI Group, Inc. f/k/a Dice Holdings Inc. and RIGZONE.com, Inc., <br>             Plaintiffs, <br><br> vs. <br><br> David W. Kent, Jr., Single Integrated Operations Portal, Inc. d/b/a Oilpro, et al., <br>             Defendants. | Civil Action Number: 16-cv-01670 |
| Single Integrated Operations Portal, Inc. d/b/a Oilpro and OILPRO.com, <br>             Counter-Plaintiff, <br><br> vs. <br><br> DHI Group, Inc. f/k/a Dice Holdings Inc. and RIGZONE.com, Inc., <br>             Counter-Defendants. | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

FOLEY GARDERE
FOLEY & LARDNER LLP

James G. Munisteri
Texas Bar No. 14667380
Marla T. Poirot
Texas Bar No. 00794736
1000 Louisiana, Suite 2000
Houston, Texas 77002-2099
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
mpoirot@foley.com

Sara Ann Brown
Texas Bar No. 24075773
2021 McKinney, Suite 1600
Dallas, Texas 75201-3340
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
sabrown@foley.com

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................. 2

TABLE OF AUTHORITIES ........................................................... 4

UNDISPUTED BACKGROUND FACTS ........................................ 8

    A.    Rigzone and Oilpro. .................................................... 8

    B.    The First Access. ......................................................... 9

    C.    The Second Access. ..................................................... 9

    D.    Neither Access Caused Damage. ............................... 10

SUMMARY OF THE ARGUMENT ............................................. 12

ARGUMENTS AND AUTHORITIES .......................................... 13

    A.    TUTSA Preempts Plaintiffs' State Law Claims, Which Also Lacks Merit. ....................................................... 13

        1.    TUTSA. .......................................................... 13

        2.    Common-Law Misappropriation. ................... 16

        3.    TTLA. ............................................................ 18

        4.    Fiduciary Duty. ............................................. 19

            a.    Kent Disclosed No Trade Secrets Gained During Employment. ................... 19

            b.    Kent Owed No Duty To Disclose the Website Functions. ................................... 20

    B.    Plaintiffs' TUTSA Claim Lacks Merit Because Resumes Do Not Qualify as a "Trade Secret" and Plaintiffs Suffered No Damages In Any Event. ........... 22

        1.    The Resumes Are Not Plaintiffs' Trade Secret. .......................................................... 23

            a.    The Rigzone Resume Collection Is Not a Trade Secret Compilation. ................. 23

            b.    Rigzone Took No Measures To Keep the Resumes Secret. ....................................... 28

        2.    Plaintiffs' "Internet Search Techniques" Are Not A Trade Secret. .................................... 34

        3.    Google Analytics Data Is Not A Trade Secret. .......................................................... 35

        4.    Oilpro's Access Caused No Damage. ............ 36

C.     The SCA Does Not Apply. ................................................................ 37

D.     RICO Does Not Apply. .................................................................... 40

    1.     No RICO pattern. .................................................................... 40

    2.     No RICO Injury or RICO Standing. ........................................ 42

        a.     No injury from "various communications" or
            Google Analytics. ....................................................... 42

        b.     HTTP requests caused no RICO injury. ...................... 43

E.     Plaintiffs have no damages. ............................................................. 48

    1.     Kent's $3.29 Million Restitution Offsets Any Claimed
       Damage. ................................................................................... 48

    2.     CFAA. ...................................................................................... 49

    3.     THACA ..................................................................................... 53

F.     Limitations Bars Plaintiffs' Claims Based On the First Access. .......... 54

CONCLUSION ............................................................................................... 55

CERTIIFCATE OF SERVICE .......................................................................... 55

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*A.M. Castle & Co. v. Byrne,*
123 F. Supp. 3d 895 (S.D. Tex. 2015) ...................................................... 20

*Aetna, Inc. v. Fluegel,*
CV074033345S, 2008 WL 544504 (Conn. Super. Ct. Feb. 7, 2008) ................................ 29, 30

*Am. Paper & Packaging Products, Inc. v. Kirgan,*
183 Cal. App. 3d 1318 (Ct. App. 1986)................................................... 22

*AMID, Inc. v. Medic Alert Found. U.S., Inc.,*
241 F. Supp. 3d 788 (S.D. Tex. 2017) ...................................................... 12

*Baxter & Associates, L.L.C. v. D & D Elevators, Inc.,*
05-16-00330-CV, 2017 WL 604043 (Tex. App.—Dallas Feb. 15, 2017, no pet.)................... 27

*Big Vision Private Ltd. V. E.I. DuPont De Nemours & Co.,*
1 F. Supp. 3d 224 (S.D.N.Y. 2014) ...................................................... 20

*Brigham Young Univ. v. Pfizer, Inc.,*
861 F. Supp. 2d 1320 (D. Utah 2012)................................................... 21

*Calisi v. Unified Fin. Services*, LLC,
232 Ariz. 103, 108, 302 P.3d 628, (Ct. App. 2013)................................... 24

*Civil Center Motors, Ltd. v. Mason Street Import Cars, Ltd.,*
387 F. Supp. 2d 378 (S.D.N.Y. 2005).................................................. 49

*Conry v. Daugherty,*
CIV.A. 10-4599, 2011 WL 4807892 (E.D. La. Oct. 11, 2011) ............................... 39

*Daboub v. Gibbons,*
42 F.3d 285 (5th Cir. 1995) ........................................................ 51

*Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc.,*
616 F. Supp. 2d 805 (N.D. Ill. 2009) ...................................................... 49

*Embarcadero Techs., Inc. v. Redgate Software, Inc.,*
1:17-CV-444-RP, 2018 WL 315753 (W.D. Tex. Jan. 5, 2018)................................ 11

*Garcia v. City of Laredo, Tex.,*
702 F.3d 788, 793 (5th Cir. 2012) ...................................................... 35

*Gen. Insulation Co. v. King,*
14-08-00633-CV, 2010 WL 307952.............................................. 20, 30

| Cases | Page(s) |
|---|---|

*Gilmore v. Sammons,*
   269 S.W. 861 (Tex. Civ. App. 1925) ............................................... 15

*Holmes v. Sec. Investor Protection Corp.,*
   503 U.S. 258 (1992) ...................................................................... 37

*Hughes v. Tobacco Inst., Inc.,*
   278 F.3d 417 (5th Cir. 2001) ......................................................... 37

*In re Harwood,*
   637 F.3d 615 (5th Cir. 2011). ........................................................ 17

*In re Simons Broad., LP,*
   CIV. W-11-CA-172, 2013 WL 9542015 (W.D. Tex. Nov. 19, 2013) ...................... 16

*Jackson v. Hammer,*
   274 Ill. App. 3d 59, 653 N.E.2d 809 (1995) .................................... 26

*Knit With v. Knitting Fever, Inc.,*
   CIV.A. 08-4221, 2012 WL 2938992 (E.D. Pa. July 19, 2012) ................ 42

*L-3 Communications Westwood Corp. v. Robicharux,*
   CIVA 06-0279, 2007 WL 756528 (E.D. La. Mar. 8, 2007) .................... 50

*Lau v. Reeder,*
   05-14-01459-CV, 2016 WL 4371813 .............................................. 51

*Mattel, Inc. v. MGA Entm't, Inc.,*
   782 F. Supp. 2d 911 (C.D. Cal. 2011) ........................................... 41

*Matter of Mandel,*
   720 Fed. Appx. 186 (5th Cir. 2018) .............................................. 34

*Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.,*
   579 F.3d 319 (3d Cir. 2009) ..................................................... 28, 29

*Numed, Inc. v. McNutt,*
   724 S.W.2d 432 (Tex. App.—Fort Worth 1987, no writ) .................... 27

*Ozburn-Hessey Logistics, LLC v. 721 Logistics,*
   *LLC*, 13 F. Supp. 3d 465 (E.D. Pa. 2014) .................................... 21

*Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.,*
   202 S.W.3d 250 (Tex. App.—Corpus Christi 2006, pet. denied) .......... 18

*Sandwich Chef of Tex., Inc. v. Reliance Nat. Indem. Ins. Co.,*
   319 F.3d 205 (5th Cir. 2003) ..................................................... 38

| Cases | Page(s) |
|---|---|

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ........................................................................... 39

*Sharma v. Vinmar Intern., Ltd.,*
  231 S.W.3d 405 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ............................ 29, 30, 31

*Sisoian v. Int'l Bus. Machs. Corp.*
  A-14-CA-565-SS, 2014 WL 4161577 (W.D. Tex. Aug. 18, 2014) ......................................... 17

*Snapt, Inc. v. Ellipse Commc'ns., Inc.,*
  No. 3-09-CV-0661-O, 2010 WL 11542003 (N.D. Tex. Aug. 10, 2010) ................................ 50

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
  3:16-CV-545, 2018 WL 1796293 (E.D. Va. Apr. 16, 2018) ................................... 12

*Super Starr Int'l, LLC v. Fresh Tex Produce, LLC,*
  531 S.W.3d 829 (Tex. App. 2017—Corpus Christi, no pet. h.) ................................ 12

*Sw. Airlines Co. v. BoardFirst, L.L.C.,*
  No. 3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) .................................... 50

*The Knit With v. Knitting Fever, Inc.,*
  625 Fed. Appx. 27 (3d Cir. 2015) ............................................................ 42

*T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.,*
  965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) ...................................... 18

*Uhlig LLC v. Shirley,*
  6:08-CV-01208-JMC, 2012 WL 2923242 (D.S.C. July 17, 2012) ........................................... 25

*United States v. Langley,*
  No. CIV.A.08-495-JJB-CN, 2009 WL 306733 (M.D. La. Feb. 9, 2009) ................................ 46

*United States v. Nosal,*
  844 F.3d 1024 (9th Cir. 2016) ...................................................... 21, 22

*United States Sporting Prod., Inc. v. Johnny Stewart Game Calls, Inc.*
  865 S.W.2d 214 (Tex. App.—Waco 1993), *writ denied* (Mar. 30, 1994) ................................ 14

*Univ. Computing Co. v. Lykes-Youngstown Corp.,*
  504 F.2d 518 (5th Cir. 1974) .................................................... 33, 34

*W. Tex. Nat. Bank v. FEC Holdings, LP,*
  MO-11-CV-086, 2013 WL 2158658 (W.D. Tex. May 17, 2013) ...................................... 38, 39

*Wellogix, Inc. v. Accenture, L.L.P.,*
  716 F.3d 867 (5th Cir. 2013) .................................................... 34

**Cases**                                                                                                           **Page(s)**

*Whelan v. Winchester Prod. Co.,*
  319 F.3d 225 (5th Cir. 2003) ........................................................................... 37

*Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,*
  90 F.3d 118 (5th Cir. 1996) ............................................................................ 38

*Zervas v. Faulkner,*
  861 F.2d 823 (5th Cir. 1988) ........................................................................... 39

**Statutes**

18 U.S.C. § 1030(g) ............................................................................................ 51

18 U.S.C. § 2707(f) ............................................................................................. 51

TEX. CIV. PRAC. & REM. CODE § 134A.007(a) ................................................... 11, 13

TEX. CIV. PRAC. & REM. CODE § 134A.007(b)(2) .................................................. 13

TEX. CIV. PRAC. & REM. CODE 143.001(b) ........................................................... 51

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002 ..................................... 20, 26, 32, 33

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6)..................................... 20, 32, 33

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.004 .................................................. 34

TEX. CIV. PRAC. & REM. CODE ANN. § 143.001 ..................................................... 50

TEX. CIV. PRAC. & REM. CODE ANN. §§ 134A.002(1),(3), (6) & 134A.004(a) ........... 20

TEX. CIV. PRAC. REM. CODE ANN. § 143.001 ........................................................ 50

Defendants David W. Kent, Jr. ("Kent") and Single Integrated Operations Portal, Inc. d/b/a Oilpro and Oilpro.com ("Oilpro" and, collectively with Kent, "Defendants") move for summary judgment on all claims asserted by Plaintiffs DHI Group, Inc. f/k/a Dice Holdings Inc. ("DHI") and RIGZONE.com, Inc. ("Rigzone" and, collectively with DHI, "Plaintiffs").

