## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| DHI Group, Inc. f/k/a Dice Holdings Inc. and RIGZONE.com, Inc.,<br>    Plaintiffs,<br>    vs.<br>David W. Kent, Jr., Single Integrated Operations Portal, Inc. d/b/a Oilpro, et al.,<br>    Defendants.<br><br>Single Integrated Operations Portal, Inc. d/b/a Oilpro and OILPRO.com,<br>    Counter-Plaintiff,<br>    vs.<br>DHI Group, Inc. f/k/a Dice Holdings Inc. and RIGZONE.com, Inc.,<br>    Counter-Defendants. | Civil Action Number: 16-cv-01670 |

## MOTION TO STRIKE PLAINTIFFS' EXPERT SHANE JOHNSON

FOLEY GARDERE
FOLEY & LARDNER LLP

James G. Munisteri
Texas Bar No. 14667380
Marla T. Poirot
Texas Bar No. 00794736
1000 Louisiana, Suite 2000
Houston, Texas 77002-2099
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
E-Mail: jmunisteri@foley.com
E-Mail: mpoirot@foley.com

Sara Ann Brown
Texas Bar No. 24075773
2021 McKinney, Suite 1600
Dallas, Texas 75201-3340
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
E-Mail: sabrown@foley.com

ATTORNEYS FOR DEFENDANTS

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS.................................................................................................. 2

TABLE OF AUTHORITIES ........................................................................................... 4

SUMMARY OF THE ARGUMENT .............................................................................. 7

BACKGROUND ............................................................................................................ 9

    A.    The Lawsuit. ....................................................................................... 9

    B.    The Information Accessed. ............................................................... 11

    C.    Johnson's Opinions........................................................................... 12

        1.    Market-value-per-user........................................................ 12

        2.    Unjust enrichment. ............................................................. 14

LEGAL STANDARD.................................................................................................... 15

ARGUMENT AND AUTHORITIES ........................................................................... 16

    A.    Johnson's Opinion Depends on False Assumptions............................ 16

    B.    Johnson's Valuation is Not Relevant. ............................................... 19

        1.    Preemption. ........................................................................ 19

        2.    TUTSA - Actual Loss. ....................................................... 21

        3.    TUTSA - Unjust Enrichment ............................................ 23

        4.    Remaining Claims.............................................................. 23

    C.    Market-Value-Per-User Calculation Is Unreliable. ............................ 25

        1.    Market-value-per-user is not an admissible methodology....................... 25

        2.    Johnson did not attempt to determine the value of resumes or emails, in the real world.................... 26

        3.    Johnson ignored the downturn in the oil and gas industry beginning in 2014. ......................... 27

        4.    Johnson's reliance on the OilCareers acquisition renders his methodology unreliable. .................... 28

        5.    Johnson's reliance on LinkedIn renders his methodology unreliable.......................... 30

        6.    Johnson's reliance on the Fairbanks investment renders his methodology unreliable. .................. 31

D.    Unjust Enrichment Calculation Is Unreliable. ...................................... 31

    1.    Johnson's calculation is based on "wholly speculative expectations of profits.". ................................................................................ 31

    2.    Johnson's calculation relies blindly on the Fairbanks Projection. ............ 33

        a.    Johnson did not investigate the assumptions underlying the Fairbanks Projection. ...................................................... 34

        b.    The Fairbanks Projection is unreliable. ....................................... 37

    3.    Johnson's methodology is flawed. ............................................. 37

        a.    Incorrect valuation date ............................................... 37

        b.    Inflated discount rate ................................................. 39

E.    Johnson Is Unqualified. ................................................................... 39

F.    Plaintiffs' Simplistic Model Is Unfairly Prejudicial. ............................ 43

CONCLUSION ............................................................................................... 44

CERTIFICATE OF SERVICE .......................................................................... 45

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Alcatel USA, Inc. v. Cisco Sys., Inc.*,
  239 F. Supp. 2d 660 (E.D. Tex. 2002) ................................................................44

*Barrell of Fun, Inc. v. State Farm Fire & Casualty Co.*,
  739 F.2d 1028 (5th Cir. 1984) ...........................................................................17

*Carbo Ceramics, Inc. v. Keefe*,
  166 F. App'x 714 (5th Cir. 2006) ...................................................................22, 43

*Cioffi v. Google, Inc.*,
  213-CV-00103JRGRSP, 2017 WL 235011 (E.D. Tex. Jan. 19, 2017) .................................46

*Cioffieta v. Google, Inc.*,
  213-CV-00103JRGRSP, 2017 WL 77395 (E.D. Tex. Jan. 9, 2017) .......................................46

*Communications, Inc. v. Microdata GIS, Inc.*,
  2:12-CV-00162-JRG, 2013 WL 11322510 (E.D. Tex. Dec. 3, 2013) ........................39, 41, 42

*Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.*,
  No. H-06-3457, 2008 WL 375505 (S.D. Tex. Feb. 11, 2008) .................................36

*Factory Mut. Ins. Co. v. Alon USA L.P.*,
  705 F.3d 518 (5th Cir. 2013) .............................................................................20

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997) ..........................................................................................17

*Group Health Plan, Inc. v. Philip Morris Inc.*,
  188 F. Supp. 2d 1122 (D. Minn. 2002) .............................................................18

*GWTP Invs., L.P. v. SES Americom, Inc.*,
  No. 3:04-cv-1383-L, 2007 WL 7630459 (N.D. Tex. Aug. 3, 2007)........................36

*Hathaway v. Bazany*,
  507 F.3d 312 (5th Cir. 2007) .............................................................................18

*Heller v. Am. Indus. Props. REIT*,
  156 F. Supp. 2d 645 (W.D. Tex. 2000)...............................................................36

*Jacked Up, LLC v. Sara Lee Corp.*,
  291 F. Supp. 3d 795, 803 (N.D. Tex. 2018), aff'd, 3:11-CV-3296-L, 2018 WL
  2064126 (N.D. Tex. May 2, 2018).......................................................................35

**Cases Cont'd**                                                    Page(s)

*JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*,
    CIV. A. 97-CV-0652, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998), *aff'd*, 178
    F.3d 1279 (3d Cir. 1999) ...................................................................................38

*Johnson v. Arkema, Inc.*,
    685 F.3d 452 (5th Cir. 2012) ............................................................................17

*Joy v. Bell Helicopter Textron, Inc.*,
    999 F.2d 549 (D.C. Cir. 1993) ..........................................................................19

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ..........................................................................................17

*LSQ Funding Grp., L.C. v. EDS Field Servs.*,
    879 F. Supp. 2d 1320 (M.D. Fla. 2012) ...........................................................46

*Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*,
    2010 WL 2978289 (D. Conn. Apr. 9, 2010) .....................................................46

*Mathis v. Exxon Corp.*,
    302 F.3d 448 (5th Cir. 2002) ............................................................................18

*Mattel, Inc. v. MGA Entm't, Inc.*,
    782 F. Supp. 2d 911 (C.D. Cal. 2011) ..............................................................27

*Mays v. State Farm Lloyds*,
    98 F. Supp. 2d 785 (N.D. Tex. 2000) ...............................................................18

*Montalvo v. Strickland*,
    No. SA-09-cv-247-XR, 2010 WL 538395 (W.D. Tex. Feb. 5, 2010) ...............36

*Orthoflex, Inc. v. ThermoTek, Inc.*,
    986 F. Supp. 2d 776 (N.D. Tex. 2013) .............................................................27

*Paz v. Brush Engineered Materials, Inc.*,
    555 F.3d 383 (5th Cir. 2009) ............................................................................18

*Powell v. Carey Int'l, Inc.*,
    2007 WL 1068487 (S.D. Fla. Apr. 9, 2007) .....................................................46

*Sierra v. Dorel Juvenile Group*,
    CV B: 12-232, 2014 WL 12598325 (S.D. Tex. Sept. 30, 2014).................27, 28

*Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*,
    No. 8:01-CV-2302-T-30MSS, 2003 WL 1738838 (M.D. Fla, Mar. 27, 2003) ......18

**Cases Cont'd**                                                                 **Page(s)**

*Sw. Energy Prod. Co. v. Berry-Helfand*,
    491 S.W.3d 699 (Tex. 2016)....................................................................24, 25, 44

*In re Taxable Mun. Bond Sec. Litig.*,
    51 F.3d 518 (5th Cir. 1995) ...............................................................................26

*Transclean Corp. v. Bridgewood Services, Inc.*,
    290 F.3d 1364 (Fed. Cir. 2002)..........................................................................44

*In re TXCO Res., Inc.*,
    475 B.R. 781 (Bankr. W.D. Tex. 2012)..............................................................24

*United States v. Kuhrt*,
    788 F.3d 403 (5th Cir. 2015) .............................................................................21

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518 (5th Cir. 1974) ...................................................................24, 33, 34

**Statutes**                                                                    **Page(s)**

18 U.S.C.A. § 1964.......................................................................................................26

18 U.S.C. § 1030 (g)....................................................................................................25

18 U.S.C. § 2707(c).....................................................................................................26

**Rules**                                                                        **Page(s)**

FED. R. EVID. 403....................................................................................................17, 46

FED. R. EVID. 702, 703...........................................................17, 18, 35, 36, 42, 46

TEX. CIV. PRAC. & REM. CODE § 134A.007(a).............................................................21

Defendant and Counter-Plaintiff Single Integrated Operations Portal, Inc. d/b/a Oilpro and Oilpro.com ("Oilpro") files this Motion to Strike Plaintiffs' Expert Shane Johnson, who was designated by Plaintiffs, Counter-Defendants DHI Group, Inc., f/k/a Dice Holdings Inc. and Rigzone.com, Inc. (collectively "Plaintiffs").

Plaintiffs hired Shane Johnson as an expert to opine on their "economic damages related to the misappropriation of member information from Rigzone" and the amount that "Defendants were unjustly enriched by the misappropriation of member information from Rigzone."[1] Johnson has submitted an expert report and appeared for deposition. Defendants[2] challenge the admissibility of Johnson's proffered testimony.

## SUMMARY OF THE ARGUMENT

Plaintiffs intend to elicit testimony from Johnson regarding "economic damages" and "unjust enrichment."[3] Johnson estimated the "market value" of each user whose resume was allegedly copied by Defendants— though Plaintiffs lost no profits as a result, Defendants did not destroy or publish the resumes, and copying the resumes did not diminish their value. But Texas law only permits a plaintiff to recover the value of an alleged trade secret when the trade secret, and its value, was destroyed (by actual destruction or publication).

---

[1]   Ex. G-1 [Expert Report of Shane Johnson] ¶6.

