IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DHI GROUP, INC. F/K/A DICE HOLDINGS, INC. AND RIGZONE.COM, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> DAVID W. KENT, JR., SINGLE INTEGRATED OPERATIONS PORTAL, INC. D/B/A OILPRO AND OILPRO.COM, ET AL., <br><br> *Defendants.* | C.A: NO.: 16-cv-01670 |

**PLAINTIFFS' SUPPLEMENT TO THEIR
MOTION TO EXCLUDE TRENT LIVINGSTON**

Plaintiffs DHI Group, Inc. and Rigzone.com, Inc. (collectively, "Plaintiffs") submit this Supplement to their Motion to Exclude the Unreliable Testimony of Trent Livingston.

**I.    SUMMARY OF ARGUMENT**

On March 22, 2019, this Court ruled that Oilpro's expert, Trent Livingston, cannot "rel[y] upon or use[] in any way" certain documents listed in Appendix A of Livingston's expert report.[1] The Court further ruled that "to the extent that Livingston had access to these files, it is ordered he must be able to recreate his report and opinions without any use or reference to them."[2] Livingston's own testimony establishes that he *cannot* recreate

---

[1] ECF 259 at 2-3.
[2] *Id.*

his report or opinions without using those documents. For this reason, Plaintiffs request that the Court exclude Livingston from testifying as an expert in this case.[3]

## II. PROCEDURAL BACKGROUND

There is no dispute that "[i]n total, approximately 111,000 Rigzone members whose email addresses were obtained improperly by Mr. Kent became members of Oilpro."[4] There is, however, a dispute about the number of those members that joined because of Kent's criminal acts. In the wake of David Kent's arrest, Jeremy Antonini was tasked with segregating the "tainted" Oilpro members from those who could be reactivated.[5] Based on his review, Antonini determined that more than 100,000 members could not be reactivated.[6] Kent ignored Antonini's analysis and reactivated all but 24,000 Oilpro members based on his own analysis of Oilpro's database.

Oilpro knows that no one will ever believe David Kent, so they hired Trent Livingston to mimic Kent's analysis and present Kent's conclusions as his own. Given the importance of the issue, Defendants requested documents related to Kent's analysis, as well as documents related to the review performed by Jeremy Antonini. Defendants refused, repeatedly stating that all documents related to the analyses were protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

That position seemed to change when Defendants served Livingston's expert report. Upon receiving it, Plaintiffs were stunned and disappointed to discover that

---

[3] In the event this Court grants this Motion, Plaintiffs withdraw their Motion for Attorneys' fees pending before the Court.
[4] David Kent's Sentencing Memorandum, ECF 215 at Ex. A, pp. 17-18.
[5] David Kent Deposition Transcript, ECF 215 at Ex. G, pp. 141:23-142:4; 145:6-9.
[6] April 25, 2016 Email from Jeremy Antonini to Oilpro Staff, ECF 215 at Ex. H.

Livingston cited multiple documents that Defendants had theretofore maintained were privileged. Based on Defendants' gaming of the work product privilege by invoking it selectively, Plaintiffs moved to exclude Defendants from in any way referencing or relying on documents responsive to numerous requests for production related to the Antonini and Kent analysis.[7] Plaintiffs further requested that the Court strike Livingston's expert report.[8]

Rather than striking Livingston's report entirely, the Court ordered that specific late produced materials listed in Appendix A of Livingston's report "may not be relied upon or used in any way by any of Defendants' witnesses."[9] The excluded files include: "Oilpro Member Activity by Month," "Oilpro Members by Source," "Report - 111k Incorrect," "Report Member Sources," "Report Members Pvs Revenue by Month," "Step 2 - Create Source Tables," "Step 3 - Never Emailed Before," and "Step 4 - Load Member Source Table"[10]

The Court further ruled that to the extent that Livingston "had access to [the disputed files]" he "must be able to recreate his report and opinions without any use or reference to them."[11] However, as discussed below, Livingston's reliance on these documents is so complete that it would be impossible to legitimately recreate his report or opinions without either direct or indirect use of the excluded documents and the

---

[7] *See* ECF 215.
[8] *Id.*
[9] ECF 259 at pp. 2-3.
[10] *Id.*
[11] *Id.* at p. 3.

