United States District Court
Southern District of Texas
**ENTERED**
July 12, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DHI GROUP, INC., F/K/A DICE HOLDINGS, INC. AND RIGZONE.COM, INC., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-16-1670 |
| DAVID W. KENT, JR., et al., | § § | |
| Defendants. | § § | |

## MEMORANDUM, RECOMMENDATION, AND ORDER

Pending before the court[1] is Plaintiffs DHI Group, Inc. f/k/a Dice Holdings, Inc. ("DHI Group") and Rigzone.com, Inc.'s ("Rigzone") (collectively, "Plaintiffs") Affirmative Motion for Partial Summary Judgment (Doc. 227), Plaintiffs' Motion for Summary Judgment on Oilpro's Counterclaims (Doc. 228), Defendants Single Integrated Operations Portal, Inc. d/b/a Oilpro and OILPRO.com's ("Oilpro") and David Kent's ("Kent") (collectively, "Defendants") Motion to Strike Plaintiffs' Expert Evelina Aslanyan ("Aslanyan") (Doc. 230), Defendants' Motion for Summary Judgment (Doc. 231), Oilpro's Motion to Strike Plaintiffs' Expert Shane Johnson ("Johnson") (Doc. 232), Plaintiffs' Motion for Attorneys' Fees (Doc. 263), and Plaintiffs' Motion to Exclude Trent Livingston ("Livingston") (Doc. 266). The court has considered the motions,

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 4, Ord. Dated June 16, 2016.

the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiffs' Affirmative Motion for Partial Summary Judgment be **DENIED**, Plaintiffs' Motion for Summary Judgment on Oilpro's Counterclaims be **GRANTED IN PART AND DENIED IN PART**, and Defendants' Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART**, and it is hereby **ORDERED** that Defendants' Motion to Strike Aslanyan is **DENIED**, Oilpro's Motion to Strike Johnson is **DENIED**, Plaintiffs' Motion for Attorneys' Fees is **GRANTED IN PART AND DENIED IN PART**, and Plaintiffs' Supplemental Motion to Exclude Livingston is **DENIED**.

## I.  Case Background[2]

Plaintiffs filed this lawsuit against multiple defendants alleging violations of various federal statutes as well as state-law causes of action.[3]  Oilpro has responded to Plaintiffs' lawsuit and filed counterclaims against Plaintiffs also alleging violations of various federal statutes and state-law causes of action.[4]

---

[2]     The court has taken its factual recitation from the cited portions of the summary judgment record.  To the extent that the parties find the court's recitation of the facts to be incomplete, the court would remind the parties that it is their duty to cite to material in the summary judgment record that supports their factual positions, and the court is only required to consider cited materials.  See Fed. R. Civ. P. 56(c)(1), (3).

[3]     See Doc. 236, Pls.' 1st Am. Compl. pp. 34-55.

[4]     See Doc. 63, Oilpro's 2nd Am. Ans. and Countercls.

## A.   Factual Background

The present lawsuit concerns the sale of Rigzone, launch of Oilpro, and criminal conduct of Kent.

### 1.   Rigzone

Rigzone offered an online platform for professionals in the oil and gas industry.[5]  On Rigzone's website, oil and gas professionals were able to create a profile and upload their resumes.[6]  When a resume was uploaded to the Rigzone website it was assigned a unique numerical identifier.[7]   These resumes were maintained in a database by Rigzone.[8]  This process allowed the Rigzone website users to apply for job openings that were posted by recruiters and employers.[9]  Additionally, recruiters and employers who paid for access to the resume database were able to directly solicit professionals who had uploaded their resumes for job opportunities, subject to the user's privacy settings.[10]

### 2.   Ownership and Sale of Rigzone

Kent became the majority owner of Rigzone in 2007 when he

---

[5]     See Doc. 1, Pls.' Orig. Compl. p. 7; Doc. 17, Def. Kent's Orig. Ans. p. 3.

[6]     See Doc. 1, Pls.' Orig. Compl. p. 8; Doc. 17, Def. Kent's Orig. Ans. p. 3.

[7]     See Doc. 1, Pls.' Orig. Compl. p. 8; Doc. 17, Def. Kent's Orig. Ans. p. 3.

[8]     See Doc. 17, Def. Kent's Orig. Ans. p. 3.

[9]     See id.

[10]     See id.

purchased the majority interest in Rigzone from his father.[11]   At
the same time, Kent assumed the positions of President and CEO of
Rigzone.[12]   In August 2010, DHI Group purchased Rigzone from Kent
for approximately $51 million consisting of $38 million plus a
performance-based bonus that eventually equaled $13 million.[13]   The
sale of Rigzone to DHI Group was memorialized in a stock purchase
agreement (the "Purchase Agreement") that Kent signed.[14]   During the
sale of Rigzone, Kent was represented by lawyers and a mergers and
acquisitions firm that specialized in selling media businesses.[15]

### 3.   The Purchase Agreement

The Purchase Agreement that Kent signed represented that
Rigzone had "taken all necessary and otherwise reasonable steps to
protect and preserve the confidentiality of all of its Trade
Secrets and all use by, or disclosure to, any Person of such Trade
Secrets has been pursuant to the terms of a [confidentiality
agreement]."[16]   Kent agreed that at the time he signed the Purchase
Agreement, "all reasonable steps to protect the [Rigzone] website"

---

[11]   See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of David Kent p. 10:13-24.

[12]   See id. pp. 10:25-11:3.

[13]   See id. pp. 11:8-12:8.

[14]   See id. p. 203:19-23.

[15]   See id. pp. 203:24-204:17.

[16]   See Doc. 227-1, Ex. 1 to Pls.' Mot. for Partial Summ. J., The Purchase Agreement p. 14.

had been taken.[17]   The Purchase Agreement defined "Trade Secrets" to "mean any trade secrets or other proprietary and confidential information including . . . Personal Information, customer lists, . . . and data collections."[18]  "Personal Information" was defined as "all information or data associated with individual Persons, including customers and employees, that [was] collected by [Rigzone] in the course of its operations."[19]

### 4.   Rigzone After the Sale and the Launch of Oilpro

Kent continued as the president of Rigzone for about a year following its sale.[20]   During that time, the company took steps to improve the security of the Rigzone website, including hiring Ernst & Young to do a security audit of the website.[21]   The security audit highlighted some potential security issues that were remediated.[22]

As a condition of the sale of Rigzone, Kent signed a non-compete agreement that prevented him from operating an oil and gas website until October 1, 2013.[23]   On January 18, 2012, Kent started

---

[17]     See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of David Kent p. 213:4-14.

[18]     See Doc. 227-1, Ex. 1 to Pls.' Mot. for Partial Summ. J., The Purchase Agreement pp. 54-55.

[19]     See id. p. 52.

[20]     See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of David Kent p. 13:2-8.

[21]     See id. p. 213:22-214:20.

[22]     See Doc. 227-5, Ex. 5 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of Jeremy Antonini pp. 20:25-21:8.

[23]     See Doc. Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of David Kent pp. 83:25-84:15.

a new company called SIOPCO.[24]  Under the umbrella of SIOPCO, Kent launched the Oilpro website on the day his non-compete agreement expired.[25]  From the start, Oilpro operated a networking website for oil and gas professionals and competed directly with the Rigzone website.[26]

### 5.    Unauthorized Access of Rigzone Resume Database

Shortly after launching Oilpro, Kent began downloading copies of resumes from the Rigzone resume database through a URL, www.rigzone.com/jobs/resume.asp, that he knew of from his previous work at Rigzone.[27]  This first round of access occurred from October 17, 2013, to April 15, 2014, and resulted in Kent's downloading of just under 100,000 resumes.[28]

In June and July of 2015, Kent again downloaded resumes from the Rigzone resume database through a second URL, www.rigzone.com/jobs/resumes/resume_writer.asp.[29]  For this second round of access, Kent wrote a program that automatically downloaded

---

[24]     See id. p. 16:15-23.

[25]     See id. p. 84:12-15.

[26]     See id. pp. 17:8-10, 125:9-125:15.

[27]     See id. pp. 17:11-18:25, 200:19-21, 201:16-18.

[28]     See Doc. 233-1, Ex. B-14 to Defs.' Mot. for Summ. J., Mandiant Report pp. 7-8; Doc. 227-6, Ex. 6 to Pls.' Mot. for Partial Summ. J., Criminal Compl. pp. 7-8; Doc. 231, Defs.' Mot. for Summ. J. p. 9.

[29]     See Doc. 231, Defs.' Mot. for Summ. J. p. 9; Doc. 231-1, Ex. J-52 to Defs.' Mot. for Summ. J., Rigzone ResumeWriter Breach Summary at DHI_0024616-17;

the resumes through the URL.[30]  During this second round of access,
Kent allegedly downloaded approximately 700,000 resumes.[31]

Kent downloaded the resumes from the Rigzone database to gain
a commercial advantage for Oilpro.[32]  After downloading the resumes,
Kent invited some of the people whose resumes he had downloaded to
join Oilpro.[33]

### 6.    Criminal Charges Against Kent

On March 23, 2016, the United States brought criminal charges
against Kent for the above conduct as well as other related acts.[34]
On December 19, 2016, Kent pled guilty to a violation of the
Computer Fraud and Abuse Act ("CFAA").[35]  At his plea hearing, Kent
admitted that he accessed the Rigzone resume database without
authorization and took resumes for his own commercial advantage and
to help Oilpro.[36]  Kent also admitted that he expected that the
resumes would allow him to increase Oilpro's membership.[37]

---

[30]    See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr.
of David Kent p. 129:11-25.

[31]    See Doc. 227-6, Ex. 6 to Pls.' Mot. for Partial Summ. J., Criminal
Compl. pp. 8-9.

[32]    See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr.
of David Kent p. 17:17-20.

[33]    See id. pp. 19:1-11.

[34]    See Doc. 227-6, Ex. 6 to Pls.' Mot. for Partial Summ. J., Criminal
Compl.

[35]    See Doc. 227-2, Ex. 2 to Pls.' Mot. for Partial Summ. J., Tr. of Kent
Plea Hearing.

[36]    See id. p. 13.

[37]    See id.

