IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DHI Group, Inc. f/k/a Dice Holdings Inc. and RIGZONE.com, Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> David W. Kent, Jr., Single Integrated Operations Portal, Inc. d/b/a Oilpro, et. al., <br><br> Defendants. | |
| Single Integrated Operations Portal, Inc. d/b/a Oilpro and OILPRO.com, <br><br> Counter-Plaintiff, <br><br> vs. <br><br> DHI Group, Inc. f/k/a Dice Holdings Inc. and RIGZONE.com, Inc., <br><br> Counter-Defendants. | Civil Action No: 16-1670 |

## Defendants' Rule 16 Motion to Simplify Issues for Trial

To simplify the issues for the trial, Defendants David W. Kent Jr. and Single Integrated Operations Portal Inc., doing business as Oilpro, ask this Court to dismiss certain of Plaintiffs' claims, pursuant to Rule 16(c)(2).

At a Rule 16 pretrial conference, the Court "may consider and take appropriate action on the following matters: (A) formulating and simplifying the issues, and eliminating frivolous claims or defenses . . . ." Fed. R. Civ. P.

16(c)(2). The rule's purpose is "to clarify and confirm the court's power to identify the litigable issues" by "identifying the real issues prior to trial" without the need for "a formal motion for summary judgment." *Id.* advisory committee notes. "Summary disposition of a cause may logically and properly follow a pretrial conference when the pre-trial procedures disclose the lack of a disputed issue of material fact and the facts so established indicate an unequivocal right to judgment favoring a party." *Wirtz v. Young Elec. Sign Co.*, 315 F.2d 326, 327 (10th Cir. 1963).

Rule 16 authorizes district courts "to dispose of the claim *sua sponte.*" *See Chavez v. Ill. State Police*, 251 F.3d 612, 654 (7th Cir. 2001). Based on the pre-trial order submissions in this case, the issues below may be determined as a matter of law—as further explained in the *Pre-Trial Brief of Oilpro and David Kent.*

## A. DHI, the parent holding company, has no valid RICO, misappropriation, or fiduciary duty claims.

DHI has no RICO injury because DHI has no injury from the predicate acts pleaded in the Complaint (Doc. 236). DHI asserts that David Kent used emails in attempts to defraud DHI into buying Oilpro, but DHI admits that it never bought Oilpro and did nothing in reliance on Kent's emails (Doc. 236 ¶ 93: "DHI Group, however, did not bite at David Kent's overture."). As Defendants explain in their *Pre-Trial Brief of Oilpro and David Kent*, RICO injury must arise from the RICO "predicate acts"—in this case, predicate acts of alleged *wire fraud* by email. DHI pleads no such injury, and concedes

it cannot—that it discovered the fraud scheme before reliance on the alleged fraud (Doc. 236 ¶ 116: "The pattern of racketeering . . . would have continued indefinitely had it not fortuitously been ended by when Plaintiffs discovered that David Kent and Dufrin were unlawfully appropriating information from Plaintiffs' private servers.").

DHI has no valid claims for misappropriation of trade secrets or confidential information—whether under TUTSA or the common law. The complaint concedes that Rigzone, not DHI, owned and operated the resume database David Kent ac-cessed through the Rigzone website, and Rigzone allegedly derived revenue from the resume database (Doc. 236 ¶¶ 20-32, 110). Improper accessing of the database, or improper use of the information acquired from it, may potentially cause injury to Rigzone but not its parent corporation, DHI—according to the complaint.

DHI's corporate representative confirmed that DHI incurred no such injuries (Durney Dep. 10, 14, 82-84, 86-89, 96-98, 101-10, 137-39, 153-59, 298, 307). The Plaintiffs' damages expert will have no opinion on DHI's damages (Johnson Dep. 30-32). So the Plaintiffs don't have a damages theory for DHI at any rate.

This Court should therefore dismiss DHI's RICO and TUTSA claims and its common law claims for misappropriation of confidential information and breach of fiduciary duty. Dismissal is proper under Rule 16 or Rule 12(b)(6) for the failure to state a claim (a defense that may be raised at trial under Rule 12(h)(2)(C)).

**B.      The TTLA claim is properly dismissed.**

This Court should dismiss Plaintiffs' Texas Theft Liability Act claim, Count XI of the complaint, because—as the Magistrate's report and recommendation had noted—Plaintiffs agreed that summary judgment is properly granted on the claim (Doc. 278 at 23-24). The Magistrate thus resolved that issue (Doc. 279).

**C.      The RICO claim is properly dismissed for lack of RICO injury.**

This Court should dismiss the Plaintiffs' RICO remaining claims (Counts VI and VII) because Plaintiffs cannot prove an injury based on the "predicate acts" alleged—wire fraud—this being a fundamental requirement of RICO damages. *See Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 13 (2010) ("Our precedent makes clear . . . that 'the compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm caused by [the] predicate acts.'").

As explained in the *Pre-Trial Brief of Oilpro and David Kent*, to prove civil liability for RICO a plaintiff must prove injury resulting from the "predicate acts" that form the "pattern of racketeering activity." The sole "predicate acts" Plaintiffs assert are acts of federal wire fraud (Doc. 236 ¶ 167). However, the only wire fraud "communications" alleged—emails David Kent sent to DHI regarding the potential sale of Oilpro—induced no reliance and resulted in no injury. David Kent's downloading of resumes from the Rigzone database was not wire fraud because it was not a "representation." *See, e.g., Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056,

1077 (N.D. Cal. 2018) ("Defendants discuss other 'wire acts,' including the actual downloading of the Synopsys software, but defendants identify no additional representations or omissions that occurred in connection with those downloads [which] are merely the effectuation of the initial fraud.").

Plaintiffs do not dispute that no one was injured in reliance on the "predicate acts" alleged here—the wire communications between DHI and David Kent (Doc. 236 ¶¶ 110, 167). In the context of wire fraud, the plaintiff must demonstrate that the predicate acts consisted of making fraudulent misrepresentations calculated to deceive. *LSC Towers LLC v. LG Preston Campbell LLC*, No. 3:17-CV-625-M, 2018 WL 1156563, at *2 (N.D. Tex. Mar. 5, 2018). "[T]he plaintiff cannot prevail without showing that someone relied on the defendant's fraud, because, without reliance by someone, the plaintiff cannot show that it was injured 'by reason of' the alleged racketeering activity." *Verde Minerals, LLC v. Burlington Res. Oil & Gas Co.*, No. 2:16-CV-463, 2017 WL 9535076, at *12 (S.D. Tex. June 30, 2017).

Undisputed deposition testimony shows that neither Plaintiff was injured by any person's reliance on the scheme to defraud. DHI did not purchase Oilpro and had no interest in doing so; it was merely assisting the government with its investigation of Oilpro (Durney Dep. 183-84, 185, 243, 255-56, 262-64, 277-78, 294). Plaintiffs seek to recover trade secret damages for their RICO claim, but no wire fraud caused those damages; any alleged trade secret injury accrued before the alleged wire fraud. Because no Plaintiff

can prove injury caused by a predicate act, this Court should dismiss the RI-CO claims for failure to prove RICO injury.

**D.      The TUTSA claim is properly dismissed.**

Plaintiffs' claim under the Texas Uniform Trade Secrets Act ("TUTSA"), Count VIII of the complaint, is properly dismissed for two reasons: (a) the alleged trade secrets were not secret, but could be disclosed to anyone, and (b) Plaintiffs cannot prove damages they seek—"actual loss" or "unjust enrichment."

<u>First</u>, there is no secret. TUTSA provides that information is a trade secret if it "(a) derives independent economic value, actual or potential, *from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use*; and (b) *is the subject of reasonable measures by the owner, under the circumstances, to maintain its secrecy.*" Tex. Civ. Prac. & Rem. Code § 134A.002(6) (emphasis added).