## UNDISPUTED BACKGROUND FACTS

### A.    Rigzone and Oilpro.

DHI purchased Rigzone from Kent in August 2010.[1] Rigzone is a website primarily used by professionals in the oil and gas industry to search for jobs. Rigzone provides news, a company directory, oil and gas events, an equipment marketplace, and a job board.[2] As part of the Rigzone website, candidates searching for jobs upload their resumes to Rigzone.[3] Under the terms of the Rigzone sale, Kent had a two-year non-compete along with a condition that he work one year for DHI.[4] Kent resigned from Rigzone on October 1, 2011.[5] Thereafter, Kent abided by his non-compete and launched Oilpro on October 1, 2013.[6] Oilpro was a social media platform modeled after LinkedIn that allowed oil and gas professionals to network with other professionals and share posts about the industry. Oilpro was much more than a job board—it was a social media platform specifically for the oil and gas industry.

---

[1]    Ex. H-1 [Closing Documents Acquisition of Rigzone.com, Inc.] at DHI_0000918.

[2]    Ex. H [Declaration of David W. Kent, Jr.] ¶2.

[3]    Ex. H [Declaration of David W. Kent, Jr.] ¶2.

[4]    Ex. H [Declaration of David W. Kent, Jr.] ¶3.

[5]    Ex. H-2 [Employment Agreement] at DHI_0000978.

[6]    Ex. H [Declaration of David W. Kent, Jr.] ¶3.

**B.     The First Access.**

In late 2013 and early 2014, Kent obtained some of Rigzone's resumes through an open uniform resource locator ("URL"), known colloquially as a "web address."[7] The publicly reachable URL, www.rigzone.com/jobs/resume.asp, allowed Kent to access a web page and download the requested resumes.[8] By using this URL, Kent downloaded resumes of Rigzone members on eight separate days (collectively, the "First Access").[9] The web page Kent accessed did not (1) use encryption, (2) contain a warning banner, (3) contain warning messages or login prompts, or (4) use a security firewall.[10] After realizing that Rigzone's information had been accessed,[11] DHI contacted the FBI in May 2014.[12] DHI told the FBI that it believed Oilpro was responsible.[13]

**C.     The Second Access.**

Over a year later, on June 16, 2015, Kent accessed resumes on Rigzone's website using a software feature that downloaded resumes automatically (the "Second Access").[14] This involved another publicly reachable web page: www.rigzone.com/jobs/resumes/resume_writer.asp.[15] The Second Access occurred in June and July 2015.[16] Again, this web page did not (1) use

---

[7]   Ex. B-14 [Mandiant Report] at 3.

[8]   Ex. B-14 [Mandiant Report] at 3; Ex. H [Declaration of David W. Kent, Jr.].

[9]   Ex. B-14 [Mandiant Report] at 8.

[10]   Ex. H [Declaration of David W. Kent, Jr.] at ¶ 6

[11]   Ex. E-1 [Email String with Robin Wall] at DHI_0000548.

[12]   Ex. B [Deposition of Jason Braddy] at 9:22-10:12.

[13]   Ex. E-3 [Holland & Knight Email to DOJ] at DHI_0000550.

[14]   Ex. J-52 [Confluence Timeline] at DHI_0024616.

[15]   Ex. J-52 [Confluence Timeline] at DHI_0024616.

[16]   Ex. N-3 [Expert Report of Trent Livingston] at 4 ¶8.

encryption, (2) contain a warning banner, (3) contain warning messages or login prompts, or (4) use a firewall.[17]

On March 31, 2016, Kent was arrested in connection with the First and Second Access. While Kent had contested whether this type access met all the elements of the Computer Fraud and Abuse Act ("CFAA") charge against him, on December 19, 2016, Kent accepted responsibility and pleaded  guilty to a CFAA violation. As a part of resolving the criminal case, Kent paid $3,292,800 to DHI in restitution and agreed to a separate $2,932,800 forfeiture.[18] This agreement took place before depositions in this civil suit revealed that Plaintiffs wildly exaggerated their losses to the government.[19]

**D.      Neither Access Caused Damage.**

First, Plaintiffs' disclosures refer to a variety of different damages, but then state that "[t]hese damage models will be calculated and supported by Plaintiffs' expert witness(es) who will be designated by the date set in the Court's scheduling order (May 22, 2017) and will be based on documents and information on Plaintiffs' business, Defendants' business and financial information, and/or industry data."[20] Plaintiffs' damages expert, Shane Johnson ("Johnson"), outlined two different theories.[21] Neither theory provides a basis under which Plaintiffs can recover based on any of the 19 claims they allege.[22] Johnson's first theory estimates the entire

---

[17]   Ex. H [Declaration of David W. Kent, Jr.] ¶¶6-7.

[18]   Ex. N-2 [Judgment in a Criminal Case].

[19]   Ex. L [Deposition of John Roberts] at 215:14-216:09.

[20]   Ex. N-5 [Plaintiffs' Initial Disclosures] ¶3.

[21]   Ex. G-1 [Expert Report of Shane Johnson] at 2 ¶6.

[22]   Plaintiffs have agreed to dismiss certain claims. Plaintiffs' remaining claims include 12 causes of action against Kent and Oilpro, including: (1 – 3) three counts under the CFAA; (4) violation of the Stored Wire and Electronic Communications and Transactional records Access Act ("SCA"); (5 – 7) three counts under the

value of the accessed information.[23] As discussed below, such damages are not recoverable and are offset by the $3,292,800 Kent paid Plaintiffs in restitution. Johnson's second theory is a purported unjust enrichment theory that is also improper.[24]

The testimony of Constance Melrose ("Melrose"), Plaintiffs' corporate representative on damages, Michael Durney ("Durney"), Plaintiffs' CEO, and John Roberts ("Roberts"), Plaintiffs' CFO, confirms the absence of damages. As the corporate representative, Melrose testified that she could not identify: (1) a customer who failed to renew or changed its subscription; (2) any disruption or interruption of services; (3) any damage to the website; (4) any corruption of data; or (5) any alteration of data.[25] Durney and Roberts confirmed the same.[26] Melrose further testified about Exhibit 2, which describes expenses that all concern aiding the criminal prosecution and are simply not recoverable.[27]

Plaintiffs allege that Estevan Dufrin—not Kent—accessed Rigzone's "Google Analytics" data in January 2015, using the username and password that had not changed since his departure from Rigzone.[28] According to Plaintiffs' complaint, the Google Analytics data is a collection of statistics about a particular website, including "(1) number of visits to the website, (2) number of

---

Racketeer Influenced and Corrupt Organizations Act ("RICO"); (8) Texas Uniform Trade Secrets Act ("TUTSA"); (9) common law misappropriation of confidential information; (10) Texas Harmful Access by Computer Act ("THACA"); (11) Texas Theft Liability Act ("TTLA"); and (15) fiduciary duty.

23   Ex. G-1 [Expert Report of Shane Johnson] at 6-10.

24   Ex. G-1 [Expert Report of Shane Johnson] at 10-16.

25   Ex. I [Deposition of Constance Melrose] at 74:11-74:17; 65:01-65:08; 68:02-68:10; 68:17-69:02.

26   Ex. E [Deposition of Michael Durney] at 83:04-84:17; 96:05-96:13; 298:07-15; Ex. L [Deposition of John Roberts] at 72:19-75:07; 76:23-78:11.

27   Ex. I [Deposition of Constance Melrose] at 39:11-43:22.

28   Ex. D [Deposition of Estevan Dufrin] at 48:23-49:06. Additionally, David Kent never had the Google Analytics username and password and never logged into that account.

new users, (3) pages viewed per visit, and (4) average duration of each visit." (DE 1 ¶ 75). Plaintiffs, however, admit this event caused no damages.[29]

## SUMMARY OF THE ARGUMENT

Plaintiffs' prior recovery in the criminal case greatly exceeds any possible damages. Yet, Plaintiffs now seek $20 million. Oilpro is entitled to summary judgment because:

- **TUTSA preempts Plaintiffs' state law claims.** These claims include: (1) common-law misappropriation of confidential information, (2) TTLA, (3) fiduciary duty, and (4) THACA.

- **Defendants are entitled to judgment as a matter of law on each of the preempted claims for independent reasons.** Plaintiffs suffered no commercial damage as required for their misappropriation claim. Plaintiffs cannot recover under their TTLA claim since Plaintiffs retained use of all the resumes. And Kent was not a fiduciary in 2014 and had no duty to disclose every aspect of the Rigzone website.

- **No trade secrets exist, and no damages resulted from Kent's access.** Plaintiffs allege three trade secrets. First, Plaintiffs allege that resumes prepared by other people made available to thousands of Rigzone customers around the world, and posted on numerous other websites constitute a trade secret. This is the antithesis of a trade secret. Further, Plaintiffs' business model was based on giving access to these resumes, which they did without requiring a nondisclosure agreement and otherwise made available without utterly nominal security. This collection is admittedly not unique and differs from the type compilation that merits trade secret status. The resumes do not include proprietary analysis. Second, Plaintiffs' internet search methods used to scrape data from other websites does not constitute a trade secret. Finally, the Google Analytics data does not constitute a trade secret and provides no independent value. Finally, Plaintiffs have no damages.

- **Plaintiffs cannot establish a RICO claim.** Plaintiffs cannot prove continuity sufficient to establish a RICO claim. Additionally, none of Plaintiffs' alleged injuries were proximately caused by the predicate offenses Plaintiffs allege. Plaintiffs lack RICO injury and RICO standing as well as other RICO elements.

---

[29] Ex. E [Deposition of Michael Durney] at 307:2-307:5.

- **The SCA does not apply here.** Kent never accessed electronic storage. The resumes were not pending delivery or backup copies.

- **Plaintiffs incurred no CFAA and THACA damages.** To the extent Plaintiffs incurred any damages, Plaintiffs already recovered $3,292,800 in the underlying criminal action. Plaintiffs simply have no access damages. Accordingly, Plaintiffs cannot support their CFAA and THACA claims (to the extent THACA even survives preemption).

- **Limitations bar Plaintiffs' claims related to the First Access.** Plaintiffs' CFAA, SCA, common-law misappropriation, THACA, and TTLA, claims all have two-year statutes of limitations. These claims are all barred. The First Access ended in April 2014. Plaintiffs did not bring suit until June 2016, but had told the Department of Justice more than two years earlier that Defendants were involved.

## ARGUMENTS AND AUTHORITIES

### A.    TUTSA Preempts Plaintiffs' State Law Claims, Which Also Lacks Merit.

#### 1.    TUTSA

TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.007(a). Plaintiffs' underlying allegations for each of the state law claims mirror their core allegations of trade-secret misappropriation. Accordingly, TUTSA preempts these claims.