[2]   Plaintiffs initially filed this suit against six defendants, but only two remain: Single Integrated Operations Portal, Inc. d/b/a Oilpro and Oilpro.com and David W. Kent, Jr., the founder and former president of Oilpro. Plaintiffs asserted 19 causes of action against Kent, including: (1-3) three counts under the Computer Fraud and Abuse Act ("CFAA"); (4) Stored Wire and Electronic Communications and Transactional Records Access Act ("SCA"); (5-7) three counts under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (8) Texas Uniform Trade Secrets Act ("TUTSA"); (9) common law misappropriation of confidential information; (10) Texas Harmful Access by Computer Act ("THACA"); (11) Texas Theft Liability Act ("TTLA"); (12) conversion; (13) trespass to chattels; (14) fraud; (15) fiduciary duty; (16) unfair competition; (17) tortious interference with present and prospective business relationships; (18) civil conspiracy; and (19) aiding and abetting. Plaintiffs assert all these same claims against Oilpro, with the exception of the RICO, fraud, and fiduciary duty claims. Also, Plaintiffs have agreed to dismiss voluntarily 7 of these claims.

[3]   Ex. G-1 [Expert Report of Shane Johnson] ¶6.

In this case Plaintiffs seek even more than just the value of the alleged trade secret (*i.e.,* the resumes). Plaintiffs seek the full value of *each user* whose resume was copied. And that is not all: Plaintiffs also intend to rely on Johnson to seek millions more through an "unjust enrichment" calculation, even though Defendants made no actual profits from their conduct. Defendants ask this Court to exclude Johnson's testimony for the following reasons:

- **False Factual Assumptions**. Johnson used factually false assumptions. Johnson assumed 796,000 resumes when the truth is 586,500. Johnson also assumed 111,000 converted members when the truth is 20,905. These false assumptions render Johnson's methodology and testimony unreliable.

- **Incorrect Damages Measure**. Neither of Johnson's two models (economic damages and unjust enrichment) estimate a form of recovery permitted by Texas law.

  - o For Plaintiffs' economic damages, Johnson estimated the value of 796,000 resumes. But this measure of recovery is inapplicable under Texas law—a plaintiff can only recover damages for actual loss. A trade secret's value can only be recovered when the defendant destroys or publishes the trade secret, neither of which occurred. And Plaintiffs always retained possession of the resumes and were not even momentarily deprived of use.

  - o Johnson's unjust enrichment opinion is even more untethered to Texas law. In trade secret cases Texas courts allow recovery of the defendant's actual profits as unjust enrichment. Johnson acknowledges that Oilpro made no profits and that he instead estimated the value of Oilpro as an entire company based on a fictional multi-year earnings stream without the disputed 110,000 disputed members. No Texas case has ever allowed a recovery of theoretical profits, let alone the difference in value of a company based on projected, theoretical profits over multiple years.

- **Market-Value-Per-User Is Junk Finance**. Johnson's market-value-per-user theory is an irrelevant business metric that no other financial expert in the world has recognized, used, tested, peer reviewed, or even written about, for purposes of valuing resumes. And the result is absurd. Johnson opines that Rigzone's resumes were worth between $20 and $90 a piece, yet he cannot identify any person or company that has ever paid more than a $1 per resume to purchase a group of 5,000 or more resumes. This methodology does not come close to crossing the threshold set by *Daubert*.

- **Market-Value-Per-User Is Unreliable For Other Reasons**. Multiple components of the methodology are unreliable. The entire idea is overly simplistic, asking the Court to believe that a resume can be valued by taking the

8

total value of a company and dividing by the number of members. But even putting aside that overriding fallacy, the market-value-per-user calculation ignores real-world resume purchase prices, ignores Rigzone's pricing for unlimited resume access, ignores the devastating oil and gas industry downturn during 2014 to 2016, relies on data for companies incomparable to Oilpro, and relies on an imputed valuation for Oilpro unrepresentative of actual value.

- **Unjust Enrichment Calculation Relies Blindly on Unreliable Information**. An expert may not just blindly accept numbers provided by another party. Here, Johnson did nothing to investigate the reliability of assumptions in the Fairbanks Projection. Worse, Fairbanks himself confirms that no judge, jury, and certainly no expert should rely on his projection and that the assumptions were made up numbers.

## BACKGROUND

### A. The Lawsuit.

As this court is aware,[4] this case involves dueling allegations from the companies behind www.rigzone.com (Plaintiffs) and www.oilpro.com (one of the Defendants); both sides "scraped" resumes from the other's website without authorization.[5] Plaintiffs allege that Defendants obtained copies of resumes previously uploaded by Rigzone users and used email addresses from a portion of those resumes to send emails inviting individuals to join Oilpro. When an individual who received an invitation, accepted the invitation, joined Oilpro, and completed user profile, Oilpro obtained a new member. Plaintiffs do not allege that Defendants published or used the resumes other than as a source of email addresses.

Plaintiffs allege that Defendants scraped resumes in two phases.[6] The first phase (the "First Access") occurred between February and April 2014; the second phase (the "Second Access") occurred between June and early August 2015. After Plaintiffs detected the First Access, they referred the matter to FBI who inquired about "the extent of the loss or harm sustained by Rigzone, as a result of the theft" and on July 2, 2014, Plaintiffs told the FBI and

---

[4] See, e.g., DE 93 at 2-16 (regarding Plaintiffs' allegations against Defendants) and DE 102 at 2–6 (regarding Defendants' allegations against Plaintiffs).

[5] Ex. L [Deposition of John Roberts] at 28:11-28:18; 31:16-32:15; 33:23-34:02; 36:19-36:22. (regarding DHI's scraping activities).

[6] DE 1 ¶71.

Department of Justice: "[w]e believe the amount of the harm, at the very least, to be in the millions of dollars."[7] The DOJ believed Plaintiffs and prosecuted Kent.[8]  Kent paid Plaintiffs $3.3 million in restitution in that criminal case.

Plaintiffs filed this lawsuit on June 10, 2016. Despite the four years that have passed since the First Access, a criminal case against Kent, and civil discovery, no evidence exists of any harm to Plaintiffs "as a result of the theft" and certainly no evidence exists of harm exceeding the $3.3 million already paid to Plaintiffs.[9] It is now clear that Plaintiffs have lost no profits, users, subscribers, or advertisers because of Defendants' actions.[10] Indeed, DHI—a public company—never mentioned to its investors any losses or damages caused by Defendants.[11] And it is undisputed that Defendants' conduct did not harm Plaintiffs' computer system, database, or any of the underlying data:[12] Plaintiffs always had access to the resumes in

---

[7]     Ex. L-95A [July 2, 2014 Email].

[8]     Ex. N-2.

[9]     Ex. L [Deposition of John Roberts] at 50:03-13 (DHI's CFO during the relevant time testifying that he never reported any losses to the SEC caused by Oilpro's access to resumes).; 70:16-71:18 (testifying that it was part of his responsibilities to report accurate financial information to management, the board, and SEC); 92:09-93:02 (noting that there was no disclosure in any press release or SEC Filing about Rigzone suffering $20 million in damages because of the resumes being copied); 93:23-94:02 and 95:23-97:06 (if there had been $3 million or more damages, that would have been a material amount that would have been disclosed); 130:25-131:06 (Roberts never notified auditors about anything to do with Defendants, even though it was important to make auditors aware of material events).

[10]     Ex. L [Deposition of John Roberts] at 87:06-11; Ex. I [Deposition of Constance Melrose] at 187:12-187:17 ("Q: Can you identify any lost revenue today? A: No, not as of today. Q: Over the last three years, has anyone identified to you any lost revenue? A: No") and 74:11-17 ("Q: Can you identify, as the corporate representative of DHI, the name of a single customer who did not renew with Rigzone because of the alleged data breaches? A. It is not possible to do that, because the data breach was unknown to customers."); 177:10-17 (same).

[11]     Ex. I [Deposition of Constance Melrose] at 198:02-09.

[12]     *See, e.g.,* Ex. I [Deposition of Constance Melrose] at 68:17 (testifying as the corporate representative that she had no knowledge that any data breaches corrupted or altered any data, and that no customer had been unable to access the Rigzone website as a result of the alleged data breaches); 157:06-15 (same); 145:19-146:01 (testifying as the corporate representative that she believed that the economic value of the Rigzone database; 183:06-13 (testifying that she could not quantify DHI's reduced competitive position).

       *See also* Ex. E [Deposition of Michael Durney] at 83:04-84:17 (testifying he is not aware of any data destruction, deletion, corruption, decreased completeness or usability of the data caused by Defendants, nor is he aware of any subscriber who ceased subscribing because of the actions of Defendants); 98:05-98:18 (has not taken "any impairment or write-off due to the loss of any business . . . [as a result] of the defendants"); 99:10-100:14 (has not disclosed any loss resulting from Defendants conduct to the investors or in any required SEC

their database, and no one has ever identified a decrease in value of the database caused by Defendants copying some resumes.[13] In fact, the evidence shows affirmatively that any losses Plaintiffs suffered were not the result of Defendants' actions but rather the tremendous decline in oil prices that began in 2014.[14]

**B.      The Information Accessed.**

Plaintiffs allege that Defendants obtained approximately 96,000 resumes during the First Access[15] and 700,000 during the Second Access.[16] These allegations are false: Defendants did not obtain or even access 796,000 resumes. At best—and viewing the evidence in Plaintiffs favor—Plaintiffs' evidence reflects that during the First Access and Second Access there were 733,072 HTTP requests to Rigzone's servers and that many of those requests were not returned or returned a blank or duplicate document.[17] Plaintiffs concede that Defendants only obtained 586,560 unique email addresses during the First Access and Second Access (DE 1 ¶71).[18]

Only a portion of the 586,500 resumes were used for their email address—and even then an individual receiving an invitation only became an Oilpro member by signing up and creating a profile either of their own accord. Plaintiffs allege that of the invited persons approximately 111,000 were—or later became—Oilpro members. (DE 1 ¶71.) But this does not answer the

---

filings); 298:07-15 (not aware of any damage to DHI's computer systems or the data on the Rigzone website as a result of the alleged breaches); Ex. L [Deposition of John Roberts] at 72:19-75:07; 76:23-78:11 (same).

[13]   Ex. L [Deposition of John Roberts] at 171:12-16.