3

information contained within them. The toothpaste is out of the tube. Accordingly, Plaintiffs request that the Court exclude Mr. Livingston's testimony as unreliable.[12]

### III. DISCUSSION

In the "Methodology for Analysis" section of Livingston's expert report, Livingston claims that the first step of his analysis was to "identif[y] criteria that clearly establishes initial possession of the data by either Oilpro or Rigzone."[13] Livingston then states that "the primary component of the disputed User Information that can establish First Possession are the date stamps associated with various User Information that correlate to the dates of the Rounds of Access."[14] The much discussed "web logs" make it possible for Defendants to pinpoint the exact date Kent accessed the stolen information, but that is only half of the equation. To complete the task, Livingston must isolate data within Oilpro's database that credibly establishes the source of a member's acceptance as well as the date and time the member accepted a particular invitation.

The files this Court excluded directly address the methodology Kent and Antonini used to collect the information for comparison to determine if a member was legitimate. Put differently, the excluded documents provide Antonini's and Kent's answers to the question "how do you figure out the time and source of individual Oilpro members." Livingston did not, and cannot, perform this essential task without using the excluded

---

[12] In its Order, this Court provided Plaintiffs the opportunity to retake the deposition of Livingston, then, within fourteen days of his deposition, move to exclude his testimony as unreliable. *Id.* at p. 3. This Motion is filed within fourteen days of the final determination that an additional deposition was unnecessary.
[13] Livingston Report, ECF 215 at Ex. N, Paragraph 22.
[14] *Id.*

4

documents. Indeed, Livingston explicitly testified that he relied on several of the now excluded documents:

> Q: So -- all right. So let's go on to paragraph 34. So it says: "OilPro also sent individual invites to Soft Profiles that originated from the Rounds of Access. To do this OilPro used 'Fictitious Profiles' to invite Soft Profiles to join OilPro. These Fictitious Profiles were often specifically used to invite those Soft Profiles that had been created as a result of the Rigzone Rounds of Access." The only way that you know that that -- the only basis for your assertion, the assertion I just read, is that David Kent told you that was the case; is that true?
>
> A: No, that's not true.
>
> Q: So where -- how else do you know that this is true?
>
> A: David Kent explained it to me. Because as I reviewed the documentation that was provided, there were SQL queries that documented four specific email addresses. I asked him the relevancy of those email address.
>
> Q: So the only way you actually know the assertion that I read in paragraph 34 is true is that David Kent told you that was so?
>
> A: It's through documentation. I asked David, and he confirmed and explained to me the relevance of the four emails.
>
> Q: You referenced SQL queries that you ran. Which SQL -- Which SQL queries that you saw in the documentation are you referencing?
>
> A: There was one that's -- there were some written by Mr. Kent, and there was another one written by -- oh, now I'm just blanking on his name. The Italian name. I'm sorry . . . Antonini.
>
> Q: Yeah, so you just referenced that. So where is that exhibit?
>
> A: *It's in the Step 1 and Step 2 SQL files I cite in my appendix. . .Exhibit A: And Exhibit A is my CV. Where is that? Or "Appendix A," I should say. There it is. There's several SQL scripts I cite in my appendix. "Report - 111,000 incorrect.sql." "Report - Member Sources.sql." That was an error. That says ".text." The same with the remainder of those. I can read off each one if you'd like.*[15]

---

[15] Livingston Dep., ECF 226 at Ex. 5, pp. 131:19-133:24.

In sum, Livingston's own testimony establishes he used the excluded materials to perform his analysis. Moreover, the analysis Livingston performed using the excluded material cannot be ignored or skipped. Livingston himself testified that each of the steps outlined in the report is *essential* to the entire analysis and must be considered sequentially with the others or the entire model falls apart:

> Q: How many members that would have otherwise been assigned to OilPro became Rig --were ultimately given credit to Rigzone because of your Figure 4 analysis?
>
> A: Ultimately, the end result was 20,905.
>
> Q: Specifically because of the analysis you conducted in Figure 4?
>
> A: Because of each step conducted sequentially.
>
> Q: But I'm trying to get a sense of how Figure 4 altered the balance.
>
> A: In the end, it resulted in 20,905.
>
> Q: Your testimony is that because of -- 13 specifically because of the Figure 4 analysis, people that were assigned to OilPro under the Figures 1, 2, and 3 analysis previously, over 20,000 people were switched and ultimately given credit to Rigzone as a result of your Figure 4 analysis?
>
> A: My testimony is -- is that as a result of each step being performed sequentially, the end result was 20,905.
>
> Q: And I understand that, but I'm asking about how many -- how I would know or how many members who were assigned credit to Rigzone under these Figures 1, 2, and 3 analysis -- I mean to OilPro under the Figures 1, 2, and 3 analysis ultimately in your final analysis were switched over and given credit to Rigzone because of your Figure 4 analysis? . . .
>
> A: *There's -- as I said, it's a culmination of the steps taken. I can't give you the exact number for Figure 4.*[16]

---

[16] Livingston Dep., ECF 226 at Ex. 5, pp. 138:1-139:6.

Described a different way, the analysis outlined in Paragraph 34 (and shown in Table 4) of Livingston's report is necessary to complete his analysis. However, necessary to Paragraph 34 and what is shown in Table 4 is information that comes from the excluded material.

The bottom line is that Livingston cannot recreate his analysis without reliance, directly or indirectly, on the excluded documents. While Defendants and Livingston will likely claim that he can create a "new" report without again "looking" at the excluded documents, he has already done so to prepare his original report. Livingston is now fully aware of the information he claims was required to perform the analysis *solely* because of his prior access to the excluded documents. It strains credulity to suppose that he could compartmentalize his brain given that he required the external guidance in the first place. *See e.g. Auto-Kaps, LLC v. Chlorox Co.*, 2016 WL 1122037, *4 (E.D. N.Y) ("An expert cannot build a Chinese wall in his own mind, despite his best efforts to do so."). The bell cannot be unrung. The egg cannot be unscrambled. The toothpaste is not going back into the tube. However, to pretend otherwise is to reward Defendants' selective and inconsistent assertions of privilege to gain an improper advantage in this litigation.

## IV.   CONCLUSION

In light of the above, Plaintiffs respectfully request that the Court (1) strike the report and exclude the unreliable testimony of Trent Livingston and (2) prohibit any of Plaintiffs' experts from referencing or relying on conclusions drawn by Livingston.

Respectfully submitted,

**JORDAN, LYNCH & CANCIENNE PLLC**

By: *s/Walter Lynch*
    **Walter Lynch**
    State Bar No. 24046330
    Federal I.D. No. 965265
    **Amir Halevy**
    State Bar No. 24065356
    Federal I.D. No. 1259956
    **Joseph ("Jeb") W. Golinkin II**
    State Bar No. 24087596
    Federal I.D. No. 2515657
    1980 Post Oak Blvd., Ste. 2300
    Houston, Texas 77056
    713-955-4020 (Telephone)
    713-955-9644 (Fax)
    wlynch@jlcfirm.com
    ahalevy@jlcfirm.com
    jgolinkin@jlcfirm.com

ATTORNEYS FOR PLAINTIFFS DHI GROUP, INC. F/K/A DICE HOLDINGS, INC. AND RIGZONE.COM, INC.

## CERTIFICATE OF CONFERENCE AND SERVICE

    I hereby certify that on this 19th day of April, I served all counsel of record with a copy of this Motion via the Court's electronic filing system.

    */s/ Jeb Golinkin*
    Joseph W. Golinkin II

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DHI GROUP, INC. F/K/A DICE HOLDINGS, INC. AND RIGZONE.COM, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> DAVID W. KENT, JR., SINGLE INTEGRATED OPERATIONS PORTAL, INC. D/B/A OILPRO AND OILPRO.COM, ESTEVAN DUFRIN, MATTHEW KENT, BRYAN ROBINS, JEREMY ANTONINI, AND JOHN DOES NOS 1-10, <br><br> *Defendants.* | C.A: NO.: 16-cv-01670 |

### **PROPOSED ORDER**

Plaintiffs' Motion to Strike the Improper "Rebuttal Expert" Report of Trent Livingston is **Granted.** The Court hereby **STRIKES** the expert report of Trent Livingston and **EXCLUDES** Livingston from testifying.

                                                                                                            _____
                                                                                                            The Honorable Nancy K. Johnson
                                                                                                            United States Magistrate Judge