### 7.  DHI Scrapes Data from Oilpro Website

On or about June 16, 2015, DHI Group began scraping data from the Oilpro website.[38]  The terms and conditions of Oilpro's website prohibited users from: (1) using "automated means, including spiders, robots, crawlers, agents, or the like to download data from any database of Oilpro, or from the site itself (for example, site or page scraping is prohibited)[;]" (2) "harvest[ing] or otherwise collect[ing] or stor[ing] information about others, including e-mail addresses[;]" (3) "us[ing], download[ing] or otherwise copy[ing], or provid[ing] (whether or not for a fee) to a person or entity any directory of users of the Services or other user or usage information or any portion thereof."[39]  The parties hotly dispute whether, in June 2015, there was a link to these terms and conditions on the home page or site map of the Oilpro website.[40]

### B.  Procedural Background

Plaintiffs commenced this action on June 10, 2016.[41]  On November 15, 2016, Oilpro filed its second amended answer and

---

[38]    See Doc. 244, Ex. T to Oilpro's Resp. to Pls.' Mot. for Summ. J. on Oilpro's Countercls., Excerpts of Michael Durney Dep.; Doc. 63, Def. Oilpro's 2nd Am. Countercls. p. 30.

[39]    See Doc 63-1, Ex. 1 to Def. Oilpro's 2nd Am. Countercls., Oilpro Terms and Conditions pp. 4-5.

[40]    See Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls.' pp. 10-11; Doc. 238, Oilpro's Resp. to Pls.' Mot. for Summ. J. on Oilpro's Countercls. p. 15.

[41]    See Doc. 1, Pls.' Compl.

counterclaims.[42]   Plaintiffs filed a motion to dismiss Oilpro's counterclaims on December 5, 2016.[43]  On April 21, 2017, the court entered a recommendation that Oilpro's counterclaims for trespass to chattels and unjust enrichment be dismissed.[44]    The recommendation was adopted on October 26, 2017.[45]

On July 20, 2018, Plaintiffs filed a motion to strike Livingston.[46] On October 12, 2018, Plaintiffs' filed: (1) a motion to exclude the testimony of Livingston; (2) their pending motion for partial summary judgment; and (3) their pending motion for summary judgment on Oilpro's counterclaims.[47]  On the same day, Defendants filed their pending: (1) motion to strike Aslanyan; (2) motion for summary judgment; and (3) motion to strike Johnson.[48] On November 16, 2018, Defendants filed responses to Plaintiffs' motions for summary judgment.[49]  On the same day, Plaintiffs filed

---

[42]    See Doc. 63, Oilpro's 2[d] Am. Countercls.

[43]    See Doc. 64, Pls.' Mot. to Dismiss Oilpro's 2[d] Am. Countercls.; Doc. 72, Oilpro's Resp. to Pls.' Mot. to Dismiss Oilpro's 2[d] Am. Countercls.

[44]    See Doc. 102, Mem. & Recom. Dated Apr. 21, 2017.

[45]    See Doc. 153, Ord. Dated Oct. 26, 2017.

[46]    See Doc. 215, Pls.' Mot. to Strike Livingston.

[47]    See Doc. 226, Pls.' Mot. to Exclude Livingston; Doc. 227, Pls.' Mot. for Partial Summ. J.; Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls.

[48]    See Doc. 230, Defs.' Mot. to Strike Pls.' Expert Aslanyan; Doc. 231, Defs.' Mot. for Summ. J.; Doc. 232, Defs.' Mot. to Strike Pls.' Expert Johnson.

[49]    See Doc. 238, Oilpro's Resp. to Mot. for Summ. J. on Oilpro's Councercls.; Doc. 239, Defs.' Resp. to Pls.' Mot. for Partial Summ. J.

responses to Defendants' October 12, 2018 motions.[50]   On November
19, 2018, Defendants filed a response to Plaintiffs' motion to
exclude Livingston.[51]   On November 26, 2018, Plaintiffs filed
replies in support of their October 12, 2018 motions.[52]   On December
3, 2018, Defendants filed replies in support of their October 12,
2018 motions.[53]

On March 21, 2019, the court held a hearing on Plaintiffs'
motions to strike and exclude Livingston.   As discussed in more
detail below, on March 22, 2019, the court granted both motions in
part.[54]   Defendants objected to the court's order granting the
motions in part, and, on May 1, 2019, the objections were
overruled.[55]

On April 19, 2019, Plaintiffs filed their pending supplemental
motion to exclude Livingston.[56]   Defendants filed a response to the

---

[50]     See Doc. 240, Pls.' Resp. to Defs.' Mot. for Summ. J.; Doc. 243,
Pls.' Resp. to Mot. to Strike Aslanyan; Doc. 241, Pls.' Resp. to Mot. to Strike
Johnson.

[51]     See Doc. 245, Defs.' Resp. to Pls.' Mot. to Exclude Livingston. This
response was incorrectly filed as docket entry number 242.  The November 16, 2018
filing is a corrected version.

[52]     See Doc. 246, Pls.' Reply in Support of Mot. for Summ. J. on Oilpro's
Countercls.; Doc. 247, Pls.' Reply in Support of Mot. for Partial Summ. J.; Doc.
248, Pls.' Reply in Support of Mot. to Exclude Livingston.

[53]     See Doc. 250, Defs.' Reply in Support of Mot. for Summ. J.; Doc. 252,
Reply in Support of Mot. to Strike Pls.' Expert Aslanyan; Doc. 254, Reply in
Support of Mot. to Strike Pls.' Expert Johnson.

[54]     See Ord. Dated Mar. 22, 2019.

[55]     See Doc. 270, Mem. Op. Dated May 1, 2019.

[56]     See Doc. 266, Pls.' Supp. Mot. to Exclude Livingston.

supplemental motion to exclude on May 10, 2019.[57]  Plaintiffs filed a reply in support of their supplemental motion to exclude on May 15, 2019.[58]  Without leave of the court, Defendants filed a sur-reply to the supplemental motion to exclude on May 23, 2019.[59]  The procedural history and merits of Plaintiffs' motions to exclude and strike Livingston are discussed further below.

## II.  Legal Standards

The following standards are relevant to the court's resolution of the pending motions.

## A.  <u>Motion for Summary Judgment Standard</u>

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.</u>, 759 F.3d 498, 504 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Ameristar Jet Charter, Inc. v. Signal Composites, Inc.</u>, 271 F.3d 624, 626 (5th Cir. 2001).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

---

[57]  <u>See</u> Doc. 271, Defs.' Resp. to Pls.' Supp. Mot. to Exclude Livingston.

[58]  <u>See</u> Doc. 273, Pls.' Reply in Support of Supp. Mot. to Exclude Livingston.

[59]  <u>See</u> Doc. 275, Sur-reply to Pls.' Supp. Mot. to Exclude Livingston.

party, there is no genuine issue for trial." <u>Coastal Agricultural</u> <u>Supply, Inc.</u>, 759 F.3d at 504 (quoting <u>Matsushita Elec. Indus. Co.</u> <u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. <u>See</u> <u>id.</u> at 505 (quoting <u>Celotex Corp.</u>, 477 U.S. at 323). If the movant carries its burden, the nonmovant may not rest on the allegations or denials in the pleading but must respond with evidence showing a genuine factual dispute. <u>See</u> <u>id.</u> The court must accept all of the nonmovant's evidence as true and draw all justifiable inferences in her favor. <u>Coastal Agric. Supply, Inc. v. JP Morgan</u> <u>Chase Bank, N.A.</u>, 759 F.3d 498, 505 (5th Cir. 2014)(quoting <u>Anderson</u>, 477 U.S. at 255).

### B.   **Expert Testimony Standard**

Under the Federal Rules of Evidence and related case law, an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "To qualify as an expert, the witness must have such knowledge or experience in [his] field or calling to make it appear that his opinion or inference will probably aid the trier in [the] search for truth." <u>United States</u> <u>v. Hicks</u>, 389 F.3d 514, 524 (5th Cir. 2004)(quoting <u>United States</u> <u>v. Bourgeois</u>, 950 F.2d 980, 987 (5th Cir. 1992)). If an opinion is

based solely or primarily on experience, it "must be grounded in an accepted body of learning or experience in the expert's field." Fed. R. Evid. 702, advisory committee's note, 2000 Amends.  The witness must connect the experience to the conclusion offered, must explain why the experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts.  Id.

Although an expert need not be highly qualified to testify on a given topic, his testimony on subjects in which he is not qualified must be excluded.  Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009).  An additional limitation on expert witnesses is that they may not offer conclusions of law.  C.P. Interests, Inc. v. Cal. Pools, Inc., 238 F.3d 690, 697 (5th Cir. 2001)(citing Owen v. Kerr McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983)).

The expert's testimony must be both relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); Smith v. Goodyear Tire & Rubber Co., 495 F.3d 224, 227 (5th Cir. 2007); see also Fed. R. Evid. 702 & advisory committee's note, 2000 Amends. The burden of establishing this predicate for the expert's testimony falls on the party producing the expert.  See Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998).  The trial court has the responsibility of determining whether that party has met its burden.  Fed. R. Evid. 104(a); Mathis v. Exxon Corp., 302 F.3d 448, 459-60 (5th Cir. 2002); see also Daubert v. Merrell Dow

Pharms., Inc., 509 U.S. 579, 589 (1993).  The court also determines, as a matter of law, whether the expert is qualified to testify on the subjects on which he offers opinions.  Mathis, 302 F.3d at 459.  The trial judge has "wide latitude in determining the admissibility of expert testimony;" yet, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, advisory committee's note, 2000 Amends.; Wilson v. Woods, 163 F.3d 935, 936-37 (5th Cir. 1999)(quoting Watkins v. Telsmith, Inc., 121 F.3d 984, 988 (5th Cir. 1997)).

To be relevant, the testimony must assist "the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; see also United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004); Daubert, 509 U.S. at 591.  The Federal Rules of Evidence define relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  In other words, the expert testimony must be applicable to the facts in issue.  Daubert, 509 U.S. at 592-93.

Reliability hinges on the sufficiency of the facts or data upon which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case.  See Fed. R. Evid. 702.  The trial judge must make certain that the expert applied

14

"the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co., Ltd.,</u> 526 U.S. at 152.

### III. Analysis

Plaintiffs have moved: (1) for summary judgment on all of Oilpro's counterclaims; (2) for summary judgment against Defendants on their claim for misappropriation of trade secrets; (3) to exclude Livingston; and (4) for their attorney's fees based on their previous motion to exclude Livingston. Defendants have moved: (1) for summary judgment on all of Plaintiffs' claims; (2) to strike Johnson; and (3) to strike Aslanyan.

### A.  <u>Plaintiffs' Affirmative Motion for Summary Judgment</u>

Plaintiffs move for affirmative summary judgment on their claims against Kent for misappropriation of trade secrets under the Texas Uniform Trade Secrets Act[60] ("TUTSA").[61]  Additionally, Plaintiffs argue that Oilpro is liable for these claims under the vice-principal theory.[62]

Under the TUTSA, there are six avenues for a plaintiff to establish a misappropriation of a trade secret. <u>See</u> Tex. Civ.