The alleged trade secret must be *secret*. But there was no secret here. The Rigzone customer contracts allowed users to access or to download every resume in Rigzone's database and to share it with anyone. The contracts impose no obligation to keep the resumes confidential, and there were no nondisclosure agreements These contracts alone conclusively negate the element of secrecy.

These facts were confirmed by Rigzone president Chad Norville (Norville Dep. 23). Norville could identify nothing in the standard Rigzone form contract requiring users to maintain the secrecy of the website information

(Norville Dep. 82-85). He knew of no company employees who signed non-disclosure agreements to keep the database secret; he know of no company policy to require nondisclosure agreements from vendors, consultants, or contractors regarding the database (Norville Dep. 166-67). He knew of no nondisclosure agreements that identified any company database as a trade secret or as confidential (Norville Dep. 171).

Second, the plaintiffs cannot prove damages as a matter of law, based on the expert testimony and the theory of damages the Plaintiffs chose: "actual loss" and "unjust enrichment" rather than reasonable royalty or avoided development costs, these being the categories of damages that TUTSA makes available to a plaintiff. Tex. Civ. Prac. & Rem. Code § 134A.004 (damages can include "actual loss" and "unjust enrichment" or, in lieu of these, a "reasonable royalty").

Specifically, according to the proposed damages jury question that Plaintiffs submitted, Plaintiffs seek to recover "actual loss" measured in terms of "the value that a reasonably prudent investor would have paid for the trade secret." But this measure of damages is only proper as "actual loss" damages (if at all) if the defendant, by appropriating the trade secret, caused the plaintiff to lose some or all of the "fair market value" of the secret. *See Wellogix Inc. v. Accenture LLP*, 716 F.3d 867, 880 (5th Cir. 2013) (actual loss shown by comparing "the 'market value of the business immediately before and after' the alleged misappropriation").

That didn't happen here. For example, this is not a case when, because the defendant revealed the trade secret to the public, the trade secret's value is now $0. In such a case, the market value of that trade secret, measured at the time it was misappropriated, is the sum by which its value had been diminished for the plaintiff. *Mandel v. Thrasher (In re Mandel)*, 720 F. App'x 186, 192 (5th Cir. 2018); *Precision Plating & Metal Finishing, Inc. v. Martin–Marietta Corp.*, 435 F.2d 1262, 1263 (5th Cir. 1970) (employing the "reasonable investor" measure where the defendant "made such public disclosure of the [secret] process as to amount to a complete destruction of the value of the process").

Plaintiffs cannot prove "actual loss" to justify submission of the "reasonable investor" standard. Regardless of whether the resumes David Kent downloaded have a market value, the question is whether Rigzone actually *lost* any market value in the information, which Rigzone continued to use. The answer is "no." There is no proof that the market value of Rigzone's resume database was any lower *after* Kent's actions than it was *before* his actions. So Rigzone has no proof that Kent's actions diminished the market value of the information.

This was confirmed by testimony of Rigzone corporate representative Constance Melrose, who testified that Rigzone had told investors that the diminution in value of Rigzone's database resulted from economic conditions, not David Kent's actions (Melrose Dep. 147-49, 197-98). In short, there is no evidence regarding Rigzone's value at any time—and Rigzone

concedes that its value decreased due to economic conditions. Because the database did not lose market value, the "reasonably prudent investor" measure of damages is not proper. *See, e.g., Bohnsack v. Varco LP*, 668 F.3d 262, 280 (5th Cir. 2012) ("reasonable investor" was a proper measure where "a reasonable juror could infer that Varco's act of filing a patent application to the Pit Bull was 'likely to result in injury to the trade secret owner' because it lowered the market value of Bohnsack's invention").

Plaintiffs cannot prove unjust enrichment. Unjust enrichment means actual profits—i.e., "the defendant's actual profits resulting from the use or disclosure of the trade secret (unjust enrichment)." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 711 (Tex. 2016). Plaintiffs have no evidence that either Defendant made actual profits from resumes David Kent downloaded. Plaintiffs' evidence is a *projection* of profits that Oilpro *might* have made had it continued in business.

Plaintiffs conceivably have potentially viable damages theories available to them. Under TUTSA a plaintiff may recover a reasonable royalty. Although there is evidence of what buyers are willing to pay for access to the database, Plaintiffs' expert offers no opinion on reasonable royalty damages—though that might have been the right approach. "Because the precise value of a trade secret may be difficult to determine, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Id.* at 711.

Under TUTSA, a plaintiff may also seek unjust enrichment damages—and that could include not only profits the defendant made, but costs saved not having to develop the trade secret. *See, e.g., Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir.1974) (authorizing could award of saved development costs). But Plaintiffs' expert offers no opinion on those costs, either.

The likely reason Plaintiffs jettisoned available, proper theories in favor of the improper theories—"value to a reasonable investor" and hypothetical projected profits rather than actual profits—is that David Kent paid Plaintiffs restitution of over $3 million; that sum is an offset against any recovery of damages in this case under the "one satisfaction" rule; and the amounts Plaintiffs might have proven with valid damages theories—e.g., saved costs, or a reasonable royalty—would not come close to exceeding that $3 million offset sum. The improper damages theories that the Plaintiffs pursue are an attempt to avoid that offset reality.

**E.    There is no tort for misappropriation of confidential information.**

The idea that Texas recognizes a common law claim for misappropriation of *confidential information* that is not a trade secret is simply wrong.

The Houston Court of Appeals stated this unequivocally: "Space Place argues a claim of misappropriation of confidential information can survive even if the information does not constitute a trade secret. We disagree. There is no cause of action for misappropriation of confidential information that is not either secret, or at least substantially secret." *SP Midtown Ltd. v.*

*Urban Storage LP*, No. 14-07-00717-CV, 2008 WL 1991747, at *5 n.5 (Tex. App.—Houston [14th Dist.] May 8, 2008, pet. denied); *see Gen. Insulation Co. v. King*, No. 14-08-633-CV, 2010 WL 307952, at *5 (Tex. App.—Houston [14th Dist.] Jan. 26, 2010, no pet.) (same).

In other words—although confidential information might be protected under various contracts or fiduciary duties, no Texas case recognizes any "misappropriation" claim for confidential information that is not a "trade secret." In fact, no case cited by Plaintiffs or the Magistrate articulates a *separate* test, distinct from trade secret theft, for a tort of misappropriation of *confidential information* (Doc. 278 at 28). Rather, courts routinely cite elements of misappropriation of *trade secrets*—and all applicable precedent traces back to the *trade secret* case of *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763 (1958), which does not recognize two torts but only one. Any doubt about the matter is laid to rest by the Fifth Circuit in *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253 (5th Cir. 2007) [Appendix A].

This Court should dismiss the claim for misappropriation of *confidential information*, Count IX of the complaint, because Texas recognizes no such claim. This claim is properly dismissed under Rule 12(b)(6) for failure to state a claim.

## F.     The fiduciary duty claim is properly dismissed.

The TUTSA claim, Count VIII of the complaint, is based upon the same operative facts as the breach of fiduciary duty claim, Count XV of the complaint. TUTSA's preemption clause bars the fiduciary duty claim. In

determining preemption '[t]he focus is on whether the facts relied on" to support one claim "differ from those supporting the TUTSA claim." *See AMID, Inc. v. Medic Alert Found.*, 241 F. Supp. 3d 788, 826 (S.D. Tex. 2017).

Although the two counts use different legal language, the operative facts are identical: Kent allegedly injured Rigzone when Oilpro, in competition with Rigzone, obtained customers using email contact information Kent obtained when he accessed the Rigzone website and downloaded resumes from it.

## G.    Request for relief—dismissal with prejudice.

In further support of this motion, Defendants adopt the arguments in the trial brief they submit as an appendix to the proposed pretrial order—the *Pretrial Brief of Oilpro and David Kent* submitted with the joint pretrial order.

Because the Defendants filed this motion shortly before the pretrial hearing, this Court should allow Plaintiffs time to respond to it pursuant to the local rules. Thereafter, and pursuant to Rule 16, this Court should dismiss with prejudice the claims set forth above, in order to simplify the issues for trial.