This Court has previously, and correctly, rejected Plaintiffs' argument that the preempted claims are based on misappropriation of confidential information rather than trade secrets.  (DE 103 at 34-35); *see also Embarcadero Techs., Inc. v. Redgate Software, Inc.*, 1:17-CV-444-RP, 2018 WL 315753, at *3 (W.D. Tex. Jan. 5, 2018) ("Plaintiffs would like to have a TUTSA claim for all of their information taken by Frignoca that qualifies as a trade secret and a fiduciary duty claim for all of the information taken by Frignoca that does not qualify as a trade secret. But both claims stem from the same underlying harm—the taking of Plaintiffs' confidential information. To allow multiple theories of relief for this same underlying harm would be to read the

13

preemption provision too narrowly."); *Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App. 2017—Corpus Christi, no pet. h.) (holding that TUTSA preempted breach of fiduciary duty claim when the breach of fiduciary duty claim rested on the same facts as the alleged trade secrets).[30]

Plaintiffs previously argued that TUTSA "does not displace claims that are based on misappropriation of something other than a trade secret." (DE 86 at 14). Plaintiffs argued that their "TTLA claim is based on access and harm to Plaintiffs' confidential and proprietary information and property, not trade secret information." (DE 86 at 15). The Court rejected that argument:

> The TTLA Defendants "knowingly and unlawfully appropriated Plaintiffs' property with the intent to deprive Plaintiffs of their exclusive use of their member information and their Google Analytics data." However, later in Plaintiffs' complaint, they allege that their "proprietary member information, internet search methods, and Google Analytics data constitute trade secrets within the meaning of the Texas Uniform Trade Secrets Act." While Plaintiffs are alleging in their TTLA claim that Defendants' appropriation of their property deprived them of exclusive use of their member information and Google Analytics data, it is unclear to what "property" they could be referring in this context, other than the member information and Google Analytics data. Therefore, because their TTLA claim is based on the misappropriation of trade secrets, the TTLA is preempted in this context by the TUTSA for any claims on or after September 1, 2013.[31]

---

[30]   One judge in the Southern District of Texas has held that the preemption provision of TUTSA does not preempt claims based on confidential information. *AMID, Inc. v. Medic Alert Found. U.S., Inc.,* 241 F. Supp. 3d 788, 826–27 (S.D. Tex. 2017).  As one judge in the Eastern District of Virginia pointed out, this judge did not have the benefit of the Texas appellate court's ruling in *Super Starr* to guide it on how Texas courts were interpreting this provision. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-CV-545, 2018 WL 1796293, at *14 (E.D. Va. Apr. 16, 2018).

[31]   DE 103 at 34-35.

Plaintiffs' other state law claims are likewise preempted. As outlined in the chart below, each of Plaintiffs' state law claims is based on the alleged misappropriation of the same information underlying Plaintiffs' trade secrets claims.

| Claim | Trade Secret Allegations |
| --- | --- |
| Misappropriation of confidential information | ¶182 - Plaintiffs' proprietary member information, internet search methods, and Google Analytics data constitute confidential information. |
| TTLA | ¶200 - Without consent, on numerous occasions, including but not limited to during the First Round of Hacks, the Google Analytics Hacks, Operation Resume Hoard, and the Second Round of Hacks, David Kent, Dufrin, and Oilpro knowingly and unlawfully appropriated Plaintiffs' property with the intent to deprive Plaintiffs of their exclusive use of their member information and their Google Analytics data in violation of section 31.03(a) of the Texas Penal Code." |
| Breach of Fiduciary Duty | ¶223 - David Kent intentionally and willfully violated his fiduciary duties to Rigzone by stealing Plaintiffs' data and member information to serve the interests of himself and the company he formed to compete with Rigzone. |
| THACA | ¶ 194 - Plaintiffs have been injured by David Kent, Dufrin, and Oilpro's knowing and intentional access to Plaintiffs' computers, computer networks, and computer systems without consent, as Plaintiffs have had to incur significant costs in (a) assessing the potential damage to Plaintiffs' [sic] that have been caused by the Defendants' unauthorized access, use, and misappropriation, (b) responding to the loss of trade secrets and confidential information caused by Defendants' actions, and (c) mitigating the loss of goodwill among Rigzone's members that has resulted from Defendants' unauthorized use, access and misappropriation. Plaintiffs have also been injured by the reduction in Rigzone's competitive advantages and the effect of Defendants' unauthorized access on Plaintiffs' ability to compete effectively in the marketplace. |

In each claim listed above, Plaintiffs seek a remedy "based upon misappropriation of a trade secret." *See* TEX. CIV. PRAC. & REM. CODE § 134A.007(b)(2). TUTSA displaces such remedies. TEX. CIV. PRAC. & REM. CODE § 134A.007(a).

Additionally, Plaintiffs' THACA claim is preempted to the extent it concerns trade-secret misappropriation.[32] Plaintiffs allege that their THACA injury includes costs Plaintiffs incurred in: "(a) assessing the potential damage to Plaintiffs' that have been caused by the Defendants' unauthorized access, use, and *misappropriation*, (b) responding to *the loss of trade secrets* and confidential information caused by Defendants' actions, and (c) mitigating the loss of goodwill among Rigzone's members that has resulted from Defendants' unauthorized use, access and *misappropriation*." (DE 1 at 41-42) (emphasis added). These alleged injuries depend in part on the alleged misappropriation of trade secrets. Accordingly, TUTSA preempts any remedy Plaintiffs seek under THACA for alleged trade-secret misappropriation. Regardless, Plaintiffs have recovered well in excess of any alleged damages under THACA.

In addition to preemption, Plaintiffs' other state law claims lack merit for the separate reasons outlined below.

### 2. *Common-Law Misappropriation.*

A misappropriation claim requires evidence showing "(i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i.e.,* a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff." *U.S. Sporting Prod., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217–18 (Tex. App.—Waco 1993), *writ denied* (Mar. 30, 1994).

---

[32]   Jeremy Antonini ("Antonini") raised TUTSA's preemption of THACA briefly in his motion to dismiss. (DE 77 ¶ 37). Defendants respectfully request that the Court consider this argument to the extent Plaintiffs' THACA claim seeks recovery for the alleged trade secret misappropriation.

Plaintiffs suffered no "commercial damage" at all. "Commercial damage" differs from "actual damage." In *Gilmore v. Sammons*, 269 S.W. 861, 863 (Tex. Civ. App.—Dallas 1925, writ ref'd), the court found that selling the misappropriated goods (in this case, news stories) "in business competition with appellant, thereby diminishing the profits which appellant would otherwise have garnered . . . constituted an unfair and illegal interference with appellant's business, and could have but one effect; that is, to deprive appellant of a portion of his fairly earned profits and to **divert** the same **to the coffers of appellee**." (emphasis added)

In *Playboy Enters,, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 558 (N.D. Tex. 1997), aff'd, 168 F.3d 486 (5th Cir. 1999), the court found that no evidence of "commercial damage" existed because (1) the plaintiff "did not see any drop in sales during the time period in which [defendant] operated"; (2) the plaintiff offered no evidence of a relative stock price; (3) the plaintiff did not introduce evidence of a diminution in value of the plaintiffs' copyrights; and (4) plaintiff produced no evidence of actual "commercial damage" resulting from the defendant's activities.

Likewise, Plaintiffs cannot establish any commercial damage. Testimony of DHI's corporate representatives confirms this. Durney testified that he was unaware of any classified customers, banner ad customers, job seekers, candidates, or members who ceased working with or doing business with DHI as a result of the actions of any of the Defendants.[33] Roberts similarly confirmed no commercial damage.[34] Durney testified that he could not recall any

---

[33]   Ex. E [Deposition of Michael Durney] at 96:5 – 98:04; *see also* Ex. I [Deposition of Constance Melrose] at 74:23 – 75:02; 76:06 – 76:14; 161:04 – 161:08; Ex. L [Deposition of John Roberts] at 87:06-11.

[34]   Ex. L [Deposition of John Roberts] at 50:03-13 (DHI's CFO during the relevant time testifying that he never reported any losses to the SEC caused by Oilpro's access to resumes).; 70:16-71:18 (testifying that it was part of his responsibilities to report accurate financial information to management, the board, and SEC); 92:09-93:02

17

customers who were considering entering a contract with DHI and decided not to because of the Defendants' actions.[35] Furthermore, DHI—a public company—has never reported any losses to its shareholders due to Defendants access of Plaintiffs' information.[36] Johnson, likewise, did not testify to any lost profits for Plaintiffs.[37] Put simply, Plaintiffs have no evidence of any lost customers or lost profits that have been diverted from their "coffers" and cannot establish a misappropriation claim. *See Gilmore*, 269 S.W. at 863.

   3.   *TTLA.*

Plaintiffs assert in their TTLA claim that Defendants violated Section 31.03(a) by misappropriating Plaintiffs' member information and Google Analytics data "with the intent to deprive Plaintiffs of their exclusive use." (DE 1 ¶ 200). Section 31.03 states that a person commits an offense of theft if he unlawfully appropriates property with intent to deprive the owner of its use. TEX. PENAL CODE ANN. § 31.03. To "deprive" is "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." *Id.* § 31.01(2)(A). It is not a violation of 31.03 to deprive Plaintiffs of "exclusive" use—Plaintiffs must actually be deprived of use of the property. *In re Simons Broad., LP*, CIV. W-11-CA-172, 2013 WL 9542015, at *15 (W.D. Tex. Nov. 19, 2013) ("As Promiseland continued possessing its trade secrets, there can be no showing that

---

(noting that there was no disclosure in any press release or SEC Filing about Rigzone suffering $20 million in damages because of the resumes being copied); 93:23-94:02 and 95:23-97:06 (if there had been $3 million or more damages, that would have been a material amount that would have been disclosed); 130:25-131:06 (Roberts never notified auditors about anything to do with Defendants, even though it was important to make auditors aware of material events).

[35]   Ex. E [Deposition of Michael Durney] at 303:25 – 304:06.

[36]   Ex. E [Deposition of Michael Durney] at 98:05 – 98:09; 102:4 – 102:12; 107:24 – 108:22; 109:06 – 109:19; Ex. L [Deposition of John Roberts] at 50:03-13; Ex. I [Deposition of Constance Melrose] at 147:02 –147:08.

[37]    Ex. G-1 [Expert Report of Shane Johnson] at 30:10-31:02.

Promiseland was deprived of its use or access."). There is no evidence that Defendants deprived Plaintiffs of the use of their member information and Google Analytics data. Just the opposite, all the testimony confirms that Plaintiffs' retained continuous use.[38] Accordingly, Plaintiffs have no viable claim under the TTLA.

### 4. *Fiduciary Duty.*

Plaintiffs assert a breach of fiduciary duty claim against Kent, as a "founder, officer, employee, and agent of Rigzone." (DE 1 at 46-48). Kent's position in these roles ended October 1, 2013. Plaintiffs allege that Kent breached his fiduciary duty by (1) keeping "his 'backdoor' secret", (2) acquiring confidential and proprietary information to use in Oilpro, and (3) not maintaining confidence in all confidential and proprietary trade secret information. (DE 1 ¶¶ 219-20). Kent owed no fiduciary duties to Rigzone for these actions, and TUTSA preempts this claim anyway.

### a.  Kent Disclosed No Trade Secrets Gained During Employment.

"Under Texas law, corporate officers and directors owe fiduciary duties to the corporations they serve . . . ." *In re Harwood*, 637 F.3d 615, 620 (5th Cir. 2011). Generally, a fiduciary duty based on employment ends when the employment relationship ends. *Sisoian v. Int'l Bus. Machs. Corp.*, A-14-CA-565-SS, 2014 WL 4161577, at *5 (W.D. Tex. Aug. 18, 2014).

---

[38]   Ex. I [Deposition of Constance Melrose] at 68:17 (testifying as the corporate representative that she had no knowledge that any data breaches corrupted or altered any data, and that no customer had been unable to access the Rigzone website as a result of the alleged data breaches); 157:06-15 (same); Ex. E [Deposition of Michael Durney] at 83:04-84:17 (testifying he is not aware of any data destruction, deletion, corruption, decreased completeness or usability of the data caused by Defendants, nor is he aware of any subscriber who ceased subscribing because of the actions of Defendants); 298:07-15 (not aware of any damage to DHI's computer systems or the data on the Rigzone website as a result of the alleged breaches); Ex. L [Deposition of John Roberts] at 72:19-75:07; 76:23-78:11 (same).

Kent's employment with Rigzone ended October 1, 2011.[39] At the time of the First and Second Access, Kent was no longer a Rigzone employee. As a matter of law, he owed no fiduciary duty to Rigzone.