[14]   Ex. I [Deposition of Constance Melrose] at 197:13-25; 147:02 -148:19 (testifying that Rigzone represented to investors and in SEC filings that the decline in the value of the database was due to the down-turn of the oil industry); 198:02-198:09 (same); Ex. E [Deposition of Michael Durney] at 101:15-102:03 (has not segregated any decline in subscriptions due to Defendants conduct, as opposed to the "enormous decline in the energy business during the latter half of 2014 to the present"); Ex. L [Deposition of John Roberts] at 97:02-97:16; 98:01-98:14; 99:21-100:05; 104:22-106:09 (testifying that Rigzone's losses beginning in mid-2014 were the result of the decline in the oil and gas market).

[15]   DE 1 ¶69.

[16]   DE 1 ¶91.

[17]   Ex. N-10 [Designation Exhibit 3, Livingston Expert Report] at ¶¶10-14.

[18]   Defendants' expert conducted his own analysis and confirmed 587,104 unique email addresses (for a variance of less than 1%). Ex. N-10 [Designation Exhibit 3, Livingston Expert Report] at ¶12.

relevant question: how many new users Oilpro received "*as a result of Kent's conduct.*" Plaintiffs admit that they have not investigated this issue and have no experts to testify on this issue. (DE 220 at 3.) But Defendants have done this analysis. The uncontested fact is that Oilpro obtained **only 20,905 new users** as a result of the First Access and Second Access.[19] Plaintiffs' allegation (on which Johnson relied blindly) is overstated by a factor of 5.3 times.

**C.    Johnson's Opinions.**

*1.    Market-value-per-user.*

To calculate Plaintiffs' economic damages—instead of looking to Plaintiffs' lost profits or other damages,[20] Johnson sets out to calculate the "value of the misappropriation," which he asserts—without authority—can be determined through his market-value-per-user method.[21] Johnson's method is faulty from inception because he accepts and relies on Plaintiffs' inaccurate allegations[22] identifying 796,000 users as the relevant asset to be valued. As discussed above, Defendants did not copy information from 796,000 users: the undisputed evidence shows that Defendants obtained only 586,500 unique email addresses. But despite this information, Johnson blindly relies on 796,000 as the relevant number.[23]

Johnson's market-value-per-user method is simple: he divides a company's total value (without discounting value from the company's goodwill, software, customer list, data, real

---

[19]    Ex. N-10 [Designation Exhibit 3, Livingston Expert Report] at ¶9.

[20]    Ex. G [Deposition of Shane Johnson] at 30:24-31:14 ("Q: Are you offering any opinions on DHI's lost profits because of any activity in this case? A: No. Q: Are you offering any opinions in this case on any expenses that DHI has incurred as a result of events in this case[?] A: No. . . . Q: Are you offering any opinions on the value of Rigzone as a company and damage to the value of Rigzone as a company . . .[?] A: No."); 32:04-32:16 ("Q: Are you offering any opinions on remediation cost? A: No. . . . Q: Are you offering any opinions on estimate damage to the Rigzone database or computer systems themselves? A: No.").

[21]    Ex. G-1 [Expert Report of Shane Johnson] at 7 ¶26.

[22]    Ex. G-1 [Expert Report of Shane Johnson] at 6 ¶24.

[23]    DE 1 at 17 ¶71; Ex. G [Deposition of Shane Johnson] at 107:21-109:02.

property, or other tangible and intangible assets) by its number of users. Johnson's method looks at the market-value-per-user for four companies, LinkedIn, Rigzone, OilCareers, and Oilpro. He looks at the value of Rigzone from 2010, with the remaining based on 2014 values.[24]

| **OilCareers**[25] | 2014 Price: | $26.4 Million | = | $20.46 per user |
|---|---|---|---|---|
| | Users: | 1.29 Million | | |

| **LinkedIn**[26] | 2014 Market Capitalization: | $28.5 Billion | = | $82.27 per user |
|---|---|---|---|---|
| | Users: | 346.7 Million | | |

| **Rigzone**[27] | 2010 Purchase Price: | $51.7 Million | = | $75.69 per user |
|---|---|---|---|---|
| | Users: | 683,000 | | |

| **Oilpro**[28] | 2014 Fair Market Value: | $20 Million | = | $74.33 per user |
|---|---|---|---|---|
| | Users: | 269,068 | | |

To determine "damages" for the First Access, Johnson calculated the mean of the four values and multiplied by 96,000 (the number of users that Johnson assumes had information copied), concluding for the First Access that the misappropriation value was $6.54 million.[29]

For the Second Access, Johnson looks solely to the value of OilCareers because it "is [his] understanding that the majority of the 700,000 user profiles accessed . . . were profiles that

---

[24]   Ex. G-1 [Expert Report of Shane Johnson] at 7-10.

[25]   For OilCareers, the numerator is the price DHI paid for the entire company in 2014. Ex. G-1 [Expert Report of Shane Johnson] at 8 ¶29; *see also* Ex. L-95.D [2014 Grant Thornton Report] at DHI_000554. And for the denominator, Johnson subtracted the users that overlapped between Rigzone and OilCareers (18%). Ex. G-1 [Expert Report of Shane Johnson] at 7 ¶27.

[26]   Ex. G-1 [Expert Report of Shane Johnson] at 8 ¶31; Johnson applied a discount rate of 24.8%.

[27]   Ex. G-1 [Expert Report of Shane Johnson] at 8 ¶29.

[28]   Ex. G-1 [Expert Report of Shane Johnson] at 8 ¶30. The 2014 "fair market value" for Oilpro is based on a $3 million investment Jonathan Fairbanks ("Fairbanks") made for a 15% stake in OilPro. From this investment Johnson implied a fair market value of $20 million.

[29]   Ex. G-1 [Expert Report of Shane Johnson] at 9 ¶34.

were added to the Rigzone database as a result of DHI's acquisition of OilCareers."[30] Johnson multiplied 700,000 by the value-per-user of OilCareers ($20.46), to calculate a value of $14.32 million for the Second Access. Combining the totals for the First Access and Second Access, Johnson concludes that the total misappropriation value is $20.86 million.[31]

> 2.     *Unjust enrichment.*

Next, Johnson outlines his "unjust enrichment" model in which he attempts to determine the value of the new users Oilpro obtained through the First Access and Second Access. Once again, Johnson's analysis is doomed from the get-go because he assumes without diligence that the number of new users is 111,000, based solely on Plaintiffs' allegation in the complaint.[32] Further, Johnson testified that the valuation date was October 17, 2013,[33] the date the First Access period began and approximately 19 months before the Second Access ended.

Johnson's methodology for his unjust enrichment calculation is a discounted cash flow approach. For this cash flow, Johnson relies on a projection made by Jonathan Fairbanks in January 2014—though Fairbanks points out that Johnson used the wrong case flow.[34] This forecast is not an internal Oilpro projection but rather something created when Fairbanks was a prospective investor seeking an investment in SIOPCO (the "Fairbanks Projection").

In his unjust enrichment methodology, Johnson first computes a discount rate using two companies—DHI and LinkedIn (both of which are public companies, standing in stark contrast

---

[30]   Ex. G-1 [Expert Report of Shane Johnson] at 7 ¶26. Johnson claimed that this knowledge was based upon a conversation he had with Chad Norville but Norville testified that no such conversation occurred. *Compare* Ex. G [Deposition of Shane Johnson] at 67:02 – 10) and  Ex. G-1 [Expert Report of Shane Johnson] at 7 n. 27, to Ex. J [Deposition of Chad Norville] at 99:06-21.

[31]   Exhibit G-1 [Expert Report of Shane Johnson] at 9 ¶34.

[32]   Ex. G [Deposition of Shane Johnson] at 110:01-111:16.

[33]   Ex. G [Deposition of Shane Johnson] at 65:05-07.

[34]    Ex. F. [Declaration of Jonathan Fairbanks] at ¶ 7-10.

to Oilpro's start-up status)—then uses the Fairbanks Projection to calculate future revenues both with and without 111,000 additional users. Johnson assumes—though the undisputed evidence is to the contrary—that Oilpro would operate indefinitely.[35] Johnson estimates the "horizon value as the forecasted 7th year cash flow divided by the difference between the discount rate and an assumed perpetual growth rate of 2.0% annually."[36] Finally, Johnson uses a ridiculously low discount rate to calculate present value and then concludes that the 111,000 new Oilpro users were worth $9.87 million—based on the difference in Oilpro's entity value with and without the 111,000.[37] This calculation has nothing to do with unjust enrichment under Texas law. The calculation is not actual profits earned as a result of the misrepresentation. The calculation involves neither actual facts nor an actual profit calculation.

## LEGAL STANDARD

Under the framework explained in the Supreme Court's *Daubert* decision, "Rule 702 assigns the district judge a gatekeeping role to ensure that [expert] testimony is both reliable and relevant." *Johnson v. Arkema, Inc.,* 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted); *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (applying *Daubert* to non-scientific experts). To be admitted, the expert's testimony must be helpful to the jury, which requires that the expert is (1) qualified and (2) that his or her testimony (a) has a reasonable factual basis, (b) is based on

---

[35]   Ex. G-1 [Expert Report of Shane Johnson] at 15 ¶51.

[36]   Ex. G-1 [Expert Report of Shane Johnson] at 15 ¶52.

[37]   Ex. G-1 [Expert Report of Shane Johnson] at 16 ¶57.

reliable methods; and (c) is relevant to facts in issue. FED. R. EVID. 702, 703; *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Daubert*, 509 U.S. at 589. [38]

"The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Mays v. State Farm Lloyds,* 98 F. Supp. 2d 785, 787 (N.D. Tex. 2000). It is the burden of the party offering an expert to prove by a preponderance of the evidence that the expert's proffered testimony satisfies Rule 702 (as elaborated in *Daubert* and its progeny). *See, e.g., Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

## ARGUMENT AND AUTHORITIES

### A.    Johnson's Opinion Depends on False Assumptions.

Johnson's market-value-per-user and unjust enrichment methods both begin with a fatal flaw: accepting the false factual allegations in the Complaint at face value. Johnson accepts without question Plaintiffs' factual allegation that information from 796,000 users was accessed and Oilpro obtained 111,000 new users as a result. But both of these assumptions are wrong: Defendants accessed 586,500 unique email addresses and converted 20,905 users.