---

[60]  Tex. Civ. Prac. & Rem. Code §§ 134A.001 et. seq.

[61]  <u>See</u> Doc. 227, Pls.' Affirmative Mot. for Summ. J. Plaintiffs' motion does not mention the Google Analytics data that is discussed in their complaint and provides the basis for two of their four TUTSA allegations. <u>See</u> Doc. 236, Pls.' 1st Am. Compl. ¶¶ 174-175. Accordingly, the court assumes that Plaintiffs' motion is only in reference to Plaintiffs' TUTSA allegations regarding the misappropriation of "proprietary member information" pursuant to Sections 3(A) and 3(B)(i). <u>See</u> Doc. 236, Pls.' 1st Am. Compl. ¶¶ 172-173.

[62]  <u>See</u> <u>id.</u> p. 16.

15

Prac. & Rem. Code § 134A.002(3). Plaintiffs have pled their TUTSA causes of action through two of these six avenues, the TUTSA Sections 134A.002(3)(A) ("Section 3(A)") and 134A.002(3)(B)(i) ("Section 3(B)(i)").[63]   Section 3(A) provides that a misappropriation is defined as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means . . . ." Tex. Civ. Prac. & Rem. Code § 134A.002(3)(A). Section 3(B)(i) provides that a misappropriation is defined as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret . . . ." Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B)(i).

Plaintiffs argue that the contents of the Rigzone resume database are trade secrets that Kent misappropriated.[64]   In their response, Defendants do not argue that either Section 3(A) or 3(B)(i) is inapplicable to Kent's conduct, but rather, that the contents of the Rigzone resume database are not trade secrets protected by the TUTSA.[65]  The established facts show that Kent's

---

[63]   See Doc. 236, Pls.' 1st Am. Compl. ¶¶ 172-174.

[64]   See Doc. 227, Pls.' Mot. for Affirmative Summ. J. pp. 13-15.

[65]   See Doc. 239, Defs.' Resp. to Pls.' Affirmative Mot. for Summ. J. p. 8. In their response, Defendants specifically argue that "Kent did not access or acquire the resume database and Plaintiffs do not argue that the individual resumes are trade secrets." See id. p. 12. However, Plaintiffs are unequivocally arguing that "The Contents of Rigzone's Resume Database Are Trade Secrets." See Doc. 227, Pls.' Mot. for Affirmative Summ. J. p. 17. Accordingly, the court's analysis is focused on whether the contents of the Rigzone resume database are trade secrets.

conduct violated Sections 3(A) and 3(B)(i) if the contents of the Rigzone resume database are in fact trade secrets. Accordingly, the only question for the court is whether the contents of the Rigzone resume database are trade secrets.

### 1.    Trade Secrets Under the TUTSA

Under the TUTSA, a trade secret is defined as:

all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.002(6). The TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Tex. Civ. Prac. & Rem. Code § 134A.007(a). While the TUTSA does not affect contractual remedies, it does not provide that its definition of a trade secret may be supplanted by a contract between parties. See Tex. Civ. Prac. & Rem. Code § 134A.007(b). Accordingly, Plaintiffs' attempted reliance on the definition of a

17

trade secret in the Purchase Agreement is misplaced when addressing Plaintiffs' TUTSA claims.[66]  It is the TUTSA's definition of a trade secret that controls.[67]

Turning back to the TUTSA's definition, Defendants' argue that the contents of the Rigzone "resume database [are] not a compilation protected under the TUTSA" and "Rigzone took no measures to maintain the secrecy of the resume database."[68] Although it is not a contested issue, the court will also address whether the TUTSA's economic value requirements are met.

### i.    Information Protected by the TUTSA

As to Defendants' first argument, the TUTSA broadly defines the various forms and types of information that can be trade secrets before narrowing its scope to include only those forms and types that meet certain secrecy (§ 134A.002(6)(A)) and economic value (§ 134A.002(6)(B)) requirements.  See Tex. Civ. Prac. & Rem. Code § 134A.002(6).  Within its broad preliminary scope, the TUTSA defines a trade secret to include "all forms and types of information . . . and any . . . compilation[,]" regardless of how it is compiled as long as it meets the more narrow secrecy and economic value requirements.  See id.  The contents of the Rigzone

---

[66]    See Doc. 227, Pls.' Affirmative Mot. for Summ. J. pp. 11-15.

[67]    This is not to say that the Purchase Agreement's definition of a trade secret is irrelevant.  The Purchase Agreement's definition supports exemplary damages and, as addressed below, the secrecy of the contents of the Rigzone resume database.

[68]    See Doc. 239, Defs.' Resp. to Pls.' Affirmative Mot. for Summ. J. pp. 13-17.

resume database are a compilation of resumes which are undeniably a "type[] of information[.]" <u>See</u> <u>id.</u> Thus, the pertinent question is whether the contents of the resume database meet the TUTSA's secrecy and economic value requirements.

### ii. Secrecy of the Resume Database

The contents of the Rigzone resume database are only trade secrets if Rigzone took reasonable measures under the circumstances to keep the contents secret. <u>See</u> Tex. Civ. Prac. & Rem. Code § 134A.002(6)(A). After Rigzone was purchased from Kent, DHI hired Ernst & Young to perform a security audit of the website and remediated any issues that were discovered.[69] Kent himself stated that he thought the security on the website was fine prior to the Ernst & Young audit, which he found to be unnecessary.[70] Furthermore, Kent signed the Purchase Agreement warranting that "all necessary and otherwise reasonable steps to protect and preserve the confidentiality of" the contents of the Rigzone resume database had been taken at the time of signing.[71] At his deposition, Kent confirmed that when he signed the Purchase

---

[69]    <u>See</u> Doc. 227-5, Ex. 5 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of Jeremy Antonini pp. 20:25-21:8.

[70]    <u>See</u> Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of David Kent p. 214:18-215:1.

[71]    <u>See</u> Doc. 227-1, Ex. 1 to Pls.' Mot. for Partial Summ. J., The Purchase Agreement p. 14. While not binding for the purposes of the TUTSA, the definition of  a Trade Secret under the Purchase Agreement includes the contents of the Rigzone resume database. <u>See</u> <u>id.</u> pp. 52, 54-55. Kent acknowledged that the Purchase Agreement defines Trade Secrets to include the contents of the Rigzone resume database. <u>See</u> Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of Kent pp. 207:1-208:9.

Agreement, "all reasonable steps to protect the [Rigzone] website" had been taken.[72]

Defendants argue that a lengthy list of reasons, including but not limited to the following, show that Plaintiffs did not take reasonable steps to protect the contents of the Rigzone resume database: (1) at one point, Rigzone sent 1,775,375 resume profiles to WorkDigital, a company affiliated with DHI Group, without making it sign a non-disclosure agreement; (2) Rigzone allowed paying customers to access and download large quantities of resumes and did not monitor their access; (3) Rigzone did not require its employees who had access to the resume database to sign non-disclosure agreements; (4) a Rigzone employee was allowed to take and keep two servers that had the resume database on them without signing a non-disclosure agreement and was not told to delete the resumes; (5) the resumes were not encrypted; and (6) Rigzone employees were not informed that the resumes were a trade secret.[73]

The evidence presented by the parties establishes that it is a contested issue of fact as to whether Rigzone took reasonable

---

[72]     See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of Kent p. 213:4-14.

[73]     See Doc. 231, Defs.' Mot. for Summ. J. pp. 30-33; Doc. 244, Ex. R-4 to Defs.' Resp. to Oilpro's Resp. to Pls.' Affirmative Mot. for Summ. J., Apr. 13, 2016 Email; Doc. 233, Ex. J to Oilpro's Resp. to Pls.' Affirmative Mot. for Summ. J., Dep. Tr. of Chad Norville pp. 156:1-19, 166:21-24, 167:24-168:03, 198:17-20, 212:06-15, 216:24-217:24; Doc. 227-5, Ex. 5 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of Jeremy Antonini pp. 141:03-15, 144:10-149:25.  Defendants also argue that customers were not required to sign non-disclosure agreements, but only cites to one contract with one customer as support.  At best, this shows that, in that instance, Rigzone did not require the customer to sign a non-disclosure agreement.

measures under the circumstances to keep the contents of its resume database secret.  The trier of fact will need to weigh the evidence presented by the parties on this issue.  Accordingly, Plaintiffs' affirmative motion for summary judgment should be **DENIED.**

Given that there is a fact issue on whether the contents of the Rigzone resume database are trade secrets, at this time, the court will not address the TUTSA's economic value requirements or Plaintiffs' vice-principal theory.

B.  **Defendants' Motion for Summary Judgment**

Plaintiffs currently allege the following causes of action: (1) violations of the Computer Fraud and Abuse Act ("CFAA") against Defendants; (2) violations of the Stored Wire and Electronic Communications and Transactional Records Access Act ("SCA") against Defendants; (3) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Kent; (4) violations of the TUTSA against Defendants; (5) misappropriation of confidential information against Defendants; (6) violation of the Texas Harmful Access by Computer Act ("THACA") against Defendants; (7) violation of the Texas Theft Liability Act ("TTLA") against Defendants; and (8) breach of fiduciary duties against Kent.[74]

Defendants argue that they are entitled to summary judgment on all of Plaintiffs' claims because: (1) the TUTSA preempts Plaintiffs' state law claims; (2) Plaintiffs' state-law claims lack

---

[74]    See Doc. 236, Pls.' 1st Am. Compl. pp. 34-55.

merit; (3) Plaintiffs' resumes are not a trade secret under the
TUTSA and, even if they are, Plaintiffs did not suffer damages; (4)
the SCA does not apply; (5) RICO does not apply; (6) Plaintiffs
have no overall damages; and (7) the statute of limitations bars
some of Plaintiffs' claims arising from the first round of access
by Kent.

### 1.   Trade Secrets Under the TUTSA

Defendants argue that Plaintiffs' claims under the TUTSA fail
because the contents of the Rigzone resume database, Plaintiffs'
internet search techniques, and Plaintiffs' Google analytics data
are not trade secrets.[75]   As discussed above, a factual dispute
exists whether the contents of the Rigzone resume database are
trade secrets.  Accordingly, summary judgment should not be granted
on Plaintiffs' TUTSA claims based on the contents of the Rigzone
resume database.