Respectfully Submitted,

**FOLEY & LARDNER LLP**

By:   */s/ James G. Munisteri*

**James G. Munisteri**
Texas Bar No. 14667380
1000 Louisiana, Suite 2000
Houston, Texas 77002-2099
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com

**Sara Ann Brown**
Texas Bar No. 24075773
2021 McKinney, Suite 1600
Dallas, Texas 75201-3340
sabrown@foley.com

**Attorneys for Defendants
David W. Kent Jr. and Single
Integrated Operations Portal,
Inc. d/b/a Oilpro and
Oilpro.com**

## Certificate of Conference

I certify that I conferred with Plaintiffs' counsel regarding the relief requested herein, and counsel cannot agree about the disposition of the motion.

/s/ James G. Munisteri
James G. Munisteri

## Certificate of Service

I certify that April 17, 2020, I electronically filed the foregoing with the Clerk of court using the CM/ECF system, which will send notification of this filing to all counsel of record in this case.

/s/ James G. Munisteri
James G. Munisteri

# Appendix A

*Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253 (5th Cir. 2007)

# Triple Tee Golf, Inc. v. Nike, Inc.

United States Court of Appeals, Fifth Circuit. |    April 17, 2007 |    485 F.3d 253 |    2007 WL 1128138

## Document Details

| | |
|---|---|
| texas Citation: | Triple Tee Golf, Inc. v. Nike, Inc., 485 F.3d 253 (5th Cir. 2007) |
| All Citations: | 485 F.3d 253, 82 U.S.P.Q.2d 1452 |

## Search Details

| | |
|---|---|
| Jurisdiction: | Texas |

## Delivery Details

| | |
|---|---|
| Date: | April 17, 2020 at 10:02 PM |
| Delivered By: | Sara Brown |
| Client ID: | 634401-0002 |
| Status Icons: | |

## Outline

Synopsis (p.1)

West Headnotes (p.1)

Attorneys and Law Firms (p.4)

Opinion (p.4)

All Citations (p.15)

485 F.3d 253
United States Court of Appeals,
Fifth Circuit.

TRIPLE TEE GOLF, INC., a Florida Corporation, Plaintiff–Appellant,

v.

NIKE, INC., an Oregon Corporation, Tom Stites & Associates, Inc., doing business as Impact Golf
Technologies, Inc., John Thomas Stites, III, also known as Tom Stites, Defendants–Appellees.

Nos. 05–10934, 05–11442.
|
April 17, 2007.

**Synopsis**

**Background:** Plaintiff producer of golf clubs brought action against competitor and golf club designer employed by competitor for misappropriation of trade secrets, negligent misrepresentation, breach of confidentiality, breach of implied contract, and deceptive trade practices. The United States District Court for the Northern District of Texas, John H. McBryde, J., 2005 WL 1639317, granted summary judgment for defendants and denied plaintiff's subsequent motion for relief from judgment. Plaintiff appealed.

**Holdings:** The Court of Appeals, Wiener, Circuit Judge, held that:

[1] alleged trade secrets relating to adjustable weighting system for golf clubs were necessarily limited to weighting systems adjustable, post-manufacture, by the user of a given club, not adjustability "at the factory;"

[2] fact issues existed as to whether competitor misappropriated fundamental elements of plaintiff's trade secrets;

[3] district court could limit plaintiff's proofs to information regarding specifically accused clubs; but

[4] district court erred in disregarding patent applications filed by competitor, showing clubs that were adjustable, post-manufacture, by the user, in denying plaintiff's motion for relief from judgment.

Affirmed in part, reversed in part, and remanded.

West Headnotes (13)

[1]     **Antitrust and Trade Regulation**  👉  What are "trade secrets" or other protected proprietary
         information, in general

         Under Texas law, a "trade secret" is defined as a formula, pattern, device or compilation of information
         used in a business, which gives the owner an opportunity to obtain an advantage over his competitors
         who do not know or use it.

         17 Cases that cite this headnote

**[2]**   **Antitrust and Trade Regulation**  ⬦ Elements of misappropriation

To succeed on a misappropriation of trade secrets claim under Texas law, plaintiff must show that (1) a trade secret exists; (2) defendants acquired the trade secret by breach of a confidential relationship or other improper means; and (3) defendants used the trade secret without authorization.

18 Cases that cite this headnote

**[3]**   **Antitrust and Trade Regulation**  ⬦ Particular cases, in general

Golf club producer's alleged trade secrets relating to adjustable weighting system for golf clubs were necessarily limited to weighting systems adjustable, post-manufacture, by the user of a given club, not adjustability "at the factory" as claimed by producer, in view of producer's own definition of its trade secrets that permitted changes to clubs, including removal or replacement of weighting elements, which actions could not be equated with a club maker's manufacturing decision, inherent in any golf club design, as to how permanently to distribute weight in any given club within a given set of clubs.

**[4]**   **Federal Civil Procedure**  ⬦ Tort cases in general

Genuine issue of material fact as to whether competitor misappropriated fundamental elements of golf club producer's trade secrets, describing club-weighting system permitting post-manufacture adjustment of clubs by their users, precluded summary judgment for competitor on trade secret misappropriation claim under Texas law, even though competitor's accused clubs could not be so adjusted.

450 Cases that cite this headnote

**[5]**   **Federal Courts**  ⬦ Taking case or question from jury;  judgment as a matter of law

Court of Appeals reviews a district court's evidentiary ruling for an abuse of discretion.

4 Cases that cite this headnote

**[6]**   **Federal Courts**  ⬦ Admission of Evidence

**Federal Courts**  ⬦ Exclusion of Evidence

If Court of Appeals finds that an abuse of discretion has occurred in a district court's evidentiary ruling, Court then applies the harmless error doctrine.

6 Cases that cite this headnote

**[7]**   **Federal Courts**  ⬦ Taking case or question from jury;  judgment as a matter of law

**Federal Courts**  ⬦ Admission of Evidence

**Federal Courts**  ⬦ Exclusion of Evidence

An evidentiary ruling will be affirmed unless the district court abused its discretion and a substantial right of the complaining party was affected.

13 Cases that cite this headnote

**[8]**   **Antitrust and Trade Regulation**  ⬦ Actions

District court could limit plaintiff golf club producer's proofs on all of its claims, including misappropriation of trade secrets, negligent misrepresentation, breach of confidentiality, breach of implied contract, and deceptive trade practices, to information regarding specifically accused clubs that allegedly incorporated trade secrets, excluding purportedly confidential information about other clubs manufactured by defendant competitor; all of plaintiff's claims related to, and grew out of, the trade secrets claim, and any allegations regarding unspecified clubs should have been included in trade secrets claim.

3 Cases that cite this headnote

**[9]    Antitrust and Trade Regulation**  What are "trade secrets" or other protected proprietary information, in general

To determine whether a trade secret exists, under Texas law, courts apply six-factor test that looks at: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

7 Cases that cite this headnote

**[10]    Federal Courts**  Altering, amending, modifying, or vacating judgment or order;  proceedings after judgment

Court of Appeals reviews district court's denial of motion for post-judgment relief for an abuse of discretion.

5 Cases that cite this headnote

**[11]    Federal Courts**  Abuse of discretion in general

A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.