Regardless, even after employment ceases, the duty to not disclose trade secrets remains. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). The only duty that remained was Kent's duty not to disclose trade secrets. As discussed further below, Kent did not access or disclose any trade secret of Plaintiffs.

> **b.** <u>Kent Owed No Duty To Disclose the Website Functions</u>.

Plaintiffs allege that their fiduciary duty claim is based, in part, on a "secret backdoor," which Plaintiffs suggest Kent should have disclosed. It is unclear when and to whom Plaintiffs contend that Kent should have disclosed the existence of the "secret backdoor." Under Texas law a duty to disclose may arise in arms-length transactions "(1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has the duty to speak." *Playboy Enters, Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 260 (Tex. App.—Corpus Christi 2006, pet. denied).

Plaintiffs have no evidence to support any of these exceptions. First, the Mandiant report confirms no "secret backdoor" existed.[40] The webpage was created by software code authored

---

[39]   Ex. H-2, [Employment Agreement] at DHI_0000978.

[40]   *See* Ex. B-14 [Mandiant Report] at 12-13.

years ago by people other than Kent and was used widely by Rigzone employees.[41] Additionally, Durney even admitted that he did not discuss with Kent what information he had about the Rigzone website.[42] Nor did Durney or anyone else discuss with Kent what information he knew about to allow himself or someone else to access the database.[43] In fact, prior to Kent's departure, Kent did not undergo any type of debriefing, nor did anyone at Rigzone discuss potential security holes with him.[44] Second, Durney knows of no false representation in the Rigzone Asset Purchase Agreement.[45]

More importantly, the supposed "secret backdoor" was a feature of the website that allowed public access. Chad Norville ("Norville"), the current President of Rigzone and former code developer for Rigzone testified that both access points were publicly reachable web pages:

> Q.  And both web pages that Mr. Kent accessed were publicly reachable web pages, true?
>
> A.  Yes.
>
> Q.  Both the Rigzone.com/jobs/resume.asp and the resume writer.asp web page?
>
> A.  Yes.[46]

Antonini likewise testified that the alleged backdoor was not a secret.[47] Moreover, five Rigzone employees wrote and revised the software code creating the URL access. These individuals

---

[41] Ex. B-14 [Mandiant Report] at 31-32 ("resume.asp" version history); Ex. E [Deposition of Michael Durney] at 338:22-344:04; Ex. J [Deposition of Chad Norville] at 248:11-16; Ex. A [Deposition of Jeremy Antonini] at 118:14-118:20.

[42] Ex. E [Deposition of Michael Durney] at 317:17-317:21.

[43] Ex. E [Deposition of Michael Durney] at 317:22-318:05.

[44] Ex. E [Deposition of Michael Durney] at 318:06-318:11.

[45] Ex. E [Deposition of Michael Durney] at 338:22-344:04.

[46] Ex. J [Deposition of Chad Norville] at 248:11-16.

included David Wuensch,  Antonini, Michael Hobley, John Hanson, and Norville.[48] Rigzone was well aware of the alleged "secret backdoor" and, rather than locking this door, Rigzone added fake resumes to trap the individual accessing resumes.[49] Not only did Kent have nothing to do with creating a "secret backdoor," but multiple Rigzone employees knew about the code and revised it.[50]

**B.      Plaintiff's TUTSA Claim Lacks Merit Because Resumes Do Not Qualify as a "Trade Secret" and Plaintiffs Suffered No Damages In Any Event.**

To establish a TUTSA claim, Plaintiffs must show that (1) they owned a trade secret, (2) defendant misappropriated the trade secret, and (3) the misappropriation caused injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 134A.002(1),(3), (6) & 134A.004(a). Under TUTSA a trade secret is defined as:

> information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6). The existence of a trade secret often presents a question of fact. *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 895, 902 (S.D. Tex. 2015). Regardless, courts have granted motions for summary judgment when the pleadings and the facts show that the information does not constitute a trade secret. *Gen. Insulation Co. v. King*, 14-08-00633-CV, 2010 WL 307952, at *7 (Tex. App.—Houston [14th Dist.] Jan. 26, 2010, no

---

[47]   Ex. J [Deposition of Chad Norville] at 248:11-16; Ex. A [Deposition of Jeremy Antonini] at 118:14-118:20.

[48]   Ex. A [Deposition of Jeremy Antonini] 115:16-117:18.

[49]   Ex. J-52 [Confluence Timeline] at DHI_0024616.

[50]   Ex. B-14 [Mandiant Report] at 12-13.

pet.); *Big Vision Private Ltd. V. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 267 (S.D.N.Y. 2014).

Plaintiffs identify three trade secrets: (1) "proprietary member information," (2) "internet search methods," and (3) "Google Analytics data constitute confidential information." (DE 1 at 40).

### 1.   *The Resumes Are Not Plaintiffs' Trade Secret.*

Plaintiffs admit they are not responsible for preparing or uploading member resumes.[51] Rather, each member uploads his or her own resume.[52] Rigzone only provides a place (the Rigzone website) for members to do so. Thus, the proposed trade secret, here, is a group of resumes authored by individuals outside of Rigzone and uploaded by those same individuals. Further, Rigzone customers around the world are permitted to access these resumes without a nondisclosure agreement. And within Rigzone, the resumes were never treated as trade secrets or restricted with security measures. In short, this group of resumes is the antithesis of a trade secret

### a.   The Rigzone Resume Collection Is Not a Trade Secret Compilation.

Generally, courts considering compilations have noted two significant factors: (1) uniqueness of the information to be considered a trade secret and (2) effort put into compiling the trade secret. *United States v. Nosal*, 844 F.3d 1024, 1043 (9th Cir. 2016), cert denied, 138 S. Ct. 314, 199 L. Ed. 2d 207 (2017) (noting that the information at issue was the unique, "customized product of a massive database"); *Brigham Young Univ. v. Pfizer, Inc.*, 861 F. Supp. 2d 1320, 1323–24 (D. Utah 2012) ("Simply pointing to a large amount of information and claiming it is

---

51   Ex. J, Deposition of Chad Norville at 46:22-47:01.

52   Ex. J, Deposition of Chad Norville at 46:22-47:01.

secret will not do. Rather, the plaintiff must explain how the combination of elements is sufficiently different, or special, to merit protection."); *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F. Supp. 3d 465, 474 (E.D. Pa. 2014) ("The rationale for protecting compilations as trade secrets is that the act of compiling entails the investment of time and resources; it is that investment the law seeks to protect."); *Am. Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326, (Ct. App. 1986) (noting that the shipping information for which the party alleging a trade secret sought protection for was "readily ascertainable to other persons in the shipping business" and that "all the competitors have secured the same information that appellant claims and, in all likelihood, did so in the same manner as appellant").

Information compiled from public sources, without more, is not a trade secret. In *United States v. Nosal* the Ninth Circuit analyzed whether source lists constituted a trade secret under the Economic Espionage Act. 844 F.3d at 1043. Korn/Ferry's core asset was an internal database of information on over one million executives, including resumes, contact information, employment history, and salaries. *Id.* at 1030. To fill a position, Korn/Ferry would compile a list of potential candidates, which was derived by running queries in the database to generate a list of candidates. *Id.* Old source lists were used to speed up the process in similar searches. *Id.* Nosal, the defendant, downloaded source lists when working to launch a competitor. *Id.* at 1031. Nosal argued that the source lists were "composed largely, if not entirely, of public information and therefore couldn't possibly be trade secrets." *Id.* at 1042. The court found that the source lists, which were made up of information from public, non-public, and quasi-public information, constituted trade secrets. *Id.* at 1030, 1042. "Each source list was the result of a query run through a propriety algorithm that generates a custom subset of possible candidates, culled from

a database of over one million executives." *Id.* The source lists "were not unwashed, public-domain lists of all financial executives in the United States, nor otherwise related to a search that could be readily completed using public sources." *Id.* Further, the creation of the Korn/Ferry database involved the input of social scientists and was not a mere collection of resumes. The court found that the nature and value of the trade secret "stemmed from the unique integration, compilation, cultivation, and sorting of, and the aggressive protections applied to the [] database." *Id.* at 1042.

The purported trade secret at issue here is a collection of resumes. The Rigzone information did not include salaries or other non-public information. Nor was the resume collection any type of customized list as in *Nosal*,[53] the product of social scientists or intellectual property development specialists.[54] While the Korn/Ferry source lists constituted carefully culled and customized information, the information accessed by Defendants was a group of unprotected resumes uploaded by individuals without any effort by Rigzone.

In *Kirgan* a California appellate court considered whether lists of customers who needed shipping supplies constituted a trade secret. 183 Cal. App. 3d 1318, 1326, 228 Cal. Rptr. 713, 717 (Ct. App. 1986). The court noted that "[w]hile the information sought to be protected here, that is lists of customers who operate manufacturing concerns and who need shipping supplies to ship their products to market, may not be generally known to the public, they certainly would be known or readily ascertainable to other persons in the shipping business." *Id.* The court further noted that the compilation process, which consisted of driving through manufacturing areas and

---

53   *See* Ex. J [Deposition of Chad Norville] at 248:11-13.

54   Ex. D [Deposition of Estevan Dufrin] at 126:17-126:23.

25

making lists of companies to call,  was "neither sophisticated nor difficult nor particularly time consuming." *Id.* Additionally, the court stated that competitors had all secured the same information and likely did so in the same manner. *Id.* Ultimately, the court found that such information was not a trade secret. *Id.*

The information here is even less secretive than the lists in *Kirgan*. The preparation and loading of the resumes entailed no effort by Plaintiffs. Jobseekers themselves uploaded their resume.[55] While the information was gathered over a long period of time, this did not involve the input or effort of Plaintiffs.[56] Rigzone's president, Norville, admitted that no person at Rigzone codes information in any sort of database as resumes are uploaded.[57] Efforts recognized in cases when the court found a compilation are significantly greater than simply building a website and passively allowing members to upload their information. *See Calisi v. Unified Fin. Srvs*, *LLC*, 232 Ariz. 103, 108, 302 P.3d 628, 633 (Ct. App. 2013)  ("The record is completely silent regarding the cost, time, frequency, and success rate of UFS's direct mail advertising or its use of any other marketing method, such as "cold calling," tax seminars, or financial planning programs. Simply put, UFS failed to present any evidence that it had expended substantial effort to develop its customers and any personal information about them in a way that its competitors could not duplicate.").

Further, Plaintiffs have done nothing to establish that this information differs from that of Plaintiffs' competitors. Quite the opposite. Plaintiffs' own expert has acknowledged that the resumes are not unique. Johnson refers in his report to Plaintiffs' purchase of OilCareers, a

---

[55]   Ex. J [Deposition of Chad Norville] at 46:22-47:01.

[56]   Ex. J [Deposition of Chad Norville] at 76:12-79:02.

[57]   Ex. J [Deposition of Chad Norville] at 223:15-18.

company based in the United Kingdom.[58] Johnson notes, that this UK company, although consisting of primarily resumes for UK based oil and gas professionals, had an 18% overlap with the members of Rigzone, even though Rigzone was a U.S.-based company.[59] Johnson further notes that OilCareers had 1.5 million members.[60] Given that there was an 18% overlap, 270,000 of the OilCareers members were also members of Rigzone.[61]

Rigzone's own President, Norville, admitted that Plaintiffs do not even guarantee the accuracy of the resumes.[62] Norville testified that Rigzone has "no control over the quality, safety, legality, truth, or accuracy of the job listings or the resumes/CVs."[63] The terms and conditions likewise, confirm the same.[64]

Another court has noted that noted "[a] compilation trade secret is, generally, not an amorphous collection of information. Instead, the compilation must work together to embody a definite methodology, process, technique, or strategy." *Uhlig LLC v. Shirley*, 6:08-CV-01208-JMC, 2012 WL 2923242, at *5 (D.S.C. July 17, 2012). Here, Defendants accessed only individual resumes, many of which included emails that were duplicates, blank, or malformed.[65] Defendants did not access the database that had search features and tables with more cohesive

---

[58]   Ex. G-1 [Expert Report of Shane Johnson] at 7.