"Expert testimony that ignores existing data and is based on speculation" or "contains 'elementary' error is not helpful" and is not admissible. FED. R. EVID. 702 (Advisory Committee

---

[38]    While Rule 702 focuses on an expert's qualifications, methodology, relevance, and reliability, Federal Rule of Evidence 703 ("Rule 703") focuses on the data underlying the expert's opinion. *See* FED. R. EVID. 702 & 703. Under Rule 703, otherwise inadmissible evidence may nonetheless form the basis of an expert's opinion, provided that the inadmissible evidence is of a type reasonably relied upon by experts in the particular field. *See* FED. R. EVID. 703. However, such inadmissible evidence, including facts or data, shall not be disclosed to the jury by the proponent of the opinion testimony unless the Court determines that the probative value of the inadmissible evidence substantially outweighs its prejudicial effect. *See id.* Stated differently, Rule 703 "does not guarantee the admissibility of all expert testimony that meets its criteria if such testimony runs afoul of other evidentiary requirements." *See Barrell of Fun, Inc. v. State Farm Fire & Casualty Co.*, 739 F.2d 1028, 1033 (5th Cir. 1984). "For instance, expert testimony otherwise admissible under Rules 702 and 703 may still be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . .'" *Id.*; FED. R. EVID. 403 ("Rule 403").

Notes, 2000 Amendments) (emphasis added); *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 389 (5th Cir. 2009) (holding that an opinion based on "insufficient, erroneous information," fails the reliability standard). Likewise, "completely unsubstantiated factual assertions" are inadmissible because the "existence of sufficient facts [to support the opinion]... is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318-19 and n. 4 (5th Cir. 2007); *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, No. 8:01-CV-2302-T-30MSS, 2003 WL 1738838, at *3 (M.D. Fla, Mar. 27, 2003) ("A district court should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (internal citations omitted).

Expert opinions based on flawed "facts" or assumptions are to be stopped by the Court in its role as gatekeeper: it is not enough that an opposing party has the opportunity to challenge the faulty foundation during cross examination. *See, e.g., Group Health Plan, Inc. v. Philip Morris Inc.*, 188 F. Supp. 2d 1122, 1134 (D. Minn. 2002) (unrealistic and speculative facts do not "merely affect the weight" that testimony should be given, but require exclusion); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 569 (D.C. Cir. 1993) ("[I]n view of the patent flaws in [the expert's] testimony, we must resist 'the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves.' ") (internal citation omitted).

Here, the Court must keep Johnson's faulty opinions from the jury because his baseline assumptions are faulty. He testified at his deposition:

Q.   Did you do anything, other than take that number at face value, to determine whether [796,000] was the correct number of resumes downloaded or not?

A.   No, that number is from the criminal and civil complaints.

. . .

Q.   My question is did you do anything, other than take at face value the 796,000 number?

A.   No.[39]

. . .

Q.   Dr. Johnson, am I correct that you accepted at face value the approximately 111,000 estimate that was given to you?

A.   Yes . . .[40]

. . .

Q.   Did you do any diligence whatsoever to determine whether 111,000 is true or not true?

A.   No.[41]

Q.   And then subsequent to the number that the DOJ gave, you know that in the record Mr. Kent actually testified that number is incorrect? That's what you just said?

A.   Yes.

Q.   And you did [] nothing to find out which number was correct, 22,000 or 111,000, did you?

A.   Correct.

Q.   You accepted the 111,000 or over 111,000 at face value, right?

A.   Correct.[42]

Johnson's positions are particularly absurd because no dispute exists about the number of unique email addresses accessed—both sides agree that it is approximately 587,000.[43] And while Plaintiffs continue to suggest that the number of new users is 111,000, they have no evidence to

---

[39]   Ex. G [Deposition of Shane Johnson] at 107:25-108:09.

[40]   Ex. G [Deposition of Shane Johnson] at 110:11-110:14.

[41]   Ex. G [Deposition of Shane Johnson] at 112:23-112:25.

[42]   Ex. G [Deposition of Shane Johnson] at 109:09-109:19.

[43]   Ex. N-12 [Plaintiffs' Answers and Objections to Oilpro's Third Set of Interrogatories] at 3 (Plaintiffs' quote from Kent's sentencing memorandum to imply wrongly that Kent admitted Oilpro gained the 111,000 users but the sentencing memorandum does no such thing, Plaintiffs' quote stops short. It goes on to say: "However, as explained in the Revised PSR, **the government agrees** 'that there is **no proof** or indication that all 111,000 new Oilpro members joined based on Kent's activities.' And certainly, some joined independently of Mr. Kent's conduct, just as many people maintain more than one social media or professional media profile. **The exact number of users that Oilpro gained as a result of Mr. Kent's actions remains unknown.**" DE 215-1 at 4 (emphasis added)).

support this number: the only admissible evidence shows that the true number is 20,905. Johnson's opinions rest on these faulty assumptions. Even if his methodology and opinions were otherwise sound, which they are not, these false assumptions would comprehensively corrupt his opinion and require that it be excluded from trial. *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise the expert may simply parrot impermissible hearsay evidence, thereby allowing a party to circumvent the rules against hearsay." (internal quotations omitted)).

**B.      Johnson's Valuation is Not Relevant.**

"The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *United States v. Kuhrt*, 788 F.3d 403, 420 (5th Cir. 2015) (citation and internal quotation marks omitted). Specifically, "expert testimony proffered in the case [must be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (citation and internal quotation marks omitted). Johnson's testimony is not relevant. Johnson presents two models—a "value of the misappropriation" model (Plaintiffs economic damages) and an "unjust enrichment" model.[44] Both models are irrelevant because, as a matter of law, none of Plaintiffs' claims allow for the recovery of the form of damages identified by Johnson. Thus, Johnson's testimony will not aid the jury in determining damages under any claim alleged by Plaintiffs.

*1.      Preemption.*

TUTSA preempts the majority of Plaintiffs' state claims. TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a

---

[44]    Ex. G-1 [Expert Report of Shane Johnson] at 2 ¶¶5-6.

trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.007(a). Plaintiffs' underlying allegations for each of these claims (described in the chart below) are at their core seeking remedies for misappropriation of trade secrets.

| Claim | Trade Secret Allegations |
|---|---|
| Misappropriation of confidential information | ¶182 - Plaintiffs' proprietary member information, internet search methods, and Google Analytics data constitute confidential information. |
| TTLA | ¶200 - Without consent, on numerous occasions, including but not limited to during the First Round of Hacks, the Google Analytics Hacks, Operation Resume Hoard, and the Second Round of Hacks, David Kent, Dufrin, and Oilpro knowingly and unlawfully appropriated Plaintiffs' property with the intent to deprive Plaintiffs of their exclusive use of their member information and their Google Analytics data in violation of section 31.03(a) of the Texas Penal Code." |
| Fiduciary Duty | ¶223 - David Kent intentionally and willfully violated his fiduciary duties to Rigzone by stealing Plaintiffs' data and member information to serve the interests of himself and the company he formed to compete with Rigzone. |
| THACA | ¶ 194 - Plaintiffs have been injured by David Kent, Dufrin, and Oilpro's knowing and intentional access to Plaintiffs' computers, computer networks, and computer systems without consent, as Plaintiffs have had to incur significant costs in (a) assessing the potential damage to Plaintiffs' [sic] that have been caused by the Defendants' unauthorized access, use, and misappropriation, (b) responding to the loss of trade secrets and confidential information caused by Defendants' actions, and (c) mitigating the loss of goodwill among Rigzone's members that has resulted from Defendants' unauthorized use, access and misappropriation. Plaintiffs have also been injured by the reduction in Rigzone's competitive advantages and the effect of Defendants' unauthorized access on Plaintiffs' ability to compete effectively in the marketplace. |

TUTSA limits damages to either the plaintiff's "**actual loss** caused by misappropriation *and* the **unjust enrichment** caused by misappropriation that is not taken into account in computing actual loss [or] [i]n lieu of damages measured by any other methods . . . a **reasonable royalty**[.]" Tex. Civ. Prac & Rem. Code § 134A.004(a) (emphasis added). There are only three categories of possible TUTSA damages: actual loss, unjust enrichment, and reasonable royalty. As Johnson explains in his report, "DHI seeks to recover economic damages [or actual loss] and

unjust enrichment[.]"[45] But the methodology Johnson employs are not recoverable measures of actual loss or unjust enrichment, and his opinions are irrelevant to the issues in this case.[46]

      2.     *TUTSA –Actual Loss.*

TUTSA requires economic damages to be based on actual loss. Plaintiffs have admitted they have no lost profits,[47] and Johnson testified at his deposition that his analysis did not attempt to calculate any lost profits:

> Q.    Now, you've identified what you're testifying [] with respect to the 800,000 and the 111,000. I want to ask you some questions about what I think you are not testifying on, but I just want to make sure that that's not part of your testimony in this case. Are you offering any opinions on DHI's lost profits because of any of the activity in this case?
>
> A.    No.[48]

Johnson's analysis is not based on damages arising from the loss of customers, subscribers, or advertisers because Plaintiffs suffered no such damage.[49] Nor does Johnson calculate damages arising from harm to Plaintiffs' data, trade secrets, servers, or computers because, again, no such damages were incurred.[50] Instead, Johnson claims that he is calculating—as Plaintiffs' economic damages—the "value of misappropriation" which he calculates as the market-value-per-user. Johnson's model purports to calculate the value of the purported trade secret at issue in this case. But Plaintiffs cannot recover the value of the trade secret unless the trade secret was destroyed (by publication or destruction). As a legal matter, Johnson's model is irrelevant to damages available in this case.

For the Plaintiffs' economic damages, TUTSA only permits recovery for **actual loss**. This is consistent with the pre-TUTSA common law on trade secret damages which has long-

---

[45]    Ex. G-1 [Expert Report of Shane Johnson] at 2 ¶5.

[46]    Johnson's report does not address reasonable royalty and the term "royalty" appears nowhere in his report. *See* Ex. G-1 [Expert Report of Shane Johnson].

[47]    Ex. E [Deposition of Michael Durney] at 331:14-331:20.

[48]    Ex. G [Deposition of Shane Johnson] at 30:24-31:02.

[49]    *Supra* notes 9-13.

[50]    *Id.*

accepted that the measure of the value of the trade secret "is an appropriate measure of damages **only when the defendant has in some way destroyed the value of the secret**." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974). "Where the plaintiff retains the use of the secret ... and when there has been no effective disclosure of the secret by publication[,] the total value of the secret to the plaintiff is an inappropriate measure." *In re TXCO Res., Inc.*, 475 B.R. 781, 824 (Bankr. W.D. Tex. 2012)); *Matter of Mandel*, 720 Fed. Appx. 186, 192 (5th Cir. 2018) (citing *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013)).

The market-value-per-user analysis purports to show Plaintiffs' "actual losses" but it is undisputed that Plaintiffs have not suffered *any* damages, losses, or harm from the misappropriation: Plaintiffs have always retained the use of the "secret" and that the value of the "secret" has not been diminished. Johnson's market-value-per-user calculation attempts to calculate the full value of the misappropriated information and would award Plaintiffs that full amount. But this simply is not recoverable under TUTSA. TUTSA only permits recovery of "actual loss caused by misappropriation."