Plaintiffs have not responded to Defendants' arguments that
Plaintiffs' internet search techniques and Google analytics data
are not trade secrets.  The court interprets this to mean that
Plaintiffs' have abandoned their TUTSA claims related to the
alleged misappropriation of their internet search techniques and
Google analytics data.  Accordingly, summary judgment should be
**GRANTED** on Plaintiffs' TUTSA claims related to the Google analytics
data and internet search techniques.

---

[75]    See Doc. 231, Defs.' Mot. for Summ. J. pp. 22-35.

22

**2.    Damages Under the TUTSA**

Defendants also argue that Plaintiffs' TUTSA claims fail because the access of the Rigzone resume database caused no damage.[76] "Remedies available under the [TUTSA] include injunctive relief; damages measured by actual loss plus unjust enrichment not included in computing actual loss; a reasonable royalty; and exemplary damages capped at two times actual damages." <u>Sw. Energy Prod. Co. v. Berry-Helfand</u>, 491 S.W.3d 699, 711 n.7 (Tex. 2016)(citing Tex. Civ. Prac. & Rem. Code §§ 134A.003-.004).

Plaintiffs have presented evidence that Kent illicitly obtained hundreds of thousands of resumes, and Kent admits that the resumes "create value for the business line" that the parties are in.[77] Accordingly, Plaintiffs have provided sufficient evidence that they were damaged for their TUTSA claim to survive summary judgment.

**3.    Preemption Under the TUTSA**

Defendants argue that the TUTSA preempts Plaintiffs claims for misappropriation of confidential information, violation of the TTLA, violation of the THACA, and breach of fiduciary duty.[78] Plaintiffs agree that summary judgment should be granted on their

---

[76]    <u>See</u> <u>id.</u> p. 36.

[77]    <u>See</u> Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of David Kent pp. 61:18-62:14.

[78]    <u>See</u> Doc. 231, Defs.' Mot. for Summ. J. pp. 13-16.

TTLA claim, but argue that the other claims are not preempted.[79]

The TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Tex. Civ. Prac. & Rem. Code § 134A.007(a). "Where a claim is based on a misappropriation of a trade secret, then it is preempted by the [TUTSA]." Super Starr Int'l, LLC v. Fresh Tex Produce, LLC, 531 S.W.3d 829, 843 (Tex. App.—Corpus Christi 2017, no pet.)(citing Tex. Civ. Prac. & Rem. Code § 134A.007(a)).   The TUTSA has no effect on "other civil remedies that are not based upon misappropriation of a trade secret . . . ." Tex. Civ. Prac. & Rem. Code § 134A.007(b)(2).

Texas federal courts have come to differing conclusions on whether the TUTSA's preemption provision encompasses the misappropriation of information that is not a trade secret. See AMID, Inc. v. Medic Alert Found. United States, Inc., 241 F. Supp. 3d 788, 827 (S.D. Tex. 2017) (holding that the plaintiff was allowed to plead that the defendant "misappropriated information protected as trade secrets, and alternatively under the theory that the misappropriated information was not a trade secret but was confidential"); but see Embarcadero Techs., Inc. v. Redgate Software, Inc., 1:17-CV-444-RP, 2018 WL 315753, at *3 (W.D. Tex. Jan. 5, 2018)(following the "majority approach" and holding that the "TUTSA's preemption provision encompasses all claims based on

---

[79]   See Doc. 240, Pls.' Resp. to Defs.' Mot. for Summ. J. p. 5.

the alleged improper taking of confidential business information").

In Embarcadero, the court addressed "whether a breach of fiduciary duty claim alleging only the misappropriation of confidential information is preempted by [the] TUTSA." Embarcadero, 2018 WL 315753 at *2-3.  The court recognized that Texas courts had not addressed the issue.  See id. However, for guidance, the court looked to Super Starr, a Texas appellate court case finding that a breach of fiduciary duty claim was preempted by the TUTSA.  See id. at *3.  The Embarcadero court recognized that the Super Starr court did not conclusively find that a claim based on the misappropriation of information that was not a trade secret is preempted by the TUTSA because the Super Starr court based its conclusion on a finding that the theft of trade secrets was a necessary component of the underlying breach of fiduciary duty claim.  See id.

"After reviewing the reasoning in Super Starr and that of various other courts across the country applying Uniform Trade Secrets Act preemption, the [Embarcadero court found] that [the] TUTSA's preemption provision encompasses all claims based on the alleged improper taking of confidential business information." Id. The court reasoned that the majority of courts across the country have come to the same conclusion, and that this conclusion is supported by the TUTSA's preemption provision's purpose to "'prevent inconsistent theories of relief for the same underlying

harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret.'" Id. (quoting Super Starr, 531 S.W.3d at 843).

Embarcadero and Super Starr both recognize that the TUTSA's preemption provision was intended to eliminate common law theories that were based on a "misappropriation of a trade secret." And, the plain language of the TUTSA's preemption provision states that it has no effect on "other civil remedies that are not based upon misappropriation of a trade secret . . . ." Tex. Civ. Prac. & Rem. Code § 134A.007(b)(2). Yet, Embarcadero and the majority of courts from other jurisdictions hold that the preemption provision eliminates common law theories that are based on a misappropriation of trade secrets and theories that are based on a misappropriation of information that is not a trade secret. These holdings directly conflict with the TUTSA's plain language stating that it is to have no effect on civil remedies not based on trade secret misappropriation. See Tex. Civ. Prac. & Rem. Code § 134A.007(b)(2).

The court fails to see how the plain language of the TUTSA's preemption provision can be read to preempt civil remedies for the misappropriation of information that is not a trade secret. Accordingly, without further guidance from Texas courts, the court finds the reasoning in AMID persuasive and finds that Plaintiffs may maintain their causes of action for the misappropriation of

26

trade secrets under the TUTSA as well as their causes of action for the misappropriation of information that is not a trade secret.

As discussed above, neither party has established the trade secret status of any of the information that was illicitly obtained. Accordingly, at this time, the court cannot say whether any of Plaintiffs' non-TUTSA claims are preempted. If it is later established that any of the illicitly obtained information is a trade secret under the TUTSA, then the TUTSA preempts Plaintiffs' claims involving the misappropriation of that information.[80]

### 4. Merits of Plaintiffs' State-Law Claims

Defendants argue that Plaintiffs' state-law claims for misappropriation of confidential information and breach of fiduciary duties fail on their merits.

### i. Misappropriation of Confidential Information

Defendants argue that Plaintiffs' claim for misappropriation of confidential information fails because Plaintiffs did not suffer commercial damage.[81] Defendants incorrectly cite to the elements of a cause of action for misappropriation of a business opportunity which requires commercial damage.[82] See e.g., Playboy Enters., Inc. v. Webbworld, Inc., 991 F. Supp. 543, 558 (N.D. Tex. 1997)(listing

---

[80] This addresses Defendants' arguments that Plaintiffs' THACA claims are partially preempted. See Doc. 231, Defs.' Mot. for Summ. J. p. 16. To the extent it is shown that Plaintiffs' claims seek THACA damages for the misappropriation of information that is a trade secret under the TUTSA, the claims are preempted.

[81] See Doc. 231, Defs.' Mot. for Summ. J. pp. 16-18.

[82] See id. p. 16.

the elements of misappropriation of a business opportunity), <u>aff'd</u>, 168 F.3d 486 (5th Cir. 1999). A cause of action for misappropriation of confidential information does not require a showing of commercial damage. <u>See e.g.</u>, <u>Samsung Elecs. Am., Inc. v. Yang Kun Chung</u>, Civ. Act. No. 3:15-CV-4108-D, 2017 WL 635031, at *14 (N.D. Tex. Feb. 16, 2017)(listing the elements of misappropriation of confidential information). Accordingly, Defendants' argument lacks merit.

### ii. Breach of Fiduciary Duty

Defendants argue that Kent owed no fiduciary duties to Plaintiffs that were breached by Kent's actions.[83] Defendants claim that the only fiduciary duty that survived Kent's employment with Rigzone was the duty to not disclose trade secrets.[84] This is incorrect. Following his employment, an ex-employee has a fiduciary duty that forbids the employee "from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer." <u>T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.</u>, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd)(citing <u>Miller Paper Co. v. Roberts Paper Co.</u>, 901 S.W.2d 593, 600 (Tex. App.—Amarillo 1995, no writ).

Kent accessed the Rigzone resume database through URLs of

---

[83]    <u>See</u> Doc. 231, Defs.' Mot. for Summ. J. p. 19.

[84]    <u>See</u> Doc. 231, Defs.' Mot. for Summ. J. p. 20.

which he was aware because of his previous employment at Rigzone.[85]
He then used the information he retrieved to help Oilpro, a company
that was directly competing with Rigzone.[86]   These facts are
sufficient for Plaintiffs' breach of fiduciary duty claim to
survive summary judgment.

### 5.   **Violation of the SCA**

The SCA provides a civil cause of action against a defendant
who "(1) intentionally accesses without authorization a facility
through which an electronic communication service is provided; or
[]intentionally exceeds an authorization to access that facility;
and [(2)] thereby obtains, alters, or prevents authorized access to
a wire or electronic communication while it is in electronic
storage in such system . . . ." See 18 U.S.C. §§ 2701(a), 2707.
Defendants argue that Plaintiffs cannot meet their summary judgment
burden on the second element of their SCA claim because Defendants
"did not access an electronic communication while it was in
electronic storage."[87]   The SCA defines "electronic storage" to mean
"(A) any temporary, intermediate storage of a wire or electronic
communication incidental to the electronic transmission thereof;
and (B) any storage of such communication by an electronic
communication service for purposes of backup protection of such

---

[85]   See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr.
of David Kent pp. 17:11-18:25, 200:19-21, 201:16-18.

[86]   See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr.
of David Kent pp. 17:17-20, 19:1-11.

[87]   See Doc. 231, Defs.' Mot. for Summ. J. p. 38.

communication[.]"  See 18 U.S.C. §§ 2711(1), 2510(17).

Plaintiffs argue that each resume stored in the Rigzone resume database is a backup copy for the user, and, thus, the resumes within the database are in "electronic storage" as defined by the SCA.[88]  As support, Plaintiffs cite to Theofel v. Farey-Jones, 359 F.3d 1066 (9th Cir. 2004).  In Theofel, the Ninth Circuit held that an obvious purpose of emails stored on an internet service provider's server after delivery was to function as backup copies for users.  See id. at 1075.  Accordingly, the Ninth Circuit held that the emails were stored "for purposes of backup protection" under the SCA.  See id.