2 Cases that cite this headnote

**[12]    Federal Civil Procedure**  Failure to Answer;  Sanctions
**Federal Courts**  Need for further evidence, findings, or conclusions

Patent applications filed by competitor, describing golf clubs that were adjustable, post-manufacture, by user of clubs, which competitor failed to disclose to plaintiff golf club producer in response to interrogatory in plaintiff's action alleging trade secret misappropriation and other claims, were erroneously disregarded by district court upon plaintiff's motion for relief from summary judgment that had been granted to competitor on ground that competitor's accused clubs were not adjustable by user as described in plaintiff's claimed trade secrets; district court's order limiting plaintiff's trade secrets proofs to only the accused clubs was based on plaintiff's inability to connect its proprietary weighting system to any other product of competitor, and such order should be revisited on remand for potential expansion so as to include clubs comprehended by patent applications. Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

4 Cases that cite this headnote

82 U.S.P.Q.2d 1452

---

**[13]**   **Antitrust and Trade Regulation**   ☞   Elements of misappropriation

A plaintiff alleging misappropriation of trade secrets need not prove an actual sale or production of a product to show "use" of its trade secrets under Texas law.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*255** Jonathan Tad Suder, Edward E. Castro, Jr. (argued), Friedman, Suder & Cooke, Fort Worth, TX, for Plaintiff–Appellant.

**\*256** Christopher J. Renk (argued), Michael Joseph Harris, J. Pieter van Es, Banner & Witcoff, Chicago, IL, Charles Gregory Pouls, Cotten Schmidt, Fort Worth, TX, for Defendants–Appellees.

Robert Daniel Martinez, Cotten Schmidt—Fort Worth, Fort Worth, TX, Bruce Judson Berman, McDermott, Will & Emery, Miami, FL, for Nike, Inc., Tom Stites & Associates, Inc. and John Thomas Stites, III.

Appeals from the United States District Court for the Northern District of Texas.

Before JONES, Chief Judge, and WIENER and BARKSDALE, Circuit Judges.

**Opinion**

WIENER, Circuit Judge:

Plaintiff–Appellant, Triple Tee Golf, Inc. ("TTG") sued Defendants–Appellees ("Defendants"), Nike, Inc. ("Nike") and Tom Stites & Associates, Inc. d/b/a Impact Golf Technologies ("IGT") for misappropriation of trade secrets, negligent misrepresentation, breach of confidentiality, breach of implied contract, and deceptive trade practices. During discovery, the district court limited TTG's proofs on all of its claims to evidence related to the use of TTG's trade secrets in two specific Nike golf clubs, the CPR Woods and the Slingshot irons (collectively, the "accused clubs"). After discovery was completed, Defendants moved for summary judgment, contending that (1) TTG's trade secrets describe a system for weighting golf clubs that is adjustable by the user of the clubs, and (2) the accused Nike clubs are not "adjustable" at all. The district court, having determined that all of TTG's claims turned on the unlawful use of trade secrets, granted Defendants' motion and dismissed TTG's suit in its entirety.

After the judgment was entered, TTG became aware of two patent applications previously filed by Nike, describing golf clubs that are adjustable by the user of the clubs. Based on Defendants' failure to disclose these patent applications in response to TTG's discovery requests, TTG moved for relief from the earlier judgment. The district court denied this motion, stating that the patent applications were not relevant to the legal issues that it had decided. TTG now appeals the district court's limiting evidentiary order, grant of summary judgment, and denial of post-judgment relief.

I. FACTS & PROCEEDINGS

*A. Background*

TTG was founded by Jack Gillig to produce and market the golf clubs that he designed. In September 2000, Gillig contacted Tom Stites, a golf club designer and the founder of IGT, to inquire whether IGT would fabricate a

prototype golf club for TTG based on one of Gillig's designs. Gillig and Stites met and discussed Gillig's ideas for club design. Gillig showed rough prototypes and sketches to Stites, who made photocopies of Gillig's written materials. After reviewing these materials, Stites agreed that IGT would fabricate a prototype club for TTG.

Shortly after this meeting, however, Stites was hired by Nike Golf ("Nike") as its Director of Product Creation. Stites informed Gillig that, because of Stites's new association with Nike, IGT would not be able to make the promised prototype golf club for TTG. In 2002, TTG submitted its design concepts directly to Nike, but Nike returned TTG's submission, indicating that it was not interested in developing those concepts.

While attending a golf industry trade show in February 2003, Gillig noticed that Nike's CPR Woods bore certain similarities to one of the club designs that he had **\*257** shown to Stites. Gillig immediately suspected that Stites and Nike had used TTG's designs to develop the CPR Woods, and he later suspected that other of his designs had been used in Nike's Slingshot Irons and OZ T–100 putter.

TTG sued Nike and Stites in January 2004, asserting claims for (1) misappropriation of trade secrets, (2) breach of confidentiality, (3) breach of implied contract, (4) negligent misrepresentation, and (5) deceptive trade practices.[1]

*B. Issues Narrowed During Discovery*

TTG's complaint does not specify its trade secrets in detail, instead referring generally to "ideas" and "concepts" for a "novel system of golf clubs and golfing equipment." During discovery, Defendants propounded interrogatories to TTG seeking (1) precise descriptions of TTG's alleged "trade secrets" (Interrogatory No. 1), and (2) a list of Nike clubs that TTG believed were developed using those trade secrets (Interrogatory No. 5). TTG's initial response to Interrogatory No. 1 did not provide detailed descriptions of the alleged trade secrets, but an April 2005 supplemental response identified seven specific trade secrets:

(a) The first trade secret of the Plaintiff was for an adjustable weighting system in a "hollow back" club, so the distribution of weight in the golf club head could be changed to obtain a desired flight path and distance of a golf ball. The Plaintiff contemplated this could be accomplished through one of three methods: (1) use of an existing sole plate, with a distinct weight distribution, and fixed by Allen screws or other means, could be removed or replaced by a new sole plate with a different weight distribution, (2) insertion of additional weight into the hollow of the club, or the sole, to obtain a different weight distribution, and (3) use of weighted metal bands, with a distinct weight distribution, spanning across the hollow, but inside the outside boundary of the club head, fixed by Allen screws or other means, that could be removed or replaced by a metal band with a different weight distribution.

(b) The second "trade secret" is that a peripheral band could be placed around the perimeter of the hollow to secure in place either inserted weights, as set forth in number (2) above, or the metal bands, in number (3), as set forth above.

(c) The third "trade secret" is a twenty-seven (27) point weighting system on a three dimensional x, y, and z coordinate system within the space of the "hollow back" golf club head, and secured with one of the methods set forth above. There would be three weight boxes along the front of the face, from left to right along the y axis, three weight boxes from the bottom of the club head to the top of the club head along the z axis, and three weight [boxes] from the front of the club head to the rear of the club head along an x axis, to create one or more of twenty-seven (27) weighted coordinates in the three-dimensional space of the "hollow back" club. The adjustable weights, as set forth above, would be changed in the twenty-seven (27) point weighting system to obtain different weight distributions in the club head, to alter the flight of the golf ball when struck to the accommodate the desires and needs of the golfer. At all times, the weights and weighting system would

**\*258** stay within the perimeter of the club, as delineated by the peripheral bands, to comply with all rules and regulations of golfing.

(d) The fourth "trade secret" is a system to analyze the swing of a golfer to determine any defect thereof, and whether the optimal striking point ("sweet spot") on the face of the golf club should be adjusted by utilizing the twenty-seven (27) point weighting system to produce the distance and flight path of the golf ball desired by the golfer. The golfer's swing would be captured by video, and then processed through a computer program, to be written and developed by qualified programmers, to analyze the golf swing, and determine the placement of the twenty-seven (27) point weighting system to correct the swing, or to produce a desired flight path or distance of the golf ball, by positioning of the optimal striking point ("sweet spot") on the face of the golf club.

(e) The fifth "trade secret" is a naming or designation system for golf clubs. Instead of designation of a "1 Wood" or a "4 Iron" or a "Pitching Wedge" or a "Putter," the golf clubs would be named or designated through lofts and description of the purpose for the club. For instance, a club may be designated as a "22° Driver," or a "26° Fairway Iron," etc.