[59]   Ex. G-1 [Expert Report of Shane Johnson] at 7.

[60]   Ex. G-1 [Expert Report of Shane Johnson] at 7.

[61]   Ex. G-1 [Expert Report of Shane Johnson] at 7.

[62]   Ex. J [Deposition of Chad Norville] at 78:22-79:09.

[63]   Ex. J [Deposition of Chad Norville] at 78:22-79:09.

[64]   Ex. J-46 [Rigzone's Terms and Conditions].

[65]   Ex. N-3 [Expert Report of Trent Livingston] at 5, ¶13.

information, but only accessed the publicly-reachable web page.[66] There is no methodology, process, technique, or strategy at issue here.

> b.    Rigzone Took No Measures To Keep the Resumes Secret.

Under TUTSA the definition of a "trade secret" requires that "the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret." TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002. "Reasonableness will vary based on the size of the business and the importance of the trade secret." John F. Cleavland, Jr., 2017 TEXAS TRADE SECRETS UPDATE, Institute for Law and Technology: Conference on Intellectual Property Law, November 13-14, 2017. The more important the trade secret is, the more closely that secret should be guarded. *Id.* Additionally, "the determination of what steps are reasonably necessary to protect information is different for a large company than for a small one." *Jackson v. Hammer*, 274 Ill. App. 3d 59, 67, 653 N.E.2d 809, 815 (1995).

Based on the following factors, one court found that the record was "legally and factually sufficient to support an implied finding that the information in question was not the subject of any efforts to maintain its secrecy":

1)    Employees worked for years without being asked to sign a "noncompetition agreement";

2)    Employees who refused to sign the "noncompetition agreement" remained employed even after they refused to sign;

3)    The alleged trade secret data was not encrypted or protected by a monitoring system or tracking software; and

4)    The documents in question were not labeled as confidential or proprietary.

---

[66]   Ex. J [Deposition of Chad Norville] at 248:11-13.

*Baxter & Associates, L.L.C. v. D & D Elevators, Inc.*, 05-16-00330-CV, 2017 WL 604043, at *10 (Tex. App.—Dallas Feb. 15, 2017, no pet.). Information that may be discovered by anyone does not constitute a trade secret. *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App.—Fort Worth 1987, no writ) ("The evidence reflects much of the information Numed wishes to protect is not secret. Instead, it is contained in the contracts distributed to Numed's customers, which in turn may be discovered by anyone."). Texas courts "refuse to extend trade secret protection when the material sought to be protected has been publicly disclosed." *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 210 (Tex. App.—San Antonio 2013, pet. denied) (internal quotations omitted*); see also Vianet Group PLC v. Tap Acquisition, Inc.*, No. 3:14-CV-3601-B, 2016 WL 4368302, at *20 (N.D. Tex. Aug. 16, 2016); *McClain v. State*, 269 S.W.3d 191, 197 (Tex. App.—Texarkana 2008, no pet.); *Smartcomm License Services LLC v. Palmieri*, No. 1 CA-CV 16-0265, 2018 WL 326510, at *6 (Ariz. Ct. App. Jan. 9, 2018) (interpreting the Arizona Uniform Trade Secret Act).

Norville testified regarding the size of both Rigzone and DHI.[67] Rigzone has offices in numerous countries.[68] Rigzone is very sophisticated, and DHI is a publicly traded company with more than 500 employees and revenues that exceed $100 million per year.[69] Norville further testified that collection of resumes was Rigzone's most important trade secret:

> Q.   And how important do you consider the resumes as a trade secret, on a scale of one to ten?  And when I say "important," I mean important to the business of Rigzone?
>
> . . .

---

[67]   Ex. J [Deposition of Chad Norville] at 26:8-27:21.

[68]   Ex. J [Deposition of Chad Norville] at 26:8-27:21.

[69]   Ex. J [Deposition of Chad Norville] at 28:6-10; 30:02-30:17.

A.     On a scale of one to ten, I'd give it a ten.[70]

Despite giving this information a "ten" in terms of its importance as a trade secret, Rigzone, a large company with offices in multiple countries, took virtually no steps to protect this information. This lack of protection is independently sufficient to establish that the "proprietary member information" is not a trade secret. According to testimony in this case:

1)     virtually all Rigzone employees had access to the resume database;[71]

2)     Jeremy Antonini took the server containing the entire Rigzone resume database without any written or oral instructions on protocol for dealing with the information or sending the servers back to DHI's offices. Rigzone in fact allowed deleting data or any type of nondisclosure agreement;[72]

3)     a feature of the Rigzone website allowed customers to download resumes to excel after using the search feature;[73]

4)     The resumes were not in read-only format, but were subject to revision;[74]

5)     Rigzone did not monitor or track all third parties with access to the resume database;[75]

6)     some customers had unlimited access and unlimited downloads;[76]

7)     Rigzone licensed its database to customers without requiring a nondisclosure agreement;[77]

8)     Rigzone did not maintain a list of all NDAs that have been signed;[78]

---

[70]   Ex. J [Deposition of Chad Norville] at 53:08-17.

[71]   Ex. J [Deposition of Chad Norville] at 158:02-05.

[72]   Ex. A [Deposition of Jeremy Antonini] at 144:10-148:06; 148:20-149:25.

[73]   Ex. C [Deposition of Bryan Robins] at 59:06-59:09; Ex. A [Deposition of Jeremy Antonini] at 141:03-15; Ex. J [Deposition of Chad Norville] 212:06-15; 216:24-217:24.

[74]   Ex. J [Deposition of Chad Norville] at 205:15-18.

[75]   Ex. J [Deposition of Chad Norville] at at 167:24-168:03.

[76]   Ex. C [Deposition of Bryan Robins] at 59:16-59:18.

[77]   Ex. N-6 [Rigzone's January 13, 2016 Contract with Petronas]. *See Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 328 (3d Cir. 2009) (noting the importance of including a requirement to maintain secrecy in license of trade secret).

9)    Rigzone had no written policy that required every contractor, vendor, consultant, or third party with access to the resume database to sign a nondisclosure agreement;[79]

10)    Rigzone did not have a comprehensive list of all nondisclosure agreements;[80]

11)    Rigzone had no nondisclosure agreements that identify the resume database as a trade secret or confidential or proprietary;[81]

12)    Rigzone's contract with Inceptive, the company through which it hired contract workers, had no nondisclosure agreement, nor did individual contractors sign any nondisclosure agreement;[82]

13)    Rigzone employment contracts did not define confidential information to include resumes on databases;

14)    Rigzone allowed free trials where potential customers could view resumes, but without contact information, without requiring a nondisclosure agreement;[83]

15)    Rigzone had no written policy requiring Rigzone employees to return resume data or access credentials at the end of their employment;[84]

16)    Rigzone did not at the time of the alleged access employ anyone as a head of security;[85]

17)    Rigzone did not store the database on a separate server;[86]

18)    the Rigzone database was not encrypted;[87]

---

[78]  Ex. J [Deposition of Chad Norville] at 165:12-14.

[79]  Ex. J [Deposition of Chad Norville] at 166:25-167:05.

[80]  Ex. J [Deposition of Chad Norville] at 167:24-168:06.

[81]  Ex. J [Deposition of Chad Norville] at 171:07-12.

[82]  Ex. J [Deposition of Chad Norville] at 175:18-176:13.

[83]  Ex. J [Deposition of Chad Norville] at 178:18-179:23. *See Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 328 (3d Cir. 2009) (noting the importance of including a requirement to maintain secrecy in license of trade secret).

[84]  Ex. J [Deposition of Chad Norville] at 186:04-08.

[85]  Ex. J [Deposition of Chad Norville] at 22:03-20.

[86]  Ex. J [Deposition of Chad Norville] at 155:01-06.

[87]  Ex. H [Declaration of David W. Kent, Jr.] ¶¶6-7. *See Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 425 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (noting that one of the measures taken to protect the trade

19)   Rigzone did not ever put its resumes in an encrypted format; [88]

20)   the resumewriter.asp link had no encryption and no log-in prompt; [89]

21)   the resume.asp page was publicly reachable; [90]

22)   the two pages accessed did not even require any type of password; [91]

23)   the resumes were not listed in the terms and conditions as proprietary information; [92]

24)   the web pages accessed included no warning to alert customers that the resumes constitute trade secrets; [93]

25)   Rigzone had no restriction on its employees against using their personal devices to access the Rigzone database or the Rigzone resume table; [94]

26)   despite the fact Plaintiffs marked other information as confidential, such as their monthly business reports, [95] the resumes contain no notation that they constitute trade secrets or confidential information; [96]

27)   employees were given no guidelines regarding the disclosure of the database; [97]

---

secret was password protection); *Aetna, Inc. v. Fluegel*, CV074033345S, 2008 WL 544504, at *5 (Conn. Super. Ct. Feb. 7, 2008) (noting encryption as a measure of keeping trade secrets).

[88]   Ex. J [Deposition of Chad Norville] at 198:17-20.

[89]   *See* Ex. J [Deposition of Chad Norville] at 198:25-199:05.

[90]   Ex. J [Deposition of Chad Norville] at 248:07-10.

[91]   Ex. J [Deposition of Chad Norville] at 198:17-20. *See Aetna, Inc. v. Fluegel*, CV074033345S, 2008 WL 544504, at *5 (Conn. Super. Ct. Feb. 7, 2008) (noting that password protection as a measure of keeping trade secrets).

[92]   Ex. J-46 [Rigzone.com's Terms and Conditions]. *See Gen. Insulation Co. v. King*, 14-08-00633-CV, 2010 WL 307952, at *7 (Tex. App.—Houston [14th Dist.] Jan. 26, 2010, no pet.) (noting that information did not constitute a trade secret because among other things there was no formal written policy that the documents were confidential).

[93]   Ex. J [Deposition of Chad Norville] at 138:04-23.

[94]   Ex. J [Deposition of Chad Norville] at 205:06-10.

[95]   Ex. N-7 [Rigzone September 2013 Monthly Business Review] at DHI_0001422.

[96]   Ex. J [Deposition of Chad Norville] at  138:20-23; 140:25-141:06. *See Gen. Insulation Co. v. King*, 14-08-00633-CV, 2010 WL 307952, at *7 (Tex. App.—Houston [14th Dist.] Jan. 26, 2010, no pet.) (noting that information did not constitute a trade secret because among other things the documents at issue did not contain any writing noting that they were considered confidential).

28)    Norville could not identify any written guidelines where Rigzone employees were told what information the company considered to be a trade secret;[98]

29)    Norville could not recall any oral guidelines;[99]

30)    Norville was not aware of any briefings to the employees (or any subset of employees) to remind employees of the rules or guidelines on handling trade secrets;[100]

31)    Norville was not aware of any employee signing an agreement regarding keeping the database confidential;[101]

32)    employees did not sign any separate nondisclosure agreements regarding the resumes or the database;[102] and

33)    Rigzone did not immediately shut down access to the public pages accessed by Kent upon learning of the access.[103]

Further, Norville never referred to the resumes as a trade secret prior to this lawsuit nor had he ever heard anyone else at Rigzone refer to them as such.[104] Durney likewise testified that they had never referred to the resumes as a trade secret.[105]

The paucity of security measures (if any) taken by a multi-national, public company to protect Rigzone's most important trade secret demonstrates why no fact question exists on

---

[97]   Ex. J [Deposition of Chad Norville] at  156:14-19. *See Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 425 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (noting that one of the measures taken to protect the trade secret was employee manuals that emphasized the confidential nature of Vinmar's business).

[98]   Ex. J [Deposition of Chad Norville] at 156:01-10.