Here, the "secret" was not destroyed. Oilpro did not publish any of the resumes, but rather used the email addresses from the resumes to offer an invitation to join Oilpro.[51] The data allegedly copied by the Defendants was, or is, still available in its original form and content on the original source websites.[52] Indeed, the testimony from Plaintiffs' employees establishes that the Plaintiffs' customers were never aware of the alleged data breach.[53] Because Johnson does not opine on damages that are recoverable in this case, his testimony is not relevant to this case and should be excluded from trial.

---

[51]   DE 1 at 17-18 ¶71.

[52]   Ex. B [Deposition of Jason Braddy] at 44:18-45:20; Ex. E [Deposition of Michael Durney] at 298:07-298:15; Ex. I [Deposition of Constance Melrose] at 157:06-157:15, 159:10-159:13.

[53]   Ex. I [Deposition of Constance Melrose] at 74:11-74:17.

3.      *TUTSA – Unjust Enrichment.*

Under Texas law unjust enrichment is the defendant's actual profits resulting from the use or disclosure of the trade secret. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d at 711. But Johnson made no effort to calculate Defendants' actual profits arising from the use of any trade secret, he testified:

> Q.    Did you in your unjust enrichment opinion and section determine what the actual profits made by Oilpro from the misappropriated resumes was?
>
> A.    The actual profits as going through time, no.[54]

He also failed to conduct any analysis on the costs saved by Oilpro. Instead, Johnson's model projects a potential income stream that could result from the acquisition of the resumes and then determines the incremental value of the entire company based on additional future profits over seven years.[55] This theory is not a recoverable measure of unjust enrichment under Texas law, and Johnson should not be allowed to present such information to the jury.[56]

4.      *Remaining Claims.*

Only specific damages are allowed under CFAA. Under the CFAA "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030 (g). Damage is "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030 (e) (8). Loss is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030 (e) (11).

---

[54]   Ex. G [Deposition of Shane Johnson] at 15:08-15:12.

[55]   Ex. G-1 [Expert Report of Shane Johnson] at 10 ¶37.

[56]   Plaintiffs only allege unjust enrichment damages related to two of their claims: common law misappropriation of trade secrets and fiduciary duty. (DE 1¶¶ 178, 226). Since the unjust enrichment model is not supported by either claim, Johnson should be prohibited from presenting any testimony on this damages model.

Johnson testified that he was not opining on any such loss or damage as defined under the CFAA.[57] Specifically, Johnson testified:

> Q.   Are you offering any opinions in this case on any expenses that DHI has incurred as a result of events in this case?
>
> A.   No.[58]

Accordingly, Johnson's opinion is irrelevant to any claim for damages Plaintiffs may make under the CFAA. Regardless, Plaintiffs own corporate representatives have testified that no such damages occurred in this case.[59]

Under the SCA a plaintiff can only recover damages, which include "the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation." 18 U.S.C. § 2707(c). Johnson testified that he is not providing any expert opinions related to such damages.

Under RICO a plaintiff can recover damages, for an injury to business or property. 18 U.S.C.A. § 1964. The Fifth Circuit found that when an injury is speculative and "does not show a conclusive financial loss" that the Plaintiff does not even have standing to bring a RICO suit. *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995). Further, in a trade secrets case when the plaintiff simultaneously made RICO allegations, one court found that the plaintiff could not "show that it suffered concrete financial loss, either in the form of lost opportunity or lost profits, as a result of the deprivation of its property interest in the exclusive use of its trade secret materials." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1021 (C.D. Cal. 2011). Accordingly, Plaintiffs' damages models are insufficient to show an injury under RICO, even assuming they could prove the substantive elements of a RICO claim (they cannot).

---

[57]   Ex. G [Deposition of Shane Johnson] at 26:25-27:13.

[58]   Ex. G [Deposition of Shane Johnson] at 31:3-31:6.

[59]   Ex. I [Deposition of Constance Melrose] at 62:8-62:11, 68:11-68:16, 64:18-64:24, 74:23-75:2, 77:8-77:16; *See also* Ex. E [Deposition of Michael Durney] at 83:04 – 83:19, 84:04–84:13, 101:20–102:03, 298:7-298:15, 142:15–142:21.

**C.      Market-Value-Per-User Calculation Is Unreliable.**

*1.      Market-value-per-user is not an admissible methodology.*

Johnson's expert report does not provide an objective methodology that can survive a *Daubert* challenge, which "requires some objective, independent validations of the expert's methodology." *Moore*, 151 F.3d at 276 (5th Cir. 1998). Experts must sufficiently establish that their testimony "is more than subjective belief or unsupported speculation." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013); *see also Sierra v. Dorel Juvenile Group*, CV B: 12-232, 2014 WL 12598325, at *6 (S.D. Tex. Sept. 30, 2014) ("There is no methodology apparent in any of Mr. Madeley's reports, affidavit or deposition. This failure is fatal to the admissibility of his testimony.)).

In Johnson's report he proclaims that in a case such as this "one can estimate damages using a 'market-value-per-user' approach", but he cites no technical or legal authority for that proposition.[60] At his deposition Johnson testified that his methodology has not been subjected to peer review, does not have a known rate of error, has not been generally accepted as a method for valuation, and he is literally the only person with any financial background who has ever used it:

> Q.   Can you identify [] any person or company by name that has ever used the market value user approach in actually buying a group of 5,000 or more resumes?
>
> A.   No.
>
> Q.   Can you identify any person or company by name that has ever paid more than a dollar per resume in buying a group of resumes of 5,000 or more?
>
> A.   No.[61]
>
> Q.   Are you aware of any academic research that indicates that the market value per user, user in the sense of an internet user, is an appropriate metric to determine valuation of a company?
>
> A.   I don't recall an article right now of research.[62]

---

[60]   Ex. G-1 [Expert Report of Shane Johnson] at 6 ¶24.

[61]   Ex. G [Deposition of Shane Johnson] at 34:14-34:21; *see also* 43:17-43:25.

[62]   Ex. G [Deposition of Shane Johnson] at 93:05-93:11.

. . .

Q.   Can you name any sound financial analyst who values companies, like DHI or Rigzone or Oilpro, based on market value per user?

A.   I cannot name any analyst that does that.[63]

Q.   Can you identify any person with any financial background who you consider authoritative who has actually used market value per user approach in valuing a company, like Oilpro or Rigzone?

A.   I did.

Q.   Anyone else?

A.   I cannot name anyone.[64]

Johnson's market-value-per-user theory is merely *ipse dixit*. Johnson neither cites to nor identifies any authority for this theory, and he did not adhere to the valuation guidelines to which he cited in his report.[65] Accordingly, Johnson's opinion and testimony should be excluded on this basis alone.

2.   *Johnson did not attempt to determine the value of resumes or emails, in the real world.*

Johnson testified that his economic damages estimate is the fair market value, defined as "the price [. . .] at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller . . . ." Yet, Johnson did not consider what a company would pay for resumes or emails, such as those accessed, in the real world. He admits that he is not giving an opinion regarding past prices paid to actually purchase resume data.[66] And in fact, Johnson testified that he does not know of any situation in which a person or company has purchased a bundle of resumes or emails for more than $1.00 (never mind the $20-$90 per resume that he postulates).[67] Johnson did not consider the age of the resumes or the degree of activity of the users whose information was accessed, in determining the market-value-

---

63   Ex. G [Deposition of Shane Johnson] at 96:06-96:09.

64   Ex. G [Deposition of Shane Johnson] at 98:02-98:09; *see also* 97:21-98:09.

65   Ex. G [Deposition of Shane Johnson] at 104:20-104:22.

66   Ex. G [Deposition of Shane Johnson] at 52:21-52:24; 53:07-53:15.

67   Ex. G [Deposition of Shane Johnson] at 34:18-34:21; Ex. L [Deposition of John Roberts] at 65:23-66:01.

per-user, but Plaintiffs' CFO during the relevant time period testified age of a resume affects its usability and benefit to a company[68] and there is "no question" that a user's activity level determines the value of a user.[69] Johnson's failure to consider the age of the resumes accessed and the activity level of the users also renders his opinion unreliable and inadmissible.

> 3.   *Johnson ignored the downturn in the oil and gas industry beginning in 2014.*

Johnson's market-value-per-user analysis relies on financial information from 2010 (for Rigzone), March 18, 2014 (for OilCareers),[70] and January 2014 (for Oilpro), despite the fact that each of these companies were impacted severely by the oil and gas market decline beginning in June 2014 and continuing throughout 2015 and 2016.[71] Further, in January 2014, Oilpro did not even have a resume database.[72]

As DHI disclosed in its 2014, 2015, and 2016 10-K filings, macroeconomic conditions surrounding the energy sector in 2010 and early 2014 differed greatly from the months and years that followed.[73] In the 2015 filing, DHI explicitly disclosed: "Declines in oil prices have decreased demand for energy professionals worldwide. This decline in demand for energy professionals has significantly decreased the use of our energy industry job posting websites and related services."[74] It is undisputed that this the oil market caused a decline in the number of jobs

---

68   Ex. L [Deposition of John Roberts] at 126:08-126:12.

69   Ex. L [Deposition of John Roberts] at 219:01-219:15.

70   Ex. L-95.D [2014 Grant Thornton Report] at DHI_000554.

71   Ex. N-8 [Expert Report of Saul Solomon] at 25 ¶39; Ex. L [Deposition of John Roberts] at 84:07-84:11 (decline in oil market began in June 2014).

72   Ex. C [Deposition of Bryan Robins] at 67:12-67:14. In fact, Oilpro did not have a resume database for approximately 9 months after the launch of the website. Ex. C [Deposition of Bryan Robins] at 67:12-67:14.

73   Ex. N-14 [2014 10-K] at PDF p. 19 ("recent declines in oil prices have decreased demand for energy professionals worldwide. This decline in demand and any future declines in demand for energy professionals could significantly decrease the use of our energy industry job posting websites and related services, which may adversely affect our financial condition and results of operations"); Ex. N-15 [2015 10-k] at PDF p. 16.

74   Ex. N-15 [2015 10-k] at PDF p. 16.

posted on Rigzone and, in turn, decline in revenues from subscriptions and advertising.[75] The

economic decline in the oil and gas market renders financial information from the pre-decline era

unreliable.[76] But Johnson simply ignored the actual decline and relied on financial information

from the market peak.[77] Johnson's failure to account for the actual market conditions existing at

the time resumes were copied renders his opinion and testimony unreliable and inadmissible.