Plaintiffs specifically quote the following passage from Theofel to support their argument:

> An obvious purpose for storing a message on an ISP's server after delivery is to provide a second copy of the message in the event that the user needs to download it again—if, for example, the message is accidentally erased from the user's own computer. The ISP copy of the message functions as a "backup" for the user. Notably, nothing in the Act requires that the backup protection be for the benefit of the ISP rather than the user. Storage under these circumstances thus literally falls within the statutory definition.

Id.  However, Plaintiffs have made alterations to this quotation so that it reads as follows:

> [a]n obvious purpose for storing [the resume] . . . after delivery is to provide a second copy of the [resume] in the event that the user needs to download it again–if, for example, the [resume] is accidentally erased from the user's own computer.  The [Rigzone] copy of the message

---

[88]    See Doc. 240, Pls.' Resp. to Defs.' Mot. for Summ. J. pp. 16-18.

> functions as a "backup" for the user.  Notably, nothing
> in the Act requires that the backup protection be for the
> benefit of [Rigzone] rather than the user.  Storage under
> these circumstances thus literally falls within the
> statutory definition.[89]

Plaintiffs ask that, based on the altered Theofel quote, the court find that one of the obvious purposes of the resumes being stored in the Rigzone resume database was "for purposes of backup protection" for Rigzone's users.  Plaintiffs cannot just replace "message" with "resume," replace "ISP" with "Rigzone," and omit that the email messages in Theofel were stored on an ISP's server, to meet their summary judgment burden to produce evidence showing that a purpose of resumes stored in the database was for backup protection.

Plaintiffs have presented no summary judgment evidence that the resumes were stored "for purposes of backup protection." Rather, the summary judgment evidence shows that the resumes were stored so that: (1) Rigzone website users could apply for job openings that were posted by employers and recruiters; and (2) recruiters and employers who paid for access to the resume database could directly solicit users who had uploaded their resumes.[90] Furthermore, the court is not prepared to hold as a matter of undisputed fact that: (1) emails are indistinguishable from resumes; (2) Rigzone is identical to an internet service provider;

---

[89]    See Doc. 240, Pls.' Resp. to Defs.' Mot. for Summ. J. pp. 17-18.

[90]    See Doc. 17, Def. Kent's Orig. Ans. p. 3.

and (3) uploading resumes to a database is factually comparable to email traffic.

For these reasons, the court finds that Plaintiffs have failed to present evidence that Defendants accessed an electronic communication while it was in electronic storage within the meaning of the SCA.  Accordingly, summary judgment should be **GRANTED** on Plaintiffs' cause of action for violations of the SCA.

### 6.   RICO

Defendants argue that summary judgment should be granted on Plaintiffs' RICO claims against Kent because: (1) Plaintiffs have failed to establish the continuity required for RICO claims; (2) Plaintiffs have not suffered RICO damages; (3) there is no RICO enterprise; and (4) Plaintiffs' have no evidence of the investment of income required for one of their RICO claims.[91]  Plaintiffs argue that they have established continuity, suffered RICO damages, and that there is a RICO enterprise.

Congress enacted RICO to prohibit conduct involving a pattern of racketeering activity.  <u>See</u> <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 453 (2006); <u>Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer</u>, 90 F.3d 118, 122 (5th Cir. 1996).  "One of RICO's enforcement mechanisms is a private right of action, available to '[a]ny person injured in his business or property by reason of a violation' of the RICO's substantive restrictions."  <u>Anza</u>, 547 U.S.

---

[91]     <u>See</u> Doc. 231, Defs.' Mot. for Summ. J. pp. 40-48.

at 453 (quoting 18 U.S.C. § 1964(c)).

Plaintiffs allege violations of 18 U.S.C. §§ 1962(a) ("Section 1962(a)"), (b) ("Section 1962(b)"), and (d) ("Section 1962(d)").[92] Section 1962(a) punishes certain uses of income obtained from a pattern of racketeering activity.  Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or in the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Section 1962(d) makes it unlawful to conspire to violate any Section 1962 provision.  The substantive requirements of 18 U.S.C. § 1962 are the same regardless of whether the suit is civil or criminal.  St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 446 n.15 (5th Cir. 2000).

A pattern of racketeering activity is created by two or more predicate acts that are related and constitute or pose a threat of continued criminal activity.  18 U.S.C. § 1961(5); Brown v. Protective Life Ins. Co., 353 F.3d 405, 407 (5th Cir. 2003). Continuity of criminal activity may refer to either a closed period of repeated conduct or an open-ended period that threatens repetition.  Zastrow v. Hous. Auto Imports Greenway Ltd., 789 F.3d 553, 561 (5th Cir. 2015)(quoting Word of Faith World Outreach Ctr.

_____

[92]  See Doc. 236, Pls.' 1st Am. Compl. pp. 41-43.

Church, Inc. 90 F.3d at 122)).

### i.   Continuity

Kent's illegal conduct spanned from at least October 2013 to August 2015.[93]  During this time period, Kent illegally downloaded resumes from the Rigzone resume database on approximately fourteen or more distinct occasions.[94]  Additionally, despite Kent's argument that his conduct would have ceased when he sold Oilpro to an unwitting purchaser, there is no evidence that Kent would have ceased his illicit conduct had he not been caught.  Kent's illegal downloading and the period over which it occurred creates a triable issue of fact on whether continuity exists for the purposes of RICO.

### ii.   RICO Damages

Regarding Defendants' second argument, RICO provides that "any person injured in his business or property" by a violation of RICO "shall recover threefold the damages he sustains and the cost of the suit . . . ."  See 18 U.S.C. § 1964(c).  Defendants stole hundreds of thousands of resumes from Plaintiffs.  The value of these resumes is disputed.  At trial, Plaintiffs will have to prove that they were damaged and that the stolen resumes had a value.

---

[93]   See Doc. 233-1, Ex. B-14 to Defs.' Mot. for Summ. J., Mandiant Report pp. 7-8; Doc. 227-6, Ex. 6 to Pls.' Mot. for Partial Summ. J., Criminal Compl. pp. 7-8; Doc. 231, Defs.' Mot. for Summ. J. p. 9; Doc. 231-1, Ex. J-52 to Defs.' Mot. for Summ. J., Rigzone ResumeWriter Breach Summary at DHI_0024616-17.

[94]   See Doc. 233-1, Ex. B-14 to Defs.' Mot. for Summ. J., Mandiant Report pp. 7-8; Doc. 231-1, Ex. J-52 to Defs.' Mot. for Summ. J., Rigzone ResumeWriter Breach Summary at DHI_0024616-17.

However, at this stage, Plaintiffs have met their burden to produce evidence that they sustained RICO damages.

### iii. RICO Enterprise

Under RICO, an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4).  Kent is a distinct legal entity from Oilpro and through their association, they form an "enterprise" under RICO.  See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001)("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in [RICO] that requires more 'separateness' than that.").  Accordingly, Defendants argument fails on this issue.

### iv.  Investment of Income

Plaintiffs' RICO claim pursuant to Section 1962(a) requires them to prove that Kent used or invested income derived from racketeering activity "in [the] acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  Defendants argue that Plaintiffs failed to present evidence of any income from racketeering activity or the investment of such income.  Plaintiffs did not respond to this argument.

35

Accordingly, because the court has not been directed to any evidence satisfying Plaintiffs' Section 1962(a) claim, summary judgment should be **GRANTED** on this claim.

### 7.    **CFAA and THACA**

Defendants argue that Plaintiffs have not presented evidence of any damages that are recoverable under Plaintiffs' CFAA or THACA claims.[95]

Under the CFAA, Plaintiffs are entitled to compensatory damages for "damage" or "loss" suffered because of a CFAA violation. <u>See</u> 18 U.S.C. § 1030(g). Under the CFAA, "loss" means "any reasonable cost . . . including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. . . ." 18 U.S.C. § 1030(e)(11). "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information . . . ." 18 U.S.C. § 1030(e)(8). The THACA provides a civil cause of action to a plaintiff "who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code . . . ." <u>See</u> Tex. Civ. Prac. & Rem. Code § 143.001(a).

Plaintiffs have presented evidence of the estimated cost

---

[95]    <u>See</u> Doc. 231, Defs.' Mot. for Summ. J. p. 49.

Rigzone incurred as a result of Defendants' unauthorized access.[96] Defendants claim these numbers are inaccurate and that portions of the overall cost are not recoverable under the CFAA or THACA.[97] However, those are issues for trial.  At this stage, Plaintiffs have presented sufficient evidence that they suffered damages recoverable under the CFAA and THACA such that these claims should survive summary judgment.

### 8.   Statute of Limitations

Defendants argue that the following of Plaintiffs' claims are partially barred by the statute of limitations: (1) violation of the CFAA; (2) violation of the SCA; (3) violation of the THACA; (4) misappropriation of confidential information; and (5) violation of the TTLA.  As discussed above, the court has recommended that Plaintiffs' SCA and TTLA claims be dismissed on other grounds. Thus, the court will only analyze the remaining three claims.

Plaintiffs' CFAA, THACA, and misappropriation of confidential information claims are governed by a two-year statute of limitations.  See 18 U.S.C. 1030(g); Tex. Civ. Prac. & Rem. Code §§ 16.003(a), 143.001(b).  In Texas, "[t]he general rule is that a cause of action accrues, and the statute of limitations begins to run, 'when facts come into existence that authorize a claimant to seek a judicial remedy.'"  Bell v. Philadelphia Intern. Records,

---

[96]   See Doc. 233-1, Ex. E-2 to Defs.' Mot. for Summ. J., Spreadsheet of Costs.

[97]   See Doc. 231, Defs.' Mot. for Summ. J. p. 52.

981 F. Supp. 2d 621, 625 (S.D. Tex. 2013).  "A CFAA claim accrues as soon as the plaintiff knows of the unauthorized access, even if the identity of the perpetrator is not yet known." <u>Quantlab Techs. Ltd. (BVI) v. Godlevsky</u>, Civ. Act. No. 4:09-CV-4039, 2015 WL 1651251, at *2 (S.D. Tex. Apr. 14, 2015).

Plaintiffs agree that they first contacted the FBI about the unauthorized access to their resume database in May 2014.[98]  This shows that Plaintiffs were aware of the unauthorized access at least as early as May 2014.  Plaintiffs did not file their lawsuit until June 10, 2016.[99]  Plaintiffs have not argued that any sort of tolling should apply to the statute of limitations for these claims.  Accordingly, summary judgment should be **GRANTED** on Plaintiffs' CFAA, THACA, and misappropriation of confidential information claims for all conduct that occurred prior to June 10, 2014.