(f) The sixth "trade secret" builds upon the concept described in the fifth "trade secret." The sixth "trade secret" is to move away from a standardized set of golf clubs with a set number of woods/drivers, a set number of irons, a set number of wedges, and a putter, with a uniform weight distribution throughout the set of clubs. The new set of golf clubs would be assembled using non-uniform/different weight distributions, as set forth above, to achieve different flight paths, distances, and purposes. The twenty-seven (27) point weighting system would be combined with different lofts to enable the golfer to choose specific clubs for specific needs and desires for his game. The golfer could choose as many, or as little a number, clubs as he wanted to complete a set of golf clubs. All of the golf clubs would be branded the same, and designated or named using the naming system set forth above. The lofts that are available to the golfer would be in 2° increments. This will, by its very nature, create golf clubs with non-standard loft. One example of this type of club, that was envisioned by the Plaintiff, was a 22° Driver.

(g) The seventh "trade secret" is the way in which all of the foregoing ideas would be marketed toward the general public as one coherent system. The first target consumer would be children and junior golfers, because there were no major golf club manufacturers who directed sets of clubs toward junior golfers. The junior golfer would be provided a set of clubs with just the basic "hollow back" golf club head. Instead of a set of golf clubs with a large number of clubs to understand, the basic junior set would contain only a few clubs, for designated purposes, with different lofts, as set forth above.

The next target consumer would be the parents of the junior golfer, who are a combination of beginning, high handicap, or low handicap golfers. This "trade secret" contemplates that the parents of the junior golfers observe their children experiencing success with the system of golf clubs and will want to use a comparable system themselves to accomplish a better game of golf.

The golf clubs would then be offered to women players, high handicap players,  **\*259** and low handicap players using all of the previous "trade secrets" set forth above. Ultimately, the system of golf clubs, using all of the trade secrets set forth above will be tailored to very low handicap/scratch golf players, and for tour players. The system of golf clubs would be marketed to these categories of players by emphasizing that each club can be altered, prior to the start of a round of golf, to accommodate the conditions, course, hazards, and mechanics of the swing of the golfer, on any particular day.

TTG's April 2005 supplemental response also addressed Defendant's Interrogatory No. 5, which sought a definitive list of the Nike products that TTG believed incorporated its trade secrets. TTG identified Nike's CPR Woods and Slingshot Irons as the only clubs relevant to its trade secrets claims, but also indicated that "certain other Nike golf clubs may be implemented by the use of Plaintiff's confidential information and club designs."

Unsatisfied with that response, Defendants filed a motion to compel TTG to provide a full and complete response to Interrogatory No. 5. The district court granted that motion, and TTG complied, again including, however, its contention that "certain other Nike golf clubs may be implemented by the use of Plaintiff's confidential information and club designs." Defendants then moved the district court to enforce its earlier order by limiting TTG's trade secrets count and its proofs on that issue to Nike's CPR Woods and the Slingshot Irons. The district court granted Defendants' motion.

Nevertheless, TTG continued to assert that "confidential information" was at issue in its *non*-trade secrets claims. TTG apparently believed that the court's earlier orders addressed only the trade secrets claims. In response, Defendants asked the district court to clarify its earlier order and confirm that there was no category of proprietary information at issue in the case other than the alleged trade secrets. The district court granted this motion and ordered that TTG "not seek to offer at trial any proof of misuse by any defendant of any information pertaining to any product" other than the accused clubs.

*C. Summary Judgment*

Having thus succeeded in narrowing the issue for trial to whether Defendants had used TTG's trade secrets to produce Nike's accused clubs, Defendants filed a motion for summary judgment on all of TTG's claims. The district court granted Defendants' motion, ruling that (1) all trade secrets asserted by TTG related to a system of weighting that was "adjustable" by the user of the club, and (2) neither of the accused clubs are "adjustable" post-manufacture. This order applied specifically to the first, second, third, sixth and seventh trade secrets. The court granted summary judgment on the fourth trade secret because it does not involve golf clubs, and TTG had already dismissed with prejudice its claim based on the fifth trade secret. The court also stated that its dismissal of the trade secrets claims was "dispositive of [TTG's] remaining claims because all of them are predicated on a determination that ... Nike [ ] used the trade secrets in its manufacture and sale of golf clubs."

*D. TTG's Motion for Relief from Judgment*

After the district court granted summary judgment, TTG uncovered two Nike patent applications for golf clubs that are **\*260** adjustable post-manufacture. [2] Both patents listed Tom Stites as the inventor and Nike as the assignee, and both were filed with the U.S. Patent Office in 2003, well before TTG propounded the following discovery requests to Defendants in October 2004:

*Interrogatory No.9*

Set forth all United States patents, patent applications and other publications which NIKE deems supportive of it's [sic] contention that any of the Defendants independently created or developed the clubs at issue and *which are applicable to any golf club product or system which NIKE is now marketing or intends to market within the next three years.* [3]

– – – – – – – –

*Request No. 67*

All golf-related U.S. patents, U.S. *pending applications for patent,* all golf-related publications, and all industry presentations of the following NIKE-related individual: Tom Stites. [4]

In response to Interrogatory No. 9, Defendants provided only patents and patent application publications described in the first part of the request, i.e., those that "may support Defendants' contention that Defendants independently

Case 4:16-cv-01670   Document 292   Filed on 04/17/20 in TXSD   Page 24 of 32

82 U.S.P.Q.2d 1452

developed the clubs at issue." Defendants identified no publications "applicable to any golf club product or system which NIKE is now marketing or intends to market within the next three years."

In response to Request for Production No. 67, Defendants stated that "NIKE [ ] objects to the production of pending, unpublished patent applications" and "further objects to producing any documents that are public information equally available to Plaintiff or its counsel." [5] Defendants concede that they provided no patent applications to TTG in response to Request No. 67. TTG did not move to compel either a more complete response to Interrogatory No. 9, or production of patent applications in response to Request No. 67. The patent applications at issue were published by the Patent Office on January 13, 2005 and June 23, 2005. The discovery deadline in this case was June 14, 2005; the pre-trial conference was set for July 5, 2005; and trial was set for August 8, 2005.

When it discovered the two patent applications post-summary judgment, TTG filed a Motion for Relief from Final Judgment and for Sanctions, asserting that Defendants improperly withheld the patent applications from discovery. The district court agreed with TTG that Defendants "should have disclosed in their discovery responses ... the existence of the two patent applications," but denied TTG's motion, conclusionally stating that those applications "[had] nothing to do with the issues presented to the court for decision." The court speculated that "the applications might form the basis for another action by plaintiff against defendants," but ultimately declared, again conclusionally, that they "were not relevant to the legal issues the court resolved ... in this case."

*261   II. ANALYSIS

A. Summary Judgment

1. Standard of Review

We review a grant of summary judgment *de novo,* applying the same standards as the district court. [6] Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. [7] The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. [8] The burden then shifts to the nonmovant to show the existence of a genuine fact issue for trial; however, the nonmovant may not rest upon allegations in the pleadings to make such a showing. [9] All evidence must be viewed in the light most favorable to the nonmovant. [10]

2. TTG's Trade Secrets Claims

a. Generally Applicable Trade Secret Law

[1]    [2]    In this diversity action, we apply Texas substantive law. [11]  In Texas, a "trade secret" is defined as a "formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it." [12]  To succeed in its misappropriation of trade secrets claims, TTG must show that (1) a trade secret exists; (2) Defendants acquired the trade secret by breach of a confidential relationship or other improper means; and (3) Defendants used the trade secret without authorization. [13]

82 U.S.P.Q.2d 1452

### b. The District Court's Summary Judgment Reasoning

The district court granted summary judgment, dismissing TTG's trade secrets claims based solely on the court's conclusion that TTG could not prove the third factor in the aforementioned test. Its reasoning was straightforward: (1) All of TTG's trade secrets relate to a golf club weighting system that is "adjustable by the user of the club"; (2) the accused clubs are in no way "adjustable by the user of the club" [14]; (3) there is, therefore, no summary judgment evidence to indicate that Defendants "used" TTG's alleged trade secrets; and consequently, (4) TTG will not be able to prove an essential element of its trade secrets claims; so (5) summary judgment **\*262** for Defendants on those claims is appropriate. The court also concluded that dismissal of TTG's trade secrets claims disposed of its remaining claims as well, as all of them depended on a determination that Nike used TTG's trade secrets.