[99]   Ex. J [Deposition of Chad Norville] at 156:11-13.

[100]  Ex. J [Deposition of Chad Norville] at 157:10-14.

[101]  Ex. J [Deposition of Chad Norville] at  166:21-24. *See Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 425 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (noting that one of the measures taken to protect the trade secret was requiring employees to execute confidentiality agreements as a condition of employment).

[102]  Ex. D [Deposition of Estevan Dufrin] 126:22-129:25.

[103]  Ex. J-52 [Confluence Timeline] at DHI_0024616.

[104]  Ex. J [Deposition of Chad Norville] at 52:23-25; *see also* Ex. A [Deposition of Jeremy Antonini] at 103:24-104:03.

[105]  Ex. E [Deposition of Michael Durney] at 227:14-227:21.

Plaintiffs' TUTSA claim. Admittedly, the only point at which Plaintiffs began claiming this information as a trade secret was during the pendency of this lawsuit.[106]

      2.    *Plaintiffs' "Internet Search Techniques" Are Not A Trade Secret.*

Plaintiffs do not define "internet search methods" in their complaint. It appears that the "internet search methods" are the processes Plaintiffs use to scrape data and information from websites such as LinkedIn, Facebook, and Oilpro.com. Princepreet Chana ("Chana"), DHI's corporate representative on Oilpro's counterclaims, testified that DHI does not use the term "scraping," preferring the word "searching" instead. He testified that their "searching" methods employ automated processes that search certain websites and then download that data for DHI's use.[107]

Essentially, Plaintiffs claim that their method for scraping information from competing websites (while violating the website terms) is a trade secret. This is absurd. Scraping is not a trade secret. In fact, LinkedIn, another website from which DHI scraped data, formally demanded that DHI cease "improperly copying content compiled by LinkedIn."[108] LinkedIn further demanded that DHI "1) stop accessing LinkedIn's website to copy content and stop assisting its users in copying data from LinkedIn's website; 2) abide by LinkedIn's User Agreement, Privacy Policy, and corporate Subscription Agreement; and 3) purge any and all data that DHI has acquired to date from LinkedIn's website."[109]

---

[106]  Ex. J [Deposition of Chad Norville] at 52:23-25.

[107]  Ex. K [Deposition of Chana Princepreet] at 43:06-46:02; 53:09 – 54:11.

[108]  Ex. N-4 [May 6, 2015 Letter from LinkedIn to DHI] at DHI_0024629-31.

[109]  Ex. N-4 [May 6, 2015 Letter from LinkedIn to DHI] at DHI_0024631.

Additionally, no evidence exists showing that these scraping processes "derive[] independent economic value . . . from not being generally known to . . . other persons who can obtain economic value from its disclosure or use" or that DHI employed any efforts at all to protect the secrecy of these methods. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6). Furthermore, even if these processes could constitute trade secrets, Plaintiffs do not allege and have no evidence to show any use by Defendants of these "internet search methods." Thus, Plaintiffs' "internet search methods" do not constitute trade secrets.

 *3.* *Google Analytics Data Is Not A Trade Secret.*

For the Google Analytics data to constitute a trade secret, the Google Analytics data must "derive[] independent economic value." TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6)(B). No evidence exists to show that Plaintiffs' Google Analytics data derives any independent economic value. In fact, Durney testified that he was unaware of any damage or cost incurred by Plaintiffs because someone looked at the Google Analytics data.[110]

Moreover, Plaintiffs did not take reasonable measures to protect this data (e.g., the password remained unchanged for over a year).[111] *See Numed*, 724 S.W.2d at 435 (noting that trade secret information must be kept secret). The lack of independent economic value and failure to take measures to protect the Google Analytics data establishes that such information was not in fact a trade secret.

---

[110] Ex. E [Deposition of Michael Durney] at 307:02–307:05.

 Q: Are you aware of any damage or cost your company incurred because someone looked at the Google Analytics?

 A: Not specifically.

[111] Ex. D [Deposition of Estevan Dufrin] at 48:23-49:06.

4.      *Oilpro's Access Caused No Damage.*

Johnson outlines two models. The first model improperly uses as the measure the total value of the alleged trade secrets.[112] A plaintiff may only recover total value when the trade secret was published or destroyed. *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974); *see also In re TXCO Res., Inc.*, 475 B.R. 781, 824 (Bankr. W.D. Tex. 2012) ("Where the plaintiff retains the use of the secret ... and when there has been no effective disclosure of the secret by publication[,] the total value of the secret to the plaintiff is an inappropriate measure.'"); *Matter of Mandel*, 720 Fed. Appx. 186, 192 (5th Cir. 2018) (citing *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013)). Plaintiffs concede that the resumes were not published or destroyed.[113] Thus, Plaintiffs have no damages.

Two issues bar Johnson's unjust enrichment model. First, TUTSA provides that a plaintiff can recover "actual loss *caused by* misapparopriation and the unjust enrichment *caused by* misappropriation." Tex. Civ. Prac. & Rem. Code Ann. § 134A.004 (emphasis added). **Plaintiffs admit they have no evidence to prove causation to support Johnson's unjust enrichment model.** (DE 220 at 5). Plaintiffs admit they have no causation witness who can testify that any persons joined Oilpro as a result of Oilpro's access of Rigzone's database. *Id.* Further, Norville, the President of Rigzone, testified that he did not know "how the FBI and the

---

[112]   Ex. G [Expert Report of Shane A. Johnson] at 6-10.

[113]   Ex. E [Deposition of Michael Durney] at 83:04-84:17 (testifying he is not aware of any data destruction, deletion, corruption, decreased completeness or usability of the data caused by Defendants, nor is he aware of any subscriber who ceased subscribing because of the actions of Defendants); 298:07-15 (not aware of any damage to DHI's computer systems or the data on the Rigzone website as a result of the alleged breaches); Ex. L [Deposition of John Roberts] at 72:19-75:07; 76:23-78:11 (same); Ex. I [Deposition of Constance Melrose] at 68:17 (testifying as the corporate representative that she had no knowledge that any data breaches corrupted or altered any data, and that no customer had been unable to access the Rigzone website as a result of the alleged data breaches).

U.S. Attorney came up with the approximately 111,000 Oilpro members they alleged in the criminal complaint were people who joined Oilpro and were obtained from Rigzone."[114]

Regardless, Texas law only allows recovery of unjust enrichment based on showing either (1) Defendants' actual profits from exploiting the trade secret or (2) costs saved. *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974). Unjust enrichment damages are not assessed on "wholly speculative expectations of profits." *Id.* And Johnson made no attempt to calculate costs saved.[115] If a plaintiff is unable to show unjust enrichment through actual profits or costs saved, it can still seek a reasonable royalty but Plaintiffs do not seek that in this case. *Id.* Likewise, Plaintiffs have no proof of any *actual* benefit to Oilpro. Rather than focusing on actual profits, Johnson's unjust enrichment model is no more than a theoretical exercise in estimating the company's value based on another theoretical model, the author of which has expressly disclaimed any reliability to calculate actual profits.[116] In truth, Oilpro gained no benefit.[117] Texas law restricts unjust enrichment to either the Defendant's actual profits earned from the misappropriation or costs saved.

## C.    The SCA Does Not Apply.

The SCA prohibits unauthorized access to wire and electronic communications in temporary and back-up storage and provides specifically that:

> [W]hoever—
>
> (1)    intentionally access without authorization facility through which an electronic communication service  is provided; or

---

[114]   Ex. J [Deposition of Chad Norville] at 268:1-5.

[115]   *See generally*  Ex. G-1 [Expert Report of Shane Johnson].

[116]   Ex. G [Expert Report of Shane A. Johnson] at 10-16; Ex. F [Declaration of Jonathan B. Fairbanks] ¶10.

[117]   Ex. C [Deposition of Bryan Robbins] at 71:04-22; Ex. F [Declaration of Jonathan B. Fairbanks] ¶¶3, 10

(2)      intentionally exceeds an authorization to access that facility;

And thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2701(a).

Defendants' did not access an electronic communication while it was in *electronic storage*. According to the Fifth Circuit, electronic storage is "information that an Internet provider stores to its servers or information stored with a telephone company—if such information is stored temporarily pending delivery or for purposes of backup protection—are examples of protected electronic storage under the statute." *Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 793 (5th Cir. 2012).

As to the first type of storage, a communication that has already reached its destination is not in transit. In *Cobra Pipeline Co., Ltd. v. Gas Natural, Inc.*, a former affiliate of a company monitored the plaintiff's fleet of trucks via a login he had been given when the two companies were working together. 132 F. Supp. 3d 945, 947 (N.D. Ohio 2015). The plaintiff sued alleging violations of the SCA. *Id.* The information was accessed through a system called SageQuest. *Id.* The SageQuest system utilized GPS data sent from each truck in the fleet, which was routed through a cellular communication tower and then processed in SageQuest's Data Center. *Id.* The data center made the information available through a web portal accessible only by username and password. *Id.* at 947-48. The information remained continuously updated from the fleet of vehicles. *Id.* at 948. Through the system, users could see individual vehicles on a map, access vehicle data, and send messages to the truck's driver. *Id.* The court found that the communications were not "in transit" because SageQuest was "more akin to an electronic bulletin board. The data is not being sent to a particular person, and the data is not being

accessed during a transmission to any user. Any user—whether authorized or not—is reviewing SageQuest's fleet data after it has reached its final destination." *Id.* at 951.

The court further found that the information was not stored for the purposes of backup protection. *Id.* Specifically, the court stated that "[t]he website is similar to a copy available to authorized users in the SageQuest lobby. A backup copy is similar to a secondary copy kept in a safety deposit box at another location. Reading the lobby paper copy is not equivalent to reading the separate location's backup copy." *Id.*

Here, the resumes accessed were not in transit to any location. The resumes had already reached their final destination—Rigzone's database—long before Defendants accessed the information. Furthermore, the information accessed was not information kept as a backup copy.[118] Rather, the information would be akin to the paper copy kept in Rigzone's lobby—not a separate backup copy. *See id.*

Plaintiffs further allege that Defendants accessed the "other electronic communications prepared by Rigzone members while that information was in electronic storage." Plaintiffs have no proof that Defendants accessed information other than the resumes. Resumes in Rigzone's database were neither sitting in temporary or intermediate storage incidental to transmission, nor stored for purposes of backup protection. In fact, the proof on this claim is so flimsy that Plaintiffs' counsel stated on the record in response to counsel for Oilpro's question regarding whether the resumes were kept as a temporary backup that "if that's an element to one of our

---

[118]   Ex. J [Deposition of Chad Norville] at 250:10-14.

claims that is necessary, I'm probably just going to dismiss whatever claim that is. That kind of sounds like what you're asking for."[119]

**D.      RICO Does Not Apply.**

Plaintiffs assert that Kent and Estevan Dufrin ("Dufrin") violated three subsections of 18 U.S.C. § 1962. Elements common to all three are: (1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct or control of an enterprise. *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228–29 (5th Cir. 2003). Additionally, civil RICO liability exists only to the extent the plaintiff suffered injury to business or property proximately caused by the defendant's conduct constituting a RICO violation (i.e., the predicate act). *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 422 (5th Cir. 2001); *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 276 (1992); *Sandwich Chef of Tex., Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003) (confirming that "the 'by reason of' language in RICO requires a causal connection between the predicate [act] and a plaintiff's injury that includes 'but for' and 'proximate' causation"). Plaintiffs' RICO claims lack merit.