4.  *Johnson's reliance on the OilCareers acquisition renders his methodology unreliable.*

Johnson either ignored (or DHI withheld from him critical information) regarding

Rigzone's March 2014 acquisition of OilCareers. Johnson claims that OilCareers was basically a

purchase of resumes[78] and knew nothing about the acquisition or what assets were included in

DHI's purchase price.[79] Johnson's belief that the OilCareers acquisition was merely the purchase

of resumes is not only unsupported but is flatly contradicted by the evidence. In its 2014 10-K,

filed on February 10, 2015, DHI characterized OilCareers as follows:

> In March 2014, we acquired all of the issued and outstanding
> shares of OilCareers Limited, OilCareers.com, Inc. and OilCareers
> Pty Limited (collectively, "OilCareers"), a leading recruitment site
> for oil and gas professionals in Europe. The purchase price
> consisted of $26.1 million, paid in cash at closing, and $0.3 million
> paid in the second quarter of 2014 to settle certain working capital
> requirements. **The acquisition resulted in recording intangible
> assets of $14.5 million and goodwill of $15.1 million.**[80]

---

[75]   Ex. L [Deposition of John Roberts] at 84:07-84:11.

[76]   Ex. N-8 [Expert Report of Saul Solomon] at 23 ¶35.

[77]   Ex. G [Deposition of Shane Johnson] at 72:14-73:05; 87:01-08 (stating that he didn't recall whether there was a decline in the oil and gas market in 2014); 253:05-253:18 (testifying that he did not adjust his OilCareers calculation, to account for the decline that began after Defendants' acquired OilCareers).

[78]   Ex. G [Deposition of Shane Johnson] at 35:06-35:19; 52:21-52:24.

[79]   Ex. G [Deposition of Shane Johnson] at 36:18-37:06.

[80]   Ex. N-14 [2014 10-K] at PDF p. 8; Ex. L [Deposition of John Roberts] at 94:09-94:21 (as the CFO, Roberts certified the accuracy of the financial reports provided to the SEC).

A fair value report by Grant Thornton provides a more precise allocation of the purchase price. As noted in the chart below, Grant Thornton valued the registered user database of OilCareers at £2,294,000 or 14% of the total purchase price.[81]

| OilCareers (£000) | | ESTIMATED FAIR VALUE |
|---|---|---|
| Working Capital, Net of Cash | £ | (653) |
| Fixed Assets, Net | | 57 |
| Trademarks: | | 675 |
| Customer Relationships: | | 5,652 |
| Registered Users: | | 2,294 |
| Technology: | | 100 |
| Assembled & Trained Workforce (part of Goodwill): | | 165 |
| Goodwill (excluding Workforce) | | 7,607 |
| TOTAL ALLOCATION OF PURCHASE PRICE | £ | 15,897 |

The 2014 10-K also states that throughout 2014, DHI received revenues from OilCareers "derived from sales of job postings, access to a searchable database of candidates, classified job postings, marketing solutions and website advertising, either as part of a package or individually."[82] The 10-K also states that "[d]uring 2014, OilCareers had on average 720,000 monthly unique visitors[.] . . . [And as] of December 31, 2014 there were approximately 8,500 job postings on OilCareers.com."[83]

Plaintiffs' CFO at the time of the OilCareers acquisition testified that in analyzing that transaction, Plaintiffs undertook no analysis of the value per resume Plaintiffs received through the OilCareers transaction,[84] that he had never used a market-value-per-user basis,[85] and that he

---

[81]   Ex. L-95.D [2014 Grant Thornton Report] at DHI_0000556.

[82]   Ex. N-14 [2014 10-K] at PDF page 10; Ex. L [Deposition of John Roberts] at 58:15-60:14; 172:18-174:12 (regarding the metrics Rigzone looked at to determine the purchase price for OilCareers none of which involved market-value-per-user).

[83]   Ex. N-14 [2014 10-K] at PDF page 10.

[84]   Ex. L [Deposition of John Roberts] at 61:10-62:05.

had never heard of a bulk resume purchase in which a company paid more than a dollar per resume.[86]

Johnson believes mistakenly that Plaintiffs' acquisition of OilCareers was essentially the purchase of OilCareers resumes. This is not the case. The record includes conclusive proof that the value of the OilCareers user database constituted only a small fraction of OilCareers purchase price. The "value" of OilCareers that Johnson used as the numerator of his equation included working capital, fixed assets, trademarks, customer relationships, technology, and goodwill. Dividing that "value" by the number of users does not calculate the value of a resume.

     *5.     Johnson's reliance on LinkedIn renders his methodology unreliable.*

LinkedIn considers the financial information of LinkedIn, in his market-value-per-user analysis. But this is improper: "Comparable firms should be similar to the firm being valued in cash flows, growth potential, and risks, among others."[87] LinkedIn and Oilpro may both be online recruiting platforms, but they "differ financially so substantially that the facts that the companies offer similar products is not sufficient reason to use them in a comparable transaction analysis."[88] In 2014, the year Johnson used LinkedIn was a well-established, publically-traded company worth over $24 billion dollars. Oilpro, meanwhile, was a privately owned start-up. LinkedIn also had a broad platform encompassing virtually all industries of job seekers, while Oilpro was limited to the oil and gas industry (and was, therefore, directly impacted by the decline in the oil and gas market, during the relevant period of time).

---

[85]    Ex. L [Deposition of John Roberts] at 186:07-186:14; 217:16-218:03 (never determined the purchase price for an acquisition based on number of resumes)

[86]    Ex. L [Deposition of John Roberts] at 65:23-66:01.

[87]    Ex. N-8 [Expert Report of Saul Solomon] at 23 ¶35.

[88]    Ex. N-8 [Expert Report of Saul Solomon] at 23 ¶36.

6.     *Johnson's reliance on the Fairbanks investment renders his methodology unreliable.*

Johnson uses the Fairbanks investment to calculate a 2014 Oilpro value but, as discussed in detail below, Fairbanks invested in SIOPCO (which included Oilpro and TechPro) TechPro's assets, revenues, and overall valuation stood separate and apart from Oilpro.[89] Moreover, Fairbanks, has testified that he did not intend his forecast to be an accurate calculation of Oilpro's value but rather was a negotiating tool used during the back-and-forth with Kent regarding Fairbanks eventual investment in Oilpro.[90] Specifically, Fairbanks states that he had "never valued a software company, or a company like Oilpro, before or since"[91] and that the projection "was never intended to be used . . . by me as a means of analyzing the actual value of SIOPCO, let alone Oilpro or its projected membership, and no jury, court or expert witness should rely on it for that purpose."[92]

**D.     Unjust Enrichment Calculation is Unreliable.**

1.     *Johnson's calculation is based on "wholly speculative expectations of profits."*

Texas law allows a plaintiff seeking to recover for trade secret misappropriation to establish unjust enrichment by showing Defendants' (1) actual profits from exploiting the trade secret or (2) costs saved. *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974). Unjust enrichment damages are not assessed on "wholly speculative expectations of profits." *Id.* If a plaintiff is unable to show unjust enrichment through actual profits or costs saved, a plaintiff can still seek a reasonable royalty. But Plaintiffs do not seek reasonable royalty in this case. *Id.*

---

[89]   Ex. F [Declaration of Jonathan Fairbanks] at 1 ¶2.

[90]   Ex. F [Declaration of Jonathan Fairbanks] at 2 ¶¶6-7.

[91]   Ex. F [Declaration of Jonathan Fairbanks] at 2 ¶9.

[92]   Ex. F [Declaration of Jonathan Fairbanks] at 2 ¶10.

Johnson does not offer any opinions on Oilpro's actual profits or costs saved[93] and in fact he has no knowledge regarding Oilpro's actual financial performance:

Q.   Did you in your unjust enrichment opinion and section determine what the actual profits made by Oilpro from the misappropriated resumes was?

A.   The actual profits as going through time, no.

Q.   Have you ever determined any actual benefit that Oilpro received other than your opinion that the value of the company as a whole increased?

A.   No.[94]

. . .

Q.   Did you ascertain the financial condition of Oilpro?

A.   No.[95]

. . .

Q.   Have you analyzed what amount of money Oilpro avoided by downloading resumes? Have you analyzed that?

A.   No.[96]

Q.   Did you have -- did you review and consider any balance sheet of Oilpro in connection with your valuation?

A.   No.

. . .

Q.   Did you consider any detail profit and loss statement in connection with your valuation of Oilpro?

A.   Outside of the forecasted one, no.[97]

. . .

Q.   Now, you know that the actual results for Oilpro, in terms of sales and costs and profits or losses, differ from the forecast, you know that, right?

A.   I would assume that to be true, but I don't know that.

Q.   You don't know what the actual performance results financially were for Oilpro, do you?

---

[93]   Ex. G [Deposition of Shane Johnson] 60:23-60:25.

[94]   Ex. G [Deposition of Shane Johnson] 15:08-15:16; *see also* 32:21-32:23.

[95]   Ex. G [Deposition of Shane Johnson] at 73:13-73:15.

[96]   Ex. G [Deposition of Shane Johnson] 60:23-61:04.

[97]   Ex. G [Deposition of Shane Johnson] at 101:24-102:05.

A.    Correct.[98]

Instead of actual profits or costs incurred, Plaintiffs use the January 2014 Fairbanks Projection (a projection by a *prospective* investor and not even an internal Oilpro projection) which is, by definition, speculative—this is not a proper measure of unjust enrichment. Further, according to Bryan Robins, Oilpro's Vice President of Sales, an increase in the number of resumes (whether it be 22,000 or 100,000) had no impact on Oilpro's revenue.[99] Because Johnson's unjust enrichment calculation is not based on Defendants' actual profits or costs saved, it is not relevant to the jury's determination of unjust enrichment.

    2.    *Johnson's calculation relies blindly on the Fairbanks Projection.*

Johnson conducted no independent investigation of the Fairbanks Projection and the evidence shows affirmatively that that the Fairbanks Projection should not be sued for determining value of additional Oilpro members.