## C.  <u>Plaintiffs' Motion for Summary Judgment on Counterclaims</u>

Plaintiffs have moved for summary judgment[100] on all of Oilpro's counterclaims on the bases that: (1) they are barred by the doctrine of unclean hands; (2) Oilpro sued the wrong parties;

---

[98]     <u>See</u> Doc. 240, Pls.' Resp. to Defs.' Mot. for Summ. J. p. 24.

[99]     <u>See</u> Doc. 1, Pls.' Orig. Compl.

[100]     As a preliminary matter, Oilpro objects to Plaintiffs' inclusion of two screenshots as evidence in their motion.  While the court questions their admissibility, it finds it unnecessary to consider these objections because, as discussed below, its consideration of the screenshots does not affect its decision.  The admissibility of the screenshots is an issue better left to the trial judge's discretion.

and (3) they do not have evidence sufficient to survive summary judgment.[101]   Given the dismissal of Oilpro's claims for trespass to chattels and unjust enrichment, the following counterclaims remain: (1) breach of contract; (2) violation of the CFAA; (3) violation of the Digital Millennium Copyright Act ("DMCA"); (4) copyright infringement; (5) misappropriation; (6) trademark infringement in violation of 15 U.S.C. § 1051; (7) Texas common law trademark infringement; (8) violation of the THACA; and (9) interference with prospective business relations.[102]

### 1.   Unclean Hands Defense

Plaintiffs argue that Oilpro's counterclaims are barred by Oilpro's "filthy" hands.[103]   "Texas courts have long held that the affirmative defense of unclean hands is available only in equity." Bagby Elevator Co., Inc. v. Schindler Elevator Corp., 609 F.3d 768, 774 (5th Cir. 2010)(citing Furr v. Hall, 553 S.W.2d 666, 672 (Tex. Civ. App.—Amarillo 1977).   In Texas, "'[t]he clean hands doctrine requires that one who seeks equity, does equity.'"   Id. (quoting Dunnagan v. Watson, 204 S.W.3d 30, 41 (Tex. App.—Fort Worth 2006, pet. denied))(alterations in original).   The clean hands doctrine "'should not be applied unless the party asserting [it] has been seriously harmed and the wrong complained of cannot be corrected

---

[101]   See Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls. pp. 12-25.

[102]   See Doc. 63, Oilpro's 2nd Am. Ans. and Countercls.

[103]   See Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls. p. 12.

without the application of the doctrine.'"  Id. (quoting Dunnagan, 204 S.W.3d at 41)(alterations in original).

It is unclear whether the clean hands doctrine can even be applied to Oilpro's counterclaims because Oilpro's remaining claims do not appear to be equitable.  Regardless, Plaintiffs have completely failed to establish that the "filthy" conduct of which they complain cannot be remedied through their live claims against Defendants.  Accordingly, Oilpro's counterclaims should not be dismissed on this basis.

### 2.   Wrong Party Defense

Plaintiffs assert that Oilpro sued the wrong parties in its counterclaims because Work Digital, Inc., a subsidiary of DHI Group, is the party that actually scraped the Oilpro website.[104] The parties have presented conflicting evidence on this point.[105] Accordingly, the court cannot grant summary judgment on this basis.

### 3.   The Oilpro Terms and Conditions

Plaintiffs argue that Oilpro's causes of action for breach of contract, violation of the CFAA, violation of the THACA, and misappropriation all fail because they did not breach Oilpro's terms and conditions.  Specifically, Plaintiffs argue that a link to Oilpro's terms and conditions did not appear on its home page or

---

[104]   See Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls. p. 13.

[105]   See Doc. 228-12, Ex. 13 to Pls.' Mot. for Summ. J. on Oilpro's Countercls., Dep. Tr. of Princepreet Chana pp. 27-28; Doc. 244, Ex. T to Oilpro's Resp. to Pls.' Mot. for Summ. J. on Oilpro's Countercls., Excerpts of Michael Durney Dep. (Sealed).

site map until after the period during which Plaintiffs allegedly scraped Oilpro's website.[106]   As support, Plaintiffs cite two screenshots that purportedly show: (1) the absence of a link to the Oilpro terms and conditions in the site map on July 23, 2015; and (2) the appearance of a link to the Oilpro terms and conditions on or around September 5, 2015.[107]

Oilpro argues that the terms and conditions existed and, as stated by Kent in an affidavit, were available in the following ways: (1) through a link in the website's side-bar navigation; (2) through links placed on the login and create profile pages; or (3) by running a search in the search bar on the homepage.[108]   Oilpro further argues that Plaintiffs were aware of the terms and conditions at the time of their alleged scraping.[109]   Plaintiffs argue that terms and conditions that are hidden cannot be binding on them.[110]   In their reply, Plaintiffs cite to multiple URLs and additional screenshots that purportedly show that the terms and conditions were never available through the Oilpro website's sidebar navigation as Kent suggests in his affidavit.[111]

---

[106]   See Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls. p. 10.

[107]   See Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls. p. 11.

[108]   See Doc. 63-1, Ex. A to Oilpro's 2nd Am. Councerls., Aff. of Kent.

[109]   See Doc. 238, Defs.' Resp. to Pls.' Mot. for Summ. J. on Oilpro's Countercls. pp. 18-19.

[110]   See Doc. 246, Pls.' Reply in Support of Mot. for Summ. J. on Oilpro's Countercls. p. 5.

[111]   See Doc. 246, Pls.' Reply in Support of Mot. for Summ. J. on Oilpro's Countercls. pp. 3-4.

DHI's CEO testified that, before scraping data from a website, multiple DHI employees confirmed that the website's terms and conditions permitted the scraping of data.[112]   Even if the screenshots and other evidence cited by Plaintiffs were considered, Oilpro has rebutted that evidence with evidence that showed that links to the terms and conditions could be found by running a search and appeared on the login and create profile pages.[113]   This, combined with the testimony that multiple DHI employees confirmed that DHI's scraping was not in violation of a website's term and conditions, is sufficient to create a factual dispute whether Oilpro's terms and conditions existed and were known to DHI Group at the time of its alleged scraping.   Accordingly, summary judgment should not be granted on Oilpro's counterclaims on this basis.

### 4.   Tortious Interference With Prospective Business Relations

Plaintiffs move for summary judgment on Oilpro's claim for interference with prospective business relations on the basis that Oilpro cannot produce evidence in support of all of the elements of its claim.[114]   The elements of a claim for tortious interference with prospective business relations are:

> "[(1)] a reasonable probability that the plaintiff would
> have entered into a business relationship with a third
> party; (2) the defendant either acted with a conscious

---

[112]   See Doc. 244, Ex. T to Oilpro's Resp. to Pls.' Mot. for Summ. J. on Oilpro's Countercls., Excerpts of Michael Durney Dep.

[113]   See Doc. 63-1, Ex. A to Oilpro's 2nd Am. Councerls., Aff. of Kent.

[114]   See Doc. 228, Pls.' Mot. for Summ. J. on Oilpro's Countercls. pp. 24-25.

desire to prevent the relationship from occurring or knew
the interference was certain or substantially certain to
occur as a result of the conduct; (3) the defendant's
conduct was independently tortious or unlawful; (4) the
interference proximately caused the plaintiff['s] injury;
and (5) the plaintiff suffered actual damage or loss as
a result."

D'Onofrio v. Vacation Publ'ns, Inc., 888 F.3d 197, 214 (5th Cir.
2018)(quoting Coinmach Corp. v. Aspenwood Apartment Corp., 417
S.W.3d 909, 923 (Tex. 2013)).  Oilpro has presented evidence that
Progressive, a global recruiting company, was interested in
entering into a business relationship with Oilpro.[115]  However,
Progressive allegedly ended contract discussions after viewing
Oilpro member profiles posted by Plaintiffs on Dice Open Web.[116]
Oilpro argues that the fact that "Plaintiffs acted with conscious
desire to prevent Progressive from entering into a business
relationship with Oilpro can be inferred from the circumstances
(i.e., that Plaintiffs were-at the same time-cooperating with the
FBI in its investigation of David Kent) and Plaintiffs' competition
with Oilpro."[117]  Oilpro's assertion is without merit.

Reporting a crime or cooperating with the FBI is not an
independently tortious or unlawful action.  Similarly, the bare
fact that Plaintiffs and Oilpro were competitors does not evidence
any conscious desire.  For these reasons, Plaintiffs motion for

---

[115]    See Doc. 244, Ex. Q to Oilpro's Resp. to Pls.' Mot. for Summ. J. on
Oilpro's Countercls., Decl. of Kent.

[116]    See id.

[117]    See Doc. 238, Oilpro's Resp. to Mot. for Summ. J. on Oilpro's
Countercls. pp. 19-20.

summary judgment should be **GRANTED** on Oilpro's claim for tortious interference with prospective business relations.

### 5.   Remaining Arguments

Plaintiffs' brief contains additional arguments regarding Oilpro counterclaims not addressed above.  However, Oilpro has only requested that Plaintiffs' motion be denied with respect to Oilpro's claims for: (1) breach of contract; (2) violation of the CFAA; (3) violation of the THACA; (4) misappropriation; and (5) tortious interference.[118]   The court understands this to be a representation that Oilpro is no longer pursuing its counterclaims for: (1) violation of the DMCA; (2) copyright infringement; (3) trademark infringement in violation of 15 U.S.C. 1051; and (4) Texas common law trademark infringement.  Accordingly, Plaintiffs' motion for summary judgment should be **GRANTED** with respect to these four claims.

### D.  <u>Motion to Strike Johnson's Expert Testimony</u>

Plaintiffs have designated Johnson to testify as a retained expert on economic damages and unjust enrichment that Plaintiffs sustained from Defendants' conduct.[119]   Defendants ask that Johnson's testimony be excluded for the following reasons: (1) his testimony relies on false assumptions; (2) he uses incorrect damages models; (3) his "market-value-per-user" valuation is "junk

---

[118]   <u>See</u> Doc. 238, Oilpro's Resp. to Mot. for Summ. J. on Oilpro's Councercls. p. 20.

[119]   <u>See</u> Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Johnson p. 1.

finance" and unreliable for other reasons; (4) his unjust enrichment calculation is unreliable; (5) Johnson is unqualified; and (6) Plaintiffs' model is unfairly prejudicial.[120]

## 1.   Reliance on False Assumptions

Defendants argue that Johnson wrongly accepts Plaintiffs' factual allegations as true.[121]   Specifically, Plaintiffs' allegations that information from 796,000 Rigzone users was accessed and Oilpro obtained 111,000 new users as a result.[122] While Plaintiffs have certainly not established that these numbers are 100% accurate, they have presented evidence that supports them.[123] It will be up to a jury to determine how many users had their information accessed and how many joined Oilpro as a result. Johnson is a damages expert.  If the facts assumed by Johnson to be true are proven to be incorrect at trial, then the court is confident that Defendants can effectively address that issue on cross-examination.