### c. "Adjustability"

[3] The district court grounded its decision primarily in its finding that all of TTG's trade secrets rely in some way on an "adjustable" weighting system. TTG does not dispute that conclusion generally, but instead argues that the district court improperly narrowed the definition of "adjustable" to "adjustable by the user of the clubs." In doing so, TTG urges, the district court ignored the deposition testimony of Gillig as the developer of TTG's alleged trade secrets, indicating that those trade secrets contemplate two kinds adjustability: (1) adjustability post-manufacture, *and* (2) adjustability "at the factory."

The district court's reading of "adjustable," in the context of TTG's chosen definition of its trade secrets, more closely conforms with common usage. For example, TTG defined its first trade secret as an "adjustable weighting system in a 'hollow back' club, so the distribution of weight in the golf club *could be changed*." The definition goes on to specify that "the Plaintiff contemplated [that changes] could be accomplished through one of three methods," namely: (1) "use of an existing sole plate ... [that] could be *removed or replaced* by a new sole plate," (2) "insertion of *additional* weight into the hollow of the club, or the sole," or (3) "use of weighted metal bands ... fixed by Allen screws or other means, that *could be removed or replaced*." [15] None disputes that this definition contemplates a club designed and constructed in such a way that its weight distribution can be altered post-manufacture.

TTG contends, however, that its concept also covers adjustability "at the factory," i.e., the ability of the club manufacturer to vary the weight distribution of a club permanently, *before completion*. Presumably, TTG's definition of adjustability "at the factory" might include either (1) the ability to produce made-to-order clubs built to a particular customer's specifications, or (2) the ability to adjust the weight distribution of individual variations of one kind of club (e.g., a 3–iron) to achieve particular results (e.g., higher or lower ball-flight trajectory). TTG does not contend that either of the accused Nike clubs are made-to-order. [16] We presume, then, that TTG uses "adjustable at the factory" to mean a weight-distribution system that can be varied during the course of manufacture so that each kind of club (e.g., a 3–iron) can be produced in a variety of weight-distribution models, each variation of the same club produced to achieve a different result.

Defendants first point out that the accused clubs are produced according to only one weight-distribution model, such that the head of each kind of club (e.g., 3–iron) is identical in every set of clubs produced. [17] Defendants also contend that, using TTG's definition, all golf clubs would have to be considered "adjustable at the factory," as each *kind* of club within a given set of clubs is necessarily constructed according to a weight-distribution model that (1) is designed to produce a particular **\*263** result, and (2) can be altered *pre-manufacture* (or "at the factory") to produce a different result. As such, Defendants contend, "adjustability at the factory" describes nothing more than

82 U.S.P.Q.2d 1452

any club manufacturer's capability to adjust its club-weighting design to achieve a different result before actually fabricating a particular kind of club.

Accordingly, if we were to read "adjustable" to include "adjustable at the factory," as that phrase is characterized by TTG, we would be forced not only to disregard the common, conversational meaning of "adjustable," but also to overlook numerous references in TTG's trade secrets definitions to the ability to "change," "remove," "replace," or "insert" weighting elements. These actions simply cannot be equated with a club maker's decision—inherent in any golf club design—as to how permanently to distribute weight in any given club within a given set of clubs. We construe TTG's trade secrets, therefore, as did the district court, to contemplate a weighting system "adjustable by the user of the club."

Unlike the district court, however, we do not end our summary judgment analysis here, but go on to more closely examine whether the lack of "adjustability" in the accused clubs, as contemplated by TTG's description of its trade secrets, necessarily eliminates any "genuine issue of material fact" as to TTG's trade secrets claims.

 [4]   TTG's "adjustable at the factory" argument, although admittedly unpersuasive as made, is at least suggestive of the more basic proposition that Defendants might have misappropriated TTG's proprietary design *even though they chose not to make the clubs adjustable post-manufacture.* In other words, even though TTG's trade secrets describe a club-weighting system that is adjustable post-manufacture, Defendants could not lawfully appropriate the proprietary design elements of that system into a permanently weighted club any more than they could copy it directly. We now consider whether a material fact issue remains in TTG's trade secrets claims based on the design elements of TTG's weighting system, as described in TTG's trade secrets definitions, despite the fact that the accused clubs are not adjustable post-manufacture.

It is undeniable that TTG's trade secret descriptions contemplated an "adjustable" weighting system. It is equally undeniable, though, that those descriptions also comprised specific concepts for *implementing* that adjustability. In TTG's final response to Defendants' Interrogatory No. 5, which asked for particular descriptions of all Nike products in which TTG's trade secrets are used, TTG detailed its allegations regarding which of those implementation concepts Defendants used and how they used them. These allegations are corroborated by the report of TTG's expert, Douglas Winfield. This report states Mr. Winfield's unequivocal belief that Defendants would not have been able to produce the accused clubs (adjustable or not) without employing particular elements of TTG's design as specified in its trade secrets.

The Winfield report identifies several such design elements that Defendants arguably learned from TTG, none of which rely on actual post-manufacture adjustability. For example, regarding the Slingshot Irons, the Winfield report states that,

> "Nike used the trade secret [18] and/or confidential information of Gillig/Triple Tee to solve the problem of how to move  **\*264**  the weight bar far enough from the back of the club face to achieve more of an effect on a flight path and how to keep the weight bar on the back of a cavity back iron within the 'Rules of Golf.' "

His report also states the opinion that,

While Stites had prototypes and other "iron" heads with weight bars within a "hollow back" or "cavity back," none of them achieved as substantial of a displacement of the CG [center of gravity] away from the club face [as did TTG's prototypes]. It is my opinion, that Stites did not learn this design technique until he met with Gillig in September 2000.

With respect to the CPR Wood, Winfield states that "[b]ased on my review of prototypes and golf clubs produced by Defendants, it is my opinion that Stites did not possess the design technique and geometry incorporated in the 'CPR Wood' product prior to meeting with Gillig." Winfield's report goes on to detail the reasons for his opinion, his methodology, and the state of the art of golf club design as it relates to the TTG club designs.

In reviewing a summary judgment, our task is to decide, *inter alia,* whether the district court properly considered *all* of the summary judgment evidence in reaching its decision. In this case, we conclude that, even though TTG chose to describe its trade secrets largely in terms of the "adjustability" of the weight-distribution system, it nevertheless presented enough evidence, particularly Winfield's expert report, to create a material fact issue whether Defendants misappropriated other fundamental elements of those trade secrets. We reach this conclusion for several reasons.

First, even though TTG's trade secrets, as described, contemplate a weight-distribution system that is adjustable post-manufacture, this "adjustability" is but one of several design elements of that system. "Adjustability" is merely an abstract concept that must be implemented in some very real way. We must treat the particular way that TTG envisioned implementing that concept as *at least* as important to TTG's trade secret definition as the concept itself. Second, if TTG could prove that Defendants used fundamental elements of TTG's design to produce a permanently weighted club, TTG would have a viable trade secrets claim. Third, TTG did produce enough summary judgment evidence, particularly the report of its expert, to meet the "genuine issue of material fact" standard as to whether Defendants used any elements of TTG's design. Finally, given the complex and technical nature of the claims at issue, the district court should have resisted basing summary judgment on but a single element of TTG's alleged trade secrets, and instead should have allowed all the evidence to be presented to a jury, which then could have weighed the "adjustability" factor, among all others, in its final analysis. Accordingly, we reverse the district court's grant of summary judgment on TTG's trade secrets claims and remand them for further proceedings not inconsistent with this opinion. [19]

### 3. TTG's Remaining Claims

The district court also granted summary judgment for Defendants on TTG's claims for breach of confidentiality, breach of implied contract, negligent misrepresentation, deceptive trade practices, and accounting. **\*265** The entirety of its reasoning on this issue is contained in the following, single paragraph.