> *1.      No RICO pattern.*

"To establish a pattern of racketeering activity, a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *W. Tex. Nat. Bank v. FEC Holdings, LP*, MO-11-CV-086, 2013 WL 2158658, at *6 (W.D. Tex. May 17, 2013) (citing *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)). Continuity can be closed-ended or open-ended. *Id.* Closed-ended continuity

---

[119]   Ex. J [Deposition of Chad Norville] at 250:19-22.

is a closed period of repeated conduct, and open-ended continuity is past conduct with a threat of repetition. *Id.*

Plaintiffs cannot establish open-ended continuity. While Plaintiffs allege that there was a pattern of activity that "would have continued indefinitely had it not fortuitously been ended by when Plaintiffs discovered that David Kent and Dufrin were unlawfully appropriating information from Plaintiffs' private servers," Plaintiffs also allege that Kent sought to sell Oilpro to DHI. (DE 1 at 27-29). Because Plaintiffs allege that Kent's goal was to sell Oilpro to DHI, Kent and Oilpro's alleged RICO actions could not have continued indefinitely. Once the alleged sale to DHI occurred, no threat of continued activity would exist. Plaintiffs' own allegations that Kent sought to sell Oilpro to DHI establishes that this case has no open-ended continuity.

Plaintiffs are likewise unable to establish closed-ended continuity. Plaintiffs attempt to construe Defendants' conduct in this case as constituting a pattern of RICO acts spanning "more than two years." (DE 1 at 29). Plaintiffs are wrong. The First Access included activity occurring only on eight days.[120] Defendants did not access any of Plaintiffs' information again until the Second Access began on June 16, 2015 over a year later.[121] The Second Access spanned a few days during a two month period, lasting only through August 2, 2015. Courts in the Fifth Circuit have found that such sporadic activities are insufficient to constitute closed-ended continuity. *See W. Texas Nat. Bank v. FEC Holdings, LP*, MO-11-CV-086, 2013 WL 2158658, at *7 (W.D. Tex. May 17, 2013) (finding no closed-ended continuity when the alleged RICO acts occurred in October 2006, September 2008, December 2008, and March 2009); *Conry v. Daugherty*, CIV.A.

---

[120]   Ex. B-14 [Mandiant Report] at 9.

[121]   Ex. J-52 [Confluence Timeline] at DHI_0024616.

10-4599, 2011 WL 4807892, at *2 (E.D. La. Oct. 11, 2011) (finding no closed-ended continuity where the alleged RICO acts occurred from January 2007 to April 2007 with the remaining acts occurring from September 2010 to January 2011). Accordingly, Plaintiffs fail to establish either closed-ended or open-ended continuity.

### 2. *No RICO Injury or RICO Standing.*

Plaintiffs allege that the RICO predicate acts include: (1) the HTTP requests in the hacks and attempted hacks, (2) the "Google Analytics Hack," and (3) various communications with Rigzone and DHI in which Kent "emailed figures and charts describing the growth in membership and number of resumes in the Oilpro members database, fraudulently concealing all three hacks." (DE ¶114). To constitute a RICO injury, the harm must be caused by the predicate acts. *Zervas v. Faulkner*, 861 F.2d 823, 832 (5th Cir. 1988) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985). Plaintiffs allege that these predicate acts resulted in damage as "Plaintiffs' assets had been wrongfully taken." (DE ¶115). No RICO injury exists in this case.

### a. No injury from "various communications" or Google Analytics.

Plaintiffs' RICO claims based on the "various communications" and Google Analytics Hack caused no injury. Plaintiffs' representatives admitted that no injury occurred as a result of the Google Analytics Hack.[122] Furthermore, the "various communications" are in no way connected to the alleged assets that were copied. No harm resulted as a part of the communications in which Kent described Oilpro's membership growth.[123] In fact, as noted above, DHI was then working with the FBI to convict Kent during the time these

---

[122] Ex. E [Deposition of Michael Durney] at 307:02–307:05.

[123] Ex. E [Deposition of Michael Durney] at 307:02–307:05.

communications took place.[124] No damages exist that are causally linked to the alleged predicate acts.

                b.      <u>HTTP requests caused no RICO injury.</u>

As for the HTTP requests, Plaintiffs allege generically that they were "damaged in their business and property." (DE 1 ¶ 162). None of the evidence Plaintiffs have produced on their damages resulted from the alleged predicate acts of wire fraud. In Plaintiffs' disclosures, Plaintiffs claim that their damages will be outlined by their expert on damages.[125] Johnson testified to only two measures of damages, one which he referred to as his damages model and another to which he referred as his unjust enrichment model.[126] Neither model provides a basis for recovery under RICO.

                i.      Johnson's models do not show a conclusive financial loss.

Under RICO a plaintiff can recover damages for an injury to business or property. 18 U.S.C. § 1964. The Fifth Circuit found that when an injury is speculative and "does not show a conclusive financial loss" that the Plaintiff lacks standing to bring a RICO suit. *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995). Further, in a trade secrets case when the plaintiff simultaneously made RICO allegations, the court found that the plaintiff could not "show that it suffered concrete financial loss, either in the form of lost opportunity or lost profits, as a result of the deprivation of its property interest in the exclusive use of its trade secret materials." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1021 (C.D. Cal. 2011). Plaintiffs' damages models in this case fail to establish either a lost opportunity or lost profits,

---

[124]   Ex. I [Deposition of Constance Melrose] at 91:22-92:05.

[125]   Ex. N-5 [Plaintiffs' Initial Disclosures] ¶ 3.

[126]   Ex. G-1 [Expert Report of Shane Johnson] at 3 ¶6.

but rather seek to claim either the entire value of the information accessed or seek to recover based on some theoretical model of profits that Oilpro never actually earned. Neither model provides a financial loss under which Plaintiffs can recover under RICO.

ii.     Plaintiffs' corporate representative could not identify any recoverable RICO damages.

Although not mentioned in Plaintiffs' disclosures, Plaintiffs' corporate representative, Melrose, testified on damages. Melrose did not testify of any concrete losses. In fact, Melrose testified to the opposite. Melrose testified that she could not identify any resume accessed by Kent to which Plaintiffs did not continue to have access.[127] Melrose further testified that Plaintiffs did not lose any customers as a result of the accesses.

Q.     Did any customers advise DHI that it failed to renew due to the alleged data breaches?

A.     No.[128]

. . .

Q.     Do you know of any customer who somehow changed their contracting relationship with Rigzone as a result of the alleged data breaches?

A.     I cannot attribute any change in a contract to that.[129]

Melrose testified that that the damages or expenses suffered by Plaintiffs were also represented in Exhibit 2.[130] Exhibit 2 contains a summary of Plaintiffs' purported costs related to the "time of management that was spent" and "the cost of the firm that we hired to work on investigating the

---

[127]   Ex. I [Deposition of Constance Melrose] at 79:03-79:09.

[128]   Ex. I [Deposition of Constance Melrose] at 74:23-75:02.

[129]   Ex. I [Deposition of Constance Melrose] at 71:09-71:14.

[130]   Ex. I [Deposition of Constance Melrose] at 38:12-39:03.

data breach, and attorneys['] fees related to that . . ."[131] But, the costs outlined in Exhibit 2 are (1) not proximately caused by the Accesses and (2) not properly segregated. Only damages that were "reasonably foreseeable consequences of the predicate acts alleged" are recoverable. *Knit With v. Knitting Fever, Inc.*, CIV.A. 08-4221, 2012 WL 2938992, at *9 (E.D. Pa. July 19, 2012), *aff'd sub nom, The Knit With v. Knitting Fever, Inc.*, 625 Fed. Appx. 27 (3d Cir. 2015). The court in *Knit With* noted that "[a]s a general rule, incidental damages where the plaintiff was not the target of the conspiracy, as well as damages incurred by a direct target in investigating and mitigating damages, are generally not deemed direct injury flowing from a defendant's illegal conduct." *Id.* at *7.

For the hours spent by various employees, two problems exist. First, Melrose testified that she was unaware of any diligence performed to ensure the accuracy of these numbers.[132] Second and more importantly, Melrose testified that the damages represented in Exhibit 2 were not connected to the remediation of the computer systems. Specifically, Melrose testified:

> Q.    So this is a little unclear. When you say you don't think this has anything to do with remediating the computer system, what did you mean by this? Did you mean Exhibit or did you mean PR in particular, or did you mean something else?

> A.    Let me rephrase that. Exhibit 2, as I understand it, is not limited to work done to remediate computer systems. I will give you an example. I am in this. I did nothing to remediate computer systems. I had a different role in this. It was to provide insight and understanding to the U.S. Attorney's office about what it takes to acquire, nurture, and retain candidates.[133]

---

[131]   Ex. I [Deposition of Constance Melrose] at 38:12-39:03.

[132]   *See* Ex. I [Deposition of Constance Melrose] at 81:12-15; 83:24-85:03.

[133]   Ex. I [Deposition of Constance Melrose] at 89:15-90:05.

Providing information to the U.S. Attorney's office is not a foreseeable damage under RICO for the access of Plaintiffs' information.

Norville spent an estimated 240 hours in connection with this matter. Norville testified that this time was no more than a "broad guess."[134] Admittedly, Norville relied on no documents in arriving at this number.[135] Almost all this time was spent in doing extensive work helping the FBI build a case against Kent.[136] Norville could not recall how many of those hours were spent helping the FBI.[137] Likewise, John Roberts, DHI's chief financial officer testified that of the approximately 40 hours he spent on this matter, his time primarily "related to the FBI's investigation of it."[138] Roberts further testified that he did not take notes that tallied up to 40 hours.[139] No recoverable RICO injury exists based on the time Melrose, Norville, and other Rigzone employees spent assisting the government in prosecuting Kent.

The Mandiant and Cypress expenses are not recoverable either. Mandiant was hired after Rigzone completed its remediation. Cypress was hired to perform an overall assessment of the security of the Rigzone.com website.[140]

---

[134]   Ex. J [Deposition of Chad Norville] at 252:23-25.

[135]   Ex. J [Deposition of Chad Norville] at 254:3-5.

[136]   Ex. J [Deposition of Chad Norville] at 256:4-6.

[137]   Ex. J [Deposition of Chad Norville] at 256:7-10.

[138]   Ex. L [Deposition of John Roberts] at 21:18-22:05.

[139]   Ex. L [Deposition of John Roberts] at 22:09-22:11.

[140]   Ex. N-1 [Cypress Data Defense Report] at 6.

> Cypress Data Defense was engaged by DHI to perform a hybrid application assessment of the Rigzone web application.  The hybrid assessment entails performing a dynamic assessment of the application along with a static assessment.  The dynamic portion of the assessment has not been conducted at this time due to resource constraints within DHI in getting a testing environment setup.  For this reason, an interim report for just the static code review is being provided so that remediation efforts can commence.

Neither Cypress's work nor Mandiant's work constitute recoverable costs under RICO.

Likewise, Plaintiffs have no evidence of what Holland & Knight did beyond helping Plaintiffs assist in the prosecution of David Kent.[141] Again, the work to prosecute Kent is not a foreseeable consequence of the Accesses. The damages for fixing the pre-existing security weaknesses in the Rigzone.com website, assessing who created the access points, and working with the U.S. Attorneys' Office to prosecute Kent can hardly be said to be damages to DHI, let alone damages that are "reasonably foreseeable consequences." Plaintiffs have no evidence of RICO injury proximately caused by the predicate acts that they allege.

### 3.      Other RICO Elements

Plaintiffs have no evidence of two critical elements of their RICO claims. As noted above, the elements include "a person" and an "enterprise." *Whelan*, 319 F.3d at 228–29. Plaintiffs lack sufficient evidence to prove the existence of either a legal entity or an association-in-fact sufficient to constitute a RICO enterprise. Furthermore, as to Plaintiffs' specific allegations under Section 1962(c), the Fifth Circuit has stated that "[c]ompany officers and employees not associated other than through the activities of the company do not constitute an enterprise for purposes of § 1962(c)." *Id.*

---

[141]   Ex. E-2 [Damages Estimate].