"The Federal Rules of Evidence require an expert to do more than blindly accept numbers provided by any party in calculating lost profits." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 803 (N.D. Tex. 2018), aff'd, 3:11-CV-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018) (striking expert report under Rule 702 when it was based on a pro forma and the expert did not review actual revenue data or explain the assumptions made in such pro forma); *see also Montalvo v. Strickland*, No. SA-09-cv-247-XR, 2010 WL 538395, at *2 (W.D. Tex. Feb. 5, 2010) (striking a portion of an expert's opinion the expert "merely relied upon [a company]'s pro forma that the company would potentially make certain profit numbers in the future" and thus issue plaintiff certain annual distributions). Rule 702 and *Daubert* requirements "are not satisfied where ... the expert fails to show any basis for believing someone else's projections." *Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.*, No. H-06-3457, 2008 WL 375505, at *2 (S.D. Tex. Feb. 11, 2008) (citing *JRL Enters., Inc. v. Procorp. Assocs., Inc.*, 2003

---

[98]   Ex. G [Deposition of Shane Johnson] at 166:04-116:14 (objection omitted).

[99]   Ex. C [Deposition of Bryan Robins] at 71:4-71:22; 80:11-80:17.

WL 21284020, at *7 (E.D. La. June 3, 2003) (excluding testimony on lost profits where expert testified that "he conducted no independent investigation of the[ ] numbers" provided to him) ); *Heller v. Am. Indus. Props. REIT,* 156 F. Supp. 2d 645, 650 (W.D. Tex. 2000) ("Plaintiffs have proffered no support for their assumption that a real estate expert may, as a method of appraisal, simply borrow figures arrived at after an unexamined, untested, arguably biased internal valuation process."); *cf. GWTP Invs., L.P. v. SES Americom, Inc.*, No. 3:04-cv-1383-L, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007) ("An expert may rely upon figures calculated by another expert so long as he conducts an independent investigation of those figures.").

Here, Johnson did nothing to investigate the reliability of the Fairbanks Projection. That alone is sufficient grounds to exclude any opinion relying on that document. But in this case, the evidence goes further and shows affirmatively that the Fairbanks Projection is not reliable.

> a.   <u>Johnson did not investigate the assumptions underlying the Fairbanks Projection.</u>

Johnson testified at his deposition regarding his investigative efforts (or lack thereof) into the accuracy of the Fairbanks Projection:

Q.   So that -- so does that mean that you did not do anything to validate the revenue assumptions, specifically?

A.   As -- as a single line item, correct.[100]

. . .

Q.   Did you do anything to evaluate the correctness of the -- of the expense assumptions in the Fairbanks model?

A.   Individually, no.[101]

. . .

Q.   Did you do anything to evaluate the assumptions for the annual earnings or EBITDA?

A.   No.[102]

. . .

---

[100]   Ex. G [Deposition of Shane Johnson] at 81:05-81:08.

[101]   Ex. G [Deposition of Shane Johnson] at 81:11-81:14.

[102]   Ex. G [Deposition of Shane Johnson] at 81:17-81:19.

Q.   [C]an you tell me what you did, if anything, to consider the goodwill of Oilpro?

A.   Nothing.

Q.   To consider the intangible value of Oilpro?

A.   Nothing.[103]

. . .

Q.   [Y]ou didn't change anything in the Fairbanks model or evaluate it specifically, in terms of any line item, did you?

A.   Correct.[104]

. . .

Q.   Okay. I mean, did you -- did you -- did you ask who prepared it?

A.   I did not.[105]

. . .

Q.   So you relied on the Fairbanks model without knowing what Mr. Fairbanks' training was, true?

A.   Correct.

Q.   You relied on the Fairbanks model without knowing what Mr. Fairbanks' education was, true?

A.   True.

Q.   You relied on the Fairbanks model without knowing whether Mr. Fairbanks ever even attended a finance class when he got his B.A., true?

A.   True.[106]

Defendants' expert Neil J. Beaton points out that "a cursory review of the forecast itself would indicate to an experienced appraiser that the forecast lacks the rigor necessary to achieve a more probable than not outcome. For example, neither total payroll nor overhead expense increases at all for five years, from 2015 through 2019. Yet, revenue increases six-fold over this same period."[107] *See, e.g., JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, CIV. A. 97-CV-

---

[103]   Ex. G [Deposition of Shane Johnson] at 89:18-89:23.

[104]   Ex. G Deposition of Shane Johnson] at 82:01-82:04.

[105]   Ex. G [Deposition of Shane Johnson] at 82:10-82:12.

[106]   Ex. G [Deposition of Shane Johnson] at 83:06-83:15.

[107]   Ex. N-18 [Expert Report of Neil Beaton] at 22.

0652, 1998 WL 175888, at *9 (E.D. Pa. Apr. 15, 1998), aff'd, 178 F.3d 1279 (3d Cir. 1999) (striking expert testimony in which expert testified that plaintiff's "operating costs would not increase [over a twelve-year period], even though sales were going to go from 6,000 containers to 115,000 containers per year"). Fairbanks did not conduct even this cursory review.

Not only did Johnson accept the Fairbanks Projection without testing its accuracy, he did nothing to update it to account for the economic conditions that arose (i.e., the steep decline in oil prices beginning in 2014)[108] after the projection was created:

> Q.   [D]id you make any changes in the forecasting that was made in January of '14 to account for the reality that in late '14, '15, and '16, the oil industry and companies like Rigzone and Oilpro were in a depressed state?
>
> A.   No.[109]

Failure to affirmatively account for actual market changes is grounds for excluding an expert's testimony. *Communications, Inc. v. Microdata GIS, Inc.*, 2:12-CV-00162-JRG, 2013 WL 11322510, at *2 (E.D. Tex. Dec. 3, 2013). Critically, Johnson also failed to analyze the relationship between additional users and revenues:

> Q.   And did you do any type of analysis to determine the sensitivity of advertising revenue or subscription revenue in relation to additional members?
>
> A.   No.[110]
>
> . . .
>
> Q.   [B]ut the relationship between the revenue and the members you assumed was proportional, that if the membership went up, you assumed that the revenue went up?
>
> A.   Yes.
>
> Q.   Okay. And you did that, you made that assumption without doing any specific research on the issue, right?
>
> A.   Right.[111]

---

[108]   Ex. L [Deposition of John Roberts] at 96:23-97:16; 98:01-98:07; 99:21-100:05; 103:11-103:23 (regarding the losses Rigzone suffered as a result of the decline in the oil and gas market).

[109]   Ex. G [Deposition of Shane Johnson] at 87:21-88:01.

[110]   Ex. G [Deposition of Shane Johnson] at 186:20-186:23.

[111]   Ex. G [Deposition of Shane Johnson] at 187:05-187:13.

Q.   Do you have any specific research or documentation to support your assertion that there is a relationship proportionally between increases and decreases in membership and revenue?

A.   For this firm, is that what you're asking about?

Q.   Yes.

A.   No.

Q.   For this industry?

A.   You mean using actual figures for this industry?

Q.   Yes, actual figures.

A.   No.[112]

Johnson's testimony lacks a proper foundation. The predictions that Johnson extrapolates from the Fairbanks Projection are nothing but wild guesses. Because Johnson blindly accepted the Fairbanks Projection, his expert opinion on unjust enrichment must be excluded.

       b.     The Fairbanks Projection is unreliable.

The Fairbanks Projection was not meant to determine the value of either SIOPCO or Oilpro.[113] Fairbanks testifies that his model was created as a negotiating tool: he sought to show Kent the value that his investment could bring to Kent's company.[114] And Fairbanks testifies that no judge, jury, and certainly no expert should rely on this model and that he "made up" the assumptions.[115] Thus, even if the Court were to overlook Johnson's failure to investigate the accuracy of the projection, Johnson's opinions must be excluded because the evidence shows affirmatively that no expert should have used the Fairbanks Projection.

       3.     *Johnson's methodology is flawed.*

       a.     Incorrect valuation date.

Johnson testified that he used October 17, 2013 as the valuation date.[116] Johnson applied this date regardless of the fact that not all profiles were accessed on that date. Johnson made no

---

[112]   Ex. G [Deposition of Shane Johnson] at 189:01-189:13.

[113]   Ex. F [Declaration of Jonathan Fairbanks] at 2 ¶5; Ex. F-2 [Stock Purchase Agreement].

[114]   Ex. F [Declaration of Jonathan Fairbanks] at 2 ¶¶6-7.

[115]   Ex. F [Declaration of Jonathan Fairbanks] at 2 ¶10.

[116]   Ex. G [Deposition of Shane Johnson] at 306:04-306:07.

attempt to discern what portion of the profiles were accessed on that date but rather assumed that the analysis, which was finalized during the height of the oil and gas market applied.[117]

Even still, the First Access occurred over six months. Johnson further displayed confusion regarding this point, testifying that:

> Q.   In the -- in the cash model that you relied on, when was it prepared?
>
> A.   I believe that was prepared at the end of 2013.[118]
>
> Q.   Did you do anything to correct the assumptions in the Fairbanks model to account for the fact that oil prices and the effect on the energy industry and job seekers changed dramatically at the end of 2014? Did you change anything in that model to account for that reality?
>
> A.   The unjust enrichment damage number is a 2013 number, so –
>
> Q.    And so is your answer "no"?
>
> A.   So did I adjust for forward-looking information or information that we know ex-post to be different? I did not.[119]

Johnson apparently lacks an understanding of the facts deep enough to realize that the converted members occurred over a period of time that cannot be entirely attributed to the first date of access. This is apparent even from relying solely on Plaintiffs' Complaint. In fact, on the date of the first access, only 17,000 members total had joined Oilpro,[120] precluding completely the possibility that all of the approximately 21,000 members who were both invited and joined came from the first access date, let alone the 111,000 Plaintiffs claim (without any proof whatever) were converted.

This point is critical when one considers the steep decline in the oil and gas market, which occurred in the latter half of 2014. Notably, one court struck a damages expert solely on the basis that the expert used the incorrect date in calculating damages. *Cassidian Communications, Inc. v. Microdata GIS, Inc.*, 2:12-CV-00162-JRG, 2013 WL 11322510, at *2

---

[117]   Ex. N-8 [Expert Report of Saul Solomon] at 24 ¶38, 26 ¶41.

[118]   Ex. G [Deposition of Shane Johnson] at 86:15-86:18.

[119]   Ex. G [Deposition of Shane Johnson] at 87:09-87:20.

[120]   Ex. N-3 [Expert Report of Trent Livingston] at 19 ¶47.

(E.D. Tex. Dec. 3, 2013). Defendants tried to argue that the record was silent "with regard to any market changes" between the two dates. *Id.* The court found that even if the record was silent, it was not persuaded that no changes occurred. *Id.* The court struck the expert stating "Mr. Gallagher has employed a fundamentally flawed methodology in calculating reasonable royalty, such that the flaw cannot be cured by "[v]igorous cross-examination, presentation of contrary evidence, [or] careful instruction on the burden of proof." *Id.* Johnson made no attempt to either (1) use the correct date or (2) differentiate between the First Access and Second Access.

       b.    <u>Inflated discount rate</u>.