## 2.   Johnson's Damages Models

Defendants argue that both of Johnson's damages models are incorrect.   Johnson opines on the actual loss suffered by Plaintiffs by calculating the value of the misappropriated

---

[120]   See Doc. 232, Defs.' Mot. to Strike Johnson.

[121]   See id. p. 16.

[122]   See id.

[123]   See Doc. 215-1, Ex. A to Pls.' Mot. to Strike Livingston, Sentencing Memo.

information.[124]   Johnson also opines on the unjust enrichment
Defendants received by projecting a potential income stream based
on the misappropriated information.[125]   Defendants argue that
Johnson's testimony should be excluded because Plaintiffs are not
allowed to recover the actual value of the misappropriated
information and unjust enrichment is limited to actual profits
gained from the use or disclosure of a trade secret.

Under the TUTSA, a plaintiff may recover "the actual loss
caused by misappropriation and the unjust enrichment caused by
misappropriation that is not taken into account in computing actual
loss." See Tex. Civ. Prac. & Rem. Code § 134A.004.  Alternatively,
a plaintiff may recover "a reasonable royalty for a
misappropriator's unauthorized disclosure or use of a trade
secret." See id.  Here, Plaintiffs do not seek a reasonable
royalty.[126]

The court does not consider Defendants' argument to raise a
Daubert issue on admissibility.  Further, the court is not prepared
to hold that Johnson's models do not fit within the TUTSA's
allowable damages.  At trial, the trier of fact must determine
whether Plaintiffs have shown that they are entitled to the damages
that Johnson calculates.  Further, to the extent that Johnson's

---

[124]   See Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Johnson, Johnson
Report pp. 6–10.

[125]   See id. p. 10.

[126]   See Doc. 237, Pls.' 1st Am. Compl. p. 46.

damages models do not comport with the trial judge's jury instructions on damages, Plaintiffs will be unable to recover damages pursuant to those models.  While Defendants make a persuasive argument, the issues they raise can be effectively addressed on cross-examination at trial.[127]

### 3.   Market-Value-Per-User Calculation

Johnson estimates the value of the misappropriated information using a market-value-per-user approach.[128]  Under this approach, Johnson determined the market values of Rigzone, Oilpro, and similar companies, and divided that market value by the number of users each company had.[129]  The resulting number was a market-value-per-user for each company.[130]  Johnson used these market-values-per-user to estimate the value of the Rigzone members' misappropriated information.[131]

Defendants argue that Johnson's market-value-per-user methodology should be excluded as unreliable because: (1) the methodology has not been subjected to peer review, lacks a known error rate, and is not a generally accepted valuation method; (2)

---

[127]     The court notes that there are obvious overlaps between both damage models.  Plaintiffs may only recover for unjust enrichment "that is not taken into account in computing actual loss."  Tex. Civ. Prac. & Rem. Code § 134A.004(a).

[128]     See Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Johnson, Johnson's Report pp. 6-10.

[129]     See id.

[130]     See id.

[131]     See id.

Johnson did not account for factors such as the age of each resume or each user's activity level; (3) in his valuation, Johnson ignored the 2014 downturn in the oil and gas market; (4) the overall value of OilCareers that Johnson used included mostly assets unrelated to the OilCareers resume database; (5) Johnson's use of LinkedIn for comparison was in error as LinkedIn is not substantially similar to Oilpro; and (6) Johnson's use of an investment in Oilpro to create an overall valuation of Oilpro was flawed as that investment did not accurately represent Oilpro's value.[132]

Regarding Defendants' first argument, Defendants themselves have previously estimated the potential value of Oilpro as a multiple of the number of future members that Oilpro would garner.[133] Further, Plaintiffs have presented evidence that social media companies are notoriously difficult to value and are sometimes valued based on their value per user.[134] These facts establish that there is at least some reliability to Johnson's method sufficient for it to proceed to trial.

All of Defendants' remaining issues with Johnson's market-value-per-user methodology can be properly raised during cross-examination at trial. They are not appropriate reasons to

---

[132]   See Doc. 232, Defs.' Mot. to Strike Johnson pp. 25-31.

[133]   See Doc. 241-5, Ex. 5 to Pls.' Resp. to Defs.' Mot. to Strike Johnson, Oilpro Presentation.

[134]   See Doc. 241-4, Ex. 4 to Pls.' Resp. to Defs.' Mot. to Strike Johnson, PwC Valuation Index.

completely exclude his testimony.  There are multiple ways to estimate the value of member information to a company such as Oilpro or Rigzone.  Plaintiffs have chosen to attempt to represent that value by using a market-value-per-user approach.  It is undisputed that Kent used the member information he took to increase Oilpro's membership by inviting the members whose information he took to join Oilpro.[135]  Accordingly, the court sees no issue with Plaintiffs' attempting to represent the value of the stolen member information by using the market-value-per-user approach.

### 4.  Unjust Enrichment

In general terms, Johnson determined the value of the unjust enrichment to Defendants by determining the value of Oilpro with the stolen information minus the value of Oilpro without the stolen information.[136]  Defendants argue that this calculation is unreliable because: (1) it is based on the "wholly speculative expectations of profits" which is an inappropriate way to establish unjust enrichment; (2) the calculation relies blindly on an investor's projection; and (3) the calculation is flawed because it uses the incorrect valuation date and discount rate.[137]

---

[135]   See Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of David Kent p. 19:1-11; Doc. 227-2, Ex. 2 to Pls.' Mot. for Partial Summ. J., Tr. of Kent Plea Hearing p. 13.

[136]   See Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Johnson, Johnson's Report p. 10.

[137]   See Doc. 232, Defs.' Mot. to Strike Johnson pp. 31-39.

In support of their first argument, Defendants cite to University Computing Co. v. Lykes-Youngstown Corp., where the Fifth Circuit found that "[n]ormally only the defendant's actual profits can be used as a measure of damages in cases where profits can be proved, and the defendant is normally not assessed damages on wholly speculative expectations of profits." 504 F.2d 518, 536 (5th Cir. 1974)(citing Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390 (1939)). However, the University Computing court also found that "every case requires a flexible and imaginative approach to the problem of damages" and "[w]here the damages are uncertain, however, we do not feel that that uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown." Id. at 538-539.

While it may have been a safer option for Plaintiffs to seek a reasonable royalty, Defendants have not cited to any case law that holds that Plaintiffs must seek a reasonable royalty. Indeed, the TUTSA provides that a reasonable royalty may be imposed in lieu of the actual loss cause by the misappropriation plus the unjust enrichment not accounted for by the actual loss. See Tex. Civ. Prac. & Rem. Code § 134A.004(a). Here, Plaintiffs seek to prove the unjust enrichment to Defendants by measuring the difference in Oilpro's value before and after it obtained the stolen information. Where Oilpro has collapsed and is now profitless, it is difficult for the court to see another way to establish the unjust enrichment to Defendants. While Johnson's unjust enrichment methodology is

50

atypical, the court cannot exclude it at this stage while also being "imaginative" and "flexible."

In their second argument, Defendants argue that Johnson's reliance on projections made by an investor in Oilpro, Jonathan Fairbanks ("Fairbanks"), was flawed because Johnson did not investigate the Fairbanks projections and Fairbanks himself admits that his projections should not be relied on. Defendants further argue that Fairbanks created his projections "as a negotiating tool: he sought to show Kent the value that this investment could bring to Kent's company."[138]

The court does not find it unreasonable of Johnson to rely on a potential investor's projections of Oilpro's future accounting figures for the purposes of valuing Oilpro at the time of the potential investment. Despite Defendants' argument to the contrary, it is highly likely that these projections would favor Defendants and highly unlikely that these projections would inflate the value of Oilpro so that Fairbanks would have to pay more to invest in the company. Finally, at best, Fairbanks' assertion that his own projections were unreliable creates a fact issue as to their reliability because Kent reimbursed Fairbanks' $3 million investment after Kent was indicted and this lawsuit had been initiated.[139]

---

[138]   See Doc. 232, Defs.' Mot. to Strike Johnson p. 37.

[139]   See Doc. 241-7, Ex. 7 to Pls.' Resp. to Defs.' Mot. to Strike Johnson, Stock Purchase Agreement; Doc. 227-4, Ex. 4 to Pls.' Mot. for Partial Summ. J., Dep. Tr. of Kent pp. 106:2-109:6.

Finally, Defendants argue that Johnson's choice of October 17, 2013, as the valuation date is flawed because Kent's illegal accesses occurred on more than one date.[140]   Additionally, Defendants argue that Kent chose an inflated discount rate.[141]   The court finds that Defendants can effectively cross-examine Johnson on these alleged issues.

### 5.   Johnson's Qualifications

Defendants also argue that Johnson is unqualified to give his testimony while admitting that Johnson is a professor who teaches valuation and is educated in valuation generally.[142]   Defendants contend that Johnson is unqualified to testify about a reasonable royalty valuation or unjust enrichment valuation.[143]   Defendants then spend the entirety of the qualifications section of their brief arguing, as they have elsewhere in their brief, that Johnson's calculations are not an appropriate way to measure damages under the TUTSA.   The lone attack Defendants make on Johnson's qualifications is that Johnson has never testified about a reasonable royalty and has not done an analysis of license agreements for the use of bulk resumes.[144]

Johnson graduated from Louisiana State University ("LSU") in

---

[140]   See Doc. 232, Defs.' Mot. to Strike Johnson pp. 37-39.

[141]   See id. p. 39.

[142]   See Doc. 232, Defs.' Mot to Strike Johnson pp. 39-40.

[143]   See id.

[144]   See id. p. 42.

1986 with a B.S. in Finance.[145]  Johnson received his Ph.D. from LSU in 1991; his major was finance and his minor was economics.[146]  From 1991 to 1997, Johnson taught as an associate professor at Bowling Green State University.[147]  From 1997 to 2000, Johnson taught as an associate professor at the University of Cincinnati.[148]  From 2000 to 2002, Johnson worked at LSU as an associate professor and "Distinguished Professor."[149]  From 2002 to 2004, Johnson was an "Endowed Chair of Banking" at LSU and from 2003 to 2004 he worked as a professor of finance at LSU.[150]  From 2004 to 2011, Johnson worked as a professor of finance at Texas A&M University.[151]  From 2011 to present, Johnson has been a "Memorial Chair in Finance" at Texas A&M University.[152]

Johnson has taught courses on valuation at the undergraduate and graduate levels.[153]  Johnson has also taught the following courses: (1) corporate finance and advanced corporate finance at

---

[145]    See Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Johnson, Johnson's Report App. p. 1272.