#### Plaintiff's Other Claims

The disposition adverse to plaintiff on his contention that defendants misappropriated his alleged trade secrets is dispositive of his remaining claims because all of them are predicated on a determination that Gillig disclosed trade secrets to Stites, that Stites transferred the trade secrets to Nike, and that Nike then used the trade secrets in its manufacture and sale of golf clubs. Therefore, summary judgment is to be granted as to the remaining claims.

The district court's ruling on these claims was predicated on its determination that "[a]ll of plaintiff's claims relate to, and grow out of, the misappropriation of trade secrets claims." This conclusion also forms the basis of the district court's earlier evidentiary order limiting TTG's proofs on all claims to (1) only the Nike clubs at issue in

Triple Tee Golf, Inc. v. Nike, Inc., 485 F.3d 253 (2007)    Case 4:16-cv-01670  Document 292  Filed on 04/17/20 in TXSD  Page 28 of 32

82 U.S.P.Q.2d 1452

the trade secrets claims, and (2) only the proprietary information at issue in the trade secrets claims. TTG also appeals this evidentiary order.

As the district court based its entire summary judgment decision on its trade secrets ruling, our reversal of that ruling revives all of TTG's other claims as well. We thus must consider the earlier evidentiary order to determine whether TTG may present evidence related to (1) the additional "confidential information" that it contends is at issue in its non-trade secret claims, and (2) Nike clubs other than the accused clubs.

### B. The June 2005 Evidentiary Order

#### 1. Standard of Review

**[5]**   **[6]**   **[7]**   We review a district court's evidentiary ruling for an abuse of discretion.[20] If we find that an abuse of discretion has occurred, we then apply the harmless error doctrine.[21] Thus, the evidentiary ruling will be affirmed unless the district court abused its discretion and a substantial right of the complaining party was affected.[22]

#### 2. Discussion

Again, Defendants sought throughout discovery to identify precisely what proprietary information they are alleged to have misused and which Nike products TTG believes have incorporated that information. TTG, on the other hand, understandably appears to have been reluctant to limit its case too narrowly. Eventually, the district court compelled TTG to define all of its trade secrets with specificity and to identify which Nike clubs TTG believed were designed and manufactured using those secrets. TTG does not challenge the order requiring this limitation of its trade secrets claims.

**[8]**   Even as it narrowed its trade secrets claims, however, TTG continued to assert that other proprietary information not rising to the level of a trade secret had been disclosed to Defendants and used in Nike clubs. Specifically, TTG alleged that its "design elements" were used in the CPR Woods and the OZ T–100 putter. TTG also alluded generically to "certain other Nike golf club products" that it believed may yet be developed on the basis of TTG's "confidential information."

**\*266**   Defendants objected to the inclusion of these additional allegations about TTG's non-trade secret "confidential information" and asked the district court to make clear to all that its earlier evidentiary order, limiting TTG's proofs on its trade secrets count to information related to the accused clubs, viz., Nike's CPR Woods and Slingshot Irons, also limited TTG's proofs on *its remaining claims* in the same way. Defendants argued that TTG was attempting to introduce a new category of proprietary information at the last minute, even though, throughout discovery, TTG had made clear that only its trade secrets were at issue, even in its non-trade secrets claims.

In contrast, TTG insisted that it had always made clear that its non-trade secrets claims involved (1) proprietary information, such as design sketches, that did not rise to the level of trade secrets, and (2) Nike clubs other than the accused clubs. The district court granted Defendants' motion and limited TTG's proofs on all claims strictly to (1) trade secret information (2) related to the accused clubs. As any evidence related to the CPR Wood, including any "design sketches," remained admissible even under the limiting order, the practical effect of this order was to preclude TTG from offering any evidence related to the Nike OZ T–100 putter or any as yet unidentified Nike clubs.[23]

We must now decide whether the district court abused its discretion in limiting TTG's proofs in this way. As noted earlier, Texas defines a "trade secret" as a "formula, pattern, device or compilation of information used

Case 4:16-cv-01670 Document 292 Filed on 04/17/20 in TXSD Page 29 of 32

82 U.S.P.Q.2d 1452

in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it."[24] We read this definition to cover any sufficiently realized proprietary golf club design, even if only executed in "design sketches."[25] The record makes clear that all of TTG's claims involve allegations that Defendants misused TTG's proprietary club designs, whether by appropriating elements of its weighting system or copying its unique "design geometry." Consequently, we agree with the district court's conclusion that all of TTG's claims "relate to, and grow out of" its misappropriation of trade secrets claims.

In defining its trade secrets in this case, TTG made no reference to a putter design. On appeal, however, TTG insists that its putter "design sketches" were "confidential information" that did not "rise to the level of trade secrets" but could form the basis for TTG's other tort claims, such as breach of confidentiality.

 [9]    TTG seems to confuse what *constitutes* a trade secret with the evidence necessary to *prove* that trade secret. At bottom, each of TTG's claims involves an allegation that the Defendants unlawfully used TTG's proprietary club design, causing it financial injury. For TTG to succeed on any of these claims, then, it must first prove that it in fact possessed (1) proprietary information, that was (2) valuable to its business. We see no salient difference between this predicate and a finding that a trade secret exists.[26] To  **267**  determine whether a trade secret exists, Texas courts apply the Restatement of Torts' six-factor test:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[27]

We understand how TTG might conclude that its sketches do not "rise to the level of a trade secret," but the district court was correct in recognizing that all of TTG's claims were "trade secrets" claims, regardless whether TTG chose to identify them as such.

We acknowledge that TTG's pleadings and discovery responses have consistently referenced "confidential information" not included in its description of its trade secrets. We also acknowledge that, in some breach of confidentiality cases, courts may regard "confidential business information" as being distinct from "trade secrets." Such cases, however, typically involve former employees accused of misusing their former employer's proprietary information, such as customer lists or pricing data, which arguably is not "secret" but still provides the one who possesses it with a competitive advantage.[28] This case, on the other hand, involves *only* TTG's proprietary club designs, which clearly fall into the category of "trade secrets." Simply put, if TTG believed that Defendants copied its "design sketches" in producing the Nike OZ T–100 putter, TTG should have included that allegation in its trade secrets claims. Having not done so, it cannot now be heard to argue that those design sketches belong to a different category of proprietary information which, although insufficient to form the basis of a trade secrets claim, nevertheless can support its other tort claims.

Accordingly, we view the district court's limitation of TTG's proofs on *all* of its claims to trade secret information related to the accused clubs as an appropriate exercise of its of discretion in evidentiary matters. On remand, that order will remain in force to prohibit TTG from offering any evidence related to the Nike OZ T–100 putter or any other Nike club that TTG could have included in its trade secrets claims.[29]

*C. TTG's Motion for Relief from Final Judgment*

   *1. Background*

82 U.S.P.Q.2d 1452

The last issue in this appeal is whether the district court erred reversibly in denying TTG's Motion for Relief from Final Judgment. [30] After the district court **268** granted summary judgment for Defendants, TTG became aware of two previously published Nike patent applications for golf clubs that are "adjustable" post-manufacture, one of which even describes an adjustable version of the Slingshot Irons. TTG had propounded both an interrogatory and a document request that undeniably contemplated patent applications such as those it later uncovered, but Defendants did not respond to the interrogatory and objected to the document request. No pending Nike patent applications were provided to TTG during discovery, and—being aware of none—TTG did not ask the court to compel Defendants to do so.

In its post-judgment motion, TTG insisted that it was entitled to relief from the earlier judgment pursuant to FRCP 60(b) because (1) these recent patent applications amounted to "newly discovered evidence," or alternatively, (2) Defendants' failure to disclose these applications was a "fraud upon the court." In a short order denying TTG's motion, the district court agreed with TTG that Defendants should have provided the patent applications during discovery, but ruled that these particular patent applications had "nothing to do with the issues presented to the court for decision in this case."