47

In Count V Plaintiffs allege a violation of 18 U.S.C. § 1962(a), Investment of Income from Racketeering Activity. Plaintiffs have no evidence of any investment of income from any alleged racketeering activity. Further Plaintiffs have no evidence of any income from the alleged racketeering activity. On this basis, Defendants are entitled to summary judgment based on Plaintiffs' Count V.

**E.      Plaintiffs have no damages.**

*1.      Kent's $3.29 Million Restitution Offsets Any Claimed Damage.*

This Court has already recognized that Defendants are entitled to an offset for amounts paid in connection with Kent's plea in the criminal case. (DE 197 at 40:17-25.)

```
        MR. MUNISTERI:  Here's the last issue, Your Honor.
And I have not raised this with Plaintiff's Counsel, so I --
but I'm trying to think of ways -- I think both parties have
tried to settle the case.  We're far apart.
        I don't know that this is an impediment, but I do
think that the large elephant in the room is whether the
$3.3 million that has already been paid as a credit will be
an offset.
        THE COURT:  Of course it will.
```

Counsel for Plaintiffs agreed. (DE 197 at 41:3-5.)

Further, a definitive policy against double recovery, spanning both the criminal and civil federal judicial systems exists. *See United States v. Langley*, No. CIV.A.08-495-JJB-CN, 2009 WL 306733, at *2 (M.D. La. Feb. 9, 2009) ("The government recognizes that it is not entitled to double recovery and that it must 'cross credit' any payments made on the civil judgment against the criminal restitution order and vice versa."). The United States Code § 3664 states that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in . . . any Federal civil proceeding." 18 U.S.C. § 3664.

In the criminal case, Kent pled guilty to accessing resume data on Rigzone's website—the same conduct alleged in this lawsuit. For losses associated with this conduct, Kent paid $3,292,800, which more than fully compensated Plaintiffs for any loss caused by Defendants.

2.     *CFAA.*

Plaintiffs assert three CFAA claims against Oilpro and Kent. Each claim requires unauthorized access but is then distinguished by the impact of the unauthorized access. The types of unauthorized access include: (1) obtaining information *or* (2) anything of value from the computer *or* (3) causing damage to the computer systems. For each of the three claims, the available damages are the same: economic damages.[142]

Plaintiffs have expressly disclaimed any damage to their computer system, so Plaintiffs cannot recover for this type of unauthorized access. Under the CFAA "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030 (g). Damage is defined as "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030 (e) (8).

Loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030 (e) (11).

---

[142]   DHI does not allege conduct that would allow it to recover non-economic damages (*i.e.,* the CFAA provides that one of the harms listed in sections II – VI of § 1030(c)(4)(A)(i) allows recover of non-economic damages, *see* §1030(g)).

As described below, Durney and Melrose testified that no such damage occurred. Durney

testified: [143]

> Q.    Are you aware of any data of DHI destroyed by any of the defendants in
> this case?
>
> A.    No.
>
> Q.    Are you aware of any property of DHI destroyed by any of the defendants
> in this case?
>
> A.    No.
>
> Q.    Are you aware of any data or property corrupted by any of the defendants
> in this case?
>
> A.    No.
>
> Q.    Are you aware of any data or property deleted by any of the defendants in
> this case?
>
> A.    No.[144]
>
> . . .
>
> Q.    Are you aware of any decrease or any change in the completeness or the
> usability of data on a Rigzone computer system that was caused by any of
> the defendants in this case?
>
> A.    No.
>
> Q.    Are you aware of any interruption in service caused by any of the
> defendants in this case?
>
> A.    No.[145]
>
> . . .
>
> Q.    Has anything been done at all, to your knowledge, within your
> organization or outside your organization, to assess whether any decline

---

[143]   Ex. E [Deposition of Michael Durney] at 142:15–142:21.

[144]   Ex. E [Deposition of Michael Durney] at 83:04–83:19.

[145]   Ex. E [Deposition of Michael Durney] at 84:04–84:13.

resulted from the actions of any of the defendants, apart from general business decline?

A.      No.[146]

This testimony was reinforced by Melrose's testimony. Specifically, Melrose testified that she was unaware of:

- any disruption or interruption in the Rigzone website caused by the data breaches;

- any damage to the website;

- any corruption of data;

- any alteration of data caused by the breach;

- the deletion of any physical files;

- any function of the Rigzone website being affected by the breach;

- any customer unable to access the Rigzone website because of the breach;

- any customers who failed to renew because of the alleged data breaches; and

- any customers identified who ceased doing business or changed their terms of service because of the data breach.[147]

Roberts' testimony further confirms Plaintiffs' lack of damages.[148] Roberts also made no statement to the SEC or investors regarding an alleged loss, despite recognizing that material events must be reported.[149] Roberts acknowledged that a loss of $3 million or more would be material.[150] No such loss was ever reported.[151]

---

[146]   Ex. E [Deposition of Michael Durney] at 101:20–102:03.

[147]   Ex. I [Deposition of Constance Melrose] at 65:02-65:08, 68:02-68:10, 68:11-68:16, 68:17-68:19, 68:20-68:22, 157:3-157:15, 68:23-69:02, 68:23-69:02, 69:3-7, 69:08-70:03, 74:23-75:02, 76:06-76:14.

[148]   Ex. L [Deposition of John Roberts] at 75:05-77:20.

[149]   Ex. L [Deposition of John Roberts] at 94:17-94:21; 95:07-95:25.

[150]   Ex. L [Deposition of John Roberts] at 96:22-97:02.

[151]   Ex. L [Deposition of John Roberts] at 97:09-97:21.

Plaintiffs' utter lack of damages became even more apparent when the examinations turned to the specific calculations of time and expenses DHI represented to the Government that it had incurred as a result of the conduct of Kent. DHI provided the Government with a spreadsheet detailing that it had incurred costs totaling $403,307 in employee time, vendor costs, and legal fees,[152] but Plaintiffs' own witnesses confirm that these numbers are unsupported and include expenses that are not recoverable.[153] *See Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc.*, 616 F. Supp. 2d 805, 812 (N.D. Ill. 2009), on reconsideration in part (May 13, 2009) ("It appears Del Monte hired Holleb for assistance in its lawsuit against Kinnavy and Chiquita, not to conduct a damage assessment. While this is certainly a legitimate business concern, it does not transform the harms suffered by Del Monte into "losses" under the CFAA."); *Civil Center Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005) ("[C]osts not related to computer impairment or computer damages are not compensable under the CFAA."); *L-3 Communications Westwood Corp. v. Robicharux*, CIVA 06-0279, 2007 WL 756528, at *4 (E.D. La. Mar. 8, 2007) (noting that the lost revenue recovery "only where connected to an interruption of service.").

Specifically, Plaintiffs did not pay any of their salaried employees anything outside of their salary and, then, made no effort to subtract all the time spent meeting with the government. The time Plaintiffs spent meeting with the government would not constitute a "loss" under the CFAA. Regardless, Plaintiffs have already received $3,292,800 in restitution.

---

[152]   Ex. E-2 [Damages Estimate].

[153]   *See,* Ex. E [Deposition of Michael Durney] at 185:19–188:10; Ex. I [Deposition of Constance Melrose] at 50:02 –50:14.

3.     *THACA*

To the extent Plaintiffs' claim is not otherwise barred by TUTSA, Plaintiffs lack sufficient damages to establish a THACA claim. "A person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code, has a civil cause of action if the conduct constituting the violation was committed knowingly or intentionally." TEX. CIV. PRAC. & REM. CODE ANN. § 143.001. "Section 33.02 makes it a crime to knowingly access a computer, computer network, or computer system without the owner's effective consent." *Snapt, Inc. v. Ellipse Commc'ns., Inc.*, No. 3-09-CV-0661-O, 2010 WL 11542003, at *3 (N.D. Tex. Aug. 10, 2010).

For a THACA claim, Plaintiffs must show that they are a "person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code." TEX. CIV. PRAC. REM. CODE ANN. § 143.001. Section 33.02(a) of the Texas Penal Code states that "[a] person commits an offense [of harmful access by computer] if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner." "Injury" under the THACA differs from "damage" or "loss" under the CFAA. *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *17 (N.D. Tex. Sept. 12, 2007). For example, the court in *BoardFirst* specifically noted that "while certain investigative and responsive costs may be recoverable as a 'loss' under the CFAA," those costs are not necessarily the type of costs that constitute an injury. *Id.* at *17. As outlined above, the claimed investigation costs was merely time spent on urging prosecution of Kent and determining who wrote the

original code. Plaintiffs did not suffer any injuries as a result of the alleged access to the Rigzone website.[154]

**F.     Limitations Bars Plaintiffs' Claims Based On the First Access.**

The statute of limitations for Plaintiffs' CFAA, SCA, misappropriation of confidential information, THACA, and TTLA claims is two years. 18 U.S.C. § 1030(g) (CFAA); 18 U.S.C. § 2707(f) (SCA); *Daboub v. Gibbons*, 42 F.3d 285 (5th Cir. 1995) (misappropriation of confidential information); TEX. CIV. PRAC. & REM. CODE 143.001(b) (THACA); *Lau v. Reeder*, 05-14-01459-CV, 2016 WL 4371813, at *5 (Tex. App.—Dallas Aug. 16, 2016), reh'g denied (Nov. 17, 2016) (TTLA). The First Access ended in April 2014, and Plaintiffs waited until June 2016 to file their claims. Accordingly, Plaintiffs' CFAA, SCA, misappropriation of confidential information, THACA, and TTLA claims based on the First Access are all barred by the statute of limitations.

Furthermore, any argument that Plaintiffs were unaware of the First Access or Oilpro and Kent's alleged involvement would be disingenuous. DHI first contacted the FBI in May 2014.[155] DHI also informed the FBI that it believed Oilpro was responsible.[156] Despite this knowledge, Plaintiffs waited to file their complaint until June 10, 2016—after the statute of limitations had already expired. (DE 1).

---

[154]  Ex. I [Deposition of Constance Melrose] at 62:08-62:11, 68:11-68:16, 64:18-64:24; *see also* Ex. E [Deposition of Michael Durney] at 298:7-298:15.

[155]  Ex. B [Deposition of Jason Braddy] at 10:22-11:13.

[156]  Ex. E-3 [Holland & Knight Email to DOJ] at DHI_0000550.

## CONCLUSION

Defendants are entitled to summary judgment as a matter of law on each of Plaintiffs' claims. Many of Plaintiffs' claims are preempted by TUTSA or are otherwise barred by the statute of limitations. Plaintiffs' other claims are barred as a matter of law. Additionally, Plaintiffs cannot prove damages sufficient to raise a genuine issue of material fact. Accordingly, Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims.

Respectfully submitted,

**FOLEY GARDERE**
 **FOLEY & LARDNER LLP**

_s_/James G. Munisteri
James G. Munisteri
Texas Bar No. 14667380
Marla T. Poirot
Texas Bar No. 00794736
1000 Louisiana, Suite 2000
Houston, Texas 77002-2099
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
mpoirot@foley.com

Sara Ann Brown
Texas Bar No. 24075773
2021 McKinney, Suite 1600
Dallas, Texas 75201-3340
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
sabrown@foley.com

**ATTORNEYS FOR DEFENDANT/**
**COUNTER-PLAINTIFF, SINGLE**
**INTEGRATED OPERATIONS**
**PORTAL, INC. D/B/A OILPRO AND**
**OILPRO.COM AND DAVID W.**
**KENT, JR.**

## CERTIFICATE OF SERVICE

I certify that on October 12, 2018, a copy of the forgoing was served via email to the following:

Walter Lynch
Amir Halevy
Jeb Golinkin
JORDAN, LYNCH & CANCIENNE PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
wlynch@jlcfirm.com
ahavely@jlcfirm.com
jgolinkin@jlcfirm.com

**Counsel for Plaintiffs DHI Group, Inc. f/k/a Dice Holdings, Inc. and Rigzone.com, Inc.**

_s_/James G. Munisteri

James G. Munisteri

4822-2783-1668.8