Johnson used an inflated discount rate. Johnson's calculates his discount rate by taking the average of DHI's weighted average cost of capital and LinkedIn's weighted cost of capital. DHI and LinkedIn are two large, publically traded companies. So these cost of capital rates are entirely inapplicable. This discount rate ignores the risk profile differences between Oilpro, on one hand, and DHI and LinkedIn. The use of the costs of capital of both firms artificially decreases the discount rate and inflates DHI's damages.[121]

Plaintiffs' own CFO disagrees with Johnson's discount rate. When Marshall and Stevens looked at the value of Rigzone in August 2010, the firm assigned an 18.3% discount rate to Rigzone,[122] and Grant Thornton assigned a 26% discount rate to OilCareers in 2014.[123]

## E.    Johnson Is Unqualified.

Under Federal Rule of Evidence 702, an expert witness must be qualified by "knowledge, skill, experience, training, or education." Oilpro does not dispute that Johnson has had education

---

[121]   Ex. N-8 [Expert Report of Saul Solomon] at 40 ¶69.

[122]   Ex. L [Deposition of John Roberts] at 169:23-170:19; Ex. L-95.C at DHI_0000615.

[123]   Ex. L [Deposition of John Roberts] at 175:12-176:18; Exs. L-95.D at DHI_0000567 and L-95.E at DHI_0000680.

in valuation generally. But Oilpro disputes Johnson's qualifications to testify about a reasonable royalty valuation and an unjust enrichment valuation. Johnson lacks a fundamental understanding of both valuation types. Johnson, while a professor who teaches valuation, is woefully unfamiliar with even the most basic of valuation standards.

Johnson apparently rejects standards in valuation, altogether. While Johnson attaches to his report the American Society of Appraiser ("ASA") principles governing valuation of intangible property,[124] he does not "go to these standards to decide how to value something"[125] and appeared confused by several of these such standards.[126] For example, Johnson was unable to identify the meaning of the term "extraordinary assumption" under the ASA standards and did nothing to account for the extraordinary assumptions he made in his report and testimony.[127]

When asked whether he thought that the ASA business valuation standards were authoritative for valuing intangible assets "like the resumes," Johnson testified: "I don't know . . . I would have to read that and think about that."[128] Thus, far from including an objective, independent validation of Johnson's methodology, Johnson eschews standards. Johnson even lacks a basic understanding of what he was measuring in his "damages" model, equating a reasonable royalty with the fair market value of the resumes:

> Q.   Using your definition, do you believe that the fair market value is equal to the reasonable royalty of a bulk of resumes?

---

[124]   Ex. G [Deposition of Shane Johnson] at 99:20-100:05.

[125]   Ex. G [Deposition of Shane Johnson] at 105:15-105:16.

[126]   Ex. G [Deposition of Shane Johnson] at 99:09-101:18; 102:21-105:24.

[127]   Ex. G [Deposition of Shane Johnson] at 106:23-107:09; 107:21-109:25.

[128]   Ex. G [Deposition of Shane Johnson] at 120:25-121:06.

> A.   I think that a buyer of bulk resumes using them in a way that Oilpro is going to use them, that that value per user, that fair market value per user would be a reasonable royalty value.[129]

Further, Johnson appears to lack a basic understanding of the valuations he purports to provide.

As to a reasonable royalty, Johnson testified:

> Q.   Okay. What is your opinion of reasonable royalty that you're offering in this case, if any?
>
> A.   Well, I think that the value per user figures that I calculate can be viewed as equivalent to some number that's in- -- economically similar to what a royalty value is.[130]
>
> . . .
>
> Q.   So it's your testimony before this Court that you are equating the value of a purchase with a -- with the reasonable royalty, true? Is that your testimony?
>
> A.   [I]n this hypothetical way that I'm answering it, I'm thinking of a very long-term royalty stream, and the present value of that should be the value per user.[131]

Based on this testimony, Johnson does not even understand the basic concept of what a reasonable royalty is. A reasonable royalty is calculated based on a fictional negotiation of what a willing licensor and licensee would have settled on as the value of the trade secret at the beginning of the infringement. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 711 (Tex. 2016).[132] And no case "holds that the acquisition price of a company can provide the measure of a reasonable royalty in the absence of actual lost profits. Furthermore, in the context

---

[129]   Ex. G [Deposition of Shane Johnson] at 57:23-58:04.

[130]   Ex. G [Deposition of Shane Johnson] at 55:20-55:25.

[131]   Ex. G [Deposition of Shane Johnson] at 58:16-58:23.

[132]   Under Texas law a reasonable royalty is calculated based on what a willing buyer and seller would settle on as the value of licensing the trade secret. *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723 (5th Cir. 2006). The Fifth Circuit looks to the following factors:

> (1) the resulting and foreseeable changes in the parties' competitive posture; (2) prices paid by licensees in the past; (3) the total value of the secret to the plaintiff, including the plaintiff's development cost and the importance of the secret to the plaintiff's business; (4) the nature and extent of the use the defendant intended for the secret; and (5) whatever other unique factors in the particular case might have been affected by the parties' agreement, such as the ready availability of alternative process.

*Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723 (5th Cir. 2006).

of cases involving lost profits, purchase price evidence is inadmissible where it is based on speculative profit projections based on 'uncertain or changing market conditions, or on changing business opportunities, or on promotion of untested products, or entry into an unknown or unviable markets, or on the success of a new and unproven enterprise.'" *Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 671–72 (E.D. Tex. 2002) (citing *Texas Instruments v. Teletron Energy Mgt.*, 877 S.W.2d 276, 279 (Tex. 1994)). An acquisition price that includes goodwill and costs other than for assets acquired, cannot be the basis of a reasonable royalty. *Transclean Corp. v. Bridgewood Services, Inc.*, 290 F.3d 1364, 1376 (Fed. Cir. 2002)

Johnson's report, calculations, and testimony establish that he was not in fact measuring a reasonable royalty. Johnson states that "in this hypothetical way" that he was "thinking of a very long-term royalty stream[.]"[133] However, this is simply not what a reasonable royalty is. Further, no discussion whatsoever exists in Johnson's report mentioning reasonable royalty. Johnson further admitted that he has never testified about a reasonable royalty[134] and he did no analysis of license agreements for use of bulk resumes.[135]

Johnson should further be barred from testifying regarding unjust enrichment because Johnson apparently lacks even a basic understanding of what is recoverable under an unjust enrichment theory. He testified:

> Q.    [W]hen you used the term in this report "unjust enrichment," am I correct that you're using that term without knowing what Texas law actually provides for recovery of unjust enrichment, true?
> A.    That's correct.[136]

---

[133]   Ex. G [Deposition of Shane Johnson] at 58:16-58:23.

[134]   Ex. G [Deposition of Shane Johnson] at 56:16-56:18.

[135]   Ex. G [Deposition of Shane Johnson] at 65:08-65:13.

[136]   Ex. G [Deposition of Shane Johnson] at 13:10-13:14.

Johnson's lack of understanding of basic terms and standards illustrates that he lacks the qualification necessary to testify as an expert on unjust enrichment and reasonable royalty.

**F.      Plaintiffs' Simplistic Model Is Unfairly Prejudicial.**

Alternatively, the Court should exclude Plaintiffs' damages model as it is unfairly prejudicial under Rule 403. *Cioffieta v. Google, Inc.*, 213-CV-00103JRGRSP, 2017 WL 77395, at *3 (E.D. Tex. Jan. 9, 2017), objections overruled sub nom. *Cioffi v. Google, Inc.*, 213-CV-00103JRGRSP, 2017 WL 235011 (E.D. Tex. Jan. 19, 2017).

Johnson's market-value-per-user analysis does not involve "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702, and offers nothing "beyond the understanding and experience of the average citizen," *Rouco*, 765 F.2d at 995. It is all just math. Therefore, it is "valueless." *Rouco*, 765 F.2d at 995-96. "[S]imple arithmetic calculation is not beyond the understanding of the average lay person and therefore would not help the trier of fact." *LSQ Funding Grp., L.C. v. EDS Field Servs.*, 879 F. Supp. 2d 1320, 1336 (M.D. Fla. 2012) (citing *Cook*, 402 F.3d at 1111); *see also Powell v. Carey Int'l, Inc.*, 2007 WL 1068487 at *4 (S.D. Fla. Apr. 9, 2007) (expert testimony excluded when was simply routine "arithmetic calculation that the jury can make with a calculator."); *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 2010 WL 2978289 (D. Conn. Apr. 9, 2010) (when expert witness merely added up amount of attorneys' fees plaintiffs' counsel told him to add up and applied an interest rate, there was nothing he "was asked to do that a jury of laypeople could not do equally well. In fact, a jury would probably do a *better* job, as it would at least apply a dose of skepticism to what the attorneys tell it."). Jurors do not need an expert to act as a calculator. And this testimony is likely to prejudice the jurors into assigning talismanic significance to his calculations.

## <u>CONCLUSION</u>

Johnson's opinions are untethered to any measure of recoverable damages, to professional standards for valuing intangible property, any technical support for his absurd methodology, and any diligence into the Fairbanks Projection. The models contain entirely too many false assumptions and are not supported by real-world evidence. Therefore, Defendants respectfully request that the Court exclude the testimony of Shane Johnson.

Respectfully submitted,

**FOLEY GARDERE**
 **FOLEY & LARDNER LLP**

*s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Marla T. Poirot
Texas Bar No. 00794736
1000 Louisiana, Suite 2000
Houston, Texas 77002-2099
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
mpoirot@foley.com

Sara Ann Brown
Texas Bar No. 24075773
2021 McKinney, Suite 1600
Dallas, Texas 75201-3340
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
sabrown@foley.com

**ATTORNEYS FOR DEFENDANT/
COUNTER-PLAINTIFF, SINGLE
INTEGRATED OPERATIONS
PORTAL, INC. D/B/A OILPRO AND
OILPRO.COM AND DAVID W.
KENT, JR.**

**CERTIFICATE OF SERVICE**

I certify that on October 12, 2018, a copy of the forgoing was served via email to the following:

Walter Lynch
Amir Halevy
Jeb Golinkin
JORDAN, LYNCH & CANCIENNE PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
wlynch@jlcfirm.com
ahavely@jlcfirm.com
jgolinkin@jlcfirm.com

**Counsel for Plaintiffs DHI Group, Inc. f/k/a
Dice Holdings, Inc. and Rigzone.com, Inc.**

*s/ James G. Munisteri*
_____
James G. Munisteri

4813-5918-8079.14