[146]    See id.

[147]    See id.

[148]    See id.

[149]    See id.

[150]    See id.

[151]    See id.

[152]    See id.

[153]    See Doc. 241-1, Ex. 1 to Pls.' Resp. to Defs.' Mot. to Strike Johnson, Johnson Dep. Tr. pp. 225-26.

the master and doctorate levels; (2) financial institutions at the bachelor, master, and doctoral levels; (3) financial markets and institutions at the bachelor and master levels; and (4) investments at the bachelor level.[154]  Johnson has been published numerous times with many of his publications being in the area of valuation.[155]

Johnson is an expert in the areas of finance and valuation and such expertise is sufficient for Johnson's testimony to proceed to trial.

### 6.   Simplistic Model

Finally, Defendants argue that Johnson's market-value-per-user model is so simplistic that it is unfairly prejudicial.[156] Essentially, Defendants argue that Johnson has done nothing more than act as a calculator and that his simple arithmetic calculation must be excluded.  Johnson's calculation is far more than simple arithmetic that the average layperson could perform.[157]  The court finds that Johnson's model is not too simplistic that it is prejudicial and that the model will aid the jury.

For all of the above reasons, Defendants' motion to strike Johnson is **DENIED.**

---

[154]     See Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Johnson, Johnson's Report App. p. 1276.

[155]     See id. App. pp. 1272-1274.

[156]     See Doc. 232, Pls.' Mot. to Strike Johnson p. 43.

[157]     See Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Johnson, Johnson's Report pp. 6-10.

## E.  <u>Motion to Strike Aslanyan</u>[158]

Plaintiffs have designated Aslanyan to testify as a non-retained expert.[159]  Aslanyan is an agent for the Federal Bureau of Investigation ("FBI") and was involved in the criminal investigation of Kent.[160]

Defendants argue that Aslanyan should be struck because: (1) Aslanyan's designation is insufficient under Federal Rule of Civil Procedure ("Rule") 26(a); (2) the facts and information Aslanyan relied on are flawed; and (3) Aslanyan's testimony's prejudice to Defendants outweighs its probative value.[161]

### 1.  Rule 26(a)

Under Rule 26(a)(2)(B), if a witness is "retained or specially employed to provide expert testimony" then the witness must provide a written report.  Under Rule 26(a)(2)(C), if a witness is not required to provide a written report, then their disclosure must state: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  Defendants argue that Aslanyan is

---

[158]   The court questions the point of Aslanyan's designation because it is unlikely that she will be permitted to testify at trial.  <u>See</u> 28 C.F.R. § 16.22 et seq.

[159]   <u>See</u> Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Aslanyan, Pls.' Expert Designations p. 3.

[160]   <u>See</u> <u>id.</u>

[161]   <u>See</u> Doc. 230, Defs.' Mot. to Strike Aslanyan pp. 6-14.

"specially employed" to provide expert testimony and did not provide a written report. Alternatively, Defendants argue that Aslanyan's disclosure is insufficient under Rule 26(a)(2)(C).

"[A] witness is 'specially employed' if she has no personal involvement in the facts giving rise to a case and is instead engaged specifically by a party to provide opinions and testimony bearing on the particulars of a case, without monetary payment for those services." Tolan v. Cotton, Civ. Act. No. H-09-1324, 2015 WL 5332171, at *7 (S.D. Tex. Sept. 14, 2015)(citing Huffman v. City of Conroe, Civ. Act. No. H-07-1964, at *6-7 (S.D. Tex. July, 31, 2008))(internal quotation marks omitted). Aslanyan was personally involved in the criminal investigation of Kent. Accordingly, she is not "specially employed" and is not required to provide a report.

Regarding their second argument, Defendants argue that Aslanyan's disclosure does not provide a summary of the facts and opinions to which she is expected to testify as required by Rule 26(a)(2)(C)(ii).[162] Aslanyan's disclosure very clearly provides that she will testify generally regarding: (1) the methods used to access Rigzone's data and information; and (2) the FBI's investigation of the underlying incident.[163] Aslanyan's disclosure

---

[162]    See Doc. 230, Defs.' Mot. to Strike Aslanyan p. 9.

[163]    See Doc. 233-2, Ex. N-10 to Defs.' Mot. to Strike Aslanyan, Pls.' Expert Designations p. 3.

also lists six specific facts that she is expected to testify to.[164]
The court finds that this disclosure complies with Rule 26.

### 2.    Reliability of Information Aslanyan Relied On

Defendants next argue that Aslanyan's testimony regarding the
number of HTTP requests and number of resumes accessed relies on a
spreadsheet that was provided to her and fails to exclude HTTP
requests that were rejected, invalid, or returned a blank or
duplicate resume.[165]   The court is confident that Defendants can
more appropriately address these issues on cross-examination at
trial.

### 3.    Prejudice to Defendants

Finally, Defendants argue that Aslanyan's testimony should be
excluded because her testimony will be misleading and prejudicial
given her position as an FBI agent.[166]   "The court may exclude
relevant evidence if its probative value is substantially
outweighed by a danger of . . . unfair prejudice . . . [or]
misleading the jury." Fed. R. Evid. 403.  Aslanyan's testimony is
certainly damaging to Plaintiffs because she will testify regarding
Kent's criminal conduct.   However, damaging testimony does equate
to unfair prejudice.  The court finds that the probative value of
Aslanyan's testimony is not "substantially outweighed" by any

---

[164]    See id.

[165]    See Doc. 230, Defs.' Mot. to Strike Aslanyan p. 13.

[166]    See Doc. 230, Defs.' Mot. to Strike Aslanyan p. 14.

potential unfair prejudice to Defendants.  See Smith v. Universal Services, Inc., 454 F.2d 154, 157 (5th Cir. 1972)(holding that the "highly probative" value of an EEOC investigator's testimony outweighed any possible prejudice to the defendant in a Title VII discriminatory employment practices case).

For the above reasons, Defendants motion to strike Aslanyan is **DENIED**.

## F.   <u>Plaintiffs' Motion to Exclude Livingston</u>

On March 21, 2019, the court held a hearing on Plaintiffs' motions to strike and exclude expert Livingston (Docs. 215 & 226). On March 22, 2019, the court ordered that Livingston must be able to recreate his analysis without any use or reference to certain files listed in the order.[167]  The court further ordered that Plaintiffs were allowed to redepose Livingston, and, if after retaking his deposition, they still believed his methodology should be excluded as unreliable, they were to so move within fourteen days of the retaking of the deposition.[168]  Plaintiffs did not redepose Livingston and instead filed the pending supplemental motion to exclude on April 19, 2019.[169]

Plaintiffs were given the opportunity to show that they were entitled to the requested relief at the March 21, 2019 hearing.  At

---

[167]    See Doc. 259, Ord. Dated Mar. 22, 2019.

[168]    See id.

[169]    See Doc. 266, Pls.' Supp. Mot. to Exclude Livingston.

the hearing, the court was unconvinced that Livingston should be completely excluded from testifying.  Plaintiffs now request that Livingston be excluded without having redeposed him as the court's order explicitly states.  The court finds Plaintiffs' failure to redepose Livingston detrimental to their supplemental motion. Accordingly, Plaintiff's supplemental motion to exclude Livingston is **DENIED**.  Plaintiffs will have to address the credibility issues related to Livingston's testimony on cross-examination at trial.

## G.  **Plaintiffs' Motion for Attorneys' Fees**

On March 22, 2019, the court awarded Plaintiffs their reasonable attorneys fees for filing their Motion to Exclude the Testimony of Livingston.[170]  On April 5, 2019, Plaintiffs filed a motion for their attorneys fees pursuant to the court's order.[171] Attached to the motion is a summary of the total fees each individual attorney incurred working on the motion to exclude.[172] Defendants requested itemized fee statements from Plaintiffs.[173] Plaintiffs refused to produce the itemized statements because doing so "would get into privilege and strategy."[174]  However, Plaintiffs

---

[170]     See Doc. 259, Ord. Dated Mar. 22, 2019.

[171]     See Doc. 263, Pls.' Mot. for Attorneys' Fees.

[172]     See Doc. 263-1, Ex. 1 to Pls.' Mot. for Attorneys' Fees, Decl. of Walter Lynch.

[173]     See Doc. 274-1, Ex. A to Defs.' Resp. to Pls.' Mot. for Attorneys' Fees, Emails Between Counsel.

[174]     See Doc. 263-1, Ex. 1 to Pls.' Mot. for Attorneys' Fees, Decl. of Walter Lynch.

have indicated that they are willing to produce itemized statements to the court for an in camera inspection.[175]

The court finds it necessary to review Plaintiffs' fee statements to ensure that their fees are reasonable and related to the motion to exclude.  Accordingly, Defendants' motion is **GRANTED IN PART AND DENIED** in part.  It is hereby, **ORDERED** that Plaintiffs produce their itemized fee statements to the court for an in camera inspection.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that: (1) Plaintiffs' Affirmative Motion for Partial Summary Judgment be **DENIED;** (2) Plaintiffs' Motion for Summary Judgment on Oilpro's Counterclaims be **GRANTED IN PART AND DENIED IN PART;** (3) Defendants' Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART;** (4) summary judgment be **GRANTED** on Plaintiffs' TUTSA claims related to the Google analytics data and internet search techniques, SCA claims, Section 1962(a) RICO claim; (5) summary judgment be **GRANTED** on Plaintiffs' CFAA, THACA, and misappropriation of confidential information claims to the extent that they relate to conduct that occurred prior to June 10, 2014; (6) summary judgment be **GRANTED** on Defendants' claims for tortious interference with prospective business relations, violation of the DMCA, copyright infringement, trademark infringement in violation

---

[175]    See id.

60

of 15 U.S.C. 1051, and Texas common law trademark infringement.

It is hereby **ORDERED,** that: (1) Defendants' motion to strike Johnson is **DENIED;** (2) Defendants' motion to strike Aslanyan is **DENIED;** (3) Plaintiffs' motion to exclude Livingston is **DENIED;** (4) Plaintiffs' motion for attorneys' fees is **GRANTED IN PART AND DENIED IN PART;** and (5) Plaintiffs produce their relevant itemized fee statements to the court for an in camera inspection.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 12<u>th</u> day of July, 2019.

Nancy K. Johnson
United States Magistrate Judge