### 2. Standard of Review

[10]    [11]    We review the district court's denial of TTG's motion for post-judgment relief for an abuse of discretion. [31] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." [32] Given the district court's agreement with TTG that Defendants should have provided the patent applications during discovery, its denial of TTG's motion was based entirely on its conclusion that those applications were not "relevant" to the issues that it had decided. Our review is limited to the propriety of that finding.

### 3. Discussion

[12]    TTG contends that the patent applications were relevant to its case in several ways. First, TTG points to two paragraphs of its Complaint containing allegations that Defendants used TTG's proprietary information in developing and attempting to patent new golf club systems. Next, TTG identifies the discovery requests through which it expressly sought information regarding Nike golf club systems under development and, specifically, "pending applications for patent." Further, TTG asserts that the patent applications were relevant to all of the expert opinions given on both sides, especially to the extent these experts concluded whether Nike was "using" TTG's trade secrets. Finally, TTG contends that the patent applications were relevant to the district court's findings, which ultimately led to summary judgment, that there was no evidence that Nike used a weighting system that was adjustable by the user of the clubs.

Defendants counter that the district court did not err in holding the patent applications irrelevant, because—in the end—the case involved only the two accused clubs, and the patent applications "do not cover" those clubs. In Defendants' view, "[w]hether the NIKE patent applications show other golf clubs that are adjustable by the golfer, or whether NIKE someday, in the future, decides to offer an adjustable golf club is irrelevant *to the basis for the District Court's grant of summary judgment*—which dealt with actual **269** golf clubs." [33] The district court gave no reasons for its conclusion that the patent applications were irrelevant, but it presumably agreed with Defendants on this point.

We acknowledge that the patent applications were not technically relevant to the narrow grounds on which the district court decided Defendants' summary judgment motion. Once the district court decided that the only issue it needed to consider was whether Defendants had used TTG's trade secrets *in the accused clubs,* the patent application evidence presumably could not have been allowed into the case. We also agree with Defendants'

82 U.S.P.Q.2d 1452

general proposition that a 60(b) motion is not an opportunity for a party to "relitigate its case" and with the district court's conclusion that the patent applications "might form the basis of another action" by TTG.

 **[13]**    We reverse, however, because we are convinced that the district court erroneously disregarded the relevance of the patent applications to its evidentiary orders that laid the foundation for its grant of summary judgment. Had the patent applications been disclosed during discovery, the district court should not have—and likely would not have—granted Defendants' motion seeking to limit TTG's proofs to only the accused clubs on *any* of its claims. [34] Consequently, the fact that the accused clubs were not adjustable post-manufacture would alone not have precluded the existence of any material fact issue whether Defendants had "used" TTG's trade secrets, and summary judgment would not have been appropriate. [35]  As we are reversing the district court's summary judgment dismissal of every TTG claim that involves the misuse of its trade secrets in the accused clubs, the practical effect of our additional reversal of its denial of post-judgment relief will be to allow TTG to expand its claims beyond the accused clubs to include any misuse of its trade secrets in any Nike club comprehended by the subject patent applications.

For the foregoing reasons, we (1) affirm the district court's evidentiary order limiting TTG's proofs on all of its claims to evidence related to the misuse of its trade secrets in the accused clubs, subject, however, to the potential need to expand that order so as not to exclude evidence relevant to other clubs comprehended by the aforesaid patent applications, (2) reverse the district court's summary judgment dismissal of those of TTG's claims that involve the accused clubs, and (3) reverse the district court's denial of TTG's motion for post-judgment relief based on the aforesaid patent applications. We remand this matter to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.


**All Citations**

485 F.3d 253, 82 U.S.P.Q.2d 1452


Footnotes

1    TTG filed its original complaint in the Southern District of Florida, and venue was transferred to the Northern District of Texas. TTG amended its complaint three times, and its Third Amended Complaint, filed on May 19, 2005, is the operative pleading.

2    Patent Application U.S. 2005/0009625 describes a wood golf club head with a weight that is "independently movable," and Patent Application 2005/0137024 describes a modification of Nike's Slingshot Irons that includes a weight that is "independently movable in multiple directions."

3    Emphasis added.

4    Emphasis added.

5    Patent applications are available through the Patent Office website, and the record makes clear that TTG and its attorneys were familiar with this process.

6    *Baker v. Am. Airlines,* 430 F.3d 750, 753 (5th Cir.2005).

7    Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

8    *Celotex,* 477 U.S. at 322–25, 106 S.Ct. 2548.

9    *Id.* at 321–25, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

10    *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

11    *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties raise no choice-of-law issues and each cites Texas law (or Fifth Circuit cases interpreting Texas law) as the controlling substantive law in this case.

82 U.S.P.Q.2d 1452

12    *Taco Cabana Intern. v. Two Pesos, Inc.,* 932 F.2d 1113, 1123 (5th Cir.1991) (citing *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 776 (1958)).

13    *Guy Carpenter & Co. v. Provenzale,* 334 F.3d 459, 467 (5th Cir.2003) (applying Texas common law).

14    None dispute that the heads of the accused Nike clubs, the CPR Woods and Slingshot Irons, are cast as one piece of metal that cannot be changed post-manufacture, except through extraordinary means.

15    Emphasis added.

16    Defendants also point to deposition testimony from TTG's marketing expert indicating that made-to-order clubs would not be considered "adjustable."

17    Other specifications, such as the flexibility or the length of the clubs' shaft, are customizable in the Nike clubs, as in any clubs.

18    Winfield's report makes clear that any reference to TTG's "trade secret" therein is based on the same trade secrets descriptions that TTG submitted to the district court.

19    As the district court found no evidence that Defendants had *used* TTG's alleged trade secrets, it did not address any of Defendants' other summary judgment arguments. We address only the issues presented on appeal and any other questions are to be answered, in the first instance, on remand.

20    *Green v. Adm'rs of the Tulane Educ. Fund,* 284 F.3d 642, 660 (5th Cir.2002) (citations omitted).

21    *Id.*

22    *Id.*

23    At the time the court entered this order, TTG had identified no other Nike clubs that it believed were made using TTG's proprietary information. We deal with the later-discovered Nike patent applications in the next section of this opinion.

24    *Taco Cabana Intern. v. Two Pesos, Inc.,* 932 F.2d 1113, 1123 (5th Cir.1991) (citing *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 776 (1958)).

25    *See id.* (citing several cases in which drawings constituted trade secrets).

26    *See id.* at 1123 (defining a trade secret as a "formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it").

27    *In Re Bass,* 113 S.W.3d 735, 739 (Tex.2003).

28    *See, e.g., Mercer v. C.A. Roberts Co.,* 570 F.2d 1232, 1238 (5th Cir.1978); *Jeter v. Assoc. Rack Corp.,* 607 S.W.2d 272, 275–76 (Tex.Civ.App.-Texarkana 1980).

29    Pursuant to the holding set forth in the next section of this opinion, however, this order must be revised, or withdrawn and reissued, to allow for evidence related to the undisclosed Nike patent applications at issue in TTG's Motion for Relief from Final Judgment.

30    TTG's motion also requested sanctions against Defendants.

31    *Goldstein v. MCI WorldCom,* 340 F.3d 238, 257 (5th Cir.2003).

32    *Bocanegra v. Vicmar Servs., Inc.,* 320 F.3d 581, 584 (5th Cir.2003).

33    Emphasis added.

34    As noted above, the court's decision to limit TTG's trade secrets proofs to only the accused clubs was based on TTG's inability to connect its proprietary weighting system to any other Nike product. If TTG had had the patent applications at that point, it might have been able to establish connections to other Nike clubs under development.

35    A plaintiff need not prove an actual sale or production of a product to show "use" of its trade secrets. *See Dresser–Rand Co. v. Virtual Automation Inc.,* 361 F.3d 831, 840–41 (5th Cir.2004) (citations omitted).

---

**End of Document**                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   16